# THE UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION, | ) ) ) |
| Plaintiffs, | ) ) Court No. 24-00079 ) |
| v. | ) Before:    Hon. M. Miller- ) Baker, Judge ) |
| UNITED STATES, | ) Public Version ) |
| Defendant, | ) Confidential Information ) has been redacted on |
| and | ) pages:22, 28–30, 37–41, 45, ) 46, 49, 50, 52, 55, and 56 |
| WIND TOWER TRADE COALITION, | ) ) |
| Defendant-Intervenor. | ) ) ) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Jarrod M. Goldfeder
Kenneth N. Hammer
Sezi Erdin

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated: October 30, 2024

*Counsel to Plaintiffs CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iii

Statement Pursuant To Rule 56.2(c) ........................................... 1

I.    Administrative Determination Under Review ................................. 1

II.   Issues Presented ........................................................................ 2

III.  Standard of Review ..................................................................... 4

GLOSSARY ......................................................................................... 7

IV.   Statement of Facts ..................................................................... 8

SUMMARY OF ARGUMENT ................................................................ 12

          A.    Commerce Unlawfully Applied 19 C.F.R.
                § 351.519 to Conclude that the Full Value of CS
                Wind's Import Duty Exemptions Under the LMW
                Program Were Countervailable ................................... 12

          B.    Commerce Unlawfully Denied CS Wind an
                Entered Value Adjustment ........................................... 13

          C.    Commerce Unlawfully Constructed the Land
                Benchmark by Including a Non-Comparable Land
                Rental Price .................................................................. 17

          D.    Commerce's Selection of Singapore Electricity
                Tariffs as a Tier Three Benchmark for Electricity
                Is Not Supported by Substantial Evidence .................. 19

Argument ........................................................................................ 22

I.    Commerce Unlawfully Applied 19 C.F.R. § 351.519 to Find
      the Full Value of Import Duty Exemptions Realized by CS
      Wind Malaysia ........................................................................... 22

II.   Commerce Unlawfully Calculated *ad valorem* Subsidy Rates
      Based on the Value of CS Wind Malaysia's Sales to CS Wind

Korea Rather than Upon the Entered Value of U.S. Sales to
Unaffiliated U.S. Customers............................................................34

    A.    CS Wind Met All of Commerce's Established
Criteria to Grant an Entered Value Adjustment ........36

    B.    Commerce Failed to Provide Notice or Otherwise
Explain Why It Required Forms 7501 for All CS
Wind's U.S. Sales to Grant an EVA ...........................43

III.   Commerce Unlawfully Constructed the Land Benchmark by
Averaging Comparable Land Prices with a Single Non-
Comparable Land Transaction ......................................................51

    A.    Commerce Unlawfully Failed to Select Domestic
Transactions for Similar Land and Account for
Other Factors Affecting Comparability ......................52

    B.    Calculating a Simple Average of a Single
Transaction Price with a Source Reflecting
Multiple Transactions is Unreasonable.......................60

IV.   Commerce's Selection of Singapore Electricity Tariffs as a
Tier Three Benchmark for Electricity Is Not Supported by
Substantial Evidence ....................................................................62

V.    CONCLUSION ..............................................................................77

# TABLE OF AUTHORITIES

## STATUTES

5 U.S.C. § 706(2)(A) ................................................................. 4

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................... 4

19 U.S.C. § 1671(a) ............................................................ 14, 35

19 U.S.C. § 1677(5)(B)(i)–(ii) ................................................. 23

19 U.S.C. § 1677(5)(E)(iv) ....................................................... 53

19 U.S.C. § 1677m(d) ......................................................... 16, 50

28 U.S.C. § 1581(c) ................................................................. 4

## REGULATIONS

19 C.F.R. § 351.511(a)(2)(i) ................................. 17, 53, 57, 59

19 C.F.R. § 351.511(a)(2)(ii) ..................................... 57, 58

19 C.F.R. § 351.511(a)(2)(iii) ......................................... 63

19 C.F.R. § 351.519(a)(1) ........................... 12, 23, 24, 25, 26

19 C.F.R. § 351.519(a)(3)(ii) ......................................... 25

19 C.F.R. § 351.519(a)(4) ................................... 25, 26, 31

19 C.F.R. § 351.519(b)(2) ................................... 24, 32, 33

iii

## CASES

*Asociacion Colombiana de Exportadores de Flores v. United States*, 2 CIT 173, 6 F. Supp. 2d 865 (1998) ...........................................................5

*Blue Field (Sichuan) Food Industrial Co., Ltd., v. United States*, 37 CIT 1619, 949 F. Supp. 2d 1311 (2013) ......................................................72

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ........6

*Canadian Solar Inc. v. United States*, 45 CIT __, 537 F.Supp.3d 1380 (2021)..................................................................................35, 36, 47, 63

*Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 636 F. Supp. 961 (1986) .......................................................................................5

*Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197 (1938) .....5

*Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607 (1966) ..........................5

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 41 CIT __, 405 F.Supp.3d 1317 (2019)....................................................................35

*Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024) ...............4

*Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008) ..............................................................................................................6

*PAM, S.p.A. v. United States*, 582 F.3d 1336 (Fed. Cir. 2009) ................6

*Rhone-Poulenc, Inc. United States*, 20 CIT 573, 927 F. Supp. 451 (1996) ..............................................................................................................5

*Risen Energy Co., Ltd. v. United States*, 46 CIT __, 570 F.Supp.3d 1369 (2022)..................................................................................................71

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)...........................6

## ADMINISTRATIVE DETERMINATIONS

*Certain Aluminum Foil from the People's Republic of China*, 88 Fed. Reg. 75267 (Nov. 2, 2023) (final results of countervailing duty administrative review) and accompanying Issues and Decision Memorandum........................................................................ 15, 44, 47, 48

*Certain Corrosion Inhibitors from the People's Republic of China*, 86 Fed. Reg. 7,537 (Dep't Commerce Jan. 29, 2021) (final affirmative countervailing duty determination*) and* accompanying Issues and Decision Memorandum........................................................... 20, 64, 68, 71

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirmative countervailing duty determination and final negative critical circumstances determination) and accompanying Issues and Decision Memorandum .................... 66, 67

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 61,278 (Dep't Commerce Oct. 11, 2022) ............... 8

*Steel Concrete Reinforcing Bar from the Republic of Turkey*, 79 Fed. Reg. 54,963 (Dep't Commerce Sept 15, 2024) (final affirmative countervailing duty determination final critical circumstances determination) ................................................................................ 56, 58

*Utility Scale Wind Towers from Malaysia*, 88 Fed. Reg. 61,516 (Dep't Commerce Sept. 7, 2023) (preliminary results of countervailing duty administrative review; 2021) and accompanying Preliminary Decision Memorandum...................................................................... 8–10

*Utility Scale Wind Towers from Malaysia*, 89 Fed. Reg. 17,404 (Dep't Commerce Mar. 11, 2024) (final results of countervailing duty administrative review; 2021) and accompanying Issues and Decision Memorandum................................................................... *passim*

*Utility Scale Wind Towers From Malaysia*, 86 Fed. Reg. 30,593 (Dep't Commerce June 9, 2021) (final affirmative countervailing duty determination) ........................................................................ 73

**OTHER AUTHORITIES**

*Countervailing Duties*, 63 Fed. Reg. 65,343 (Dep't Commerce Nov. 25, 1998) (final rule) .............................................................. 24, 63

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                     **PUBLIC VERSION**

## MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Plaintiffs, CS Wind Malaysia Sdn. Bhd. ("CS Wind Malaysia") and

CS Wind Corporation ("CS Wind Korea") (collectively, "CS Wind" or

"Plaintiffs"), hereby submit this Memorandum in Support of their

Motion for Judgment on the Agency Record in accordance with Rule

56.2(c) of the Rules of this Court. For the reasons set forth below,

Plaintiffs respectfully request that the Court reverse the challenged

determination of the U.S. Department of Commerce ("Commerce"), and

remand with instructions consistent with this Memorandum and the

Court's findings.

### STATEMENT PURSUANT TO RULE 56.2(C)

I.    Administrative Determination Under Review

This action is an appeal from Commerce's final results in *Utility

Scale Wind Towers from Malaysia*, 89 Fed. Reg. 17,404 (Dep't

Commerce Mar. 11, 2024) (final results of countervailing duty

administrative review; 2021) ("*Final Results*"), P.R. 262, Appx____, and

Memorandum to Ryan Majereus, Deputy Assistant Secretary for Policy

and Negotiations, performing the non-exclusive functions and duties of

the Assistant Secretary for Enforcement and Compliance, re: "Decision

1

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                **PUBLIC VERSION**

Memorandum for the Final Results of the Administrative Review of the

Countervailing Duty Order on Utility Scale Wind Towers from

Malaysia; 2021 (Mar. 5, 2024), P.R. 260, Appx____ ("Final Decision

Memo").[1]

## II.     Issues Presented

Plaintiffs seek judgment on the agency record with respect to the

following four issues:

1. Whether Commerce lawfully applied 19 C.F.R. § 351.519 to

conclude that CS Wind Malaysia received a countervailable benefit in

the form of import duties exempted upon importation of raw materials

and inputs that are subsequently exported under the Licensed

Manufacture Warehouse ("LMW") program where CS Wind Malaysia

recorded only export sales during the POR.

2. Whether Commerce lawfully denied CS Wind an entered value

adjustment ("EVA"), and calculated *ad valorem* subsidy rates by

---

[1]     Documents contained in the administrative record are identified by the
name and date of the documents, followed by the public ("P.R.") and
confidential ("C.R.") index numbers assigned to these documents in the
respective administrative record indices that the U.S. Department of
Commerce filed with the Court on June 10, 2024.  *See* Admin. Rec., ECF Nos.
21-2 and 21-3, June 10, 20249.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

allocating countervailable benefits over the free-on-board ("FOB") sales

values recorded by CS Wind Malaysia—and not the values of CS Wind

Korea's sales of subject merchandise produced by CS Wind Malaysia

during the POR—where the U.S. imported price reflects the value of the

sale from CS Wind Korea to its Unaffiliated U.S. customer in a back-to-

back sale.

3. Whether Commerce's determination to measure the adequacy of

remuneration for CS Wind Malaysia's purchases of electricity during

the POR based on 2021 electricity tariffs published by the Department

of Statistics of Singapore where Commerce ignored information that

Singapore is at a grossly disparate level of economic development

relative to Malaysia.

4. Whether Commerce's determination to include a land prices

published by C.B. Richard Ellis from a non-comparable region, *i.e.*,

Penang, Malaysia, in the benchmark to measure the adequacy of

remuneration for CS Wind Malaysia's land rental located in Pahang,

Malaysia, was supported by substantial evidence.

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                           **PUBLIC VERSION**

### III.    Standard of Review

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c). In reviewing final results in countervailing ("CVD") duty administrative reviews, the Court holds as unlawful agency determinations that are not supported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

Under Section 706 of the Administrative Procedures Act ("APA"), a reviewing Court will set aside any agency action that is inconsistent with the law. 5 U.S.C. § 706(2)(A). When applying this standard, the APA provides that "the reviewing court shall decide all relevant questions of law {and} interpret constitutional and statutory provisions." *Id..* Courts, not agencies, decide "all relevant questions of law" arising on review of agency action." *Id.*; *see also Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2273 (2024) (holding that "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires . . . . {C}ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous").

4

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

The Court "will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

The Court has found Commerce's determinations unsupported by substantial evidence "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. United States*, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996); *see also Asociacion Colombiana de Exportadores de Flores v. United States*, 2 CIT 173, 184, 6 F. Supp. 2d 865, 880 (1998) (stating that a change in practice requires Commerce to explain the basis for its change and that such basis must be in accordance with law and supported by substantial evidence).

Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619-20 (1966) (*quoting Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)), *PAM, S.p.A. v. United States*, 582 F.3d 1336,

5

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                              **PUBLIC VERSION**

1339 (Fed. Cir. 2009). In order for a determination to satisfy this

standard, "{t}here must be a rational connection between the facts

found and the choice made." *Burlington Truck Lines, Inc. v. United

States*, 371 U.S. 156, 168 (1962); *Nucor Corp. v. United States*, 32 CIT

1380, 594 F. Supp. 2d 1320, 1331-32 (2008). Additionally, "{t}he

substantiality of evidence must take into account whatever in the

record fairly detracts from its weight." *Universal Camera Corp. v.

NLRB*, 340 U.S. 474, 488 (1951).

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    PUBLIC VERSION

# GLOSSARY

**Licensed Manufactured Warehouse:**    LMW

**Entered Value Adjustment:**    EVA

**Free-on-Board:**    FOB

**Royal Malaysian Customs Department:** RMCD

**Malaysia Investment Development Authority:**    MIDA

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                       **PUBLIC VERSION**

### IV.    Statement of Facts

On October 11, 2022, Commerce initiated the first administrative

review of utility scale wind towers from Malaysia for the period March

25, 2021, through December 31, 2021. *See Initiation of Antidumping*

*and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 61,278,

61,286 (Dep't Commerce Oct. 11, 2022), P.R. 11, Appx____. On

November 15, 2022, Commerce selected the CS Wind Malaysia as the

sole mandatory respondent in this administrative review. *See*

Memorandum to Emily Halle, Acting Director, Office V, Antidumping

and Countervailing Duty Operations, re: "Countervailing Duty

Administrative Review of Utility Scale Wind Towers from Malaysia:

Respondent Selection" (November 15, 2022), at 2, P.R. 14, Appx____.

On September 7, 2023, Commerce published the preliminary results

of the 2021 administrative review. *See Utility Scale Wind Towers from*

*Malaysia*, 88 Fed. Reg. 61,516, 61,517 (Dep't Commerce Sept. 7, 2023)

(preliminary results and partial rescission of countervailing duty

administrative review, 2021) ("*Prelim. Results*"), P.R. 221, Appx____,

and accompanying Memorandum to Lisa W. Wang, Assistant Secretary

for Enforcement and Compliance, re: "Decision Memorandum for the

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                     **PUBLIC VERSION**

Preliminary Results of the Countervailing Duty Administrative Review, 2021: Utility Scale Wind Towers from Malaysia" (August 30, 2023), P.R. 215, Appx____ ("Prelim. Decision Memo").

First, Commerce preliminarily relied on CS Wind Malaysia's own reported sales revenue as the denominator for calculating CS Wind's *ad valorem* subsidy rates. Prelim. Decision Memo at 5, Appx____. Commerce declined to calculate *ad valorem* subsidy rates based on CS Wind Korea's sales values of wind towers produced and exported by CS Wind Malaysia during the POR. *Id., Appx ____*.

Second, to measure the adequacy of remuneration of land leased by CS Wind Malaysia located in Pahang, Malaysia, from the Pahang State Development Corporation, Commerce selected a land transaction located in Penang, Malaysia, from the "Real Estate Market Outlook 2020 Malaysia" report published by C.B. Richard Ellis as a Tier One benchmark. *Id.* at 6, Appx____. Specifically, Commerce relied on a rental price of industrial land located in Penang, Malaysia. *Id., Appx____*.

Third, Commerce selected electricity rates published by Department of Statistics of Singapore as a Tier Three benchmark source to assess

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

whether Malaysia's electricity tariffs were set in accordance with market principles during the POR. *Id.* at 7, Appx____.

Fourth, Commerce concluded that the entire amount of import duties exempted on raw materials imported by CS Wind Malaysia under the LMW program provided a countervailable benefit to CS Wind Malaysia. *Id.* at 13, Appx____. Commerce concluded he Government of Malaysia ("GOM") did not provide sufficient information to demonstrate that the Royal Malaysian Customs Department ("RMCD") had a system in place to confirm which imported inputs are consumed in the production of exported products and in what amounts. *Id.*, Appx____.

Based upon these determinations, Commerce calculated a combined *ad valorem* subsidy rate of 10.96% for CS Wind in the *Preliminary Results*. *Prelim. Results*, 88 Fed. Reg. at 61,517, Appx____.

On March 11, 2024, Commerce published the *Final Results*. *See Final Results*, 89 Fed. Reg. 17,404, Appx____. First, Commerce continued to deny CS Wind an EVA, and it calculated *ad valorem* subsidy rates for CS Wind Malaysia based on the FOB value of CS Wind Malaysia's sales of subject merchandise to its parent company, CS Wind Korea, rather than upon the entered value of CS Wind Korea's

10

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                   **PUBLIC VERSION**

sales to unaffiliated U.S. customers. *Final Decision Memo* at 11,

Appx____.

Second, Commerce altered its benchmark for measuring the

adequacy of remuneration of CS Wind's leased land. *Id.* at 20–22,

Appx____–Appx____ Specifically, Commerce calculated its benchmark

by averaging the same rental price for industrial land in Penang used in

the *Preliminary Results* with a range of rental prices of land in Pahang,

published by the Malaysia Investment Development Authority

("MIDA"). *Id.* at 20, Appx____.

Third, Commerce continued to find the full value of the duty

exemptions realized by CS Wind Malaysia under the LMW program to

be countervailable pursuant to 19 C.F.R. § 351.519(a)(4)(i). *Id.* at 34–35,

Appx____.

Fourth, Commerce continued to rely upon electricity tariff rates from

Singapore as a Tier Three benchmark to value the extent to which

Malaysian electricity prices were set consistent with market principles.

*Id.* at 40, Appx____.

Based upon these determinations, Commerce calculated a combined

*ad valorem* subsidy rate of 10.72% for CS Wind in the *Final Results*.

11

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

*Final Results*, 89 Fed. Reg. at 17,404, Appx____.

This appeal followed.


### SUMMARY OF ARGUMENT

CS Wind summarizes the arguments below on the following four

issues raised in this memorandum of law:

A.    Commerce Unlawfully Applied 19 C.F.R. § 351.519 to Conclude
      that the Full Value of CS Wind's Import Duty Exemptions Under
      the LMW Program Were Countervailable

Commerce cannot lawfully conclude that the import duty exemptions

received by CS Wind under the LMW program exempted inputs not

consumed in the production of exported product (*i.e.*, utility scale wind

towers) because CS Wind Malaysia exported *all* subject merchandise

produced during the POR.

It is unreasonable to apply 19 C.F.R. § 351.519(a) to conclude that the

LMW program exempted CS Wind Malaysia from import duties on

imported inputs not consumed in the production of the exported

product. *See* 19 C.F.R. § 351.519(a)(1).

CS Wind Malaysia recorded only export sales during the POR. Letter

from Trade Pacific PLLC, re: "Section III Questionnaire Response" (Jan.

11, 2023), at III-7, Ex. II.C.1(a), C.R. 32–51, Appx____. Since CS Wind

12

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                **PUBLIC VERSION**

Malaysia necessarily cannot have sold imported inputs, or finished

merchandise incorporating those inputs, domestically, Commerce

unlawfully applied its regulation in this case to determine that CS

Wind Malaysia received excess import duty exemptions under the LMW

program

Commerce unlawfully applied 19 C.F.R. § 351.519(a)(4) to conclude

that the GOM for not demonstrating that the LMW program meets the

criteria under 19 C.F.R. § 351.519(a)(4)(i). Final Decision Memo at 34,

Appx____. Whether the GOM tracks the quantity of raw material inputs

and the eventual outputs through the application of standard input-

output norms is irrelevant to determining whether CS Wind Malaysia

received import duty exemptions on inputs not consumed in the

production of exported wind tower because the record shows that CS

Wind Malaysia only recorded *export* sales of finished wind towers

during the POR.

B.     Commerce Unlawfully Denied CS Wind an Entered Value
       Adjustment

Using CS Wind Malaysia's sales value as the sales denominator

rather than CS Wind Korea's sales of subject merchandise produced by

CS Wind Malaysia to unaffiliated U.S. customers unlawfully reflects

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

the *intermediate* sales value realized by CS Wind Malaysia's parent company, CS Wind Korea, which resold the subject merchandise produced by CS Wind Malaysia to unaffiliated United States customers on a back-to-back basis.

Commerce must base its calculation of countervailing duties on countervailable subsidies on the value merchandise imported, or sold (or likely to be sold) for importation into the United States. 19 U.S.C. § 1671(a). Where merchandise is marked up between export and importation into the United States, it is unlawful not to account for this mark-up because, otherwise, the CVD rate will not equal the net countervailable subsidy. *See id.* (requiring that the collection of duties would equal the net countervailable subsidy).

> 1. CS Wind Met All of Commerce's Established Criteria to Grant an Entered Value Adjustment

CS Wind satisfied each of the six criteria to be granted an EVA under Commerce's practice. Therefore, Commerce's denial of an EVA to CS Wind is contrary to law and otherwise not supported by substantial evidence. CS Wind Malaysia sold the subject merchandise to unaffiliated U.S. customers via its Korean parent CS Wind Korea, whose invoices—which are identical to those of CS Wind Malaysia

14

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                     **PUBLIC VERSION**

except for the price markup—accompanied the export shipments to the

United States. *See* Letter from Trade Pacific PLC, re: "Fifth

Supplemental Questionnaire Response" (Jan. 3, 2024), at Exs. S5-1(2),

Ex. S5-2(1), Appx____, Appx____.

> 2. Commerce's Denial of an EVA Because CS Wind Did Not
>    Supply Forms 7501 for All CS Wind's U.S. Sales Is Contrary to
>    Its Practice

Commerce's determination that the record did not contain sufficient

information to determine that CS Wind Korea's invoice price establishes

the customs values for certain sales is contrary to law. *See* Final

Decision Memo at 11, Appx____.

Commerce's recent EVA practice is to adjust a subsidy rate by

changing the denominator of the original subsidy rate from the

respondent's total worldwide sales to the affiliate's marked-up sales

value. *See, e.g., Certain Aluminum Foil from the People's Republic of

China*, 88 Fed. Reg. 75267 (Nov. 2, 2023) (final results of countervailing

duty administrative review), and accompanying Memorandum from

Scot Fullerton, Associate Deputy Assistant Secretary for Antidumping

and Countervailing Duty Operations, re: "Issues and Decision

Memorandum for the Final Results of the Countervailing Duty

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                **PUBLIC VERSION**

Administrative Review of Certain Aluminum Foil from the People's

Republic of China; 2021" (Oct. 27, 2023) at 16–18 ("Aluminum Foil from

China 2021 IDM")).

The entered value of CS Wind's U.S. sales uniformly reflects the

invoice value stated in CS Wind Korea's invoices to unaffiliated U.S.

customers rather than the value reflected in the invoices issued by CS

Wind Malaysia to CS Wind Korea. If Commerce required additional

information to understand why CS Wind Korea's invoiced price could

differ slightly from the entered values reflected in the CBP Forms 7501

for the same project in certain circumstances, it was required to request

an explanation from CS Wind rather than denying the EVA because of

minor differences. *See* 19 U.S.C. § 1677m(d). Commerce unlawfully

made no effort to clarify the information reported or to attempt to verify

whether CS Wind could explain how the entered value could be

reconciled with CS Wind Korea's invoice value.

Commerce's denial of an EVA to CS Wind unlawfully failed to

prevent the overcollection of duties where the record uniformly

demonstrated that CS Wind Korea's invoice price to the U.S. customers

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

reflect the customs value of all exported shipments of wind towers

produced by CS Wind Malaysia during the POR.

C.    Commerce Unlawfully Constructed the Land Benchmark by
      Including a Non-Comparable Land Rental Price

Commerce's determination to average a single land lease transaction

in Penang, Malaysia, with the MIDA average land lease prices for the

East Coast Economic Region in Pahang, Malaysia, is contrary to law.

Commerce normally measures the adequacy of remuneration by

comparing the government price to a market-determined price resulting

from actual transactions in the country in question. 19 C.F.R.

§ 351.511(a)(2)(i). Where Commerce chooses a benchmark based on

actual transactions in the country in question (i.e., a Tier One

benchmark), Commerce "will consider product similarity; quantities

sold, imported or auctioned; and other factors affecting comparability."

*Id.*

First, Commerce unlawfully failed to account for factors affecting

comparability by including a single land rental transaction from a non-

comparable region (*i.e.*, Penang) in its land benchmark. *See*

Memorandum to The File, re: "Placing Benchmark on the Record" (Aug.

30, 2023), P.R. 216, at Attach. (page 64), Appx____. Commerce

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                        **PUBLIC VERSION**

unreasonably and unlawfully disregarded information that

demonstrated that land prices in Penang are not comparable to those in

Pahang state. Letter from Trade Pacific PLLC, re: "Utility Scale Wind

Towers from Malaysia: Benchmark Submission" (Aug. 1, 2023), P.R.

160–161, at Ex. 1, Appx____ ("CS Wind BM Submission").

Second, Commerce's finding that the Penang land parcel used in its

benchmark calculation is comparable in size is unsupported by

substantial evidence because the record showed substantial differences

in size between the Penang land selected for Commerce's benchmark

and the CS Wind Malaysia's land rental. Commerce failed to weigh

evidence of price and size disparity between the land rented by CS Wind

Malaysia and the Penang land price included in Commerce's benchmark

calculation, which significantly undermined Commerce's determination

that the Penang land price reflected a land lease that was comparable

to land leased by CS Wind Malaysia. *See* Memorandum to The File, re:

"Placing Benchmark on the Record" (Aug. 30, 2023), P.R. 216, at Attach.

(page 64), Appx____, Letter from Trade Pacific PLLC, re: "Utility Scale

Wind Towers from Malaysia: Benchmark Submission" (Aug. 1, 2023),

P.R. 160–161, at Ex. 1, Appx____. Therefore, Commerce's determination

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

to include the C.B. Richard Ellis Penang land transaction in its

benchmark was not supported by substantial evidence.

Finally, even if it were reasonable to include the land price from

Penang in the Department's benchmark calculation, Commerce's

determination to calculate a simple average of the *single* land

transaction from Penang with the *multiple* land transactions reflected

in the MIDA data is not supported by substantial evidence. By equally

weighting a single price from Penang with data that it recognized

reflected multiple land prices from Pahang unreasonably and

unlawfully skewed the data towards the Penang price with no record

basis for doing so.

D.    Commerce's Selection of Singapore Electricity Tariffs as a Tier
      Three Benchmark for Electricity Is Not Supported by Substantial
      Evidence

Commerce's selection of Singapore Electricity prices as a Tier Three

Benchmark without accounting for or weighing evidence that Singapore

is not supported by substantial evidence because Commerce failed to

weigh evidence that Singapore is at a grossly disparate level of

economic development, consistent with its practice.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

Commerce's Tier Three benchmark practice requires it to consider whether a Tier Three external benchmark source is from a country at an economically comparable level of development where evidence of economic comparability of potential benchmark sources is on the record. *See, e.g., Certain Corrosion Inhibitors from the People's Republic of China*, 86 Fed. Reg. 7,537 (Dep't Commerce Jan. 29, 2021) (final affirmative countervailing duty determination), and accompanying Memorandum from James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, re: "Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Corrosion Inhibitors from the People's Republic of China" (Jan. 25, 2021), at 35–36 (stating that Commerce's Tier 3 benchmark practice for land considers the country's geographic proximity and level of economic development, including GNI).

Commerce reflexively relied upon the same source selected the investigation without citing any evidence that rendered Singaporean electricity pricing comparable or the alternative Turkish electricity

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                  **PUBLIC VERSION**

pricing on the record of this administrative review less comparable. *See*

Final Decision Memo at 40–41, Appx____–Appx____.

    In order for its benchmark selection to be supported by substantial

evidence, Commerce had to weigh the relevancy of the alternative

Turkish benchmark source on the record. Commerce failed to

meaningfully address the Turkish alternative Tier Three benchmark

source or support its determination that the Singapore data was

superior. Therefore, Commerce's selection of Singapore electricity prices

as a Tier Three benchmark was not supported by substantial evidence.

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

## ARGUMENT

I. Commerce Unlawfully Applied 19 C.F.R. § 351.519 to Find the Full Value of Import Duty Exemptions Realized by CS Wind Malaysia

Commerce's determination that the full value of import duty exemptions on inputs and raw materials imported by CS Wind Malaysia under the LMW program confers a benefit is unlawful as applied in the instant administrative review. Commerce cannot lawfully conclude that the import duty exemptions received by CS Wind extended to inputs not consumed in the production of exported product (*i.e.*, utility scale wind towers) where CS Wind Malaysia received a complete exemption on *all* imported inputs and exported *all* subject merchandise produced during the POR.

Commerce also failed to explain how it could lawfully apply 19 C.F.R. § 351.519 to calculate benefits under the LMW program that exceeded the total value of CS Wind Malaysia's domestic sales (*i.e.*, scrap sales) by a factor of more than [          ]. For these reasons, the Court should remand Commerce's determination in the *Final Results* and direct Commerce to conclude that import duty exemptions received by CS Wind Malaysia under the LMW program are not countervailable.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

Alternatively, the Court should require Commerce to explain on remand why it is reasonable to conclude that the import duty exemptions claimed by CS Wind Malaysia during the POR could confer a benefit equal to the full value of imported inputs and raw materials when CS Wind Malaysia recorded *only* export sales during the POR, which demonstrates that all imported raw materials were incorporated into finished merchandise that was exported by CS Wind Malaysia.

The statute defines a countervailable subsidy as a subsidy where the government authority provides a financial contribution, any form of income or price support, or makes payment to a funding mechanism to provide a financial contribution to a respondent and a benefit conferred by that financial contribution. 19 U.S.C. § 1677(5)(B)(i)–(ii). Commerce generally does not consider exemptions of import charges that are consumed in the production of exported products to confer a countervailable benefit. *See* 19 C.F.R. § 351.519(a)(1). Where import duties are exempted upon export, Commerce's regulations consider a benefit to be conferred upon the respondent only:

> to the extent that the exemption extends to inputs that *are not consumed in the production of exported product*, making normal allowances for waste, or if the exemption covers charges other than imported charges that are imposed on the input.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **PUBLIC VERSION**

*Id.* at § 351.519(a)(1)(ii) (emphasis added). In the case of an import duty

exemption program, the benefit is conferred as of the date of

exportation. 19 C.F.R. § 351.519(b)(2). Therefore, Commerce's

regulation considers a benefit to be conferred when a government

exempts import duties on imported inputs *are not* consumed in the

production of *exported* product.

The preamble of Commerce's regulation states that governments

may exempt imported inputs consumed in the production of exported

finished products so long as the import duties exempted *do not exceed*

the import charges that would otherwise be due on imported inputs.

*Countervailing Duties*, 63 Fed. Reg. 65,343, 65,384 (Dep't Commerce

Nov. 25, 1998) (final rule) (emphasis added). In other words, Commerce

regulation is not aimed at countervailing a typical import duty

drawback or exemption program. Rather, Commerce's regulation

countervails exemptions of import duties on inputs that would not

otherwise be subject to drawback where those imported inputs and raw

materials are not incorporated into finished goods subsequently

exported or destroyed.

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

First, the structure of Commerce's regulation underscores that, in order to depart from the presumption that import duty exemption programs on raw material inputs *do not* confer a benefit, Commerce must conclude that the respondent could have had import duties exempted on imported inputs that were not exported.

Commerce unlawfully conflates the regulatory standard for assessing the *amount* of benefit conferred under 19 C.F.R. § 351.519(a)(4)(i), with the threshold determination of whether a benefit is conferred under 19 C.F.R. § 351.519(a)(1)(ii). Assessing whether the GOM has a reasonable and effective system in place—and applies that system to confirm which inputs are consumed in the production of exported products and in what amounts—is only relevant to determining how Commerce determines the *amount* of benefit, if any. *See* 19 C.F.R. § 351.519(a)(3)(ii) (stating that Commerce considers the amount of the benefit to be the import charges that otherwise would have been paid on the inputs not consumed in the production of exported product only if it first determines that the exemption of import charges upon export confers a benefit).

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

Subsection 351.519(a)(4) contains criteria to determine whether

Commerce should apply the *entire amount* of the exemption as a benefit

or calculate the *amount* of benefit based on the amount benefit that

otherwise would have been due pursuant to 19 C.F.R.

§ 351.519(a)(3)(ii). *See* 19 C.F.R. § 351.519(a)(4) (stating that,

notwithstanding the methodology prescribed by paragraph (a)(3) for

calculating the *amount* of benefit, Commerce will consider the *entire*

*amount* of import duties exempted unless the government in question

can meet certain criteria) (emphasis added). But, this inquiry

determines only whether Commerce measures the benefit pursuant to

the default methodology under 19 C.F.R. § 351.519(a)(3) or the

exception under § 351.519(a)(4).

Commerce's regulation requires that it assess whether a benefit

exists based on whether the import duty exemption extends to inputs

that are not consumed in the production of the *exported* product. 19

C.F.R. § 351.519(a)(1)(ii). Where, as here, the record shows that CS

Wind Malaysia only recorded export sales—and did not record *any*

domestic sales during the POR except for a small amount of scrap sales,

as discussed in further detail below—it is unreasonable to apply 19

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                        **PUBLIC VERSION**

C.F.R. § 351.519(a) to conclude that the LMW program exempted CS Wind Malaysia from import duties on imported inputs not consumed in the production of the exported product.

Further, a respondent receives a benefit under an import duty exemption program when it *exports* the finished product. 19 C.F.R. § 351.519(b)(2). The fact that the regulation recognizes that an importer receives a benefit upon the date of exportation rather than importation underscores that that the import duty exemption itself is not the benefit. Rather, the benefit, if any, is the *excess* duty exempted, which is realized when a party exports finished merchandise that does not contain *all* imported inputs subject to the import duty exemption.

In other words, a respondent *does not* realize an excess import duty exemption under 19 C.F.R. § 351.519 by stockpiling inputs in a warehouse. Rather, a respondent company realizes an excess duty exemption on imported inputs where it does not export or otherwise dispose of the imported asset, but instead sells that imported input *domestically* that would otherwise not be entitled to an import duty exemption had the input not been imported under the LMW program. As discussed in greater detail below, the record shows that CS Wind

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **PUBLIC VERSION**

Malaysia recorded only export sales during the POR. Since CS Wind

Malaysia necessarily cannot have sold imported inputs, or finished

merchandise incorporating those inputs, domestically, Commerce

unlawfully applied its regulation in this case to determine that CS

Wind Malaysia received excess import duty exemptions under the LMW

program.

Second, Commerce's application of 19 C.F.R. § 351.519 to conclude

that the full value of import duty exemptions was countervailable

ignores that CS Wind Malaysia cannot possibly have received *excess*

exemptions on imported raw materials because it is uncontroverted that

CS Wind Malaysia had only *export* sales during the POR. As explained

below, CS Wind Malaysia is a factory operation in Malaysia that exists

to produce wind towers for orders arranged by its parent company (CS

Wind Korea) to be sold exclusively in export markets.

Commerce unlawfully applied its regulation to calculate benefits

equal to the value of *all* imported inputs and raw materials of

[                    ] even though the record shows that CS Wind Malaysia

recorded *only* export sales of subject merchandise during the POR. *See*

Memorandum to The File, re: "Countervailing Administrative Review of

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **PUBLIC VERSION**

Utility Scale Wind Towers from Malaysia; 2021: CS Wind Final Results

Calculations" (Mar. 5, 2024), at Attach. II ("Import Tariff and VAT-

Material" Tab), APPX____ ("CS Wind Final Calc Memo"); *see also* Letter

from Trade Pacific PLLC, re: "Section III Questionnaire Response" (Jan.

11, 2023), at III-7, C.R. 32–51, Appx____ ("CS Wind IQR") (stating that

CS Wind Malaysia produced and sold only wind towers, and a small

quantity of scrap generated in the production of wind towers during the

POR). CS Wind Malaysia's total sales revenue in U.S. dollars during the

POR (*i.e.*, [              ]) matches its total export sales for the POR. *Id.*

at Ex. II.C.1(a), Appx____. Moreover, CS Wind's total POR merchandise

sales revenues consisted entirely of: (1) export sales of wind towers to

its parent company, CS Wind, that were exported to unaffiliated

customers in the United States; and (2) *export* sales of imported raw

material inputs to its affiliate, [                                        ].

*Id.* at Ex. III.C.5, Appx____ (reconciling CS Wind's total POR sales

revenues, as recorded in its 2021 audited financial statements to its

trial balance, which reflects only sales of wind towers to CS Wind that

were exported to the U.S. and export sales to its affiliate). The only non-

export sales recorded by CS Wind Malaysia were scrap sales of minimal

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                          **PUBLIC VERSION**

value (*i.e.*, [          ] Malaysian ringgit ("MYR"), which is equivalent

to [          ]). CS Wind IQR at Ex. III.C.5, Appx____.

Commerce unlawfully applied 19 C.F.R. § 351.519(a)(3) to calculate

excess duties on imported inputs that necessarily must have been

incorporated into exported merchandise. Where, as here, it is

uncontroverted that a respondent exported all merchandise produced

during the POR, Commerce's application of 19 C.F.R. § 351.519(a)(3) to

calculate a benefit that far exceeded the value of CS Wind Malaysia's

only non-export sales (*i.e.*, total scrap sold) during the POR by [

          ] cannot be reasonable.

Commerce highlights no record evidence to support its determination

that CS Wind Malaysia received import duty exemptions under the

LMW program on imported inputs that were not consumed in the

production of exported wind towers. Instead, Commerce faults the GOM

for not demonstrating that the LMW program meets the criteria under

19 C.F.R. § 351.519(a)(4)(i). Final Decision Memo at 34, Appx____.

Whether the GOM tracks the quantity of raw material inputs and the

eventual outputs through the application of standard input-output

norms is irrelevant to determining whether CS Wind Malaysia received

***Business Proprietary Information Has Been Redacted***

**Case No. 24-00079**                    **PUBLIC VERSION**

import duty exemptions on inputs not consumed in the production of
exported wind tower because the record shows that CS Wind Malaysia
only recorded *export* sales of finished wind towers during the POR.

The policy behind Commerce's practice of verifying a government's
tracking of input-output norms is to ensure that the government
verifies the relationship between the quantities of imported inputs
exempted and the quantities of finished merchandise exported. *See* 19
C.F.R. § 351.519(a)(4). The purpose of Commerce's regulation is
fundamentally to ensure that the quantity of inputs on which the
respondent receives import duty exemptions are only those quantities
necessary to complete finished merchandise that is subsequently
exported. *See id.* Only benefits that are realized by the respondent when
it imported a quantity of imported inputs and raw materials that
exceeds the amount necessary to produce the merchandise exported is
countervailable. *See id.* Since CS Wind Malaysia is an export operation
that only recorded export sales, it cannot have realized any benefit
through *excess* import duty exemptions because all merchandise
produced during the POR was exported.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                              **PUBLIC VERSION**

Lastly, Commerce defends its determination on the grounds that information in CS Wind Malaysia's financial statements reflects that CS Wind Malaysia may not have consumed all imported raw materials during the same period in which it recorded export sales of subject merchandise. *See* Final Decision Memo at 36, Appx ____. Commerce speculates that raw materials and inputs imported during the end of the POR may not have been incorporated into merchandise sold during the same period. *Id.*

Commerce's point ignores its regulatory framework, which considers *excess* duty exemptions on imported inputs not incorporated into finished goods, if any, to be a benefit under 19 C.F.R. § 351.519(a). Moreover, Commerce's regulation considers any such benefits to be received as of the date of exportation, not the date of importation. *See* 19 C.F.R. § 351.519(b)(2). It is irrelevant whether CS Wind Malaysia actually consumed all imported inputs on which it received exemptions during the same period in which it records sales of finished merchandise. Rather, it is only relevant whether the quantity of imported inputs exceeds the quantity of imported inputs actually consumed in the exported finished goods.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

Since CS Wind Malaysia recorded *only* export sales, it cannot have received any exemption on inputs or raw materials not consumed in the production of exported product. Lining up the time frame of importation and exportation is unnecessary to determining whether CS Wind Malaysia received benefits during the POR because CS Wind Malaysia recorded no domestic sales of finished merchandise. This is particularly true because any benefits realized upon the exportation of merchandise consumed in the production of finished wind towers that incorporated inputs imported towards the end of the POR would have been realized, if at all, when finished merchandise was *exported* during the subsequent POR under Commerce's regulation. *See* 19 C.F.R. § 351.519(b)(2).

Therefore, Commerce unlawfully applied 19 C.F.R. § 351.519 to conclude that CS Wind Malaysia received countervailable excess import duty exemptions while ignoring record information that demonstrated that CS Wind Malaysia consumed all imported inputs in the production of exported wind towers since CS Wind Malaysia exported all wind towers produced during the POR. Accordingly, the Court should direct Commerce to find that CS Wind received no countervailable benefits

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                   **PUBLIC VERSION**

under the LMW program or otherwise explain what record evidence

supports its determination that CS Wind Malaysia received import duty

exemptions on imported inputs and raw materials that were not

incorporated into finished subject merchandise that was exported.

II.    Commerce Unlawfully Calculated *ad valorem* Subsidy Rates
       Based on the Value of CS Wind Malaysia's Sales to CS Wind
       Korea Rather than Upon the Entered Value of U.S. Sales to
       Unaffiliated U.S. Customers

Commerce acted contrary to the statute and its practice by

calculating *ad valorem* subsidy rates by allocating benefits received by

CS Wind Malaysia over its sales to its parent company, CS Wind Korea,

rather than on CS Wind Korea's sales of subject merchandise produced

by CS Wind Malaysia to unaffiliated U.S. customers during the POR.

Using CS Wind Malaysia's sales value as the sales denominator

unlawfully reflects the *intermediate* sales value realized by CS Wind

Malaysia's parent company, CS Wind Korea, which resold the subject

merchandise produced by CS Wind Malaysia to unaffiliated United

States customers on a back-to-back basis. Therefore, Commerce should

have granted an EVA because doing so is necessary to ensure that the

subsidy rate is based on the import value of sales of subject

merchandise to the United States.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                  **PUBLIC VERSION**

The statute requires Commerce to base its calculation of

countervailing duties on countervailable subsidies:

> {w}ith respect to the manufacture, production, or export of a class
> or kind of merchandise imported, or sold (or likely to be sold) for
> importation into the United States.

19 U.S.C. § 1671(a). Where merchandise is marked up between export

and importation into the United States, it is unlawful not to account for

this mark-up because, otherwise, the CVD rate will not equal the net

countervailable subsidy. *See id.* (requiring that the collection of duties

would equal the net countervailable subsidy).

Countervailing duties must be assessed upon an accurate sales

value, as reflected on the relevant entry forms on which U.S. Customs

computes those countervailing duties. *See Jiangsu Zhongji Lamination*

*Materials Co. v. United States*, 41 CIT __, __, 405 F.Supp.3d 1317, 1330

(2019). Commerce must adjust the *ad valorem* subsidy rate to ensure

that the FOB export value upon which the subsidy rate is calculated

equals the import value of the merchandise entering the United States

upon which duties are collected. *See Canadian Solar Inc. v. United*

*States*, 45 CIT __, __, 537 F.Supp.3d 1380, 1395 (2021).

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                **PUBLIC VERSION**

Failure to account for such markup, where the respondent

demonstrates that it meets the criteria to be entitled to an EVA,

violates section 1671(a). *Id.* Where the total export value before the

mark-up applied by the affiliate in a back-to-back sale is greater than

the total value of merchandise before mark-up, failure to grant an EVA

could lead to an overcollection of duties. *Id.*.

A. CS Wind Met All of Commerce's Established Criteria to Grant an
   Entered Value Adjustment

CS Wind satisfied each of the six criteria to be granted an EVA

under Commerce's practice. Therefore, Commerce's denial of an EVA to

CS Wind is contrary to law and otherwise not supported by substantial

evidence.

In order to qualify for an EVA, a respondent must demonstrate that

the following circumstances apply:

(1) the price on which the alleged subsidy is based differs from the
    U.S. invoiced price;
(2) the exporters and the party that invoices the customer are
    affiliated;
(3) the U.S. invoice establishes the customs value to which the
    CVD duties are applied;
(4) there is a one-to-one correlation between the invoice that
    reflects the price on which subsidies are received and the
    invoice with the mark-up that accompanies the shipment;
(5) the merchandise is shipped directly to the United States; and

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                              **PUBLIC VERSION**

(6) the invoices can be tracked as back-to-back invoices that are identical except for price.

*See* Final Decision Memo at 9–10, Appx____.

First, all of CS Wind Malaysia sales of subject merchandise that were exported to the United States were made to its parent company, CS Wind Korea, which then resold the subject merchandise to unaffiliated customers in the United States at a higher price than the revenue recorded by CS Wind Malaysia. *See* CS Wind IQR at III-2 to III-3, Ex. II.C.1(a), Appx____–Appx____, Appx____ (containing a worksheet linking related invoices issued by CS Wind Malaysia and CS Wind Korea related to a sample project number and related sample invoices demonstrating that the prices charged by CS Wind Malaysia to its affiliated parent company are lower than those changed by CS Wind Korea to the unaffiliated U.S. customer for the sale identified by the same project number). For example, the total price CS Wind Malaysia charged for U.S. project code [      ] is [              ]. *See* CS Wind IQR at Ex. II.C.1(a), Appx____. The amount invoiced by CS Wind Korea to the U.S. importer (i.e., [                        ]) for the same project code is [            ]. *Id.*, Appx____.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                  **PUBLIC VERSION**

Invoices from CS Wind Malaysia to CS Wind Korea, invoices from CS Wind Korea to unaffiliated U.S. customers, bills of lading, packing lists, and Forms 7501 for sample transactions collectively demonstrate that the invoiced U.S. price of CS Wind Korea's sales to the unaffiliated U.S. customer is higher than the sales value reported by CS Wind Malaysia to CS Wind Korea. *See* Letter from Trade Pacific PLC, re: "Fifth Supplemental Questionnaire Response" (Jan. 3, 2024), at Ex. S5-1(2), Appx____ (showing, for project # [     ], that CS Wind Malaysia invoiced CS Wind Korea for [          ] whereas CS Wind Korea invoiced the unaffiliated customer, i.e., [                              ] for [                ] for the same project); and Ex. S5-2(1) (showing that, for project # [     ], CS Wind Malaysia invoiced CS Wind Korea for [                    ] whereas CS Wind Korea invoiced the unaffiliated customer, i.e., [                              ] for [                ] for the same project).

The total value of CS Wind Malaysia's sales of all exports of subject merchandise to the United States from CS Wind Malaysia to CS Wind Korea during the POR was [                ]. *See* CS Wind IQR at Ex. II.C.1(a), Appx____. The total value of CS Wind Korea's corresponding

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

resales of the same subject merchandise to the ultimate unaffiliated

U.S. customer was [                    ]. *See id.*, Appx____. The U.S. invoiced

value of subject merchandise exported to the United States during the

POR is approximately [        ] higher than the value of subject

merchandise exported to the United States invoiced by CS Wind

Malaysia to CS Wind Korea during the POR. See *id.* at Ex. II.C.1(b),

Appx____. Accordingly, CS Wind demonstrated that the price charged

by CS Wind Malaysia to CS Wind Korea differs from the U.S invoiced

price of the same merchandise between CS Wind Korea and the

unaffiliated U.S. customer.

Second, it is undisputed that CS Wind Malaysia and CS Wind Korea

are affiliated. *See* Letter from Trade Pacific PLLC, re: "Section III

'Affiliated Companies' Response" (Dec. 6, 2022), at AFF-4, Appx____

(stating that CS Wind Malaysia and CS Wind Korea are affiliated

because CS Wind Malaysia is a wholly-owned subsidiary of CS Wind

Korea, its parent company, and confirming that the companies share a

common board member, Mr. Seong Gon Gim).

Third, the U.S. invoiced price from CS Wind Korea to the unaffiliated

U.S. customer establishes the customs value to which CVD duties are

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

applied. Invoices issued from CS Wind Korea to the U.S. unaffiliated

customer for two separate project numbers (i.e., [              ]) and the

entered value, as stated on the Form 7501, for the same projects are

virtually identical to the U.S. invoiced prices for each project. *See* CS

Wind SQR 5 at Exs. S5-1(2), Appx___ (reflecting a U.S. invoiced price

from CS Wind Korea to the unaffiliated customer of [              ] on

the commercial invoice issued by CS Wind Korea in connection with

project # [      ] and an entered value of [              ] in box 32 of the

related Form 7501), S5-2(1), Appx___ (reflecting a U.S. invoiced price

from CS Wind Korea to the unaffiliated customer of [              ] on

the commercial invoice issued by CS Wind Korea in connection with

project # [      ] and combined entered values of [              ] in the

boxes 32 of the related Forms 7501).

   Fourth, all commercial invoices issued from CS Wind Malaysia to CS

Wind Korea, and the corresponding invoices from CS Wind Korea to the

unaffiliated U.S. customer, reflect the same products and same

quantities for each project. For example, the invoices for projects # [

      ] from CS Wind Malaysia to CS Wind Korea, and the

corresponding invoices from CS Wind Korea to the unaffiliated

40

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                **PUBLIC VERSION**

customers—i.e., [                                                    ]—reflect

the same product and the same quantity (i.e., [


]). *See* CS Wind IQR at Ex. II.C.1(a), Appx____, CS Wind SQR

5 at Exs. S5-1(2), Appx____ (reflecting [    ] sections on both the

Commercial Invoices from CS Wind Malaysia to CS Wind Korea and the

commercial invoices from CS Wind Korea to the unaffiliated customers).

Therefore, the invoices on the record demonstrate a one-to-one

relationship in terms of the product and quantity.

Fifth, the sample bills of lading demonstrate that the merchandise

was shipped directly from Malaysia to the United States. Specifically,

for project # [    ], the bill of lading demonstrates that the port of

loading is [                         ] and the port of discharge is

[                         ]. *See* CS Wind SQR 5 at Ex. S5-1(2), Appx____.

Likewise, for project # [    ], the bills of lading demonstrate that the

ports of loading are [                              ] and the ports of

discharge are [                    ]. <u>See</u> *id.* at Ex. S5-2(1), Appx____. The

quantities reflected on the bills of lading link to the relevant

commercial invoices for each relevant project. Specifically, the bills of

41

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

lading may be linked to the relevant packing list via the gross weights, prices, and package descriptions on each document. Therefore, CS Wind demonstrated that the merchandise in question was shipped directly from Malaysia to the United States.

Sixth, the invoices issued from CS Wind Malaysia to CS Wind Korea, and the corresponding invoices from CS Wind Korea to the unaffiliated U.S. customer, can be tracked as back-to-back invoices that are identical except for price. The product descriptions, number of tower sections, and consignees listed demonstrate that the invoices are otherwise identical except for price. Worksheets listing the invoice dates, identifying project information, billing dates, quantities, and billing amounts for sales invoiced by CS Wind Malaysia and CS Wind Korea, respectively, demonstrate the direct linkage between the invoices on a project basis, except for price. *See* Letter from Trade Pacific PLLC, re: "Supplemental Questionnaire Responses" (Feb. 24, 2023), at Exs. S-11(a) and S-11(b), Appx____, Appx____ ("CS Wind SQR 1").

In sum, CS Wind Malaysia sold the subject merchandise to unaffiliated U.S. customers via its Korean parent CS Wind Korea,

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

whose invoices—which are identical to those of CS Wind Malaysia

except for the price markup—accompanied the export shipments to the

United States. Therefore, CS Wind demonstrated that its sales of

subject merchandise produced by CS Wind Malaysia met all criteria

required for an EVA under Commerce's established practice.

B.    Commerce Failed to Provide Notice or Otherwise Explain Why It
      Required Forms 7501 for All CS Wind's U.S. Sales to Grant an
      EVA

Commerce denied CS Wind an EVA because it found that CS Wind

Malaysia had not provided a Form 7501, or alternative customs

documentation, for two of four projects for which Commerce requested

such documentation in a supplemental questionnaire. *See* Final

Decision Memo at 10, Appx____. For the reasons explained below,

Commerce lacked any basis to conclude the record did not contain

sufficient information to determine that CS Wind Korea's invoice price

establishes the customs values for certain sales. *Id.* at 11, Appx____.

Commerce's stated rationale for denying CS Wind an EVA is

unreasonable and inconsistent with its standard practice. The criteria

for granting an EVA do not require that a respondent demonstrate a

specific mark-up for every sale. Rather, Commerce's recent EVA

43

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                      **PUBLIC VERSION**

practice is to adjust a subsidy rate by changing the denominator of the

original subsidy rate from the respondent's total worldwide sales to the

affiliate's marked-up sales value. *See, e.g., Certain Aluminum Foil from*

*the People's Republic of China*, 88 Fed. Reg. 75267 (Nov. 2, 2023) (final

results of countervailing duty administrative review), and

accompanying Memorandum from Scot Fullerton, Associate Deputy

Assistant Secretary for Antidumping and Countervailing Duty

Operations, re: "Issues and Decision Memorandum for the Final Results

of the Countervailing Duty Administrative Review of Certain

Aluminum Foil from the People's Republic of China; 2021" (Oct. 27,

2023) at 16–18 ("Aluminum Foil from China 2021 IDM")). Commerce's

current methodology for calculating an EVA—by replacing the

denominator of the subsidy rate with the total worldwide marked-up

sales value—does not require it to confirm the sales mark-up on each

U.S. sale. *See Canadian Solar Inc. v. United States*, 45 CIT at __, 537

F.Supp.3d at 1397 (noting that, Commerce's practice in recent reviews

does not required U.S.-specific sales data, and recognizing that

Commerce has not adjusted its evidentiary requirements to reflect its

current practice).

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

The absence of CBP Forms 7501 for two projects does not support Commerce's conclusion that CS Wind did not demonstrate that CS Wind Korea's sales value to the unaffiliated customer established the imported value of CS Wind Malaysia's sales of subject merchandise during the POR. Final Decision Memo at 11, Appx____ Commerce's conclusion is not supported by the record, and the conclusion is inconsistent with its practice in other proceedings.

CS Wind Korea's invoiced price to its unaffiliated U.S. customer established the customs value to which the CVD duties are applied. The POR-wide average mark-up by CS Wind Korea of merchandise produced by CS Wind Malaysia, and sold on a back-to-back basis by CS Wind Korea, was approximately **[        ]**. CS Wind IQR III-15, Ex. II.C.1(a), Appx____. The commercial sales documentation uniformly demonstrated that invoiced price of CS Wind Korea to its unaffiliated customer established the customs value to which the CVD duties are applied. Specifically, CS Wind Korea's commercial invoice issued to its unaffiliated U.S. Customer (i.e., **[                                    ]**) for project # **[    ]** reflects a U.S. invoiced price from CS Wind Korea to the unaffiliated customer of **[            ]** and the same project has

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

an entered value of [            ] in the Form 7501 provided. CS Wind

SQR 5 at Exs. S5-1(2), Appx____. Likewise, CS Wind Korea's

commercial invoice issued to its unaffiliated customer (i.e., [

                              ]) for project # [    ] reflects a U.S.

invoiced price of [              ] and the Form 7501 reflects an

entered value of [            ]. *Id.* at  S5-2(1), Appx____.

   No documentation on the record contradicted that CS Wind Korea's

price to its unaffiliated U.S. customer established the U.S. import value

of wind towers produced by CS Wind Malaysia. CS Wind provided Form

7501 entry summaries for all of the sample projects requested by

Commerce for which it had such documentation in its possession. *See*

CS Wind IQR, at Ex. II.C.1(a), Appx____. CS Wind explained that it

was unable to provide the Forms 7501 for two sample projects for which

Commerce requested the information because the sales terms of these

other two sample sales were made on sales terms where CS Wind would

not have possessed the import documentation for the requested projects.

CS Wind SQR 5 at S5-1, S5-2, Appx____, Appx____ (reflecting that both

projects were sold on [        ] basis). Commerce did not explain how

the absence of Forms 7501 for the other two project could undermine

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

that CS Wind Korea's invoice value established the imported value of subject merchandise produced by CS Wind Malaysia.

Commerce also failed to explain why it was reasonable to require CS Wind to meet the six criteria for an EVA for *all* sample sales requested when requiring this information does not correlate with the underlying purpose of the EVA, which is to prevent the over-collection of duties. *See Canadian Solar*, 45 CIT at __, 537 F.Supp.3d at 1399.

CS Wind reported that *all* of its shipments entered the U.S. through back-to-back sales through CS Wind Korea. *See* CS Wind IQR at III-2 to III-3, Ex. II.C.1(a), Appx____–Appx____, Appx____. Commerce lacked any basis to conclude that the U.S. mark-up on all sales for which CS Wind had such documentation are insufficient to verify that CS Wind Korea's U.S. invoice price establishes the customs value upon which CVD duties are calculated. In *Aluminum Foil from China* Commerce accepted samples of selected sales instead of requiring Forms 7501 for *every* U.S. sale. *See* Aluminum Foil from China 2021 IDM at 17 (dismissing the notion that a failure to provide CBP Forms 7501 for certain sales undermines that sales made through an affiliate do not

47

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

meet the requirements for an EVA). Commerce has not explained what record information made it unable to do the same here.

Commerce did not find that any of the circumstances where it has declined to allow sampling of Forms 7501 under its current practice applied to CS Wind. In past cases, Commerce has declined to accept sample Forms 7501—rather than requiring this documentation for every sale—where there is evidence of distorted transfer pricing between related parties as evidenced by unusually high mark-ups in the U.S. entered value. *See Certain Aluminum Foil From the People's Republic of China*, 88 Fed. Reg. 28,496 (preliminary results of countervailing duty administrative review and rescission of review, in part; 2021), and Memorandum from James Maeder, Deputy Assistant Secretary for Antidumping And Countervailing Duty Operations, re: "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review of Certain Aluminum Foil from the People's Republic of China; 2021" (Apr. 27, 2023), at 9. Commerce highlighted no such concerns here because there is no evidence on the record that could support any such conclusion.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **PUBLIC VERSION**

Finally, Commerce improperly focuses on tiny observed differences between CS Wind Korea's commercial invoices and the CBP Forms 7501 that are irrelevant to evaluating whether CS Wind Korea's invoiced price to the unaffiliated U.S. customer establishes the customs value to which CVD duties are applied. *See* Final Decision Memo at 11, Appx____. At the same time, Commerce ignored record information that clearly demonstrated that the Forms 7501 provided by CS Wind *uniformly* demonstrated that CS Wind Korea's invoiced value was almost identical to the entered values for the same project codes.

The fact that these observed differences "were not uniform in value or direction," *see id.*, is irrelevant to assessing whether CS Wind Korea's invoiced price to the U.S. customer established the customs value of imported merchandise. CS Wind Korea's commercial invoice issued to its unaffiliated U.S. Customer for project # [      ] differed from the value on the Form 7501 by [

                    ]. *See* CS Wind SQR 5 at Exs. S5-1(2), Appx____.

Likewise, CS Wind Korea's U.S. invoiced price for project # [     ] differed from the value on the Form 7501 by [

                              ]. *See id.* at Exs. S5-

49

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

2(1), Appx____. Neither set of commercial documents undermined that

CS Wind Korea's commercial invoice price established the customs

value for the projects in question.

Commerce unreasonably ignored that the difference between CS

Wind Malaysia's invoice price to CS Wind Korea was uniformly [

            ] the value stated on the Forms 7501 for the same projects by

[      ] and [        ], respectively. *See id.* at Exs. S5-1(2), S5-2(1),

Appx____, Appx____. In contrast, the entered value, as reflected on all

Forms 7501 provided by CS Wind, is uniformly almost identical to the

[         ] invoice value stated in CS Wind Korea's invoices to unaffiliated

U.S. customers rather than the value reflected in the invoices issued by

CS Wind Malaysia to CS Wind Korea. *See id*, Appx____, Appx____.

If Commerce required additional information to understand why CS

Wind Korea's invoiced price could be [                    ] than the entered

values reflected in the Forms 7501 for the same project, it was required

to request an explanation from CS Wind rather than denying the EVA

without further inquiry. *See* 19 U.S.C. § 1677m(d) (requiring that, if a

response is deficient, Commerce must promptly inform the party and

provide it with an opportunity to remedy or explain the deficiency).

50

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

Commerce unlawfully made no effort to clarify the information reported

or to verify whether CS Wind could explain how the entered value could

be reconciled with CS Wind Korea's invoice value.

For all these reasons, Commerce's denial of an EVA to CS Wind was

unlawful. The record shows that Commerce's denial of an EVA to CS

Wind unlawfully failed to prevent the overcollection of duties where the

record uniformly demonstrated that CS Wind Korea's invoice price to

the U.S. customers reflect the customs value of all exported shipments

of wind towers produced by CS Wind Malaysia during the POR.

Therefore, the Court should direct Commerce to grant CS Wind an EVA

or otherwise explain what record evidence supports its conclusion that

CS Wind Korea's invoiced price to the U.S. customer does not reflect

the customs value of imported merchandise.

III.   Commerce Unlawfully Constructed the Land Benchmark by
       Averaging Comparable Land Prices with a Single Non-
       Comparable Land Transaction

Commerce's determination to average a single land lease transaction

in Penang, Malaysia, with the average land lease prices for the East

Coast Economic Region in Pahang, Malaysia, is contrary to law. First,

CS Wind addresses the reasons Commerce's determination to include

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                              **PUBLIC VERSION**

the C.B. Richard Ellis data in its land benchmark calculation is

unlawful. Second, CS Wind explains the reasons that—even if it were

lawful to include the same data in the land benchmark—Commerce's

calculation of a simple average of the MIDA data and the C.B. Richard

Ellis data is unreasonable and not supported by substantial evidence.

> A. Commerce Unlawfully Failed to Select Domestic Transactions for
>    Similar Land and Account for Other Factors Affecting
>    Comparability

Commerce unlawfully failed to account for factors affecting

comparability by including a single land rental transaction from a non-

comparable region (*i.e.*, Penang) in its land benchmark. *See*

Memorandum to The File, re: "Placing Benchmark on the Record" (Aug.

30, 2023), P.R. 216, at Attach. (page 64), Appx____ ("DOC Land BM

Data") (containing an industrial land price located in Penang at a price

of 1.76 Malaysian ringgit ("RM") per square foot), Memorandum to The

File, re: "Countervailing Duty Administrative Review of Utility Scale

Wind Towers from Malaysia, 2021: CS Wind Final Results

Calculations" (March 5, 2024), C.R. 148, at Attach. at "Land for LTAR"

tab) ("Final Results Calc. Memo"), Appx____ (reflecting that the

benchmark price used in Commerce's land benchmark calculation is

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

[




]).

Therefore, the Court should remand Commerce's selection of a land

benchmark and require it to include only market-determined land lease

prices for comparable land located in Pahang in its land benchmark.

 The statute requires Commerce to determine the adequacy of

remuneration in relation to "prevailing conditions," *i.e.,* price, quality,

availability, marketability, transportation, and other conditions of sale,

for the goods being provided or purchased in the country that is subject

to the administrative review. *See* 19 U.S.C. § 1677(5)(E)(iv). Commerce

normally measures the adequacy of remuneration by comparing the

government price to a market-determined price resulting from actual

transactions in the country in question. 19 C.F.R. § 351.511(a)(2)(i).

Where Commerce chooses a Tier One benchmark based on actual

transactions in the country in question, Commerce "will consider

product similarity; quantities sold, imported or auctioned; and other

factors affecting comparability." *Id.*

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                       **PUBLIC VERSION**

Commerce failed to account for factors affecting comparability by
including a land rental price from a non-comparable region (*i.e.*,
Penang) in the land benchmark calculation. *See* Final Decision Memo at
21 (acknowledging that the C.B. Richard Ellis source used in the
*Preliminary Results*, and included in the benchmark for the *Final
Results*, reflects a land rental in Penang) , Appx___.

First, Commerce unreasonably and unlawfully disregarded
information that demonstrated that land prices in Penang are not
comparable to those in Pahang state. Specifically, the MIDA data shows
that the 2021 per square foot monthly rental prices of rent for a factory
in Mainland Penang range from 1.00 to 2.00 RM per square foot. Letter
from Trade Pacific PLLC, re: "Utility Scale Wind Towers from Malaysia:
Benchmark Submission" (Aug. 1, 2023), P.R. 160–161, at Ex. 1,
Appx___ ("CS Wind BM Submission"). The MIDA data reflected an
average range of land lease prices stemming from actual transactions
between private parties in the same region as the land leased by CS
Wind Malaysia (*i.e.*, Pahang). CS Wind BM Submission at Ex. 1,
Appx___. The same data shows that rent for a factory located in
Pahang during this period ranges from 0.40 to 0.60 RM per square foot.

54

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

*Id., Appx____.* Therefore, the average rental rate for a factory facility located in mainland Penang is (i.e., 1.5 RM) is three times higher than the average rental rate for a factory facility in Pahang (i.e., 0.5 MYR). Compare CS Wind BM Submission at Attach. 1 with DOC Land BM Data at Attach. at 64. The Department failed to explain why it was reasonable to include the Penang land transaction in its benchmark calculation despite the significant disparity in pricing between the regions. Therefore, the Department unlawfully failed to account for factors affecting comparability when it included the C.B. Richard Ellis land price in its land benchmark.

Second, Commerce's finding that the Penang land parcel used in its benchmark calculation is comparable in size is unsupported by substantial evidence. Final Decision Memo at 21, Appx____. CS Wind Malaysia rented an [



]. Letter from Trade Pacific PLLC, re: "Second Supplemental Questionnaire Response" (July 21, 2023), C.R. 100–102, at Ex. S2-13, Appx____. In contrast, the land selected from the C.B. Richard Ellis data by Commerce reflects pricing for a single 2.067 acre

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

parcel. *See* DOC Land BM Data at Attach. at 64, Appx____. In other

words, CS Wind's rental land was also [                                    ] of

the Penang land. The Department relied upon the fact that the Penang

land was comparable in size and nature (*i.e.*, industrial) land without

explaining why size or use of the land outweighed the evidence that

prices in Penang were grossly disparate. Therefore Commerce's

determination to include the land lease from Penang in its land

benchmark calculation was not supported by substantial evidence.

Third, neither Commerce's regulation nor its practice supported

averaging a non-comparable source with a comparable source in its land

benchmark calculation. Commerce illogically justified including the

land lease from Penang in its benchmark based on its general practice

of preferring to average more than one commercially available market

price to construct a benchmark price. Final Decision Memo at 21,

Appx___ (citing *Steel Concrete Reinforcing Bar from the Republic of*

*Turkey*, 79 Fed. Reg. 54,963 (Dep't Commerce Sept 15, 2024) (final

affirmative countervailing duty determination final critical

circumstances determination), and accompanying Memorandum from

Christian Marsh, Deputy Assistant Secretary for Antidumping and

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **PUBLIC VERSION**

Countervailing Duty Operations, re: "Issues and Decision Memorandum for the Final Affirmative Countervailing Duty Determination and Final Critical Circumstances Determination in the Countervailing Duty Investigation of Steel Concrete Reinforcing Bar from the Republic of Turkey" (Sept. 8, 2024) ("Rebar from Turkey CVD INV IDM")).

As an initial matter, neither Commerce's regulation nor its the case cited by Commerce support that its Tier Three benchmark practice requires commerce to average multiple datasets. Commerce's Tier Two benchmark regulation requires it to average more than one commercially available benchmark price where available. *See* 19 C.F.R. § 351.511(a)(2)(i) (stating Commerce compare the government to a market-determined price from actual transactions in the country in question). However, Commerce's Tier One benchmark regulation reflects no such requirement. *See* 19 C.F.R. § 351.511(a)(2)(ii) (stating that, where no market-determine price in the country in question is available, Commerce will measure the adequacy of remuneration by comparing the government price to a world-market price, and, to the extent practicable that Commerce will average world market prices to the extent practicable).

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                **PUBLIC VERSION**

In *Rebar from Turkey*, Commerce applied its 19 C.F.R.

§ 351.511(a)(2)(ii), not its Tier One benchmark practice under 19 C.F.R.

§ 351.511(a)(2)(i). *See* Rebar from Turkey CVD INV IDM at 23 (noting

that Commerce constructed a benchmark by averaging two datasets

pursuant to 19 C.F.R. § 351.511(a)(2)(ii)). As Commerce recognized in

*Rebar from Turkey*, its regulations require it to average more than one

commercially available world market price to the extent practicable. *See*

*id.*; *see also* 19 C.F.R. § 351.511(a)(2)(ii) (stating that Commerce will

average more than one commercially available world market price, to

the extent practicable, making allowance for factors affecting

comparability). Since Commerce was applying a Tier One benchmark,

not a Tier Two benchmark to measure the adequacy of remuneration of

CS Wind's land lease, Commerce's reliance on *Rebar from Turkey* does

not support its decision to average multiple land lease prices from

Pahang with a non-comparable lease price from Penang.

Even if Commerce did have a practice of averaging multiple sources

when calculating Tier One benchmarks for comparable goods in certain

contexts, including non-comparable data from another region to value

real estate—the price of which is inherently location-specific—was

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

unreasonable and unlawful because it ignored the requirement that

Commerce consider product similarity and "other factors affecting

comparability" in selecting transactions to be included in a Tier One

benchmark. *See* 19 C.F.R. § 351.511(a)(2)(i).

Critically, there was no evidence to support that including the

Penang land transaction in Commerce's land benchmark added to the

robustness of that land benchmark. Commerce found that the MIDA

data reflected ranges of rental rates reflecting multiple transaction

prices for particular locales. *See* Final Decision Memo at 21, Appx____.

Therefore, Commerce could not reasonably have concluded that

averaging a single transaction price with a source that reflected

multiple transaction prices for locations added to the robustness of its

benchmark.

In sum, the evidence of price and size disparity between the land

rented by CS Wind Malaysia and the Penang land price included in

Commerce's benchmark calculation significantly undermined

Commerce's determination that the Penang land price reflected a land

lease that was comparable to land leased by CS Wind Malaysia.

Therefore, Commerce's determination unlawfully failed select from land

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                          **PUBLIC VERSION**

transactions for similar land rentals and to account for other factors

affecting comparability, including location. The Court should remand

Commerce's land benchmark determination and instruct Commerce to

base its land benchmark only on comparable transactions or otherwise

explain why the land price from Penang reflected comparable land

transactions for valuing the adequacy of remuneration for CS Wind

Malaysia's land lease in Pahang.

B. Calculating a Simple Average of a Single Transaction Price with a
   Source Reflecting Multiple Transactions is Unreasonable

Even if it were reasonable to include the C.B. Richard Ellis land

price from Penang in the Department's benchmark calculation—which

it is not for the reasons stated above—Commerce's determination to

calculate a land benchmark based on a simple average of the *single* land

transaction from Penang with the *multiple* land transactions reflected

in the MIDA data is not supported by substantial evidence. By equally

weighting a single price from Penang with data that it recognized

reflected multiple land prices from Pahang unreasonably and

unlawfully skewed the data towards the Penang price with no record

basis for doing so.

60

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **PUBLIC VERSION**

Commerce's decision to equally weight a single transaction price from Penang with multiple transaction prices from Pahang was distortive of the market-determined price for comparable land in Malaysia. As noted above, the C.B. Richard Ellis data reflected the rental price of a single 2.067 acre parcel. *See* DOC Land BM Data at Attach. at 64, Appx____. In contrast, Commerce found that the MIDA data reflects ranges of rental rates of multiple transaction prices for particular locations, including Penang. *See* Final Decision Memo at 21, 21 n. 111, Appx____ (*citing* CS Wind BM Submission at Exs. 1-3, which Commerce acknowledges shows price ranges for rental rates in question).

Therefore, even if Commerce's practice of weighting multiple benchmark sources were generally reasonable in the Tier One context, it was not reasonable to equally weight the price for a single parcel of land in a non-comparable region of Malaysia with MIDA data that already reflected multiple land transactions in the same region in which CS Wind's land is located. Commerce lacked any basis to conclude that a land benchmark that equally weighted these two sources accurately reflected actual transaction prices for comparable land in Malaysia. If

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

the Court finds that Commerce's determination to include the C.B.

Richard Ellis single transaction land price was lawful, the Court should

require Commerce to explain what evidence supports its determination

that equally weights a single transaction price with another benchmark

source would accurately reflect actual land transaction prices in

Malaysia.

IV.   Commerce's Selection of Singapore Electricity Tariffs as a Tier
      Three Benchmark for Electricity Is Not Supported by
      Substantial Evidence

The record does not support Commerce's conclusion that Singapore's

electricity prices can be used judge the degree to which Malaysian

electricity tariffs reflect market principles. Commerce also failed to

weigh the relevance of Turkish Energy Market Regulatory Board of

Turkey or to explain why the Singapore electricity data was a superior

benchmark source considering evidence that Singapore is at a much

more advanced level of economic development. Without accounting for

or weighing evidence that detracts from the reasonableness of its

determination, Commerce's decision cannot be supported by substantial

evidence.

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                              **PUBLIC VERSION**

If there is no world market price available to purchasers in the country in question, Commerce will measure the adequacy of remuneration by assessing whether the government price is consistent with market principles. 19 C.F.R. § 351.511(a)(2)(iii). Commerce generally assesses consistency with market principles using "such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination." *Jiangsu* Zhongji, 41 CIT at __, 405 F.Supp.3d at 1335 (*citing Countervailing Duties*, 63 Fed. Reg. at 65,377–78). However, if Commerce determines that the government price is not consistent with market principles, or where it lacks information to undertake such an inquiry, it may construct an external benchmark. *See Canadian Solar*, 45 CIT at ___, 537 F.Supp.3d at 1389 n.6.

Commerce's Tier Three benchmark practice requires it to consider whether a Tier Three external benchmark source is from a country at an economically comparable level of development where evidence of economic comparability of potential benchmark sources is on the record. *See, e.g., Certain Corrosion Inhibitors from the People's Republic of China*, 86 Fed. Reg. 7,537 (Dep't Commerce Jan. 29, 2021) (final

63

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                          **PUBLIC VERSION**

affirmative countervailing duty determination*)*, and accompanying

Memorandum from James Maeder, Deputy Assistant Secretary for

Antidumping and Countervailing Duty Operations, re: "Issues and

Decision Memorandum for the Final Affirmative Determination of the

Countervailing Duty Investigation of Corrosion Inhibitors from the

People's Republic of China" (Jan. 25, 2021), at 35–36 ("Corrosion

Inhibitors from PRC INV IDM") (stating that Commerce's Tier 3

benchmark practice for land considers the country's geographic

proximity and level of economic development, including GNI).

Commerce may also consider geographic proximity where it is

relevant to assessing whether an outside benchmark represents prices

in a comparable setting. *Id.* (considering geographic proximity in

evaluating the suitability of land pricing in Thailand to China because

it is relevant to determining whether Thailand is a reasonable

alternative to China as a target for foreign direct investment).

Commerce concluded that Singaporean electricity prices are a

suitable Tier Three benchmark based upon geographic proximity,

regional interconnection, and similarity of pricing mechanisms between

Singapore and Malaysia. Final Decision Memo at 41, Appx____.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **PUBLIC VERSION**

However, Commerce unreasonably failed to consider evidence of gross

economic disparity between Malaysia and Singapore. *See id.* For these

reasons Commerce's selection of Singapore electricity prices as a Tier

Three benchmark source to value the extent to which Malaysian

electricity tariffs are set in accordance with market principles was not

supported by substantial evidence.

In addition, Commerce's conclusion that geographic proximity is

relevant to determine whether it was appropriate to rely on an outside

benchmark source was not supported by substantial evidence.

Commerce claims that the interconnection and geographic proximity of

Singapore to Malaysia "suggests there is some level of regional

availability of electricity between Malaysia and other surrounding

countries." Final Decision Memo at 41, Appx____. While

interconnections between Singapore and Malaysia may suggest that

electricity generated in Singapore may flow into Malaysia, this fact

alone does not support that Singaporean electricity is available to

electricity consumers in Malaysia or that electricity consumers in

Malaysia consider geographic proximity in deciding whether to

purchase Singapore electricity over Malaysian electricity. Commerce

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                **PUBLIC VERSION**

did not explain why these considerations are relevant to comparability

of Malaysian and Singaporean electricity prices or consistent with its

Tier Three benchmark practice.

Commerce cites *Cold-Rolled Steel from Russia* in support of its

determination that geographic proximity is relevant to determining the

suitability of Singapore electricity tariffs as a Tier 3 benchmark source.

*Id.*, Appx____ (*citing Countervailing Duty Investigation of Certain Cold-*

*Rolled Steel Flat Products From the Russian Federation*, 81 Fed. Reg.

49,935 (Dep't Commerce July 29, 2016) (final affirmative countervailing

duty determination and final negative critical circumstances

determination), and accompanying Memorandum from Christian

Marsh, Deputy Assistant Secretary for Antidumping and

Countervailing Duty Operations, re: "Countervailing Duty Investigation

of Certain Cold-Rolled Steel Flat Products from the Russian Federation:

Issues and Decision Memorandum for the Final Determination" (July

20, 2016) ("CRS from Russia INV IDM")). None of the facts that

supported Commerce's determination of the relevancy of geographic

proximity in *Cold-Rolled Steel from Russia* are present here.

66

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                              **PUBLIC VERSION**

In *Cold-Rolled Steel from Russia*, Commerce concluded that regional European natural gas pricing could serve as an appropriate natural gas pricing because of evidence on the record showed that European regional markets set natural gas prices in similar ways. CRS from Russia INV IDM at 70. Moreover, Commerce concluded that the record showed that Russian natural gas was a key market for Russian natural gas exports. *Id.* . The record in this administrative review contained no evidence that electricity was sold on regional markets or that pricing conditions in certain regional electricity markets were more similar than others. Moreover, unlike in *Cold-Rolled Steel from Russia,* the record in this administrative review lacked any evidence that Singapore electricity prices were market-determined in a regional market to which Malaysia belonged. For these reasons, Commerce's reliance on geographic proximity does not support its selection of Singapore electricity prices as a Tier Three benchmark source.

Similarly, Commerce's determination that interconnections between the Malaysian and Singapore grids supported the superior relevancy of Singapore electricity prices to assessing the extent to which Malaysian electricity prices were set consistent with market principles is not

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                      **PUBLIC VERSION**

supported by substantial evidence. Commerce relied on a single

sentence in the GOM's response, which stated merely that the TNB grid

and Singapore grid (through SP PowerGrid Ltd) are interconnected, to

conclude that geographic proximity is relevant to determining whether

Singaporean prices are a reasonable proxy for Malaysian electricity

prices. Final Decision Memo at 41, Appx____ (*citing* Letter from

Norazah Abdul Jabbar, Trade Practices Section, Ministry of

International Trade and Industry, Malaysia, "Administrative Review of

Countervailing Duty Order on Imports of Utility Scale Wind Towers

from Malaysia: Submission of Supplementary Questionnaire Response"

(Mar. 28, 2023), at Ex. B9, P.R. 117, Appx____). The fact that the

electricity grids are interconnected did not establish that Singapore and

Malaysia were part of a market-determined regional Southeast Asian

market for electricity..

Commerce and the Court have considered geographic proximity to be

relevant to assessing the suitability of an external Tier Three

benchmark source where the record shows that countries may compete

for the same foreign direct investment opportunities. *See* Corrosion

Inhibitors from PRC INV IDM at 36 (stating that location is relevant to

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **PUBLIC VERSION**

evaluating whether or not other locations are reasonable alternative locations to China for Asian production), Canadian Solar, 45 CIT at ___, 537 F.Supp.3d at 1391 (finding that it was reasonable for Commerce to consider geographic location in selecting a Tier Three land benchmark because of evidence that China and Thailand had competed for the same foreign direct investment opportunities). Commerce cited no evidence that geographic proximity is relevant to assessing whether electricity prices in Singapore are a reasonably proxy for electricity prices in Malaysia in this administrative review. Land prices are inherently tied to their location. Commerce cited no evidence that location concerns are relevant to selecting an external Tier Three benchmark source for electricity. Therefore, Commerce did not support the relevancy of geographic proximity or explain why this consideration should outweigh economic comparability.

Commerce's selection of Singapore electricity prices as a Tier Three benchmark source is inconsistent with Commerce's benchmark practice of considering economic comparability in selecting a Tier Three benchmark. Therefore, Commerce's selection is not supported by substantial evidence.

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                           **PUBLIC VERSION**

Historical per-capita GNI information for Malaysia, Singapore, and
Turkey from the World Bank's World Development Indicators database
shows that Singapore was at a much more advanced level of economic
development than Malaysia. *See* Letter from Trade Pacific PLLC, re:
"Utility Scale Wind Towers from Malaysia – Submission of Factual
Information to Rebut, Clarify or Correct Petitioner's August 1st
Benchmark Submission" (Aug. 11, 2023), P.R. 178–179, at 4–5, Attachs.
B and C, Appx___, Appx___ ("CS Wind Rebuttal BM Submission").
Specifically, Singapore's per-capita GNI (i.e., $63,000) was nearly five
times higher than that of Malaysia (i.e., $10,710). *Id.*, Appx___,
Appx___.

Singapore's per capita GNI is nearly five times higher than that of
Malaysia. *See* CS Wind Rebuttal BM Submission, Attachs. B and C,
Appx___, Appx___. In contrast, Turkey's per-capita GNI was only
approximately 7 percent less than that of Malaysia during the POR. *See*
*id.*, Appx___, Appx___. Commerce also found Turkey and Malaysia to be
economically comparable during the POR in a surrogate country
memorandum that covered the same POR. *See* CS Wind BM
Submission at Ex. 10, Appx____. Yet, Commerce dismissed the

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

relevancy of economic comparability without explanation despite the
fact that Commerce's practice consistently considers economic
comparability to be relevant. *See Corrosion Inhibitors from PRC INV
IDM* at 35–36. Commerce also provided no reason to depart from its
prior practice.

In *Risen Energy Co., Ltd. v. United States*, the Court found that
Commerce had not adequately explained its selection of a Tier Three
benchmark source where it did not sufficiently weigh geographic
proximity concerns against a widening gap in economic comparability
metrics, including GNI. *See Risen Energy Co., Ltd. v. United States*, 46
CIT __, __, 570 F.Supp.3d 1369, 1375 (2022). Commerce failed to weigh
similar considerations here in selecting Singapore as a Tier Three
benchmark source. Therefore, Commerce's continued selection of
Singapore data without explaining why it was superior to alternative
Tier 3 benchmark sources on the record was not supported by
substantial evidence.

While general benchmark data need not represent a comparable
economy to the foreign producer's, benchmarks "become less
informative the greater the difference in the levels of development of

71

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

the countries from which the data derive." *Blue Field (Sichuan) Food Industrial Co., Ltd., v. United States*, 37 CIT 1619, 1622, 949 F. Supp. 2d 1311, 1317 (2013).

Because the record shows that Turkish electricity tariffs reflect electricity rates available to industrial consumers, and the Turkey is at a significantly more comparable level of GNI relative to Malaysia than Singapore, Turkish electricity tariff rates are the only electricity benchmark rates on the record that reflect comparable electricity pricing to those available to CS Wind as an industrial electricity consumer in Malaysia.

In the absence of record evidence that could demonstrate that Singapore and Malaysian electricity frameworks were comparable, Commerce reflexively relied upon the same source selected the investigation without citing any evidence that rendered Singaporean electricity pricing comparable or the alternative Turkish electricity pricing on the record of this administrative review less comparable. *See* Final Decision Memo at 40–41, Appx\_\_\_–Appx\_\_\_.

However, unlike in the underlying investigation where Commerce had no alternative electricity benchmark to consider—the record in this

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

administrative review included electricity prices from Turkey as an
alternative Tier Three benchmark source. *See Utility Scale Wind
Towers From Malaysia*, 86 Fed. Reg. 30,593 (Dep't Commerce June 9,
2021) (final affirmative countervailing duty determination) and
accompanying Memorandum from James Maeder, Deputy Assistant
Secretary for Antidumping and Countervailing Duty Operations re:
"Issues and Decision Memorandum for the Final Determination in the
Countervailing Duty Investigation of Utility Scale Wind Towers from
Malaysia" (June 2, 2021), at 37 (relying on Singapore prices, as facts
available, as the best available benchmark on the record because
Commerce found information is missing from the record due to the
GOM's partial response to Commerce's cost-related questions, but not
considering any potential alternative benchmark source). Commerce
failed to meaningfully address the Turkish alternative Tier Three
benchmark source or explain why the Singapore data was superior.
Therefore, Commerce's selection of Singapore electricity prices as a Tier
Three benchmark is not supported by substantial evidence.

Other than geographic proximity—which is irrelevant to an
electricity Tier 3 benchmark source for the reasons discussed above—

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

Commerce's decision to prefer Singapore prices over Turkish electricity
prices as a Tier Three benchmark source rests solely on its finding that
the record lacked sufficient explanation to allow it to analyze the nature
of the Turkish electricity and/or the pricing mechanisms and
government involvement. Final Decision Memo at 41, Appx____. The
record significantly undermines Commerce's implicit conclusion that
the Singapore electricity data was superior to the Turkish electricity
data.

On the contrary, the record shows that the Singapore data lacked
any information that could allow Commerce to analyze the nature of
government involvement in electricity pricing in Singapore or whether
Singapore's electricity pricing mechanism was similar to that of
Malaysia. The Singapore data contained no explanation of the
electricity tariff setting methodology in Singapore to establish that
those tariffs were more similar to those in Malaysia or that the tariffs
are market-based. *See* Letter from Wiley Rein LLP re: "Utility Scale
Wind Towers from Malaysia: Submission of Benchmark Information"
(Aug. 1, 2023), P.R. 162–168, at Ex. NFI-1, Appx____ ("Pet's BM
Submission") (showing that the Singapore data only contained a tariff

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                    **PUBLIC VERSION**

table and screenshots from the website from which the table was
generated).

Like the Singapore electricity data, the Turkish benchmark source
was accompanied by a summary of Turkish electricity tariff schedules
for industrial users and the actual published tariff schedules reflecting
electricity tariffs for industrial users under the "Medium Voltage" tariff
schedule in effect during the POR. *See* CS Wind BM Submission at Exs.
6, 7, Appx____, Appx____. However, unlike the Singapore data, the
Turkish tariff schedules on the record included an explanation of the
methodology for calculating electricity tariffs in Turkey and the "Cost of
Electricity" section of the Investment Guide published by the
Investment Office of the Presidency of the Republic of Turkey, which
explained the various charges that are reflected in the tariff schedule.
*See Id.* at Ex. 9, Appx____.

Thus, the Turkish electricity had more information to allow
Commerce to evaluate whether its electricity prices were set in
accordance with market principles than the Singapore data. Commerce
did not consider or explain how Singapore electricity data could be
superior to Turkish data despite the fact the record lacked any

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                                    **PUBLIC VERSION**

information concerning Singapore electricity pricing other than a summary of tariff rates.

Therefore, the Court should remand Commerce's selection of a Tier Three electricity benchmark and direct Commerce to select the Malaysian electricity data or otherwise explain why the evidence that detracts from Commerce's selection does not outweigh the information that supports the selection of Singapore electricity data as a Tier Three benchmark source.

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                                        **PUBLIC VERSION**

V.    CONCLUSION

For the reasons set forth above, the *Final Results* issued by

Commerce are contrary to law and are not supported by substantial

evidence. Therefore, Plaintiffs respectfully request that the Court

reverse and remand this case to Commerce with instructions to

recalculate the *ad valorem* subsidy rates for CS Wind in accordance

with the Court's opinion in this action.

Respectfully submitted,

/s/ Kenneth N. Hammer
Jarrod M. Goldfeder
Kenneth N. Hammer
Sezi Erdin

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel to Plaintiffs
CS Wind Malaysia Sdn. Bhd. and CS
Wind Corporation

Dated:    October 30, 2024

# THE UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> WIND TOWER TRADE COALITION, <br><br> Defendant-Intervenor. | Court No. 24-00079 <br><br> Before:    Hon. M. Miller-Baker, Judge |

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Memorandum of Law in Support of Plaintiffs' Motion for Judgment Upon the Agency Record, dated October 30, 2024, complies with the word-count limitation described in the Standard Chambers Procedures. The memorandum of law contains 13,667 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Kenneth N. Hammer
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  October 30, 2024