# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| CS WIND MALAYSIA SDN. BHD. AND CS WIND CORPORATION, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| UNITED STATES, | ) | Court No. 24-00079 |
| Defendant, | ) | |
| and | ) | |
| WIND TOWER TRADE COALITION, | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

Of Counsel:

REGINALD T. BLADES, JR.
Assistant Director

BRIEN STONEBREAKER
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

ISABELLE AUBRUN
Trial Attorney | Commercial Litigation
Branch
U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
202-616-0465 |
isabelle.aubrun2@usodj.gov
*Attorneys for Defendant*

April 18, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

RULE 56.2 STATEMENT ........................................................................ 2

    I.    The Administrative Determination Under Review ............... 2

    II.   Issues Presented For Review ................................................... 2

STATEMENT OF FACTS ........................................................................ 3

    I.    Commerce Initiates An Administrative Review Of
        The Countervailing Duty Order Covering Utility
        Scale Wind Towers From Malaysia ........................................ 3

    II.   Commerce Preliminarily Finds That CS Wind
        Received A Countervailable Subsidy During The
        Period of Review ...................................................................... 4

        A.    Land Benchmark ............................................................ 6

        B.    Electricity Benchmark ................................................... 7

        C.    Licensed Manufacturing Warehouse ........................... 8

    III.  Commerce Issues the Final Results .................................... 9

SUMMARY OF ARGUMENT ............................................................... 15

ARGUMENT ......................................................................................... 18

    I.    Standard Of Review ............................................................... 18

    II.   Commerce Reasonably Countervailed The Full
        Value Of CS Wind's Import Duty Exemption ...................... 19

        A.    The Government of Malaysia Neither Tracked
            CS Wind's Consumption Of Inputs For Which
            It Receives An Exemption Nor Conducted An
            Examination Thereof, As Required By 19
            C.F.R. § 351.519(a)(4) ................................................... 22

        B.    CS Wind's Policy Arguments Have No Bearing
            On Commerce's Consideration Of The Record ........... 27

III.   Commerce Correctly Denied CS Wind An Entered Value Adjustment Because CS Wind Did Not Meet The Criteria ....................................................... 28

    A.   Commerce Correctly Calculated CS Wind's Subsidy Rate Based On The Entered Value Of Its Merchandise, Rather Than On A Mark-Up Of Merchandise Sold through Its Parent Company ..................................................... 30

IV.   Commerce's Selection Of Benchmarks For Less Than Adequate Remuneration for Land And Electricity Are Supported By Substantial Evidence ........... 41

    A.   Land Benchmark ...................................... 43

        1.   Commerce Appropriately Included CBRE Data In Its Land Benchmark Calculation .......... 43

        2.   CS Wind's Arguments Concerning Land Size and Averaging Methodology Are Waived For Failure To Exhaust Administrative Remedies ................................... 49

    B.   Electricity Benchmark ................................ 55

        1.   Commerce Reasonably Selected Singapore's Electricity Rates As A Tier Three Benchmark For Electricity ...................... 55

        2.   CS Wind's Argument That Commerce Should Have Used Turkish Rates Instead Of Malaysian Rates Because Of The Differences In Economic Comparability Between The Two Countries Is Without Merit .................................................... 61

        3.   CS Wind's Challenge To Commerce's Analysis Of Geographic Proximity And Interconnectedness Of The Singaporean And Malaysian Electricity Grids Is Without Merit ..................................... 68

CONCLUSION ..................................................... 71

# TABLE OF AUTHORITIES

## CASES

*ArcelorMittal USA LLC v. United States,*
  337 F. Supp. 3d 1285 (Ct. Int'l Trade 2018) ........................................ 58

*Beijing Tianhai Indus. Co. v. United States,*
  52 F.Supp.3d 1351 (Ct. Int'l Trade 2015) ............................................ 49

*Boomerang Tube, LLC, TMK IP-SCO v. United States,*
  856 F.3d 908 (Fed. Cir. 2017) ......................................................... 50, 52

*Building Sys. De Mex., S.A. de C.V. v. United States,*
  567 F. Supp. 1306 (Ct. Int'l Trade 2022) .............................................. 25

*Canadian Solar Inc. v. United States,*
  537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ......................................... 39

*Canadian Solar, Inc. v. United States,*
  2020 Ct. Int'l, Trade LEXIS 24 (Ct. In'tl Trade 2020) ............. 28, 29, 30

*Cleo Inc. v. United States,*
  501 F.3d 1291 (Fed. Cir. 2007) ............................................................ 19

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) .............................................................................. 18

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) .............................................................................. 19

*Corus Staal BV v. United States,*
  502 F.3d 1370 (Fed. Cir. 2007) ...................................................... 50, 51

*Essar Steel Ltd. v. United States,*
  678 F.3d 1268 (Fed. Cir. 2012) ............................................................ 45

*Gov't of Quebec v. United States,*
  105 F.4th 1359 (Fed. Cir. 2024) ............................................................ 5

*Guizhou Tyre Co., Ltd. v. United States,*
  348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ............................ 21, 22, 27

*HabasSinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States,*
  536 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ............................ 59, 65, 69

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States,*
  651 F. Supp. 3d 1348 (Ct. Int'l Trade 2023) ........................................ 41

*Jiangsu Zhongji Lamination Materials Co. v. United States,*
  405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ............................ 28, 29, 30

*Luoyang Bearing Factory v. United States,*
  240 F. Supp. 2d 1268 (Ct. Int'l Trade 2002) ........................................ 51

*Mittal Steel Point Lisas, Ltd. v. United States,*
  548 F.3d 1375 (Fed. Cir. 2008) ............................................................ 52

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ............................................................ 19

*Nucor Corp. v. United States,*
  286 F. Supp. 3d 1364 (Ct. Int'l Trade 2018) ........................................ 57

*Posco v. United States,*
  977 F.3d 1369 (Fed. Cir. 2020) ............................................................ 42

*Risen Energy Co. v. United States,*
  658 F. Supp. 3d 1364 (Ct. Int'l Trade 2023) ........................................ 41

*Royal Thai Gov't v. United States,*
  436 F.3d 1330 (Fed. Cir. 2006) ............................................................ 27

*United States v. Eurodif S.A.,*
  555 U.S. 305 (2009) .............................................................................. 18

*United States v. L.A. Trucker Truck Lines, Inc.*,
  344 U.S. 33 (1952)..................................................................................52

## STATUTES

19 U.S.C. §1677m(d) ..........................................................................39, 40
19 U.S.C. § 1671(a) .....................................................................................29
19 U.S.C. § 1677(5)(B) ................................................................................25
19 U.S.C. § 1677e(a)(1) ...............................................................................60
28 U.S.C. § 2637(d) .....................................................................................50

## REGULATIONS

19 C.F.R. § 351.511....................................................................................59, 65
19 C.F.R. § 351.511(a) ..............................................................................41, 45
19 C.F.R. § 351.511(a)(2) ....................................................................... passim
19 C.F.R. § 351.511(a)(ii)............................................................................56
19 C.F.R. § 351.519......................................................................19, 20, 23, 25
19 C.F.R. § 351.519(a)(3)............................................................................25
19 C.F.R. § 351.519(a)(4) ....................................................................... passim
19 C.F.R. § 351.525(a)................................................................................29
19 C.F.R. § §351.519(a)(2) .........................................................................46

## FEDERAL REGISTER NOTICES

*Countervailing Duties*,
  63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) .....................57

*Certain Aluminum Foil from the People's Republic of China: Final
Results of Countervailing Duty Administrative Review*,
  88 Fed. Reg. 75,267 (Dep't of Commerce Nov. 2, 2023)........................34

*Laminated Woven Sacks from the People's Republic of China:  Final
Affirmative Countervailing Duty Determination and Final Affirmative
Determination, In Part, of Critical Circumstances*,
  73 Fed. Reg. 35639 (Dep't of Commerce June 24, 2008) ..............49, 67

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
   75 Fed. Reg. 59,212 (Dep't of Commerce Sept, 27, 2010). ............. 11, 31

*Certain Aluminum Foil from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Recission of Review, In Part; 2021,*
   88 Fed. Reg. 28,496 (May 4, 2021) ....................................................... 36

*Narrow Woven Ribbons With Woven Selvedge From Taiwan; Final Results of Antidumping Duty Administrative Review; 2012-2013,*
   80 Fed. Reg. 19,635 (Dep't of Commerce April 13, 2015) .................... 37

*Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,*
   81 Fed. Reg. 49,935 (Dep't of Commerce July 29, 2016) ..................... 58

*Certain Corrosion Inhibitors from the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
   86 Fed. Reg. 7,537 (Dep't of Commerce Jan. 29, 2021) ....................... 63

*Utility Scale Wind Towers from Malaysia: Preliminary Affirmative Countervailing Duty Determination,*
   86 Fed. Reg. 15,887 (Dep't of Commerce March 5, 2021).................... 61

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
   87 Fed. Reg. 61,278 (Dep't of Commerce Oct. 11, 2022)....................... 4

*Utility Scale Wind Towers from Malaysia: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review,*
   88 Fed. Reg. 61,516 (Dep't of Commerce Sept. 2023)........................... 4

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2020,*

88 Fed. Reg. 44,108 (July 11, 2023) ..................................................55

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from thePeople's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, Rescission and Intent To Rescind, in P*art; 2020,
88 Fed. Reg. 1,355 (January 10, 2010)...............................................54

*Laminated Woven Sacks from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part; and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination,*
72 Fed. Reg. 67,893 (Dep't of Commerce Dec. 3, 2007) .....................66

*Wood Mouldings and Millwork Products from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review;2020-2021,*
88 Fed. Reg. 62,319 (September 11, 2023).........................................55

*Utility Scale Wind Towers from Malaysia: Final Results of Countervailing Duty Administrative Review*; 2021,
89 Fed. Reg. 17,404 (Dep't of Commerce Mar. 11, 2024) .................2, 9

Defendant, the United States, respectfully submits this response in opposition to the motion for judgment on the agency record filed by plaintiffs CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation (collectively CS Wind), challenging the final results of the United States Department of Commerce's (Commerce) administrative review of the countervailing duty order covering utility scale wind towers from Malaysia.

In the final results, Commerce made six determinations, four of which CS Wind now challenges.  Relevant to this appeal, Commerce reasonably determined the following: (1) the full value of CS Wind's duty exemptions were countervailable because the government of Malaysia could not confirm which raw inputs were consumed in the production of exported goods, (2) CS Wind was not entitled to an Entered Value Adjustment (EVA) for the period of review because CS Wind's sales to the United States did not meet the necessary six criteria, (3) the Tier One land benchmark was an average of data from two separate datasets, and (4) the Tier Three electricity benchmark was derived from electricity rates in Singapore.  CS Wind's arguments to the contrary are unpersuasive.  Because Commerce's final results are

lawful and supported by substantial evidence, we respectfully request that the Court deny CS Wind's motion and sustain the final results.

RULE 56.2 STATEMENT

I.    The Administrative Determination Under Review

CS Wind challenges *Utility Scale Wind Towers from Malaysia: Final Results of Countervailing Duty Administrative Review*; 2021, 89 Fed. Reg. 17,404 (Dep't of Commerce Mar. 11, 2024) (Final Results) (P.R. 262), Appx____, and accompanying issues and decision memorandum (IDM) (P.R. 260), Appx____.[1]  The administrative review covers the period from March 25, 2021, to December 31, 2021.

II.    Issues Presented For Review

1.    Whether Commerce's decision to calculate countervailable benefits based on the full value of import duty exemptions is supported by substantial evidence and in accordance with law.

2.    Whether Commerce's decision to deny CS Wind's request for an EVA is supported by substantial evidence and in accordance with law.

3.    Whether Commerce's decision to use a simple average of data published by C.B. Richard Ellis (CBRE data) for industrial land in

---

[1] "P.R." and "C.R." refer to documents in the public and confidential records, respectively.

Penang and average industrial land prices in Pahang to calculate the benchmark to measure the adequacy of remuneration of CS Wind's rental of industrial land is supported by substantial evidence and in accordance with law.

4.    Whether Commerce's decision to use electricity tariffs from Singapore to calculate the benchmark to measure the adequacy of remuneration of CS Wind's electricity purchases is supported by substantial evidence and in accordance with law.

STATEMENT OF FACTS

I.    Commerce Initiates An Administrative Review Of The Countervailing Duty Order Covering Utility Scale Wind Towers From Malaysia

In August 2021, Commerce issued a countervailing duty (CVD) order covering utility scale wind towers from Malaysia. *Utility Scale Wind Towers from Malaysia: Countervailing Duty Order*, 86 Fed. Reg. 41,950 (August 4, 2021). The covered merchandise consists of certain wind towers and sections of wind towers of a minimum height of 50 meters. In October 2022, Commerce initiated the first administrative review of this CVD order on utility scale wind towers from Malaysia for the period of review from March 25, 2021, through December 31, 2021.

*See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 61,278, 61,286 (Dep't of Commerce Oct. 11, 2022) (P.R. 11), Appx____.   CS Wind submitted comments on behalf of itself requesting that it be selected as a mandatory respondent.  Letter from Trade Pacific PLLC to Secretary of Commerce Pertaining to CS Wind Respondent Selection CMTS, November 1, 2022 (P.R. 13), Appx____. Commerce found that CS Wind was the only interested party of eleven companies that had entries of subject merchandise during the period of review and therefore selected CS Wind as the sole mandatory respondent.  *See* Countervailing Duty Administrative Review of Utility Scale Wind Towers from Malaysia: Respondent Selection (Nov. 15, 2022) (P.R. 14) at 2, Appx____.

II.   **Commerce Preliminarily Finds That CS Wind Received A <u>Countervailable Subsidy During The Period of Review</u>**

In September 2023, Commerce published its preliminary results, calculating a net countervailable subsidy at a subsidy rate of 10.96 percent *ad valorem*.  *See Utility Scale Wind Towers from Malaysia: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review*, 88 Fed. Reg. 61,516 (Dep't of Commerce Sept. 7, 2023) (Prelim. Results) (P.R. 221), Appx____, and accompanying

Preliminary Decision Memorandum (PDM) (P.R. 215), Appx___.

A countervailable subsidy exists when (1) a foreign governmental authority "provides a 'financial contribution;' (2) a 'benefit' is thereby conferred upon a recipient in connection with the manufacture or export of the subject merchandise; and (3) the subsidy is 'specific' to a foreign enterprise or industry, or a group of such enterprises or industries." *Gov't of Quebec v. United States*, 105 F.4th 1359, 1362 (Fed. Cir. 2024) (citing 19 U.S.C. §§ 1677(5), (5A)).

Applying these elements, Commerce preliminarily determined that CS Wind received a countervailable subsidy.  To calculate CS Wind Malaysia's *ad valorem* subsidy rates, Commerce relied on CS Wind's self-reported free on board sales revenue for its denominator—the sales value of the products.  *See* PDM at 5-6*,* Appx____.  Commerce used CS Wind's reported free on board sales revenue because CS Wind alone was the producer and the first seller of the wind towers that were the subject merchandise.  *Id.* at 5-6, Appx____.[2]

Commerce found that a benefit was conferred to CS Wind because

---

[2]  In an earlier POR when CS Wind Malaysia had a tolling agreement with its parent company, CS Wind Korea, Commerce did not rely on CS Wind's sales values.  *See* PDM at 5-6, Appx____.

the government of Malaysia both leased land and provided electricity to CS Wind for less than adequate remuneration. *Id.* at 6-7, 8-12, Appx___.   In assessing whether goods or services are provided for less than adequate remuneration, Commerce considers, in order of preference, (1) a comparison between the government price and a market-determined price for actual transactions within the country" (a Tier One benchmark), (2) a comparison between the government price and a world market price (a Tier Two benchmark), or (3) if no world market price is available, an assessment whether the government price is consistent with market principles (a Tier Three benchmark). *Id.* at 6, Appx___; 19 CFR § 351.511(a)(2).  To determine the value of government-provided goods that CS Wind received from the government of Malaysia for less than adequate remuneration, Commerce made use of land and electricity benchmarks. *Id.* at 6-7, Appx___.

A. <u>Land Benchmark</u>

To determine the benefit conferred by the rental of land by the government of Malaysia to CS Wind, Commerce used a Tier One benchmark.  Commerce preliminarily determined that although CS

6

Wind proposed a land benchmark from the Malaysia Investment

Development Authority (MIDA) data that contained annual land rental

prices, it did not include any information about the methodology of how

those prices were collected nor whether they were government or

private transactions. *Id.* at 6, Appx___. Therefore, Commerce instead

preliminarily relied on the "Real Estate Market Outlook 2020 Malaysia"

publication from CBRE as a benchmark because that dataset included

purchase prices and lease rates for industrial land in Malaysia during

the period of review. *Id.* To determine whether the land leased to CS

Wind by the Malaysian government authority (specifically the Pahang

State Development Corporation) was for less than adequate

remuneration, Commerce selected a rental price of land in an industrial

zone between two private parties located in Penang, Malaysia as a Tier

One benchmark. *Id.* at 6, 8-9, Appx____.

B.     Electricity Benchmark

To evaluate the benefit conferred by the provision of electricity,

Commerce constructed a Tier Three benchmark analysis of whether the

government of Malaysia provided electricity pricing based on market

principles because CS Wind did not provide sufficient information for

either a Tier One or Tier Two benchmark. *Id.* at 7. However, because the government of Malaysia did not provide Commerce with enough information to determine whether Malaysia's electricity rates result in recovery of costs and sufficient rate of return, Commerce used electricity rates published by the Department of Statistics in Singapore for measuring the adequacy of remuneration for electricity provided under Malaysia's electricity tariffs during the period of review, consistent with 19 C.F.R. § 351.511(a)(2). *Id.* at 7-8, Appx___. Commerce found that this was appropriate because it represents rates for a comparable class/type of electricity consumer and the record indicates that the Singapore rates are market based. *Id.* at 6-8, Appx____.

    C.   <u>Licensed Manufacturing Warehouse</u>

Lastly, Commerce concluded that CS Wind Malaysia received a countervailable benefit under the Licensed Manufacturing Warehouse program for the amount of import duties exempted on raw materials imported by CS Wind. *Id.* at 12-15, Appx___. Commerce explained that duty exemptions provided by a country's government that are used in the production of goods ultimately exported are typically not

countervailable *so long as* those inputs are entirely consumed in production of the exported products and the government in question tracks those inputs. *Id.* at 13; 19 C.F.R. §. 351.519(a)(4). Commerce preliminarily determined that the government of Malaysia did not provide adequate information to substantiate that the Royal Malaysian Customs Department had an established or applied a system to verify which and how many imported inputs are exhausted in the production of exported products. PDM at 12-15, Appx_____.

III.   Commerce Issues the Final Results

After Commerce published its preliminary results, CS Wind submitted responses to two rounds of post-preliminary supplemental questionnaires, petitioner and CS Wind submitted case briefs, and rebuttal briefs. Following a public hearing, Commerce published the final results of its administrative review of the countervailing duty imposed on CS Wind on March 11, 2024. *See Utility Scale Wind Towers from Malaysia: Final Results from Countervailing Duty Administrative Review,* 89 Fed. Reg. 17,404 (Dep't of Commerce March 11, 2024) (Final Results) (P.R. 262), Appx___, and accompanying Issues and Decision Memorandum (IDM), (P.R. 260), Appx_____. In

9

administrative case briefs, CS Wind raised six issues for additional review, only four of which remain in dispute.  *See generally* PDM, Appx\_\_\_; *see generally* CS Wind Admin. Br. (P.R. 252) (C.R. 143). Following its review of the comments submitted by all interested parties, Commerce made certain changes to its Preliminary Results, ultimately calculating an updated, lowered *ad valorem* subsidy rate of 10.72 percent for CS Wind.  *Id.*, Appx\_\_\_.

First, Commerce declined to revisit its determination to deny an EVA to CS Wind.  *Id.* at 5-11, Appx\_\_\_.  Commerce explained that, although its typical practice is to use the free on board sales value reported by a respondent as its denominator, "in limited circumstances, Commerce has adjusted (*via* an EVA) the calculation of the subsidy rate where the sales value used to calculate that subsidy rate does not match the entered value of the subject merchandise."  *Id.* at 9, Appx\_\_\_.  This is appropriate when "the subject merchandise is exported to the United States with a mark-up from an affiliated company, and where the respondent can demonstrate" it meets six

additional criteria.[3]  *Id.*

CS Wind requested that Commerce grant an EVA to account for the mark-up between the export value of the merchandise that CS Wind Malaysia sold to its parent company, CS Wind Korea, and the entered (allegedly marked-up) value of the merchandise that CS Wind Korea then sold to the United States.  *Id.* at 5-7, Appx____.  Commerce, however, declined to adjust the subsidy rate using an EVA because CS Wind did not demonstrate that the required EVA criteria were met. *Id.* at 10-11, Appx____.  Indeed, CS Wind provided information on only two of the four projects on which Commerce requested documentation and the information for the two projects that it provided contained

---

[3]  A respondent seeking an EVA must demonstrate that:  "(1) the price on which the alleged subsidy is based differs from the U.S. invoiced price; (2) the exporters and the party that invoices the customer are affiliated; (3) the U.S. invoice establishes the customs value to which the CVD duties are applied; (4) there is a one-to-one correlation, except for differences in price, between the invoice that reflects the price on which subsidies are received and the invoice with the mark-up that accompanies the shipment; (5) the merchandise is shipped directly to the United States; and (6) the invoices can be tracked as back-to-back invoices that are identical except for price. PDM at 9-10 (citing *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,212 (September 27, 2010), and accompanying IDM at Comment 32), Appx___.

discrepancies[4] between the sales value listed on invoices and entered

value declared on customs forms, failing to demonstrate whether there

was in fact a higher customs value for CS Wind's subject merchandise

during the period of review. *Id.* Commerce therefore left in place its

preliminary determination and declined to find that CS Wind met the

standard for receiving an EVA. IDM at 12, Appx____.

Second, CS Wind contested Commerce's construction of the land

benchmark, arguing that Commerce should rely on the MIDA data as a

benchmark instead of the CBRE data, or in the alternative, should

average the two data sources. IDM at 18, Appx___, citing CS Wind

Admin Br. at 17-21, Appx____. Upon review of CS Wind's

administrative brief and those submitted by other interested parties,

Commerce revised its preliminary determination to instead "average{e}

the rental price for the industrial zone in Penang (from the CBRE data)

with the rental price of industrial land in Pahang (as contained in the

MIDA data)." IDM at 20, Appx____.

---

[4] These discrepancies were not uniform in terms of value or direction, leading Commerce to conclude that the record evidence does not support a finding that U.S. invoice establishes the customs value to which CVD duties are applied. IDM at 11, Appx____.

Third, CS Wind challenged Commerce's reliance on the Singaporean electricity tariff rates as a Tier Three benchmark to determine the extent to which Malaysia's electricity tariffs were based on market principles for purposes of determining the value of the electricity CS Wind purchased during the period of review. IDM. at 36-41, Appx____, citing CS Wind Admin. Br. at 21-26, Appx____. In this review, CS Wind requested that Commerce instead rely on energy market data from Turkey because, CS Wind claimed, Singapore was a more economically developed country than Malaysia whereas Turkey was a more comparable match—which would be reflected in its electricity prices as well. *Id.* Commerce disagreed with CS Wind, however, and determined that Singapore was the appropriate market comparator to Malaysia because their "grids are interconnected, the data represent comparable class/type of electricity consumer, and the record indicates that the Singapore rates are market-based"—all appropriate for a Tier Three benchmark assessment. *Id.* at 40, Appx___. Commerce explained that simply sharing the same level of economic development was insufficient basis upon which to determine a benchmark, especially when CS Wind failed to provide any information

13

about how the Turkish government set its prices or why a market that was entirely disconnected from that of Malaysia was a proper benchmark. *Id* at 40-41, Appx___. Therefore, Commerce determined to continue using Singaporean electricity rates to calculate the electricity for less than adequate remuneration.

Finally, Commerce found that the full value of CS Wind's duty exemptions under this program was countervailable. IDM at 34-36, Appx____. CS Wind argued in its administrative briefs that, in finding that the Licensed Manufacturing Warehouse program was countervailable and that CS Wind received the full value of the duty exemptions, Commerce ignored the nature of CS Wind's operations. *Id.* at 35, Appx____, citing CS Wind Admin. Br. at 13-16, Appx____. On that point, CS Wind claimed that it produces subject merchandise exclusively for export and therefore could not have received duty exemptions on inputs not consumed in production. *Id.* Nevertheless, Commerce upheld its determination that the full value of CS Wind's duty exemptions was countervailable because the government of Malaysia did not demonstrate that it had an independent mechanism for tracking the conversion of raw material inputs into eventual

outputs, as required by 19 C.F.R. § 351.519(a)(4)(i). *Id*. at 35, Appx___.

And, Commerce explained, although the government of Malaysia could have relied on evidence that it conducted examinations during on-site visits, it provided no such evidence. *Id*. at 35-36, Appx___. Indeed, Commerce explained, a company's self-reporting or its own business documents are not enough to demonstrate an effective government tracking system for, or actual examination of, CS Wind's inputs. *Id*. at 35-36, Appx___.

This appeal followed.

<u>SUMMARY OF ARGUMENT</u>

Commerce's final results should be sustained in their entirety.

First, in deciding to countervail the full amount of CS Wind's import duty exemption, Commerce reasonably determined that the government of Malaysia did not provide evidence of either a system for tracking the consumption of exempted inputs in production of the subject merchandise or an inspection to confirm the same, as required by 19 C.F.R. § 351.519(a)(4). CS Wind's attempts to skirt this requirement by instead pointing to its business operations—that it recorded only export sales rather than domestic sales and therefore

simply *could not have* received a benefit—do nothing to address the requirements of the regulation.

Second, Commerce's decision to deny an EVA to CS Wind is entirely consistent with Commerce's past practice to adjust a respondent's subsidy rate only if it has met the six required criteria. Because CS Wind did not provide a Customs Form 7501 for certain sales in the United States, despite Commerce's explanation that it required that information EVA, and because the entered values on the Form 7501 for certain other sales were inconsistent with the corresponding U.S. invoice values, CS Wind failed to establish its entitlement to the requested adjustment. Although CS Wind focuses its argument on operations and information for which the record *does* contain information, this does not fill the gap in showing that CS Wind suffered from a mark-up between its export value to its parent company and the value at which the parent company sold the wind towers to the United States.

Third, Commerce's construction of both land and electricity benchmarks pursuant to 19 C.F.R. § 351.511(a)(2) are reasonable and supported by substantial record evidence. With respect to Commerce's

construction of the Tier One land benchmark, Commerce' reasonably used the CBRE data for a private, land purchase transaction in the state of Penang because the data computation methodology was clear and remained separate from governmental data. The data that CS Wind advocates Commerce should have used at the exclusion of the CBRE data—the MIDA data—does not contain information to allow Commerce to make this same determination. Commerce therefore reasonably averaged, at CS Wind's request, the MIDA data with the CBRE data to construct a better land benchmark. Any argument CS Wind now makes about the rental land parcel size, Commerce's choice to perform an average, and Commerce's methodology in so doing, however, has not been exhausted because CS Wind did not raise those arguments in its case brief in response to Commerce's preliminary findings.

Finally, Commerce reasonably constructed its Tier Three electricity benchmark when it relied on electricity rates from Singapore in the absence of Tier One and Tier Two data. Singapore's geographical proximity to Malaysia, similarity of customer types, and their interconnected electricity grids, as well as the market-based nature of

Singapore's rates, support its use as an appropriate benchmark under 19 C.F.R. § 351.511(a)(2).  The Court should reject CS Wind's claims that Turkey is the better electricity price comparator simply because it has a level of economic development similar to Malaysia; that assertion is insufficient to satisfy the criteria for selecting a benchmark.

ARGUMENT

## I.    <u>Standard Of Review</u>

In reviewing a CVD determination made by Commerce, the Court upholds determinations that are "supported by substantial evidence on the record" and otherwise "in accordance with law{.}" 19 U.S.C. § 1516a(b)(1)(B)(i).  Commerce's factual findings are "conclusive unless unsupported by substantial evidence."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6(2009) (citation omitted).  That is, wherever Commerce's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," that determination is properly grounded in substantial evidence. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Indeed, the possibility of drawing two inconsistent conclusions from evidence upon the record "does not prevent an administrative agency's findings from

18

being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) ("A party challenging the {agency's} determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal.'" (citation and internal quotation marks omitted)).  Nor may Commerce's decision be overturned "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

II.    Commerce Reasonably Countervailed The Full Value Of CS Wind's Import Duty Exemption

    CS Wind challenges Commerce's decision to countervail the full value of CS Wind's exemptions under 19 C.F.R. § 351.519.[5]  CS Wind Br. at 22-34.  CS Wind claims as "irrelevant" whether the government of Malaysia has in place a tracking system of standard input-output norms to determine how inputs are used to produce final exports.  *Id.* Instead, CS Wind argues that because "the record shows that CS Wind Malaysia only recorded *export* sales of finished wind towers during the

_____

[5] This argument responds to Comment 5 in Commerce's Final Results.  IDM at 31-36, Appx___.

{period of review}," Commerce was wrong to determine that the entire exemption conferred a benefit. *Id.* at 31, 22-34 (emphasis in original). But CS Wind incorrectly asks the Court to rely on CS Wind's export sales when, in fact, Commerce reached its determination on this point because the government of Malaysia did not provide evidence that its duty exemption program met the criteria of 19 C.F.R. § 351.519(a)(4)(i).

Undisputed is that "the {Government of Malaysia} provides an exemption of duties and taxes on specified imports;" CS Wind reported as much. PDM at 12, Appx____. The question for Commerce, then, is the value of the remission or drawback of import charges with respect to CS Wind's importation of raw materials. *Id.* at 12-15, Appx___. When a government provides an exemption of import charges, as the government of Malaysia has to CS Wind, "a benefit exists to the extent that the exemption extends to inputs *that are not consumed* in the production of the exported product{.}" 19 C.F.R. § 351.519(a)(1)(ii) (emphasis added). Put another way, if the import duty exemption extends to only inputs that are then consumed in the production of the exported product, those exemptions are not countervailable. *Id.*

Commerce must consider the entire amount of the exemption to be

a countervailable benefit *unless* Commerce determines that the

government of respondent's country satisfactorily confirms the

consumption of those inputs, consistent with the requirements of 19

C.F.R. § 351.519(a)(4).  To do so, Commerce must assure itself that (1)

"the Government in question has in place and applies a system to

confirm which inputs are consumed in the production of the exported

products and in what amounts, and the system is reasonable, effective,

and based on the country of export's commercial practices{,} or (2) if no

such system exists, the Government has carried out an examination of

actual inputs involved to confirm which inputs are consumed in the

exported product's production and in what amounts."  19 C.F.R. §

351.519(a)(4); *see e.g.*, *Guizhou Tyre Co., Ltd. v. United States*, 348 F.

Supp. 3d 1261, 1277-79 (Ct. Int'l Trade 2018).

What matters in this analysis is what the g*overnment* in question

tracks and can confirm to Commerce regarding the consumption of

input materials, not simply practices that the respondent may have or

can be expected to adhere to.  *See Guizhou Tyre Co*, 348 F. Supp. at

1278.  In *Guizhou Tyre Co.*, for example, the Court held that Commerce

reasonably determined that the respondent did not provide a sufficient

21

basis for non-countervailability when the government of China "provided generic responses to Commerce's questions" "and referred generally to the Customs Measures and Processing Trade Goods handbook, while utterly neglecting to provide specific details on *how* the {Government of China} determined the quantity of the {inputs consumed in the production process." *Id.* (emphasis in original)

A.    The Government of Malaysia Neither Tracked CS Wind's Consumption Of Inputs For Which It Receives An Exemption Nor Conducted An Examination Thereof, As Required By 19 C.F.R. § 351.519(a)(4)

Commerce reasonably determined that the full amount of the exemption was a countervailable benefit because the government of Malaysia did not demonstrate that its exemption verification program met the regulatory criteria.  PDM at 12-15, Appx___; IDM at 34-36, Appx___.  Commerce found that the government of Malaysia did not satisfy 19 C.F.R. § 351.519(a)(4) because the government of Malaysia provided no evidence that it either tracked the consumption of inputs subject to its duty exemption program, nor did the government of Malaysia provide any evidence that it performed an examination of the actual inputs to confirm which inputs are consumed in the production of the subject merchandise and in what amounts.  PDM at 13-15, Appx___;

22

IDM at 34-36, Appx\_\_\_.  Indeed, in response to Commerce's initial and supplemental questionnaires asking the government of Malaysia to provide documentation of its tracking system, the government of Malaysia instead explained a general process that exporters themselves must undertake to confirm that their imported inputs are consumed. Government of Malaysia January 10, 2023, Initial Questionnaire at 72-72 (P.R. 32) (C.R. 5), Appx\_\_\_; PDM at 14, Appx\_\_\_\_; 19 C.F.R. §. 351.519(a)(4)(i).  The government of Malaysia likewise provided no evidence that even in the absence of a tracking system, it nevertheless inspected the actual inputs consumed in the production of the exported product following Commerce's request for that information. Government of Malaysia January 10, 2023 Initial Questionnaire at 77. Appx\_\_\_ ; PDM at 15, Appx\_\_\_\_.  Again, the government of Malaysia spoke in only unspecific, abstract terms.  *Id.* ("During on-site inspections, RMCD will refer to the {bill of materials (BOM)} to verify the input-output quantities reported by CS Wind Malaysia…).  The government of Malaysia claimed that it conducted a single inspection but declined to provide the report due to concerns of confidentiality. Government of Malaysia March 28, 2023 Supplemental Questionnaire

at 11 (P.R. 117), Appx____.  In the absence of *any* evidence that the

government of Malaysia could attest to CS Wind's consumption of the

exempted duty inputs in its production, Commerce was constrained to

find, as it did, that the entire amount of the exemption constituted a

countervailable benefit.  IDM at 34-36, Appx___; 19 C.F.R.

§ 351.519(a)(4).

 CS Wind claims that Commerce's determination that the

government of Malaysia's duty exemption program did not meet the

criteria outlined in 19 C.F.R. § 351.519(a)(4) is unreasonable because

"CS Wind Malaysia only recorded export sales {} and did not record *any*

domestic sales during the POR except for a small amount of scrap

sales{.}"  CS Wind Br. at 26.  That is, CS Wind claims that it simply

could not have received any exemptions from the government of

Malaysia because CS Wind used all of its imports of raw materials for

the production of exports.  *Id.* at 26-33.  This argument, however,

entirely disregards the standard outlined by the regulation and

Commerce's review of the *relevant* information contained in the record.

 Contrary to CS Wind's claim that Commerce has conflated its

regulations for how to assess the amount of benefit with the threshold

determination of whether a benefit is conferred at all, CS Wind Br. at 25, 19 C.F.R. § 351.519(a)(4) instructs Commerce to find "the entire amount{…}to *confer* a benefit" notwithstanding 19 C.F.R. § 351.519(a)(3) (emphasis added).  Further, 19 U.S.C. §§ 1677(5)(B) and (E) require only that benefits be conferred to satisfy whether a subsidy is countervailable.  Thus, the regulation, supported by the statute, instructs Commerce to find a benefit to be conferred if the government in question cannot demonstrate that it has met the criteria found in 19 C.F.R. § 351.519 (a)(4).  Plainly, CS Wind has not made a showing that overcomes the presumption in the regulation.  *See e.g.*, *Building Sys. De Mex., S.A. de C.V. v. United States*, 567 F. Supp. 1306, n.14 (Ct. Int'l Trade 2022).

CS Wind entirely misplaces reliance on the value of its export sales, claiming that because CS Wind recorded only export sales during the period of review—and not domestic sales—CS Wind could not have received a benefit from the import duty.  CS Wind Br. at 27-30. Although CS Wind highlights its business records and other evidence of its export operations, these arguments do not address the heart of what the regulation requires from the government of an exporting country—

that "{t}he *Government* in question ha{ve} in place and applies a system

or procedure to confirm which inputs are consumed in the production of

the exported products and in what amounts{.}"  19 C.F.R. §

351.519(a)(4)(i).  Indeed, Commerce cannot take CS Wind's invitation to

simply disregard the absence of pertinent evidence in the record in

favor of looking at CS Wind's business records showing CS Wind

recorded only export sales during the period of review when that runs

directly contrary to the regulation's requirements.  CS Wind Br. at 26-

28; *see* IDM at 35, Appx___.  CS Wind's argument that "{w}hether the

{government of Malaysia} tracks the quantity of raw material inputs

and eventual outputs through the application of standard input-output

norms is irrelevant to determining whether CS Wind Malaysia received

import duty exemptions on inputs not consumed in the production of

export wind towers" is flatly overwritten by the regulation.  CS Wind

Br. 30-31; 19 C.F.R. § 351.519(a)(4).

The Court should not hesitate to find that Commerce reasonably

determined that, in the absence of evidence of a system by the

government of Malaysia to track—either through a system or through

on-site inspections—how raw material inputs are consumed in the

exported product, CS Wind has not satisfied 19 C.F.R. § 351.519(a)(4).

*See e.g.*, *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1339 (Fed.

Cir. 2006); *Guizhou Tyre Co.*, 348 F. Supp. at 1278 ("Commerce {was}

entitled to focus on the {government's} response in light of the fact that

its regulations specifically require{}that the 'g*overnment* in question has

in place and applies' the appropriate procedure{.}" (emphasis in

original)).  It is not enough, as CS Wind has done, to provide

information about how a respondent's sales revenue compares to its

export revenue during the period of review when "the underlying

concern is whether the Government maintains and applies a consistent

procedure{}to confirm the inputs consumed in the production." *Guizhou*

*Tyre Co.*, 348 F. Supp at 1279.  CS Wind offers no authority in rebuttal.

    B.    CS Wind's Policy Arguments Have No Bearing On
               Commerce's Consideration Of The Record

CS Wind's remaining policy arguments on this point are

unpersuasive.  CS Wind attempts to rely on its characterization of the

"policy behind Commerce's practice of verifying a Government's

tracking of input-output norms," claiming that it "is to ensure that the

Government verifies the relationship between the quantities of

imported inputs exempted and the quantities of finished merchandise

27

exported." CS Wind Br. at 31. But this is merely an attempt by CS Wind to circumvent the clear language of 19 C.F.R. § 351.519(a)(4) requiring that, under either (i) or (ii), "the Government in question" confirms that the inputs are fully used in the export process. Because CS Wind does not identify any support in the record that the government of Malaysia complies with the regulatory framework, Commerce's determination is supported by substantial evidence.

Accordingly, the Court should find that Commerce correctly applied 19 C.F.R. § 351.519(a)(4) to find that, because the government of Malaysia did not track the imports consumed in CS Wind's production of wind towers, Commerce correctly countervailed the full value of CS Wind's importation duty exemptions.

III. **Commerce Correctly Denied CS Wind An Entered Value Adjustment Because CS Wind Did Not Meet The Criteria**

Commerce reasonably denied CS Wind an entered value adjustment (EVA)[6] because CS Wind did not demonstrate it met the

---

[6] This is sometimes also referred to as an "Export Value Adjustment." *See Canadian Solar, Inc. v. United States*, 2020 Ct. Int'l Trade LEXIS 24, at *21 & n.12 (2020) (citing *Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2019)).

criteria for that discretionary adjustment.[7]

Typically, Commerce imposes a countervailing duty that totals the amount of the net countervailable subsidy received by a respondent. 19 U.S.C. § 1671(a); *see e.g.*, *Jiangsu Zhongji Lamination*, 405 F. Supp. at 1326. The rate at which a countervailing duty is imposed is calculated by "dividing the amount of the benefit allocated to the period of investigation or review by the sales value during the same period of the product to which {Commerce} attributes the subsidy." 19 C.F.R. § 351.525(a). For a product that is exported, that value is calculated using a respondent's free on board sales value as the denominator. 19 C.F.R. § 351.525(a); *see Jiangsu Zhongji Lamination*, 405 F. Supp. at 1327. In limited circumstances, however, Commerce adjusts the calculation of a subsidy rate when the sales value used to calculate that rate does not match the entered value of the subject merchandise, that is, when the subject merchandise is exported to the United States with a mark-up from an affiliated company. *See* IDM at 9, Appx___; *see e.g.*, *Canadian Solar, Inc. v. United States*, 2020 Ct. Int'l Trade LEXIS 24,

---

[7] This argument responds to Comment 1 in Commerce's Final Results. IDM at 5-11, Appx___.

*21-22 (2020). "When entering the United States, therefore, the mark-up creates a mismatch between the previously calculated subsidy rate and the final invoiced price to which the subsidy rate is applied, resulting in a potential over-collection of duties." *Jiangsu Zhongji Lamination*, 405 F. Supp. at 1328. Commerce has thus "established a practice to adjusting the calculation of the subsidy rate" under such circumstances. *Id.*; *see also Canadian Solar*, 2020 Ct. Int'l Trade LEXIS 24 at 21.

A. Commerce Correctly Calculated CS Wind's Subsidy Rate Based On The Entered Value Of Its Merchandise, Rather Than On A Mark-Up Of Merchandise Sold through Its Parent Company

A respondent will be granted an EVA on their countervailing duty only if it can demonstrate all six of the following: (1) the price on which the alleged subsidy is based differs from the U.S. invoiced price, (2) the exporters and the party that invoices the customer are affiliated, (3) the U.S. invoice establishes the customs value to which the CVD duties are applied, (4) there is a one-to-one correlation, except for differences in price, between the invoice that reflects the price on which subsidies are received and the invoice with the mark-up that accompanies the shipment, (5) the merchandise is shipped directly to the United States,

and (6) the invoices can be tracked as back-to-back invoices that are identical except for price.  IDM at 9-10, Appx___, citing, *e.g.*, *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,212 (Dep't of Commerce Sept. 27, 2010), and accompanying IDM at Comment 32.

Following CS Wind's request for an EVA in response to Commerce's preliminary determination, Commerce sought additional information from CS Wind. IDM at 10, Appx____.  In response, CS Wind explained that it sold its subject merchandise to the United States through its parent company, CS Wind Korea, requesting that "Commerce make an EVA to the calculation of the subsidy rate to account for the mark-up between the export value from Malayasia and the entered value of subject merchandise produced by CS Wind Malaysia entering into the United States." *Id.*, citing Initial Questionnaire (P.R. 61) (C.R. 32), Appx____.  Commerce then issued a supplemental questionnaire requesting, for four projects, (1) the invoice from CS Wind Malaysia to CS Wind Korea, (2) the invoice issued from CS Wind Korea to the United States customer, (3) the bill of lading and

the packing lists, and (4) the Customs Form 7501s. *Id*. at 10, Appx____, citing Supplemental Questionnaire (P.R. 244) (C.R. 140), Appx____.

But Commerce could not determine the customs value to which the CVD duties were applied for two reasons. First, CS Wind did not provide the CBP From 7501 for two of its four projects, nor did it provide alternative customs documentation to establish the entered value of relevant shipments. *Id*. at 10-11, Appx___, citing CS Wind 5th Supplemental Questionnaire Response (P.R. 247) (C.R. 141-2) at S5-1 and S5-2, Appx___ . Second, for the two sales for which CS Wind *did* provide Form 7501, there is "a discrepancy between the sales value listed on the invoices and the total entered value on the CBP 7501s" and "this discrepancy was not uniform in terms of value or direction." *Id*. at 11, citing CS Wind 5th Supplemental Questionnaire Response at S5-1(2) and S5-2(1), Appx___. Because the Form 7501 is necessary to establish criteria number three—whether the United States' invoice establishes the customs value to which CVD duties are applied, in the absence of those forms Commerce did not have enough information to determine the customs value for certain sales. *See Aluminum Foil from China 2021* IDM at Comment 9; *see also* IDM at 11, Appx____.

Nevertheless, CS Wind challenges Commerce's decision to deny it an EVA as unlawful. According to CS Wind, Commerce was wrong to use CS Wind Malaysia's free on board sales value as the denominator in its calculation of the countervailable subsidy rate because that value is actually the "intermediate sales value realized by CS Wind Malaysia's parent company, CS Wind Korea, which resold the subject merchandise{.}" CS Wind Br. at 34. Commerce should have granted CS Wind an EVA, CS Wind claims, because only then would the countervailable subsidy be "based on the import value of sales of subject merchandise *to the United States*." *Id.* (emphasis added).

In support of its argument that Commerce has over-collected duties on the subject merchandise, CS Wind first claims that it satisfied all six of the criteria for an EVA. CS Wind Br. at 36-43. But only criteria number three remains at issue in this review of the administrative determination; therefore, we do not respond to CS Wind's arguments with respect to the remaining five. *See* CS Wind Br. at 38-43. With respect to criteria number three, CS Wind first argues that the "U.S. invoiced price from CS Wind Korea to the unaffiliated U.S. customer establishes the customs value to which CVD duties

applied," pointing to two sets of relevant data reflected on the Form 7501. CS Wind Br. at 40.

Perhaps in recognition that this initial argument was not consistent with Commerce's established practice to grant an EVA, CS Wind next argues that Commerce did not provide notice or explain why CS Wind was required to provide Form 7501s for *all* CS Wind's U.S. sales during the period of review to grant an EVA. CS Wind Br. 43-51. According to CS Wind, a subset of documentation was adequate pursuant to Commerce's recent change in practice. CS Wind Br. at 43-51. CS Wind relies on a segment from the order *Aluminum Foil from China* for support, to argue that "Commerce accepted samples of selected sales instead of requiring Forms 7501 for *every* U.S. sale." *Id.* at 47, citing *Certain Aluminum Foil from the People's Republic of China: Final Results of Countervailing Duty Administrative Review*, 88 Fed. Reg. 75,267 (Dep't of Commerce Nov. 2, 2023), and accompanying IDM at 16-18. That is, CS Wind claims that "Commerce's current methodology for calculating an EVA—by replacing the denominator of the subsidy rate with the total worldwide marked up sales value—does not require it to confirm the sales mark-up on each." *Id.* at 44. Thus,

34

CS Wind requests a remand so Commerce can grant an EVA based on only a *subset* of submitted Form 7501s.

CS Wind's request for a remand is misplaced.  Whether Commerce examines a subset of sales or the entirety of sales with respect to CS Wind, the request for an EVA nonetheless fails.  As explained previously, CS Wind provided Form 7501s for just two of the four sales requested, but even those two Form 7501s had different entered values than the values in the corresponding U.S. invoices.  *See* CS Wind January 3, 2024 Supplemental Questionnaire Response at Exhibits S5-1(2) and S5-2(1), Appx____.  Such discrepancies plainly indicate that criterion three—the U.S. invoice establishes the customs value to which the CVD duties are applied–cannot be met even by examining the subset of Form 7501s provided by CS Wind.  Whether Commerce examines only a subset of CS Wind's sales or the entirety of sales makes no difference in this proceeding because CS Wind failed to provide sufficient evidence to justify granting an EVA even with the subset of documentation that it did provide.

Further, although Commerce agrees that, in theory, depending on the circumstances of a given proceeding (*e.g.*, when the respondent

reports thousands of sales for which an EVA is requested), Commerce could appropriately grant an EVA based on documentation for a subset of sales. Commerce was justified in requiring the respondent to provide documentation for all sales when the transaction was of only four total turbines. *See generally* IDM, Appx___. Commerce appropriately required documentation for each of the four sales in order to reach a substantiated conclusion that the U.S. invoices establish the customs value to which the countervailing duties are applied under these circumstances.

The cases cited by CS Wind do not dictate a different conclusion. The *Aluminum Foil from China 2023* administrative review does not establish a bright line rule as to how much information Commerce may request from a respondent in any given case. Nor does it elaborate what number of sales constitutes an acceptable "subset," nor does CS Wind provide insights into what this number should be. *See Aluminum Foil from China 2023* IDM at 17; *see also Certain Aluminum Foil from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Recission of Review, In Part; 2021*, 88 Fed. Reg. 28,496 (*Aluminum Foil from China Prelim. 2023*), and

36

accompanying PDM at 8-9; *and* CS Wind Br. at 43-51.

Similarly, in the *Aluminum Foil from China 2021* proceeding, although Commerce requested Form 7501s representing a subset of respondent's total sales, Commerce also explained in its preliminary results that the respondent was denied an EVA because it was "unable to provide the CBP Form 7501s for the *majority* of sales in 2017 and 2018." *Aluminum Foil from China Prelim. 2023* PDM at 10 (emphasis added). Neither of these cases established a particular proportion of sales for which Commerce must receive documentation to support an EVA claim, nor would such a brightline figure be appropriate given the nature of the analysis.

In this case, Commerce required the Form 7501s for only four sales. Commerce adopted a case-by-case approach because each proceeding stands on its own and facts may differ from proceeding to proceeding. *See*, *e.g.*, *Narrow Woven Ribbons With Woven Selvedge From Taiwan; Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 19,635 (Dep't of Commerce April 13, 2015), and accompanying IDM at 41 (when Commerce reviewed transaction-specific margins regarding hundreds of US sales of subject

merchandise during the period of review).  And indeed, Commerce had a

specific reason for requesting such supporting documentation, namely,

that the documentation initially proffered by CS Wind contained

discrepancies and, thus, failed to demonstrate that the invoice

established the entered value of the merchandise.  IDM at 11,

Appx____.  In short, granting an EVA is a fact-based determination that

relies on a case-by-case analysis, and in this case, Commerce did not

have enough information from which to determine that CS Wind's

subsidy rate should be adjusted.  Although in other instances when a

respondent could not furnish a Form 7501 the respondent provided

alternative customs documentation, CS Wind did not do so. *See*, *e.g.*,

*Aluminum Foil from China 2023* PDM at 9 (observing that Commerce

may find the new methodology not appropriate in certain

circumstances).  The scope of requested information was limited to four

sales, and the documentation on the record undermines CS Wind's

claim to an EVA by failing to satisfy criterion three.  In this case,

Commerce's request for all four Form 7501s was not unreasonable.

     CS Wind relies on *Canadian Solar Inc. v. United States* for the

proposition that Commerce has a new practice whereby it "does not

required (sic) U.S.-specific sales data," and thus need not confirm mark-ups on *each and every* U.S. sale.  *See* CS Wind Br. at 43, 44, citing *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1397 (Ct. Int'l Trade 2021).  As explained, Commerce may not need all Form 7501s in every instance, depending on the facts and circumstances of a given proceeding, but a satisfactory substitute would be needed because Commerce requires documentation to establish that the EVA criteria are met.  Further, even when Commerce's EVA practice was re-evaluated, Commerce continues to require such documentation.  *See Aluminum Foil from China 2023* IDM at Comment 2 ("We find that {respondent} provided the requested CBP forms, and where it was unable to do so, {respondent} provided a satisfactory substitute as appropriate.").

CS Wind's argument that, if Commerce wished to know more about CS Wind Korea's invoice prices, it should have issued a deficiency notice with an opportunity to remedy pursuant to 19 U.S.C. § 1677m(d) is meritless.  CS Wind Br. at 50-51.  This is beside the point because the focus of this inquiry is on the Form 7501s representing evidence of the customs value and its relationship with the associated invoices for those

39

sales.  And those invoices that CS Wind did provide, as explained above, did not have the same sales value as the information in the Form 7501s. IDM at 10-11, citing CS Wind 5th Supplemental Questionnaire Response at S5-1 and S5-2.  Given the number of transactions at issue, a limited amount of documentation could be relied upon for CS Wind to demonstrate the eligibility of an EVA in the first instance.  Commerce required CS Wind to satisfy the six criteria to receive an EVA, and pursuant to its practice, Commerce requested Form 7501s to satisfy the third criteria.  CS Wind failed to provide that or a sufficient substitute.

Further, to the extent CS Wind argues that Commerce should have provided notice under 19 U.S.C. § 1677m(d) that it needed to submit the remaining two CBP Form 7501s along with an opportunity to remedy, CS Wind's supplemental questionnaire response states that it did not have the information, and, thus, requesting the remaining two Form 7501s, which CS Wind already reported it did not have, would have been futile.  CS Wind 5th Supplemental Questionnaire Response at S5-1 and S5-2, stating "CS Wind Malaysia does not maintain the requested documentation in connection with this project{.}"; *see also Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 651 F.

Supp. 3d 1348, 1368 (Ct. Int'l Trade 2023) ("{E}ven if Commerce allowed another opportunity for Plaintiff to produce the requested information, Plaintiff already stated that it did not keep records{} necessary to demonstrate it was entitled to a{n} offset.").

Accordingly, the Court should reject CS Wind's arguments.

IV.  Commerce's Selection Of Benchmarks For Less Than Adequate Remuneration for Land And Electricity Are Supported By Substantial Evidence

CS Wind also challenges how Commerce measured the benefit that it countervailed on CS Wind's rental of land and receipt of electricity, for which Commerce used a Tier One and Tier Three benchmark, respectively.  CS Wind Br. at 51-62, 62-76.  CS Wind's arguments disregard the precise regulatory requirements that Commerce must—and did—follow in constructing benchmarks under 19 C.F.R. § 351.511(a).

Commerce calculates the financial contribution of a foreign government's provision of goods or services for less than adequate remuneration by identifying appropriate market-determined benchmarks.  19 C.F.R. § 351.511(a)(2); *see e.g.*, *Risen Energy Co. v. United States*, 658 F. Supp. 3d 1364, 1375 (Ct. Int'l Trade 2023)

(detailing the process by which Commerce considers which tier is appropriate for calculating a land benchmark). Commerce's regulation at 19 C.F.R. § 351.511(a)(2) outlines the potential benchmarks upon which Commerce may rely on in order of preference: (Tier One) market prices from actual transactions within the country under investigation (actual sales, actual imports, or competitively-run Government auctions); (Tier Two) world market prices that would be available to consumers in the country under investigation; and (Tier Three) an evaluation of whether the government price is consistent with market principles (tier three). 19 C.F.R. § 351.511(a)(2)(i)-(iii); *see e.g.*, *Posco v. United States*, 977 F.3d 1369, 1372 (Fed. Cir. 2020) (Commerce developed the tiered benchmark system when "the Government is the sole supplier of the good or service in the country or within the area where the respondent is located." (quotation omitted)). When selecting the proper land benchmark, Commerce considers product similarity; the quantity sold, imported, or auctioned; and other factors affecting comparability. 19 C.F.R. § 351.511(a)(2)(i). In this review, Commerce had access to market transactions for land in Malaysia and therefore used a Tier One benchmark. *Id*; PDM at 6, Appx___; IDM at 18-22,

Appx___.  For its electricity benchmark calculations, Commerce had

neither access to a market-determined transaction nor world market

prices and therefore constructed a Tier Three benchmark.  PDM at 6,

10-12, Appx___; IDM at 36-41, Appx___.

    A.    <u>Land Benchmark</u>

        1.    <u>Commerce Appropriately Included CBRE Data In Its Land Benchmark Calculation</u>

First, CS Wind claims that Commerce unreasonably included in

its land benchmark calculations data that was not comparable to the

relevant transaction because it was for the purchase of land instead of

rental of land, and that it was in a different region of Malaysia than the

relevant transaction.  According to CS Wind, Commerce was wrong to

include CBRE data *at all* in its land benchmark calculation.  The Court

should reject this argument because Commerce's construction of the

Tier One land benchmark is supported by substantial evidence.

In its initial decision, Commerce found that, because CS Wind

leased the land from the Pahang State Development Corporation, the

government of Malaysia provided a financial contribution that was

countervailable.  PDM at 9, Appx____.  Commerce therefore calculated

the adequacy of remuneration for this government-provided good

pursuant to 19 C.F.R. § 351.511(a)(2) by "compar{ing} the monthly benchmark price of leased land with the actual price at which CS Wind leased the land from PSDC," then divided the sum of the monthly benefits by CS Wind's total sales during the period of review to determine the countervailable subsidy CS Wind received during that time. *Id.* (citing Memo from Commerce to File Pertaining to Interested Parties Placing Benchmark on the Record, August 31, 2023) (CS Wind Benchmark Memorandum) (P.R. 216) at 64, Appx___. Commerce did this using a benchmark price from an industrial land transaction between private parties from the "Real Estate Market Outlook 2020 Malaysia" publication from CBRE, relying specifically on a private rental transaction from an industrial complex in the state of Penang. *Id*. After CS Wind challenged Commerce's methodology, Commerce adjusted its calculation so that the final land benchmark was instead an average of the CBRE data that Commerce initially used and the price of industrial land in Pahang, as contained in Malaysian Investment Development Authority (MIDA) data, as advocated by CS Wind. CS Wind Admin. Br. at 17-21, Appx___; IDM at 18-22, Appx____.

   As Commerce explained, it selected the CBRE data as a Tier One

benchmark, reflecting a land rental in Penang, "because the rental land was of land roughly comparable in size to CS Wind's piece of land, was land of a similar nature (*i.e.*, industrial), and also reflected a transaction between private parties."  IDM at 20-22, Appx___; PDM at 6, Appx___, citing Commerce Benchmark Memorandum at 64, Appx___.

Commerce's analysis is entirely consistent with the Tier One regulatory mandate that the benchmark be the result of "actual transactions in the country in question," and "consider product similarity" and "other factors affecting comparability," such as size and purpose of the land.  *Id.*; 19 C.F.R. § 351.511(a)(2).  The purpose of the benchmark system is to determine the extent to which the respondent receives a benefit from the government by comparing that government-provided service to a non-governmental transaction.  *See generally* 19 C.F.R. § 351.511(a); *see, e.g., Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012) (concluding that respondent's proposed benchmark was not appropriate because it was of sales controlled by the respondent's government instead of a competitively-run auction).  Demonstrably, the CBRE dataset contains market transactions.  *See generally* Commerce Benchmark Memorandum., Appx___.  Commerce

therefore acted reasonably in relying on that data.

Nevertheless, CS Wind argues that the disparity in land prices between Penang and Pahang renders the CBRE data unusable as a benchmark, claiming that Commerce's choice disregards its obligation to consider "factors affecting comparability" under 19 C.F.R. §351.519(a)(2). CS Wind Br. at 53-54. According to CS Wind, because "the average rental rate for a factory facility located in mainland Penang (*i.e.*, 1.5 Malaysian ringgit) is three times higher than the average rental rate for a factory facility in Pahang (*i.e.*, 0.5 Malaysian ringgit)," Commerce did not correctly account for comparability when it used that data. CS Wind Br. at 54. "{A}n import benchmark's comparability means it must bear a reasonably realistic resemblance to the importing market's reality or it will not be in accordance with the statute." *Risen Energy Co*, 658 F. Supp. at 1378 (internal quotation omitted). For one, the key to a Tier One benchmark calculation is that the comparator dataset be of *market-determined* transactions. 19 C.F.R. § 351.511(a)(2). Commerce was correct to ensure that its chosen data source, the CBRE data, was of market-based transactions. Factors affecting comparability cannot be used to

outweigh the regulation's purpose.  Although CS Wind wants to focus the Court on differences between the land transaction in Penang and the rental of its factory in Pahang to argue that Commerce did not properly consider factors affecting comparability, CS Wind has not met its burden to demonstrate that transactions in that region are market-based.  For example, as one petitioner's briefs explains, Commerce's decision not to rely on transactions in its region was reasonable in part because the region in question "seeks to attract investment through various incentive packages," and therefore the land might be subsidized by the government of Malaysia.  Rebuttal Brief of Wind Tower Trade Coalition, January 23, 2024 at 16  (P.R. 256), Appx____.

   To support its argument that the MIDA would be a more appropriate benchmark, CS Wind argues that in selecting the CBRE data, (1) Commerce unlawfully disregarded the fact that the land prices in Penang are not comparable to those in Pahang state, (2) that Commerce's finding that the Penang parcel is comparable in size is unsubstantiated, and (3) Commerce's averaging of a non-comparable source with a comparable source in a land benchmark calculation is not supported.  CS Wind Br at 55-56.

47

But as Commerce explained in its preliminary decision, the record does not demonstrate that CS Wind's preferred land benchmark from the MIDA data in fact was collected reliably or that the transactions contained therein are private rather than government transactions. PDM at 6, Appx___.  CS Wind's arguments to this Court do not satisfactorily address this shortcoming of the MIDA data; instead, CS Wind merely cites the pricing differences for support.  *See* CS Wind Br. at 54-55.  Although Commerce may consider land pricing differences as a factor affecting comparability, Commerce's regulations require it to use benchmarks derived from market-based transactions, which based on the evidence of this record was certain for only the CBRE price.  19 C.F.R. § 351.511(a)(2).  As a result, Commerce correctly declined to find that the MIDA data were better than the other data on the record.

The CBRE data reflect private land transactions occurring within Malaysia for the period of review, the nature of the land, the location of the plot, and the transacting parties.  PDM at 6, Appx____; IDM at 21, Appx____, citing Benchmark Memo at 60-64, Appx___.  This is also a source that Commerce has relied on for many years and in dozens of proceedings.  *See, e.g., Laminated Woven Sacks from the People's*

48

*Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, In Part, of Critical Circumstances*, 73 Fed. Reg. 35,639 (Dep't of Commerce June 24, 2008), and accompanying IDM at Comment 11.  Thus, Commerce determined that both sources offered usable, albeit imperfect, benchmark prices. *See Beijing Tianhai Indus. Co. v. United States*, 52 F.Supp.3d 1351, 1369 (Ct. Int'l Trade 2015) ("Commerce's averaging of multiple data sets, when available, to obtain a world market price is consistent with not only its regulation but its past practice.").  Under such circumstances, Commerce applied its long-standing practices of relying on average prices in constructing a benchmark.

> 2.    CS Wind's Arguments Concerning Land Size and Averaging Methodology Are Waived For Failure To Exhaust Administrative Remedies

CS Wind argues that Commerce's use of the CBRE data is also inappropriate because of the supposed differences in the size of the rental land.  CS Wind Br. at 55-56.  And CS Wind argues that neither Commerce's regulations nor practice supported averaging a non-comparable source with a comparable source.  *Id.* at 56-60.  Lastly, CS Wind argues that Commerce should not have simple averaged the

CBRE and MIDA data and requests the Court remand for Commerce to further explain its decision. *Id.* at 60-62. However, these arguments have been waived for failure to exhaust administrative remedies and should be rejected.

Congress has directed that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube, LLC, TMK IP-SCO v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (*citing Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). Further, "general policies underlying the exhaustion requirement—protecting administrative agency authority and promoting judicial efficiency"—would be negated if the Court were to consider arguments raised for the first time in judicial proceedings. *Corus Staal*, 502 F.3d at 1379 (internal quotation and citation omitted). For these reasons, the Court should "generally take{} a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Id.* An

exception to the exhaustion requirement is possible only if exhaustion would have been "futile;" the relevant matter is a "pure question of law;" an intervening court decision would affect the agency's action; or a party had no reason to believe the agency would not follow established precedent. *Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1297 n.26 (Ct. Int'l Trade 2002) (citing authorities). None of these exceptions apply.

CS Wind failed to exhaust its administrative remedies by not raising land size as an argument before Commerce. In its administrative briefing, CS Wind does not discuss comparability issues between CBRE and MIDA based on land size. *See* generally CS Wind Adm. Br. at 17-21, Appx____. CS Wind contested only the alleged disparities in land *prices*. At the preliminary stage, all interested parties were made aware of Commerce's choice to rely on the CBRE data and had the opportunity to present arguments prior to the final results. PDM at 6. CS Wind chose to make arguments regarding only the sale price disparity. Now, CS Wind is introducing an additional argument for the first time before this Court that it failed to raise before Commerce at the administrative level.

When an interested party to the administrative proceeding should have been aware that Commerce could use data in a certain way, it is incumbent on the party to raise any objections in their case briefs. *Boomerang Tube*, 856 F.3d at 913; *accord Mittal Steel Point Lisas, Ltd. v. United States*, 548 F.3d 1375, 1383-1384 (Fed. Cir. 2008) (explaining that "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*" (quoting *United States v. L.A. Trucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)) (emphasis added in *Mittal Steel*)).

CS Wind also failed to exhaust its administrative remedies with respect to both arguments that Commerce (1) could not average a "non-comparable" and comparable land benchmark and (2) should not have simple averaged the two benchmarks. In its administrative brief CS Wind argued that, if Commerce continue to use the CBRE data, "{it} should average the industrial facility rental prices on the record in order to drive a benchmark to value adequacy of remuneration for CS Wind's storage facility located in Pahang." CS Wind Adm. Br. at 21, Appx____. That is the totality of CS Wind's discussion of land

benchmark averaging. Commerce agreed with CS Wind's request to average the two benchmarks. IDM at 21-22, Appx____.

CS Wind plainly had notice of the available data on the record and how Commerce had used it. CS Wind suggested averaging the data in the first place. CS Wind's decision to remain silent on precisely how that data would be used forecloses it from now challenging Commerce's chosen methodology, particularly when Commerce chosen methodology is consistent with Commerce's past practice.

Even if CS Wind had not failed to exhaust its argument concerning the averaging of CBRE and MIDA data, the Court should nevertheless reject CS Wind's reasoning. CS Wind argues that neither Commerce's regulations nor practice support averaging a non-comparable source with a comparable source, and that Commerce should have done a weighted, rather than simple, average of the data if it used CBRE data at all. *Id.* at 56-62. These arguments are contrary, however, to CS Wind's explicit request to Commerce that "the Department should average the industrial facility rental prices on the record in order to derive a benchmark to value adequacy of remuneration for CS Wind's storage facility located in Pahang." CS

Wind Admin. Br. at 21.  Now that Commerce has done precisely that,

CS Wind disagrees.  IDM at 21-22, Appx____.

Commerce reasonably recognized that, although the MIDA data
*on its own* was an insufficient benchmark and therefore should not

altogether replace the CBRE data, Commerce nevertheless adopted CS

Wind's suggestion to consider it by averaging it with the CBRE data.

IDM at 20-22, Appx___.  Although the MIDA data does not clearly

indicate whether the prices are private transactions or government

transactions—a key feature for a Tier One analysis—Commerce

nevertheless agreed to rely on it because it has used that data in past

analysis.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not*

*Assembled Into Modules, from the People's Republic of China:*

*Preliminary Results of Countervailing Duty Administrative Review,*

*Rescission and Intent To Rescind, in Part; 2020*, 88 Fed. Reg. 1,355

(January 10, 2023), and accompanying PDM at 13, unchanged in

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into*

*Modules, from the People's Republic of China: Final Results and Partial*

*Rescission of Countervailing Duty Administrative Review; 2020*, 88 Fed.

Reg. 44,108 (July 11, 2023); and *Wood Mouldings and Millwork*

*Products from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 62,319 (September 11, 2023), and accompanying IDM at Comment 17 (relying on such data as a Tier Three benchmark, observing that "{t}he MIDA data respondents submitted represent land prices in 16 different locations throughout Malaysia").  Commerce did so in part in an effort to address CS Wind's concerns about its belief that the CBRE data were an inadequate benchmark.

    B.    <u>Electricity Benchmark</u>

        1.    Commerce Reasonably Selected Singapore's Electricity <u>Rates As A Tier Three Benchmark For Electricity</u>

CS Wind challenges Commerce's decision to use electricity rates from Singapore as a Tier Three benchmark for electricity, rather than rates from Turkey.[8]  CS Wind Br. at 62-76.  Commerce reasonably determined that the record did not contain enough information about the Turkish electricity system, its pricing mechanisms, and the government's involvement in the market.  IDM at 39, 41, Appx____; CS Wind Benchmark Submission at 3 and Exhibit 9, Appx____.  And

---

[8]  This argument responds to Comment 6 in Commerce's Final Results.  IDM at 36-41, Appx___.

Commerce concluded that Singaporean electricity pricing was an appropriate Tier Three electricity benchmark because Malaysia's and Singapore's electricity grids are interconnected, the data represent rates for a comparable class/type of electricity consumer, and Singapore electricity rates are market-based—all consistent with the dictates of 19 C.F.R. § 351.511(a)(2)(iii).

Commerce conducted a Tier Three benchmark analysis. When no market-determined prices are available on the record (19 C.F.R. § 351.511(a)(2)(i)), and no world market prices available to consumers in the country in question (19 C.F.R. § 351.511(a)(ii)), then Commerce must assess how the government sets its prices and whether the price setting mechanism is consistent with market principles. 19 C.F.R. § 351.511(a)(2)(iii). The *CVD Preamble*[9] indicates that Commerce may rely upon a number of factors when calculating a Tier Three benchmark, such as the government's price-setting philosophy, costs (including rate of return sufficient to ensure future operations), and

---

[9] The regulations governing CVD determinations were revised in 2024. However, the final determination at issue in this case is governed by the pre-2024 regulations. *See Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377-65,380 (Dep't Commerce Nov. 25, 1998).

possible price discrimination.  *Nucor Corp. v. United States*, 286 F. Supp. 3d 1364, 1372 (Ct. Int'l Trade 2018).  "Commerce does not prioritize any one factor and may rely on one or more of those factors in a particular case."  *Id.* (internal quotation omitted).

Because Commerce examines a wide variety of goods and services, its analyses are necessarily fact- and circumstance-specific.  As a result, in applying its Tier Three benchmark methodology, Commerce can rely on certain additional factors depending on the nature of the product in question, the circumstances of a given case, or the availability of information.  For example, when constructing a Tier Three benchmark for another kind of utility, natural gas, Commerce considered whether the country under investigation and the country or region from which the benchmark prices are derived had similar pricing mechanisms and whether they were part of the same regional market.  *ArcelorMittal USA LLC v. United States*, 337 F. Supp. 3d 1285 (Ct. Int'l Trade 2018) (*ArcelorMittal*); and *Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't of Commerce July 29, 2016),

and accompanying IDM at Comment 1.

Commerce has also considered geographic proximity of the country under review and the country whose services serve as a benchmark. *See Cold-Rolled Steel from Russia* IDM at Comment 7.  In *Cold-Rolled Steel from Russia*, Commerce determined that countries in the same regional utility market were appropriate Tier Three benchmarks when Commerce concluded, in part based on Russia's connections to Europe and its classification as part of the European regional gas market, that European natural gas pricing was an appropriate natural gas benchmark for Russia. *Id.* In contrast, factors impacting price comparability are irrelevant for a Tier Three benchmark analysis because the Court has determined that, pursuant to 19 C.F.R. § 351.511, price comparability is a relevant consideration for only Tier One and Tier Two benchmark analyses. *Habas Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*, 536 F. Supp. 3d 1333, 1344 (Ct. Int'l Trade 2021).

In this case, Commerce first sought to conduct a Tier One benchmark analysis by "measur{ing} the adequacy of remuneration by comparing the Government price to a market-determined price for the

good or service resulting from actual transactions in the country in question."  19 C.F.R. § 351.511(a)(2).  In the preliminary results, Commerce determined that "there were no usable Malaysian electricity prices on the record (*i.e.*, prices that were not from a state-owned electricity provider)".  *See* PDM at 7-8, 11, Appx___; IDM at 40, Appx____.  As a result, Commerce next attempted to undertake a Tier Two benchmark assessment on world market prices, in accordance with 19 C.F.R. § 351.511(a)(2)(ii).  Commerce determined that "there were no world market prices available to end users in Malaysia," thus a Tier Two benchmark was unavailable.  IDM at 40, Appx____; PDM at 11, Appx____.

Commerce therefore determined—and CS Wind does not contest this determination–to rely on a Tier Three benchmark. 19 C.F.R. § 351.511(a)(2)(iii); PDM at 6-9, 10.  Further, Commerce relied on facts available under 19 U.S.C. §§ 1677e(a)(1), (a)(2)(A), (C), and (D) because the government of Malaysia failed to provide the information necessary for Commerce to determine whether the government of Malaysia's pricing methodology resulted in industrial tariffs that recovered costs and included a fair rate of return.  *See* PDM at 7-8, 11, Appx____.  As a

result, Commerce reasonably selected the Singaporean electricity tariff rates for use as a Tier Three benchmark to calculate the benefit provided because these prices represented the best information on the record. IDM at 40, Appx____; 19 C.F.R. § 351.511(a)(2)(iii).

Commerce correctly considered several factors to determine suitability of Singapore's electricity tariffs for a Tier Three benchmark—geographic proximity and interconnectivity of transmission lines or grids, the class/type of electricity consumer, and the similarity of the pricing mechanisms. PDM at 10-12, Appx___; IDM at 39-41, Appx___. This is consistent with the findings made during the investigation proceedings, when Commerce also used Singaporean electricity tariffs pursuant to facts available. *Id.*, citing *Utility Scale Wind Towers from Malaysia: Preliminary Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 15,887 (Dep't of Commerce March 5, 2021)*,* and accompanying PDM, unchanged in the final determination.

The record evidence supports Commerce's determinations with respect to these factors. For geographical proximity and connectedness, Commerce found that the Malaysia and Singapore grids are interconnected and that the arrangement includes the "interconnection

of the Tenaga Nasional Board grid to the Singapore grid through SP

PowerGrid Ltd (SPPG), as well as the {Tenaga Nasional Board} grid to

the Thailand grid through the Electricity Generating Authority of

Thailand (EGAT)." *Id*. at 41, Appx_____, citing Government of

Malaysia Sec II QR – Narrative (P.R. 32) (C.R. 5) at 56, Appx___ and

government of Malaysia Supplemental Questionnaire Response (P.R.

117) at Exhibit 9, Appx___.  For class/type of electricity consumer,

Commerce cited evidence provided by the petitioner in response to the

government of Malaysia's section II initial questionnaire response.

PDM at 7, Appx____, citing Petitioner's Letter, "Comments and New

Factual Information regarding the {GOM}'s Section II Initial

Questionnaire Response (P.R. 78) (C.R. 53) at Exhibit 1, page 204,

Appx___.  Singapore's electricity tariff rates are also market based and

rely on a similar electricity tariff setting mechanism to Malaysia.  *Id*. at

7, Appx___, and footnote 41, Appx___, citing Government of Malaysia

Sec II QR – Narrative at 25, Appx___.

> 2.  CS Wind's Argument That Commerce Should Have
> Used Turkish Rates Instead Of Malaysian Rates
> Because Of The Differences In Economic Comparability
> Between The Two Countries Is Without Merit

CS Wind claims that Commerce's selection of Singaporean

electricity tariff rates, rather than Turkish rates, as a Tier Three benchmark for electricity is not supported by substantial evidence. Specifically, CS Wind argues that Commerce failed to weigh the relevance of the Turkish electricity market and tariff rates and otherwise failed to explain why the Singapore electricity data were superior if Singapore is at a more advanced level of economic development. CS Wind Br. at 62-76. These arguments are without merit.

CS Wind argues that Commerce's practice is to consider whether a Tier Three external benchmark source is from a country at an economically comparable level of development when evidence of economic comparability is on the record. *Id.* at 63 (citing *Certain Corrosion Inhibitors from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 7,537 (Dep't of Commerce Jan. 29, 2021), and accompanying IDM at 35-36). However, the cases cited concern Commerce's analysis of the provision of *land* for less than adequate remuneration, and as Commerce found in its decision memorandum, CS Wind "provided insufficient evidence demonstrating *why* the level of economic development would be a

similarly relevant consideration when examining electricity." IDM at 40-41, Appx___ (emphasis added). In this proceeding, "CS Wind neither provided evidence to demonstrate that the Singapore and Malaysian electricity frameworks are not comparable, nor {did} it argue that the Singapore electricity tariffs are not market-based." *Id*.

In its briefings, CS Wind cites gross national income information for Malaysia, Singapore, and Turkey from the World Bank's World Development Indicators database to show that Singapore was at a more advanced level of economic development that Malaysia. CS Wind's Br. at 70; CS Wind Admin. Br. at 23-24, at 23-24, Appx____. That evidence does not address Commerce's finding that CS Wind failed to provide sufficient evidence for "why the level of economic development would be a similarly relevant consideration when examining electricity." IDM at 41, Appx____. Commerce explained that "as prescribed in 19 CFR § 351.511(a)(2)(iii), the basis of Commerce's analysis is on how the government sets its prices and whether the mechanism by which it determines its prices is consistent with market principles." IDM at 41, Appx____. Because CS Wind failed to provide evidence that Singaporean electricity framework is not comparable or that it is not

market based, Commerce reasonably determined that there is no basis to conclude that Singaporean electricity tariffs are not suitable for measuring the adequacy of remuneration.  *Id*.

Further, Commerce explained in *Corrosion Inhibitors from China*, on which CS Wind relies, that economic comparability is a relevant factor in Tier Three *land* benchmark analyses.  *See* CS Wind's Br. at 64-71, citing *Corrosion Inhibitors from China* IDM at 35-36.  Although such a consideration of economic development may be necessary with respect to land benchmarks, contrary to its claim that Commerce has departed from its prior practice, CS Wind points to no established practice whereby Commerce considers geographic proximity when calculating *electricity* benchmarks.    This is a meaningful distinction. Contrary to CS Wind's characterization, Commerce did not indicate that it would *not* consider the factor of geographic proximity if CS Wind had shown that differences in economic comparability in some way affect the comparability between the Singaporean and Malaysian electricity rates. Commerce stated that it was unable to consider economic comparability between the Singaporean and Malaysian markets given CS Wind's lack of evidence of the relevance of that factor. It is not Commerce's

responsibility to establish on CS Wind's behalf the causal link between electricity tariff rates and economic development.  IDM at 40-41, Appx____.

As this Court explained in *Habas,* "Commerce is only expressly required by 19 C.F.R. § 351.511 to consider price comparability when conducting a tier-one or tier-two analysis." *Habas*, 536 F.Supp.3d at 1345.  In this case, no Tier One nor Tier Two benchmark was available and, therefore, Commerce conducted a Tier Three analysis—in which a price comparability analysis is *not* required.  CS Wind has conceded that its gross national income analysis concerns price comparability, thus its stance that the price comparability between the Turkish and Singaporean electricity markets is dispositive is directly contrary to this Court's holding in *Habas*.  CS Wind's Br. at 72 ("Turkish electricity tariff rates are the only electricity benchmark rates on the record that reflect *comparable electricity pricing*{.}").

CS Wind also references the antidumping duty surrogate country decision memoranda showing that Turkey is economically comparable to Malaysia.  CS Wind's Br. at 70, citing CS Wind Benchmark Submission (P.R. 178) at Exhibit 10, Appx____.  As Commerce indicated

in *Sacks from China*, the use of one country as a surrogate for another does not mean that Commerce considers that country to be more economically comparable, and antidumping and countervailing proceedings determine economic comparability in disparate ways. *See Laminated Woven Sacks from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part; and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 72 Fed. Reg. 67,893 (Dep't of Commerce Dec. 3, 2007)*, unchanged in Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances,* 73 Fed. Reg. 35,639 (Dep't of Commerce June 24, 2008) (collectively, *Sacks from China*), and accompanying IDM at Comment 11. In *Sacks from China*, Commerce stated that "{t}he selection of a surrogate country requires a different additional step and is not the same as the development of benchmark rates for measuring subsidies." *Id.*

Lastly, CS Wind summarizes the evidence on the record

concerning the Turkish electricity tariff rates with the conclusion that the record supports selecting them over those of Malaysia. CS Wind Br. at 73-76. As Commerce explained, CS Wind "provided a 'general explanation' of electricity tariffs in Turkey, along with the rate schedules, {with} little information that would allow {Commerce}" to analyze the nature of the market and/or the pricing mechanisms and Government involvement." IDM at 41, Appx____, citing CS Wind Benchmark Submission at 3, Appx___, and Exhibit 9, Appx____. Rather, the citations that CS Wind relies on are the Turkish electricity tariff rates themselves, not the pricing mechanisms that Commerce needs to consider in its analysis. *See* CS Wind Benchmark Submission at Exhibit 9, Appx____, discussing formulas to calculate electricity rates. Further, the government of Malaysia has stated on the record that the "IBR{…}mechanism is also implemented by{…}Singapore{.}" Malaysia Sec II QR – Narrative at 25, Appx___. The whole purpose of a Tier Three calculation is to choose a benchmark that has a market-based price setting mechanism. Absent this information on Turkey's electricity market on the record, Commerce reasonably determined Turkey was an inapt benchmark. Nothing CS Wind argues warrants a

different approach, nor does it rebut Commerce's reliance on geographic

proximity and interconnectedness between the Singaporean and

Malaysian electricity grids as relevant factors in this case.  Accordingly,

the Court should reject CS Wind's arguments.

      3.    CS Wind's Challenge To Commerce's Analysis Of
              Geographic Proximity And Interconnectedness Of The
              Singaporean And Malaysian Electricity Grids Is
              Without Merit

CS Wind argues that Commerce failed to explain the relevance of

geographic proximity and interconnectedness to the Singaporean and

Malaysian electricity markets and that the record evidence for these

factors does not outweigh the record evidence for economic

comparability.  CS Wind's Br. at 65-69.  As established above, CS Wind

fails to support its contention that economic development is a factor

that Commerce should consider in its Tier Three benchmark analysis

when examining electricity.  *See* 19 C.F.R. § 351.511(a)(2)(iii); *Habas*,

536 F. Supp. at 1345.  The only remaining factors to weigh with respect

to provision of electricity by utilities, geographic proximity and

interconnectedness, fall in favor of selecting Singapore as a benchmark.

As Commerce explained, "the Malaysia and Singapore grids are

interconnected."  IDM at 41, citing Government of Malaysia Sec II QR –

Narrative at 56, Appx___.  The record indicates that "{Malaysia} is

interconnected with Singapore via two (2) 230kV HVAC submarine

cables with total installed capacity of 1000MW" and that "the Laos-

Thailand-Malaysia-Singapore (LTMS) multilateral power trading is

utilizing the interconnections in Peninsular Malaysia to transfer 100

MW from Laos to Singapore."  GOM Sec II QR – Narrative at 56,

Appx___.  The record also indicates that "this regional arrangement

includes 'the interconnection of the {TNB} grid to the Singapore grid

through SP PowerGrid{…}as well as the TNB grid to the Thailand grid

through the Electricity Generating Authority of Thailand{…}."  IDM at

41, citing Government of Malaysia Supplemental Questionnaire

Response at Exhibit B9, Appx____.  In addition, the Commerce

concluded "{t}he relationship between the Malaysian electricity

market{…and} Singapore{}stands in sharp contrast to the

geographically-separated Turkish electricity market."  *Id.*

Geographic interconnectedness and grid interconnectedness are

both instructive measures in determining a Tier Three benchmark in

this case because CS Wind did not provide information to permit

Commerce to determine whether its electricity prices were based on

market principles.  PDM at 7-8, Appx____.  Because the government of

Malaysia did not provide Commerce with information about its price

setting mechanism, citing confidentiality concerns, Commerce was

required to choose a proxy to determine to set a Tier Three benchmark.

*Id*.  Commerce reasonably selected those two factors for its analysis but,

we explained above, likewise could have considered economic

comparability but for the lack of information on the record about why

this information would be pertinent.  Commerce did not have enough

information to analyze any other factors precisely because CS Wind did

not provide Commerce with information about how its electricity

regulator, Tenaga Nasional Board, set costs.  IDM at 40-41, Appx____.

Although CS Wind attempts to rebut Commerce's reliance on

*Cold-Rolled Steel from Russia* by distinguishing facts, both cases

considered geographic proximity and interconnectedness in the context

of Tier Three benchmark for utility markets.  As for the granular case-

specific facts the facts for each tier-three benchmark construction will

differ, potentially significantly, "as the circumstances of each case vary

widely."  *CVD Preamble*, 63 Fed. Reg. at 65,378.  Regardless of how CS

Wind characterizes this case, it only acts to support Commerce's

conclusions that the electricity markets are within the same geographical proximity and are interconnected. Therefore, given the facts of this specific case and the information available, the use of Singaporean electricity tariffs as a benchmark is appropriate. Accordingly, the Court should reject CS Wind's arguments.

<u>CONCLUSION</u>

For these reasons, the Court should deny CS Wind's motion for judgment on the agency record and sustain Commerce's final results in their entirety.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
Reginald T. Blades, Jr.
Assistant Direction

BRIEN STONEBREAKER                  /s/ Isabelle Aubrun
Attorney                            Isabelle Aubrun
Department of Commerce              U.S. Department of Justice
Office of Chief Counsel for Trade   Commercial Litigation Branch
Enforcement & Compliance            Civil Division
1401 Constitution Avenue, NW        P.O. Box 480
Washington, DC 20005                Ben Franklin Station
                                    Washington, DC 20044
                                    (202) 616-0465
                                    isabelle.aubrun2@usdoj.gov

Dated April 18, 2025                *Attorneys for Defendant, the
                                    United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 13,543 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s/ Isabelle Aubrun</u>

### IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

Before:  The Honorable M. Miller Baker, Judge

|  |  |
|---|---|
| CS WIND MALAYSIA SDN. BHD. AND CS WIND CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant, <br><br> and <br><br> WIND TOWER TRADE COALITION <br><br> Defendant-Intervenor. | Court No. 24-00079 |

## <u>ORDER</u>

Upon consideration of plaintiff's and plaintiff-intervenor's motions for judgment on the agency record, all responses thereto, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is

further

ORDERED that judgment shall enter in favor of the United

States.

**SO ORDERED.**

_____
The Hon. M. Miller Bake, Judge

Dated:_____, 2025
        New York, New York