Ct. No. 24-00079                                    NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr>
<td>

CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION,

                Plaintiffs,

      v.

UNITED STATES,

                Defendant,

     and

WIND TOWER TRADE COALITION

                Defendant-Intervenor.

</td>
<td>

Before: Hon. M. Miller Baker, Judge

Court No. 24-00079

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information Removed from Pages 8-10, 13-16, 22-24

</td>
</tr>
</table>

## <u>RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Alan H. Price, Esq
Robert E. DeFrancesco III, Esq.
Laura El-Sabaawi, Esq.
Derick G. Holt, Esq.
Kimberly A. Reynolds, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Wind Tower Trade Coalition*

Dated: May 22, 2025

Ct. No. 24-00079                          NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................... 1

    A. Issues Presented and Summary of Argument ........................... 1

II. ARGUMENT ...................................................................... 4

    A. Commerce's Determination To Deny CS Wind An EVA Was Lawful And Supported By Substantial Evidence ................................................................. 4

        1. Record Evidence Demonstrates That Plaintiffs Failed The Six-Factor Test And Do Not Qualify For An EVA ......................................... 5

        2. Commerce Provided CS Wind Sufficient Opportunity To Demonstrate That It Met The Criteria To Qualify for An EVA ........................... 17

    B. Commerce's Determination to Countervail The Full Value of CS Wind's Import Duty Exemption Was Lawful and Supported By Substantial Evidence ................................................................. 19

    C. Commerce's Determination to Include CBRE Data In The Land Benchmark Was Lawful and Supported By Substantial Evidence ..................................... 25

    D. Commerce's Determination to Use Singapore Electricity Rates for the Electricity Benchmark Was Lawful and Supported by Substantial Evidence ................................................................. 29

        1. Economic and Price Comparability Are Not Required For A Tier Three Benchmark ...................... 30

        2. Grid Interconnection Is Required When Selecting A Tier Three Benchmark For Utilities .................................................................... 32

III. CONCLUSION .................................................................. 37

Ct. No. 24-00079                                NON-CONFIDENTIAL VERSION

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*ArcelorMittal USA LLC v. United States*,
   337 F. Supp. 3d 1285 (Ct. Int'l Trade 2018)................................. 33, 35

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ............................................................ 11

*INS v. Elias Zacarias*,
   502 U.S. 478 (1992)............................................................................. 10

*Matsushita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984) ........................................................... 10

*Risen Energy Co. v. United States*,
   570 F.Supp. 3d 1369 (Ct Int'l Trade 2022)....................................... 33

*Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*,
   536 F. Supp. 3d 1333 (Ct. Int'l Trade 2021).......................... 31, 32, 33

*Timken Co. v. United States*,
   12 CIT 955, 699 F. Supp. 300 (1988) ................................................. 11

## Regulations

19 C.F.R. 351.511(a)(2)................................................................................ 27

19 C.F.R. 351.519(a)(4)(i)-(ii) ................................................................... 21

19 C.F.R. § 351.511 ..................................................................................... 32

19 C.F.R. § 351.511(a)(2)............................................................................ 27

19 C.F.R. § 351.519 ............................................................................... 19, 20

19 C.F.R. § 351.519(a)(4)................................................................. 20, 22, 25

19 C.F.R. § 351.519(a)(4)(i)-(ii)............................................. 2, 20, 22, 25

## Other Authorities

*Aluminum Foil from the People's Republic of China,*
88 Fed. Reg. 28,496 (Dep't Commerce May 4, 2023) .......................... 15

*Aluminum Foil from the People's Republic of China*,
88 Fed. Reg. 75,267 (Dep't Commerce Nov. 2, 2023) ......................... 15

*Coated Free Sheet Paper from the People's Republic of China*,
72 Fed. Reg. 60,645 (Dep't Commerce Oct. 25, 2007) ......................... 6

*Certain Cold-Rolled Steel Flat Products from the Russian
Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29,
2016) ......................................................................................... 31, 36

*Countervailing Duties*,
63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ...................... 32

*Crystalline Silicon Photovoltaic Cells, Whether or Not
Assembled Into Modules, From Malaysia,* 90 Fed. Reg.
17,384 (Dep't Commerce Apr. 25, 2025) ........................................... 37

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
79 Fed. Reg. 54,963 (Dep't Commerce Sept. 15, 2014) ...................... 35

*Utility Scale Wind Towers from Malaysia*,
89 Fed. Reg. 17,404 (Dep't Commerce Mar. 11, 2024) ......................... 5

NON-CONFIDENTIAL VERSION

## <u>GLOSSARY</u>

**CBRE**

Real Estate Market Outlook 2020 Malaysia Report

**CVD**

Countervailing

**Commerce**

Department of Commerce

**ECER**

East Coast Economic Region

**EVA**

Entered Value Adjustment

**GOM**

Government of Malaysia

**LTAR**

Less than Adequate Remuneration

**LMW**

Licensed Manufacture Warehouse

**MIDA**

Malaysia Investment Development Authority

**Petitioners**

Wind Tower Trade Coalition

**POR**

Period of Review

**TNB**

Ct. No. 24-00079                                    **NON-CONFIDENTIAL VERSION**

Tenaga Nasional Berhad

## I.    Introduction

On behalf of the Wind Tower Trade Coalition ("Petitioner"), we respectfully submit this brief in response to the October 30, 2024 opening brief of CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation ("Plaintiffs"). *See* Pls.' Mem. in Supp. of Rule 56.2 Mot. For J. on the Agency R. (Oct. 30, 2024), ECF No. 26 ("Pls. Op. Br."). We further submit this brief in support of the United States' ("Defendant") response brief. Def.'s Resp. to Pl.'s Rule 56.2 Mot. For J. on the Agency R. (Apr. 18, 2025), ECF No. 36 ("Def. Resp. Br.").

### A.   Issues Presented and Summary of Argument

#### 1.   Whether Commerce's Determination to Deny CS Wind an Entered Value Adjustment ("EVA") Is Supported by Substantial Evidence and Is Otherwise In Accordance with the Law

Yes. In the final results, the Department of Commerce ("Commerce") correctly rejected CS Wind's request for an EVA and continued to allocate countervailable benefits that CS Wind Malaysia received over CS Wind Malaysia's sales in accordance with its normal countervailing duty methodology. Although Commerce may grant an EVA in very limited circumstances, those circumstances are not present here. Specifically, in order to receive an EVA, six specific criteria must

**NON-CONFIDENTIAL VERSION**

be met. The underlying record demonstrates that Plaintiffs did not meet

at least two of those criteria – criterion one, that the price on which the

alleged subsidy is based differs (is marked up) from the U.S. invoiced

price; and criterion three, that the U.S. invoice establishes the customs

value to which countervailing ("CVD") duties are applied.

> **2.    Whether Commerce's Determination to Countervail
> All Of CS Wind's Duty Exemptions Under the
> Licensed Manufacture Warehouse ("LMW")
> Program Is Supported by Substantial Evidence and
> Is Otherwise In Accordance with the Law**

Yes. In the final results, Commerce continued to find that CS

Wind received a countervailable benefit through the LMW program.

Commerce correctly found that since the Government of Malaysia

("GOM") does not maintain an adequate input system as required by 19

C.F.R. § 351.519(a)(4)(i)-(ii), the entire amount of any exemption,

deferral, or remission of drawback is countervailable. Accordingly,

Commerce correctly rejected Plaintiffs' unsupported factual and legal

argument that it could not have benefitted from the program because it

did not have any domestic sales of qualifying inputs during the period of

review ("POR").

NON-CONFIDENTIAL VERSION

### 3. Whether Commerce's Use of A Market-Based Transaction from the Real Estate Market Outlook 2020 Malaysia Report ("CBRE") for the Land Benchmark Is Supported By Substantial Evidence And Is Otherwise In Accordance with the Law

Yes, in the final results, Commerce correctly used a market-based land rental transaction from the CBRE as a part of its land benchmark. Doing so was consistent with Commerce's regulations for using a Tier One benchmark. Plaintiffs point to no evidence indicating that the Malaysia Investment Development Authority ("MIDA") data are anything other than government transactions. The CBRE transaction was thus the only available information that is consistent with Commerce's Tier-one benchmark requirements, and thus must be used in Commerce's benchmark. Moreover, Plaintiffs' claims concerning the size of land between benchmark sources, as well as the averaging methodology used by Commerce must be waived since Plaintiffs did not raise these issues in the underlying review, and thus did not exhaust their remedies at the administrative level.

> **4.  Whether Commerce's Determination to Use
>     Singapore Electricity Rates as a Benchmark to
>     Value Electricity Is Supported By Substantial
>     Evidence and is Otherwise In Accordance with the
>     Law**

Yes, Commerce correctly used Singapore electricity rates as a Tier three benchmark to value electricity. Specifically, consistent with Commerce's practice and as affirmed by the courts, the focus of a Tier three analysis is not on price comparability but on how pricing mechanisms are set. Additionally, for less than adequate remuneration ("LTAR") benchmarks concerning utilities, Commerce's practice is to use benchmarks for countries with connected grids or lines to the country in question. No evidence demonstrates that Turkey's and Malaysia's grids are connected. Moreover, record evidence shows that Singapore has a similar electricity pricing methodology, and the data represent a comparable class or type of electricity and are market based.

## II.    Argument

### A.  Commerce's Determination To Deny CS Wind An EVA Was Lawful And Supported By Substantial Evidence

In the final results, Commerce correctly calculated CS Wind's subsidy rate by allocating countervailable benefits that CS Wind

Malaysia received over CS Wind Malaysia's sales, rather than CS Wind Korea's sales of CS Wind Malaysia's product. *See* Issues and Decision Memorandum accompanying *Utility Scale Wind Towers from Malaysia*, 89 Fed. Reg. 17,404 (Dep't Commerce Mar. 11, 2024) (final results of countervailing duty admin. rev.; 2021) P.R. 260 at 9-11, Appx__ ("Final IDM"). In so doing, Commerce lawfully denied CS Wind an EVA based on substantial evidence. *Id.*

CS Wind makes two main arguments. First, that CS Wind met all six criteria required to receive an EVA despite uncurable deficiencies regarding the third criterion of the six-factor test, and despite that not all of Plaintiffs' sales reflected a mark-up. Pls. Op. Br. at 36-43. And second, that Commerce failed to provide notice or explain why it required Form 7501s for all of CS Wind's sales in order to grant the EVA. *Id.* at 43-51.  For the reasons discussed below and in Defendant's brief, this Court should reject CS Wind's claims.

### 1. Record Evidence Demonstrates That Plaintiffs Failed The Six-Factor Test And Do Not Qualify For An EVA

All parties agree that Commerce will only grant an EVA in limited circumstances. Specifically, in order to be *eligible* for an EVA, the U.S.

sales value of the subject merchandise must reflect a markup from an affiliated company, and the respondent must demonstrate that all of its U.S. sales meet each factor of Commerce's six-factor test. *See e.g., Issues and Decision Memorandum accompanying Coated Free Sheet Paper from the People's Republic of China*, 72 Fed. Reg. 60,645 (Dep't Commerce Oct. 25, 2007) (final affirm. countervailing duty deter.) at cmt. 21*;* (establishing Commerce's six factor test); 537 F.Supp.3d 1380 (Ct. Int'l Trade 2021) (recognizing Commerce's six-factor test); Pls. Op. Br. at 36; Def. Resp. Br. at 30-31. As Defendant detailed, record evidence demonstrates that CS Wind failed to meet the third criterion of Commerce's six factor test and as such was not legally entitled to an EVA.  Def. Resp. Br. at 32; Final IDM at 11, Appx__. That is, CS Wind could not demonstrate that the commercial invoices provided for its U.S. sales establish the customs value to which CVD duties are applied. Def. Resp. Br. at 32; Final IDM at 11, Appx__. Since the party requesting the EVA must meet all six factors in order to be eligible, Commerce correctly determined that CS Wind was not eligible for an EVA by failing to meet criterion three, on its own. Final IDM at 11, Appx__.

NON-CONFIDENTIAL VERSION

And, another basis for Commerce's determination, as Defendant likewise detailed, is that CS Wind fails to meet even the threshold requirement for an EVA. Specifically, CS Wind failed to demonstrate that the price on which the subsidy is based differs from the U.S. invoiced price (and is marked up). Commerce also correctly recognized that record evidence concerning transfer pricing could raise concerns about whether CS Wind's pricing practices could lead to price manipulation and distortion, further limiting Commerce's ability to consider a subset, rather than all four of CS Wind's sales as the basis for an EVA. *Id.*

As detailed by Defendant, Commerce's rationale for denying the EVA was that the commercial documentation provided by CS Wind did not demonstrate that the commercial invoice established the customs value. *Id.* Specifically, there were uncurable discrepancies between the documentation, and Plaintiffs likewise failed to provide the requested Form 7501s or alternative documentation for two of four Plaintiffs' sales. *Id.* That is, the Department had no documentation to determine that each, or any of Plaintiffs' commercial invoices established the value at which CVDs would be assessed. *Id.* It is thus not true, as Plaintiffs

suggests, that Commerce's "stated rationale" for denying the EVA was that Plaintiffs failed to demonstrate a mark-up for every sale. *Id.* As Commerce stated on this matter (criterion one) "other information on the record leads us to conclude that an EVA is not appropriate and, as such, we need not address these issues here." *Id.* Rather, Commerce denied the EVA because Plaintiffs failed to provide the requested Form 7501s for two of its four sales, and critically, the Form 7501s that it did provide did not reconcile with the sales values on the corresponding invoices. *Id.*

We agree with Defendant that Commerce lawfully determined that discrepancies in the commercial documentation provided by Plaintiffs demonstrate that criterion three cannot be met. Def. Resp. Br. at 35. Specifically, the documentation provided by Plaintiffs demonstrate that the U.S. invoice does <u>not</u> establish the customs value to which CVD duties are applied. *Id.* Defendant-Intervenor adds that even Plaintiffs stated, "CS Wind Korea's commercial invoice issued to its unaffiliated U.S. Customer for project # [      ] <u>differed</u> from the value on the Form 7501 by [        ] (i.e., ([

                    ] {and} CS Wind Korea's U.S. invoiced price for project #

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

[     ] <u>differed</u> from the value on the Form 7501 by [         ] (i.e.,

([                                                    ]." Pls. Op. Br. at 49

(citing Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Utility Scale Wind Towers from Malaysia: Fifth Supplemental Questionnaire Response* (Jan. 3, 2024), C.R. 141-142, P.R. 247 at Ex. S5-1(2), Ex. S5-2(1), Appx__, Appx__ ("CS Wind's 5 SQR")) (emphasis added). Accordingly, by CS Wind's own characterization, the customs value reflected on the Form 7501s "differed" from the price on the commercial invoices, which confirms that the commercial invoice does not establish the value at which the product is imported. *Id.* at 50. For the commercial invoice to establish the value at importation, the values on the Form 7501 and commercial invoice must be identical. As detailed above, they are not.

In an attempt to remedy this blatant deficiency, Plaintiffs argue that it was not appropriate for Commerce to focus on the "tiny" observed differences between the values on the documentation, and that such differences were somehow "irrelevant" to evaluating criterion three. *Id.* at 49. This is nonsensical and inconsistent with the legal framework, which requires that the commercial invoice must reflect the value that

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

will be assessed for duties. The Form 7501s submitted by Plaintiffs

confirm that this is not true. Moreover, these amounts are not "tiny"

differences. Rather, the difference for project #[     ] amounts to

$[          ], and the difference for project #[    ] is $[          ]. *See*

CS Wind's 5 SQR at Ex. S5-1(2), Ex. S5-2(1), Appx__, Appx__. As the

Defendant and Commerce explained, this fact, in and of itself

disqualifies CS Wind from an EVA. Final IDM at 11, Appx__.

Further, Plaintiff is essentially asking the Court to reweigh the

evidence.  A plaintiff cannot ask the Court to re-weigh the evidence on

the record and decide the case for Commerce. *See Matsushita Elec.*

*Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984). Factual

findings by Commerce are afforded considerable deference. *See INS v.*

*Elias Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-

intensive situations, agency conclusions should be reversed only if the

record contains evidence "so compelling that no reasonable factfinder"

could reach the same conclusion). Indeed, Commerce is afforded

"tremendous deference," which is "both greater than and distinct from

that accorded the agency in interpreting the statutes it administers"

when Commerce exercises its "technical expertise in identifying,

selecting, and applying the methodologies to implement the dictates set forth in the governing statute." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996). Particularly regarding technical matters, it is not the role of the Court to "weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988). As such, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle*, 463 U.S. at 43 (citation omitted). Commerce explained that the evidence does not support granting an EVA because evidence plainly demonstrates that criterion three is not met.

Criterion three requires that the Commercial invoice must establish the value that customs duties will be assessed. Accordingly, if the commercial invoice in fact establishes the value that CVDs will be assessed, the values on the commercial invoice and the Form 7501 would match. By arguing that the differences between the values on the commercial invoices and Form 7501s are "tiny", Plaintiffs are essentially asking the Court to reweigh the evidence and find that the

11

difference does not matter. To do so, would usurp Commerce's fact-finding authority as well as essentially create an exception for commercial invoices and Form 7501s that do no match. There is no such exception under the EVA legal framework and the Court should not take Plaintiffs' invitation to create one.

Next, Plaintiffs argue that notwithstanding these discrepancies and the missing Form 7501s Commerce's determination was unlawful because Commerce did not provide notice or explain why it required Form 7501s for <u>all</u> of CS Wind's U.S. sales in order to grant an EVA. Pls. Op. Br. at 43-48. As Defendant correctly explains, regardless of whether Commerce properly required CS Wind to provide Form 7501s for all of its sales (*i.e.*, only four sales), rather than a subset of sales, the Form 7501s that Commerce had for the "subset" of sales plainly demonstrate that Plaintiffs fail to meet the third criterion. Moreover, Defendant likewise explains that the cases cited by Plaintiffs do not establish a brightline rule as to whether or not a requestor must provide documentation demonstrating that all, rather than a subset of sales, meet each of the six criteria. Def. Resp. Br. at 34-39.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED    NON-CONFIDENTIAL VERSION

In particular, Plaintiffs argue that Commerce established a new

practice in *Aluminum Foil from China*, where it will grant an EVA

based on documentation for a subset, rather than all sales, and will

decline to use a subset rather than all sales only in cases where there is

evidence of distorted transfer pricing. Pls. Op. Br. at 47-48. But

Commerce recognized that evidence of distorted transfer pricing existed

by acknowledging Defendant-Intervenor's "arguments on the question

of whether CS Wind's pricing pattern provides an avenue for

manipulation of the price/denominator." Final IDM at 11, Appx__. It is

thus incorrect, as Plaintiffs suggest, that Commerce did not highlight

concerns regarding distorted transfer pricing between CS Wind

Malaysia and CS Wind Korea. Pls. Op. Br. at 48.

Indeed, the record contains certain [          ] from Plaintiffs

regarding Plaintiffs' transfer pricing policy generally, but did not tie

any of the transfer pricing rates to specific sales between CS Wind

Korea and CS Wind Malaysia. Letter from Trade Pacific PLLC to Sec'y

Commerce, re: *Utility Scale Wind Towers from Malaysia: Second*

*Supplemental Questionnaire Response* (July 21, 2023), C.R. 100-102,

P.R. 156 at Exhibit S2-4 ("CS Wind's 2 SQR"), Appx__-__. For example,

BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED

"CS Wind Korea and CS Wind Malaysia adjust the transfer price to reflect industry profit levels with an accounting code" in instances where "CS Wind Malaysia's transfer price to CS Wind Korea is below the median rate of profit for the same industry." *Id.* As indicated in the inter-company [        ], the transfer price rates [

], and again, are not tied to specific sales between CS Wind Korea and CS Wind Malaysia. *Id.* Thus, the prices between CS Wind Malaysia and CS Wind Korea could be artificially and inconsistently distorted and manipulated by this policy. Accordingly, the record does not support Commerce relying on Plaintiffs' total sales values in the aggregate, given that transfer pricing can be distorted. *See e.g., Preliminary Decision Memorandum accompanying Aluminum Foil from the People's Republic of China,* 88 Fed. Reg. 28,496 (Dep't Commerce May 4, 2023) (prelim. results of countervailing duty admin. rev. and recission of rev., in part: 2021) at 9 (unchanged in *Issues and Decision Memorandum accompanying Aluminum Foil from the People's Republic of China*, 88 Fed. Reg. 75,267 (Dep't Commerce Nov. 2, 2023) (final results of countervailing duty admin.; 2021) at cmt. 2) (emphasis added).

Moreover, the record likewise contains additional information for why a subset of sales is not appropriate, including that CS Wind also failed the first criterion of the six-factor test. Plaintiffs incorrectly asserted that *all* of CS Wind Malaysia's U.S. sales were first made to its parent company, "CS Wind Korea, which then resold the subject merchandise to unaffiliated customers in the United States *at a higher price* than the revenue recorded by CS Wind Malaysia." Pls. Op. Br. at 37 (citing Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Utility Scale Wind Towers from Malaysia: Section III Questionnaire Response* (Jan. 11, 2023), C.R. 32-51, P.R. 61-70 at III-2-III-3, Ex. II.C.1(a), Appx__-__ ("CS Wind's IQR")). This is [                    ]. The price at which CS Wind Korea sells the wind tower to its customers does not necessarily reflect the true price of the wind towers. For example, CS Wind Malaysia [                         ] on [                    ] for $[                ], and CS Wind Korea resold these same towers at a [     ] for only [              ] to its ultimate customer. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Comments and New Factual Information regarding CS Wind Malaysia's Section III Initial Questionnaire Response* (Jan. 23, 2023), C.R. 52, P.R.

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

75 at 14, Appx__. Accordingly, this specific sale was [                    ]

during the POR. Given that CS Wind has failed to adequately explain

its [                         ], CS Wind Korea can manipulate the price to

the ultimate customer such that it does not reflect the true FOB sales

value of the customer. Indeed, for this sale, CS Wind conceded that it

[            ] the price of wind towers to this unaffiliated customer [

                          ], which would have had the effect of [            ]

the subsidy margin. *See* CS Wind's 2 SQR at S2-10, Appx__. Other sales

were also provided at a [


                                                              ].

*See* CS Wind's IQR at Exhibit II.C.1, Exhibit II.C.2, Appx__.

    Plaintiffs attempt to brush past this by averaging the total

invoiced value of subject merchandise exported to the United States

during the POR to show an average mark-up. Pls. Op. Br. at 39.

However, record evidence demonstrates that Plaintiffs sold wind towers

at a [      ] during the POR. Likewise, Plaintiffs were not forthcoming

about its transfer pricing and have admitted to [            ] prices of wind

towers during the POR. Accordingly, Commerce could not have relied on CS Wind's sales value in the aggregate.

> **2.  Commerce Provided CS Wind Sufficient Opportunity To Demonstrate That It Met The Criteria To Qualify for An EVA**

We further agree with Defendant that regardless of whether Commerce requested additional information from Plaintiffs in relation to the differences in values between commercial documentation, the flaws in the documentation could not be cured. Def. Resp. Br. at 39-41. Or stated differently, the documentation provided by Plaintiffs plainly demonstrates that the commercial invoice does not establish the value that will be assessed for CVDs, and thus, the third criterion cannot be met, because the facts simply do not exist. That is, unless Plaintiffs were going to generate new Form 7501s and commercial invoices and replace the ones already on the record, there was nothing to cure. Moreover, with regard to the missing Form 7501s, Defendant explained that Plaintiffs actually stated that they could not provide the missing forms, and in any event did not offer alternative documentation to demonstrate that criterion three was otherwise met. *Id.* at 39-41.

NON-CONFIDENTIAL VERSION

Defendant-Intervenor adds that as an experienced respondent and the requestor of the EVA, Plaintiffs were well aware of the evidentiary and documentary requirements needed to qualify for such an adjustment.  And indeed, Commerce's request was clear. For example, Plaintiffs set forth an argument for all six of the factors in its questionnaire response, and provided some supporting documentation. CS Wind's IQR at III-11 - III-21, Appx__-__. In a supplemental questionnaire, Commerce notified Plaintiffs that the record did not contain the necessary information for Commerce to consider an EVA, and requested the necessary information from Plaintiffs. *See generally*, CS Wind's 5 SQR, Appx__. Accordingly, Commerce properly notified Plaintiffs of the deficiency, and provided Plaintiffs an opportunity to remedy the deficiency. That Plaintiffs did not do so in no way undermines Commerce's determination to deny Plaintiffs the EVA. The Court should uphold Commerce's determination to deny Plaintiffs an EVA as lawful and supported by substantial evidence.

**B.  Commerce's Determination to Countervail The Full Value of CS Wind's Import Duty Exemption Was Lawful and Supported By Substantial Evidence**

In the final results, Commerce correctly countervailed the full value of CS Wind's import duty exemption. *See* Final IDM at 34-36, Appx__; 19 C.F.R. § 351.519. Given that the GOM failed to demonstrate that it maintains adequate input tracking procedures to ensure that processed raw materials are traced through the production process, as contemplated by 19 C.F.R. § 351.519(a)(4)(i)-(ii), Commerce was required to countervail the full value of CS Wind's duty exemptions pursuant to 19 C.F.R. § 351.519(a)(4).  Final IDM at 31, 34, Appx_; Def. Resp. Br. at 20-21. Plaintiffs do not appear to dispute this fact.  Rather, Plaintiffs rest their entire argument on the sole fact that because it recorded only export sales during the POR, it was unreasonable for Commerce to countervail the full value of CS Wind's import duty exemption. Def. Resp. Br. at 19-20.  For the reasons detailed in Defendant's brief and below, this argument fails.

In an attempt to avoid CVD liability under this program, Plaintiffs set forth a legally misguided and factually unsupported argument that it could not have received duty exemptions on inputs not

consumed in the production of subject merchandise because CS Wind only recorded export sales during the POR.  Pls. Op. Br. at 22-34. The basis of CS Wind's argument is that (1) a benefit under an import exemption for export program can only be assessed when a company imports excess inputs and sells those inputs domestically, and (2) that whether the GOM maintains a tracking system consistent with 19 C.F.R. § 351.519 is "irrelevant." *Id.* at 27, 30-31.  This is simply wrong and misunderstands the purpose and function of Commerce's regulations, which speak to the importance of a government having an effective and reliable system in place.

As detailed by Defendant, despite numerous attempts to obtain information from the GOM, the GOM failed to provide information to demonstrate that it had a tracking system in place that would meet the requirements of 19 C.F.R. 351.519(a)(4)(i)-(ii). Def. Resp. Br. at 22-23 (citing Issues and Decision Memorandum accompanying *Utility Scale Wind Towers from China*, 88 Fed. Reg. 61,516 (Dep't Commerce Sept. 7, 2023) (prelim. results and partial rescission of countervailing duty admin. rev., 2021), P.R. 215 at 13-15, Appx__ ("PDM") and Final IDM at 34-36, Appx__). Accordingly, Commerce was "constrained to find {. . . .}

that the entire amount of the exemption constituted a countervailable benefit." Def. Resp. Br. at 24 (citing Final IDM at 34-36, Appx__; 19 C.F.R. § 351.519(a)(4)). Commerce was thus bound by the standard in its regulations, which required it to countervail the entire amount of the import exemptions Plaintiffs received during the POR.

Likewise, contrary to Plaintiffs' arguments, Commerce's findings are consistent with the purpose of Commerce's regulations. That is, without the ability to track what is or what is not consumed, Commerce cannot confidently or accurately measure actual consumption, and thereby cannot measure a benefit. As detailed in the Defendant's brief, Commerce found, and the record demonstrates that the GOM does not have a system in place "to confirm which inputs are consumed in the production of exported products and in what amounts," nor has it "'carried out an examination of actual inputs involved to confirm which inputs are considered in the production of the exported product, and in what amounts.'" Def. Resp. Br. at 22-23 (citing PDM at 13-15, Appx__ and Final IDM at 34-36, Appx__); 19 C.F.R. § 351.519(a)(4)(i)-(ii).

Defendant-Intervenor agrees with Defendant that consistent with Commerce's regulations and court precedent, in absence of a system by

the GOM that tracks how raw materials are consumed in an exported product, Plaintiffs themselves cannot satisfy 19 C.F.R. § 351.519(a)(4). Def. Resp. Br. at 26-27 (*citing Royal Thai Gov't v. United States*, 436 F.3d 1330, 1339 (Fed. Cir. 2006); *Guizhou Tyre Co., Ltd. v. Tiajin United Tire and Rubber Int'l Co., Ltd.*, 348 F. Supp. 1261, 1278 (Ct. Int'l Trade 2018)). Defendant-Intervenor also adds that in any event, Plaintiffs did not provide evidence demonstrating that it indeed consumed all of the inputs that it imported during the POR that are subject to this program. As Commerce explained, its "countervailing of the import duty exemptions under this program was based on the date of importation for the raw materials in question" whereas CS Wind's financial statements reference "sales of merchandise and scrap that were booked during the POR." Final IDM at 36, Appx__.  Therefore, as Commerce explained, there is an imperfect overlap between the period for the duty-exempt imports, and the presumed export sales. *Id.*

For example, the [          ] of CS Wind's [          ] suggests that certain [                                   ] that were imported during the POR, [                              ] during the POR. *See* CS Wind's IQR at Exhibit III.C.2(a), Appx__; Letter from

Trade Pacific PLLC to Sec'y Commerce, re: *Utility Scale Wind Towers
from Malaysia: Supplemental Questionnaire Response* (Feb. 24, 2023),
C.R. 81-82, P.R. 110 at Exhibit S-11(a), Appx__ ("CS Wind's SQR").
Specifically, the Import Tariff and VAT Exemptions Template in
Exhibit III.C.2(a) of CS Wind's IQR, shows that the last reported entry
date for [                            ], for a total amount of [
      ]. *See* CS Wind's IQR at Exhibit III.C.2(a), Appx__.  On the
other hand, CS Wind's last POR sale had an on board date of [
      ]. *See* CS Wind's SQR at Exhibit S-11(a), Appx__. It seems
[              ] that CS Wind utilized [          ] that it [
      ] to [                                    ] later.
Rather, it seems more likely that CS Wind imported that [          ]
during [                          ] in a sale that was exported
[                  ].  As Commerce explained, raw materials imported
towards the end of the POR were unlikely incorporated into subject
merchandise that was sold or booked before the end of the calendar
year, and therefore their time of incorporation/use could not be
established based on sales and accounting records. *See* Final IDM at 36,
Appx__. This is further supported by the fact that CS Wind shutdown

its Malaysia manufacturing facility in early 2022, which begs the question of whether these [                    ] were consumed for export, or sold domestically. *See* CS Wind's 2 SQR at S2-3 to S2-4, Appx__.

Plaintiffs argue that this is irrelevant to Commerce's regulatory framework, which it argues considers the benefit to be "excess duty exemptions on imported inputs not incorporated into finished goods". Pls. Op. Br. at 32. However, Plaintiffs misunderstand the relevance of this argument. To the contrary, evidence suggesting that inputs were not consumed in the POR demonstrates that CS Wind's export sales information "does not substitute for the requirements imposed by 19 C.F.R. § 351.519(a)(4)(i)-(ii)." Final IDM at 36, Appx__.

Accordingly, since record evidence demonstrates GOM lacked the necessary tracking system required by 19 C.F.R. § 351.519(a)(4), Commerce reasonably calculated the full value of CS Wind's duty exemption. The Court should uphold Commerce's determination to calculate the full value of CS Wind's duty exemption as lawful and supported by substantial evidence.

### C. Commerce's Determination to Include CBRE Data In The Land Benchmark Was Lawful and Supported By Substantial Evidence

In the final results, Commerce correctly included CBRE data in its benchmark when calculating the benefit Plaintiffs received for the land lease from the GOM.  inal IDM at 20-22, Appx__. On appeal, despite requesting that Commerce average the CBRE and MIDA data as a basis for a land benchmark in the preliminary results, Plaintiffs now oppose Commerce's determination to average these data. *See* Pls. Op. Br. at 51-62; Final IDM at 20-22, Appx__.

Specifically, Plaintiffs now argue that averaging the CBRE data with the MIDA data was unlawful for four primary reasons. Specifically, that (1) the CBRE data consisted of a single rental transaction from a different region than the region where the actual lease at issue took place; (2) the price per square foot of land between Penang (where the CBRE transaction took place) was higher than the average rental rate in Pahang (where CS Wind's lease is located); (3) the size of the land parcel from the CBRE transaction was not comparable to the size of the land rented by CS Wind; and (4) that Commerce's regulations do not support "averaging" comparable and non

comparable sources when constructing a benchmark (despite Plaintiffs' request in the preliminary results to do so). Pls. Op. Br. at 53-56.

As an initial matter, Defendant-Intervenor agrees with Defendant that CS Wind's arguments concerning the land size and averaging methodology (points three and four above) are waived because Plaintiffs failed to raise them in the administrative review. Def. Resp. Br. at 49-55. Defendant-Intervenor thus agrees with and incorporates by reference the Defendant's arguments as they relate to exhaustion, and will not repeat these arguments here.

On the remaining arguments, Defendant-Intervenor agrees with Defendant that Commerce appropriately included the CBRE transaction in its land benchmark, particularly given that it was the only benchmark on the record that was market-based. Def. Resp. Br. at 46-49. Defendant-Intervenor likewise agrees that when using a Tier One benchmark, Commerce's regulations require Commerce to use market-based transactions. *Id.* at 48; 19 C.F.R.  351.511(a)(2). While Commerce can consider "factors affecting comparability", such factors cannot be used to outweigh the fact that market-based transactions must be used for a Tier One benchmark. 19 C.F.R. § 351.511(a)(2); *see*

*e.g.*, Def. Resp. Br. at 46-47. To further support Commerce's determination to include the CBRE transaction in its land benchmark, Defendant-Intervenor adds and emphasizes the following points regarding the location and price differences between the CBRE transaction and CS Wind's land lease.

In regard to location, Plaintiffs' focus on the different regions (Pahang and Penang) where the leases took place, is misplaced. Specifically, the regulations call for Tier one benchmarks to be based on transaction in the <u>country</u> in question, <u>not the region</u>.  19 C.F.R. § 351.511(a)(4)(i). And, in regard to price, as Plaintiffs raised in the underlying administrative review, the East Coast Economic Region ("ECER") which includes Pahang, is a region "that seeks to attract investment through various incentive packages." Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Utility Scale Wind Towers from Malaysia: CS Wind's Case Brief* (Jan. 16, 2024), C.R. 143, P.R. 252 at 20, Appx__. Thus, it is not surprising that the cost of land in the ECER is lower than that in Penang, given that the GOM offers incentives for that region, and thus the land could be subsidized by the GOM.

Finally, Defendant-Intervenor likewise agrees with Defendant that notwithstanding the issue of exhaustion concerning the averaging methodology used by Commerce when calculating the land benchmark, evidence does not demonstrate that the MIDA data are market-based. Def. Resp. Br. at 54. Accordingly, MIDA data on their own would be inappropriate as a Tier One land benchmark. *Id.*; Final IDM at 20-22, Appx__. For example, the documentation accompanying the MIDA data contains no supporting sources for where the rental information is derived. Indeed, the data is contained in a publication from MIDA, "the Government's principal investment promotion and development agency under the Ministry of International Trade and Industry (MITI) to oversee and drive investments into the manufacturing and services sectors in Malaysia." Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Utility Scale Wind Towers from Malaysia: Benchmark Submission* (Aug. 1, 2023), P.R. 160 at Exhibit 1, p. 2, Appx__. The report is thus inherently bias towards attracting business to Malaysia, which could include presenting pricing data from government transactions that are lower-priced and which do not reflect market-based transactions.

Commerce's determination to include the CBRE transaction in its
land benchmark was thus lawful and supported by substantial
evidence. The Court should uphold Commerce's determination to
include the CBRE transaction in the land benchmark, and decline to
consider Plaintiffs' claims on land size and the averaging methodology
consistent with the exhaustion doctrine.

### D. Commerce's Determination to Use Singapore Electricity Rates for the Electricity Benchmark Was Lawful and Supported by Substantial Evidence

In the final results, Commerce correctly used electricity rates from
Singapore as the benchmark to value electricity. As detailed by
Defendant, Commerce's determination was lawful and supported by
substantial evidence, as the Singapore rates were market based,
reflected the same class or type of electricity user as CS Wind, reflected
similar pricing mechanisms to Tenaga Nasional Berhad ("TNB"), and
critically, that Singapore and Malaysia are interconnected through
transmission lines. Def. Resp. Br. at 60-61; PDM at 10-12, Appx__;
Final IDM at 39-41, Appx__.  We agree. For the reasons detailed in
Defendant's brief, and as further supported below, the Court should

uphold Commerce's determination to use Singapore electricity rates as the electricity benchmark as supported by substantial evidence.

Plaintiffs argue that Commerce's determination to use Singapore rates are not supported by substantial evidence for two primary reasons. Pls. Op. Br. at 62-76. First, that Singapore "is at a grossly disparate level of economic development" and thus does not have pricing comparable to Malaysia. *Id.* at 3. And, second, that Commerce did not "meaningfully" address the Turkish alternative on for Tier Three benchmark, and thus Commerce's determination was not support by substantial evidence. As detailed by Defendant and further below, Plaintiffs' arguments are both legally and factually flawed.

### 1. Economic and Price Comparability Are Not Required For A Tier Three Benchmark

Contrary to Plaintiffs' assertions, when undertaking a Tier three analysis, "the Department is no longer solely examining prices, but {is} assessing how the government sets it prices and whether the mechanism by which it determines its prices is consistent with market principles." Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed.

Reg. 49,935 (Dep't Commerce July 29, 2016) (final affirmative countervailing duty deter. and final negative critical circumstances deter.) at 17-18 ("Cold Rolled Steel Russia IDM"). As noted by this Court in *Habaş*, unlike in a Tier-one or Tier-two analysis, where the Department is required to consider "factors affecting comparability" the Department is not required to consider factors affecting *price* comparability in a Tier three analysis. *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*, 536 F. Supp. 3d 1333, 1345 (Ct. Int'l Trade 2021) ("there is no clear regulatory requirement that Commerce consider {. . . .} 'factors affecting comparability,' as in a tier-one analysis, or '{make} due allowance for factors affecting comparability,' as in a tier-two analysis, for purposes of its tier-three analysis") (citing 19 C.F.R. § 351.511(a)(2)(i)-(ii)). This Court instead recognized that "Commerce is only expressly required by 19 C.F.R. § 351.511 to consider price comparability when conducting a tier-one or tier-two analysis." *Id*. Such is not the case here.

Pursuant to the CVD Preamble, Commerce considers "such factors as the government's price-setting philosophy, costs {. . . .} or possible price discrimination." *Countervailing Duties*, 63 Fed. Reg. 65,348,

Ct. No. 24-00079                                  NON-CONFIDENTIAL VERSION

65,378 (Dep't Commerce Nov. 25, 1998) ("CVD Preamble"). As the

countervailing duty Preamble makes clear, "{t}hese factors are not

hierarchical in application, and Commerce may rely on one or more

factors to calculate a tier-three benchmark in any particular case."

*Habaş Sinai*, 536 F. Supp. 3d at 1337 (citing CVD Preamble).

### 2. Grid Interconnection Is Required When Selecting A Tier Three Benchmark For Utilities

Additionally, and as completely disregarded by Plaintiffs, when

constructing a Tier three benchmark for *utilities*, Commerce has

considered whether the country in question and country or region for

which the surrogate prices are derived are "interconnected."

*ArcelorMittal USA LLC v. United States*, 337 F. Supp. 3d 1285, 1296

(Ct. Int'l Trade 2018); *see also*, Cold Rolled Steel Russia IDM 18.  The

focus when constructing a Tier three benchmark for a utility LTAR is

whether the pricing mechanisms are similar and whether the

benchmark country and the country in question share a transmission

line or grid. *Habaş Sinai*, 536 F. Supp. 3d at 1345. This is unlike a Tier

one or two analysis, where the focus is solely on examining price and

thus whether the benchmark country is of a similar economic status as

the country in question is relevant.

In this regard, Plaintiffs' reliance on *Risen Energy Co., Ltd. v. United States* is misplaced. Pls. Op. Br. at 71. Specifically, and as likewise addressed by Defendant, the underlying issue in *Risen Energy* involved that of a land benchmark, not a utility benchmark. *Risen Energy Co. v. United States*, 570 F.Supp. 3d 1369, 1376 (Ct Int'l Trade 2022); Def. Resp. Br. at 64. Because this is an LTAR analysis involving a utility that is transmitted and consumed on a grid, the appropriate benchmark country would <u>only</u> be one that is interconnected. *See e.g.*, Cold Rolled Steel Russia IDM at 18. In this case, the only benchmark information available on the record that meet these criteria is the Singapore data. Final IDM at 40-41, Appx__.

Plaintiffs likewise do not point to any evidence, because they cannot, that Turkey's and Malaysia's electricity grids are somehow interconnected and are a part of the same market. Instead, Plaintiffs attempt to distract from this shortcoming in the Turkish data by suggesting that physical interconnectedness, when selecting a benchmark for utilities, is not necessary in the Department's analysis. Pls. Op. Br. at 65-71. However, this is patently untrue based on Commerce's practice alone.

Specifically, Plaintiffs suggest that the Department's finding in *Cold-Rolled Steel from Russia* did not consider interconnectivity. Pls. Op. Br. at 66-68. However, in *Cold-Rolled Steel from Russia*, the Department cited to the interconnectedness of Russia to European pipelines as evidence of Russia being a part of the regional European market. *Cold Rolled Steel Russia* IDM at cmt 7 ("Russia is part of the European gas market" and "Gazprom acknowledges the company's interconnectivity with Europe."). Indeed, *ArcelorMittal USA LLC*, the Court affirmed that in the underlying *Cold Rolled Steel from Russia* proceeding the Department used regional European gas prices as the Tier three benchmark because "Russia is part of the European gas market, the two markets are interconnected, and 'regional European prices are market-determined in the regional market to which Russia belongs.'" *See ArcelorMittal USA*, 337 F. Supp. 3d at 1296.

Interconnectedness is indicative of a country being able to participate in, and thus be a part of a regional market. For example, in *Steel Concrete Reinforcing Bar from the Republic of Turkey*, the Department explained that it was rejecting U.S. prices as a benchmark for a natural gas program in Turkey because they would not be

available to purchasers in Turkey, whereas Russian and European

pricing would be "*potentially* available to purchasers in Turkey" because

the pipelines in Europe and Russia are interconnected. Issues and

Decision Memorandum accompanying *Steel Concrete Reinforcing Bar*

*from the Republic of Turkey*, 79 Fed. Reg. 54,963 (Dep't Commerce Sept.

15, 2014) (final affirm. countervailing duty deter. and final affirm.

critical circumstances deter.) at 8-13 (emphasis added). Specifically,

although the Department was evaluating a tier two benchmark issue in

*Rebar from Turkey*, the threshold question is not that the prices are

most certainly available to users in the home market, as Plaintiffs

suggest, but rather, that they are *potentially* available.

Indeed, as the Department in *Cold-Rolled Steel from Russia*

confirmed, whether there is interconnectivity between the markets and

utilities at issue speaks directly to whether the benchmark prices were

set in a market that the country under investigation belongs. *Cold-*

*Rolled Steel Russia IDM* at cmt 7. For electricity, without a

transmission line, there is *zero* chance that the benchmark pricing

would be available to users in the home market, and thus *zero* chance

that the home market could somehow belong to the third country

market. That is precisely the issue with the Turkish data, and Plaintiffs cannot point to any evidence in the contrary.

For example, in *CSPV Cells and Modules from Malaysia*, the Department explained that it "has found that this regional arrangement {between Singapore and Malaysia} includes the 'interconnection of the Tenaga Nasional Berhad (TNB) grid to the Singapore grid through SP PowerGrid Ltd (SPPG)'" and that "{t}his interconnection and geographic proximity similarly suggests there is some level of regional availability of electricity between Malaysia and neighboring countries." Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Malaysia,* 90 Fed. Reg. 17,384 (Dep't Commerce Apr. 25, 2025) (final affirm. countervailing duty deter.) at cmt. 10.

Accordingly, Singapore data offer the only usable data on the record because they are they only data from a country with an electricity grid that is connected to Malaysia, and for which there is a regional electricity market that Malaysia could conceivably belong. Moreover, record evidence demonstrates that they are market-based,

NON-CONFIDENTIAL VERSION

reflect the same class or type of electricity user as CS Wind, and reflect

similar pricing mechanisms to TNB.  Def. Resp. Br. at 60-61, 67-68;

Final IDM at 41, Appx__. The Court should uphold Commerce's

determination to use Singapore electricity rates as the benchmark to

value electricity as lawful and supported by substantial evidence.

## III.     CONCLUSION

For the reasons detailed above, Defendant-Intervenor respectfully

submits that this Court should affirm the final results of Commerce's

countervailing duty administrative review consistent with the

arguments herein.

Respectfully submitted,

*/s/ Derick G. Holt*
Alan H. Price, Esq.
Robert E, DeFrancesco III, Esq.
Laura El-Sabaawi, Esq.
Derick G. Holt, Esq.
Kimberly A. Reynolds, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Wind Tower Trade*
*Coalition*

**NON-CONFIDENTIAL VERSION**

Dated: May 22, 2025

NON-CONFIDENTIAL VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Response Brief of Defendant-Intervenor, Wind Tower Trade Coalition, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 6,984 words.

<u>*/s/ Derick G. Holt*</u>
(Signature of Attorney)

<u>Derick G. Holt, III</u>
(Name of Attorney)

<u>Wind Tower Trade Coalition</u>
(Representative Of)

<u>May 22, 2025</u>
(Date)