IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION, | ) ) ) |
| *Plaintiffs,* | ) ) ) Ct. No. 24-00079 |
| v. | ) ) Public Version |
| UNITED STATES, | ) ) Confidential Information |
| *Defendant,* | ) has been redacted on ) pages: 7–9, 12–14, 16, 17, ) and 19. |
| and, | ) ) |
| WIND TOWER TRADE COALITION, | ) ) |
| *Defendant-Intervenor.* | ) ) ) |

REPLY BRIEF OF PLAINTIFFS CS WIND MALAYSIA
SDN. BHD. AND CS WIND CORPORATION

Jarrod M. Goldfeder
Kenneth N. Hammer
Sezi Erdin

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE,
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated: July 17, 2025          *Counsel to Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iii

GLOSSARY OF CASE SPECIFIC ACRONYMS ....................................... vi

I.   INTRODUCTION ............................................................................... 1

II.  ARGUMENT ....................................................................................... 3

    A.   Commerce's Unlawfully Calculated Countervailable Benefits Under the Licensed Manufacture Warehouse Program ........................................................................................... 3

    B.   Commerce Unlawfully Calculated CS Wind's Countervailable Subsidy Rate Based on CS Wind Malaysia's Sales Denominator ..................................................... 10

        1.   Commerce's Unlawfully Denied CS Wind an Entered Value Adjustment Because its Practice Does Not Require Documentation for All Sales . 11

        2.   Differences Between Entered Values and Invoiced Values do Not Justify Denying an Entered Value Adjustment ................................................. 15

    C.   Commerce Unlawfully Included Non-Comparable Land Prices in the Land Benchmark Price ........................... 21

        1.   Commerce Failed to Select Domestic Transactions for Similar Land and Account for Other Factors Affecting Comparability ............. 21

        2.   CS Wind Exhausted Administrative Remedies Where Required ................................................. 23

            a)   CS Wind Raised Arguments Concerning Non-Comparability of the C.B. Richard Ellis Data ............................................................. 24

        b)    Commerce First Averaged Two Land
               Benchmark Sources in the Final Results...26

   D.   Substantial Evidence Does Not Support Commerce's
       Selection of Singapore Electricity Tariffs as a Tier
       Three Benchmark for Electricity ..................................29

III.   CONCLUSION ....................................................................38

TABLE OF AUTHORITIES

Page

**STATUTES**

19 U.S.C. § 1671(a) .................................................................... 20

**REGULATIONS**

19 C.F.R. § 351.519(a)(4) ..........................................................3, 5

19 C.F.R. § 351.519(a)(1) .............................................................. 5

19 C.F.R. § 351.519(b)(2) .............................................................. 7

19 C.F.R. § 351.511(a)(2)(i) ....................................................22, 23

19 C.F.R. § 351.511(a)(2)(ii) ....................................................... 22

**CASES**

*U.S. Steel Corp. v. United States*, 33 CIT 593, 627 F.Supp.2d 1374
(2009)....................................................................................... 4

*Blue Field (Sichuan) Food Industrial Co., Ltd. v. United States*, 37 CIT
1619, 949 F. Supp. 2d 1311 (2013)........................................25

*Zhaoqing Tifo New Fibre Co., Ltd. v. United States*, 60 F.Supp.3d 1328
(Ct. Int'l Trade 2015).............................................................27

*ArcelorMittal USA LLC v. United States*, 337 F. Supp. 3d 1285 (Ct. Int'l
Trade 2018) .....................................................................29, 30

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*,
536 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) .........................35

*Risen Energy Co., Ltd. v. United States*, 46 CIT ____, 570 F. Supp. 3d
1369 (2022)............................................................................37

*Mosaic Co. v. United States*, 589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022) ....................................................................................37

## ADMINISTRATIVE DETERMINATIONS

Utility Scale Wind Towers from Malaysia, 89 Fed. Reg. 17,404 (Dep't Commerce Mar. 11, 2024), and accompanying Decision Memorandum (Mar. 5, 2024)........................................ 1, 2, 13, 17, 22, 31–33

*Common Alloy Aluminum Sheet from India*, 86 Fed. Reg. 13,285 (Dep't Commerce Mar. 8, 2021), and accompanying Decision Memorandum (Mar. 1, 2021)................................................................ 7, 8

*Certain Aluminum Foil from the People's Republic of China*, 88 Fed. Reg. 75267 (Nov. 2, 2023), and accompanying Decision Memorandum (Oct. 27, 2023) ................................................. 13, 14

*Utility Scale Wind Towers from Malaysia*, 88 Fed. Reg. 61,516, 61,517 (Dep't Commerce Sept. 7, 2023), and accompanying Preliminary Decision Memorandum (August 30, 2023) ...........................................21

*Polyethylene Terephthalate Film, Sheeting, and Strip from the People's Republic of China*, 80 Fed. Reg. 33,241 (Dep't Commerce June 11, 2015), and accompanying Decision Memorandum (June 3, 2015) ....................................................................................27, 28

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016), and accompanying Decision Memorandum (July 20, 2016) ......................................................31

*Utility Scale Wind Towers from Malaysia*, 86 Fed. Reg. 15,887 (Dep't Commerce Mar. 25, 2021), and accompanying Preliminary Decision Memorandum (Mar. 19, 2021) ...........................................33

*Utility Scale Wind Towers From Malaysia*, 86 Fed. Reg. 30,593 (Dep't Commerce June 9, 2021), and  accompanying Decision Memorandum (June 2, 2021) ........................................................34

*Certain Corrosion Inhibitors from the People's Republic of China*, 86
    Fed. Reg. 7,537 (Dep't Commerce Jan. 29, 2021), and accompanying
    Decision Memorandum (Jan. 25, 2021) .........................................36, 37

# GLOSSARY OF CASE SPECIFIC ACRONYMS

Licensed Manufacture Warehouse:    LMW

Entered Value Adjustment:    EVA

Malaysia Investment Development Authority:    MIDA

Government of Malaysia:    GOM

**Case No. 24-00079**                          **PUBLIC VERSION**

REPLY BRIEF OF PLAINTIFFS
CS WIND MALAYSIA SDN. BHD. and CS WIND
CORPORATION

## I.    INTRODUCTION

Plaintiffs, CS Wind Malaysia Sdn. Bhd. ("CS Wind Malaysia") and

CS Wind Corporation ("CS Wind Korea") (collectively, "CS Wind" or

"Plaintiffs"), hereby reply to the response briefs filed by Defendant, the

United States, and Defendant-Intervenor, the Wind Tower Trade

Coalition, respectively.  *See* Def. Resp to Pls. Rule 56.2 Mot. J. Upon

Agency. R., ECF No. 36, Apr. 18, 2025 ("Def. Resp. Br."), Wind Tower

Trade Coalition's Resp. Br., ECF No. 37–39 (May 22, 2025) ("D-I Resp.

Br.").

This action is an appeal from the U.S. Department of Commerce's

("Commerce") final results of the first administrative review of the

countervailing duty ("CVD") order on *Utility Scale Wind towers from*

*Malaysia.  See Utility Scale Wind Towers from Malaysia*, 89 Fed. Reg.

17,404 (Dep't Commerce Mar. 11, 2024) (final results of countervailing

duty administrative review; 2021) ("*Final Results*"), P.R. 262, Appx____,

and Memorandum, re: "Decision Memorandum for the Final Results of

the Administrative Review of the Countervailing Duty Order on Utility

Case No. 24-00079                    PUBLIC VERSION

Scale Wind Towers from Malaysia; 2021 (Mar. 5, 2024), P.R. 260,

Appx____ ("Final Decision Memo").[1]

    In their response briefs, Defendant and Defendant-Intervenor fail to

support why Commerce's determinations to countervail the full import

value of merchandise that was exempted from import duties under the

Licensed Manufacture Warehouse ("LMW") program was in accordance

with law. They also fail to support that Commerce's denial of an entered

value adjustment ("EVA") to CS Wind was lawful. Finally, they fail to

explain why Commerce's land and electricity benchmark calculations

were in accordance with law and otherwise reported by substantial

evidence.

    For the reasons explained in greater detail below, the Court should

grant Plaintiffs' Rule 56.2 motion for judgment on the agency record

and hold that the *Final Results* issued by Commerce are contrary to law

and are not supported by substantial evidence. Therefore, Plaintiffs

respectfully request that the Court reverse and remand this case to

---

[1] Documents contained in the administrative record are identified by the name and date of the documents, followed by the public ("P.R.") and confidential ("C.R.") index numbers assigned to these documents in the respective administrative record indices that the U.S. Department of Commerce filed with the Court on June 10, 2024. *See* Admin. Rec., June 10, 2024, ECF Nos. 21-2 and 21-3.

Case No. 24-00079                    **PUBLIC VERSION**

Commerce with instructions to recalculate the *ad valorem* subsidy rates

for CS Wind in accordance with the Court's opinion in this action.

## II.    ARGUMENT

### A.    Commerce's Unlawfully Calculated Countervailable Benefits Under the Licensed Manufacture Warehouse Program

Defendant claims that Commerce is required by 19 C.F.R.

§ 351.519(a)(4) to find a benefit to be conferred if the government

cannot demonstrate that it has in place and applies a system or

procedure to confirm which inputs are consumed in the production of

the exported products and in what amount. *See* Def.'s Resp Br. 25–26

(*citing* 19 C.F.R. § 351.519(a)(4)(i)). This argument  ignores the basis for

Plaintiffs' challenge.

CS Wind asserts an "as applied challenge" to Commerce's unlawful

application of 19 C.F.R. § 351.519 in this particular proceeding.

Commerce has no reasonable basis to consider the entire amount of an

import duty exemption on imported inputs and raw materials to confer

a benefit—or to require the detailed record evidence required by 19

C.F.R. § 351.519(a)(4)—where the record shows that CS Wind Malaysia

consumed all inputs for which it received import duty exemptions in the

3

Case No. 24-00079                                    PUBLIC VERSION

production of exported product. *See U.S. Steel Corp. v. United States*, 33

CIT 593, 601, 627 F.Supp.2d 1374, 1381 (2009) (distinguishing a "facial

challenge," which involves a claim that a practice is *per se* illegal from

an "as applied" challenge, which "concerns a claim that the application

of a law to a particular proceeding and the factual determinations and

legal conclusions reached as a result of the use of such rule or practice

is unlawful.").

In other words, it is unreasonable to require CS Wind to demonstrate

that the Government of Malaysia ("GOM") has a system to confirm

which inputs are consumed in the production of exported products, and

in what amounts, when the record shows that CS Wind had only export

sales. No verification is necessary to ensure that all imported inputs

were consumed in the production of exported product where the record

demonstrates that CS Wind had only export sales.

Defendant's argument ignores the structure of the regulation, which

generally prevents Commerce from considering exemptions of import

charges that are consumed in the production of exported products to

confer a countervailable benefit. *See* 19 C.F.R. § 351.519(a)(1).  Where

4

Case No. 24-00079                              PUBLIC VERSION

import duties are exempted upon export, the regulation considers a

benefit to be conferred upon the respondent only:

> to the extent that the exemption extends to inputs that *are not*
>
> *consumed in the production of exported product*, making normal
>
> allowances for waste, or if the exemption covers charges other than
>
> imported charges that are imposed on the input.

*Id.* at § 351.519(a)(1)(ii) (emphasis added). Thus, in order to depart

from the presumption that import duty exemption programs on raw

material inputs *do not* confer a benefit, the record must show that the

respondent could have had import duties exempted on imported inputs

that were not exported.

Commerce unlawfully conflates the regulatory standard for assessing

the *amount* of benefit conferred under 19 C.F.R. § 351.519(a)(4)(i), with

the threshold determination of whether a benefit is conferred under 19

C.F.R. § 351.519(a)(1)(ii). Defendant continues to parrot the regulatory

language, but it offers no answer for why it is reasonable to conclude

that the LMW program exempted CS Wind Malaysia from import duties

on imported inputs not consumed in the production of the exported

product when CS Wind had no domestic sales.

**PUBLIC VERSION**

Defendant-Intervenor argues that the ability to track what is, or is not, consumed is a prerequisite to accurately measuring consumption, and measuring the benefit provided by an import duty exemption. D-I Resp. Br. 21. While this may be so in most cases, the regulation is unreasonable, as applied, because CS Wind exported all merchandise it produced. *See* Letter from Trade Pacific PLLC, re: "Section III Questionnaire Response" (Jan. 11, 2023), at Ex. II.C.1(a), C.R. 32–51, P.R. 61–70, Appx____ ("CS Wind IQR") (showing that CS Wind Malaysia's total sales revenue in U.S. dollars during the period of review ("POR") matches its total export sales for the POR); *Id.* at Ex. III.C.5, Appx____ (reconciling CS Wind Malaysia's total POR sales revenues, as recorded in its 2021 audited financial statements to its trial balance, which reflects only sales of wind towers to CS Wind Korea that were exported to the U.S. and export sales to its affiliate).

Where a respondent only exported merchandise under consideration—and recorded no domestic sales—the quantity of inputs consumed in the production of exported product is not relevant because all imported inputs must necessarily have been consumed in the production of *exported* product. Thus, the difference between the

6

amount of import charges remitted and the amount paid on imported

inputs consumed in production for which remission was claimed is

necessarily zero because *all* finished product sold by CS Wind Malaysia

during the POR was exported.

Defendant-Intervenor questions that CS Wind demonstrated that CS

Wind Malaysia consumed all inputs that it imported during the POR by

raising irrelevant doubts about the **[         ]** of consumption of inputs

imported during the POR. *See* D-I Resp. Br. 22–24. An importer realizes

the benefit of an import duty exemption upon exportation rather than

importation or consumption. *See* 19 C.F.R. § 351.519(b)(2).

Commerce's practice evaluates the proportion of imported inputs

that received an exemption that are used in finished goods. This is why

Commerce requires governments to verify standard input-output norms

reported by companies to ensure that they reflect a company's actual

production experience. *See, e.g., Common Alloy Aluminum Sheet from

India*, 86 Fed. Reg. 13,285 (Dep't Commerce Mar. 8, 2021) (final

affirmative countervailing duty determination and final negative

critical circumstances determination), and accompanying "Issues and

Decision Memorandum for the Final Determination of the

Case No. 24-00079                          PUBLIC VERSION

Countervailing Duty Investigation of Common Alloy Aluminum Sheet

from India" (Mar. 1, 2021), at 26 (Requiring that Commerce verify the

accuracy of standard input-output norms ("SIONs") and the extent to

which reported SIONs are verified by government authorities to grant

an EVA).

Commerce's practice does not require importations and exportations

to be linked or otherwise assume that imported inputs not consumed or

sold within the same POR are countervailable during the POR. Had CS

Wind Malaysia recorded domestic sales of finished merchandise in the

subsequent POR using inputs imported during the POR, those benefits

would be realized during the following POR if the record showed

potential for inputs not to have been consumed in the production of

exported merchandise.

Other than the regulation—which presumes that a company could

have consumed at least some of the imported inputs on finished product

that was not exported—neither Defendant nor Defendant-Intervenor

assert any rationale for why it is reasonable to calculate countervailable

benefits that exceeded the value of CS Wind Malaysia's only domestic

sales (*i.e.*, scrap sales) by a factor of more than **[           ]**. *Compare* CS

Wind IQR at Ex. III.C.5, Appx____ (reflecting that the only non-export

sales recorded by CS Wind Malaysia during the POR were scrap sales

(*i.e.*, [          ] Malaysian ringgit, which is equivalent to $[          ]))

to Memorandum to The File, re: "Countervailing Administrative Review

of Utility Scale Wind Towers from Malaysia; 2021: CS Wind Final

Results Calculations" (Mar. 5, 2024), at Attach. II ("Import Tariff and

VAT-Material" Tab), C.R. 147–148, P.R. 261, Appx____ ("CS Wind Final

Calc Memo") (reflecting that Commerce calculated a benefit of

[                    ]).

Likewise, the fact that CS Wind Malaysia shut down its

manufacturing facility in early 2022 (*i.e.*, outside the POR), does not

demonstrate that [

                                    ] could have been incorporated in

wind towers that were not exported in the same year. Since CS Wind

recorded no domestic sales other than scrap sales in 2021, any benefits

from [

          ] would not be attributable to the current POR.

For these reasons, Commerce unreasonably and unlawfully applied

its regulation to conclude that all inputs imported by CS Wind Malaysia

during the POR were countervailable even though the record shows

that none of these inputs could have been incorporated into finished

merchandise that was not exported during the POR.

## B. Commerce Unlawfully Calculated CS Wind's Countervailable Subsidy Rate Based on CS Wind Malaysia's Sales Denominator

CS Wind argued that Commerce should have allocated

countervailable benefits over CS Wind Korea's sales of wind towers

produced by CS Wind during the POR because, to do otherwise would

unlawfully calculate CS Wind's overall CVD rate by the *intermediate*

sales value paid by CS Wind Malaysia's parent company, CS Wind

Korea, and not the value merchandise imported, or sold  for importation

into the United States. *See* Pls.' Mot. J. Agency R. Pursuant to Rule

56.2 at 41–61, Oct. 30, 2024, ECF No. 26 ("CS Wind 56.2 Br.").

Defendant claims that Commerce could not determine the customs

value to which CVD duties were applied because: (1) CS Wind did not

provide CBP Forms 7501 (or alternative customs documentation to

establish entered value) for two of four projects for which Commerce

requested documentation; and (2) there were unresolved discrepancies

between the invoice value and the entered value, as stated on the

Case No. 24-00079                    PUBLIC VERSION

Forms 7501, for the two sales for which CS Wind did provide Forms

7501. Def.'s Resp. Br. at 32.

Neither issue identified by Defendant supports Commerce's

determination that CS Wind did not demonstrate that CS Wind Korea's

U.S. invoice price established the customs value to which the CVD

duties are applied.[2]

### 1.    Commerce's Unlawfully Denied CS Wind an Entered Value Adjustment Because its Practice Does Not Require Documentation for All Sales

First, Defendant claims that Commerce appropriately required

documentation for every one of the sales for which it requested

documentation to determine whether the customs value to which

countervailing duties applied was established by U.S. invoice prices.

Def.'s Resp. Br. at 36–39. Defendant implies that the fact that

Commerce requested documentation for only four projects, justifies

denying the EVA where CS Wind did not provide entry documentation

for all sales requested. *Id.* at 37. CS Wind does not argue that

Commerce lacked the discretion to determine the number of sales for

---

[2] Defendant concedes that only this criterion of the EVA test is disputed.  Def.'s Resp. Br. at 33.

which to request entry summaries. However, the superficially modest

absolute number of projects for which Commerce requested Forms 7501

does not justify that Commerce ignored available evidence that

consistently demonstrated that the U.S. invoice value established the

imported price of imported wind towers.

The number of entry summary documents provided by CS Wind was

significant relative to its total number and value of export sales on a

project basis. CS Wind exported only **[    ]** total projects to the U.S.

during the POR. The four projects accounted for almost **[   ]**% of the

total number of projects exported during the POR. *See* CS Wind IQR at

Ex. II.C-2, Appx____. Moreover, the two projects for which CS Wind did

provide supporting documentation (*i.e.*, Projects #s **[              ]**)

accounted for **[     ]** of the total sections exported by CS Wind to the

United States during the POR. *Id.*, Appx____. The two projects also

accounted for **[     ]** of the total value of CS Wind's U.S. export sales

during the POR. *Id.*, Appx____.

Commerce never explained why the relative share of total projects

for which CS Wind provided Forms 7501 was insufficient to evaluate

whether CS Wind Korea's U.S. invoice price established the imported

value of the subject merchandise.[3] This was a critical omission since the

commercial documentation and Forms 7501 provided by CS Wind

*uniformly* demonstrated that CS Wind Korea's invoiced value was

almost identical to the entered values for the same project codes.

In other past cases, Commerce did not expect perfect compliance or

require Forms 7501 for *every* U.S. sale to grant an EVA. *See*, *e.g.*,

*Certain Aluminum Foil from the People's Republic of China*, 88 Fed.

Reg. 75267 (Nov. 2, 2023) (final results of countervailing duty

administrative review), and accompanying Memorandum, re: "Issues

and Decision Memorandum for the Final Results of the Countervailing

Duty Administrative Review of Certain Aluminum Foil from the

---

[3] Defendant also claims that Commerce requested such documentation because the documentation initially proffered by CS Wind contained discrepancies. Def.'s Resp. Br. at 38 (*citing* Final Decision Memo at 11). The record does not support this claim.

Commerce did not allege any alleged discrepancies in Forms 7501 during the administrative review. In fact, CS Wind provided only sales invoices for Project #s [                    ] in its initial Section III questionnaire response. *See* CS Wind IQR at Exs. II.C.1(a), II.C.1(b), Appx___ (containing commercial invoices, but not Forms 7501, for the projects for which CS Wind provided documentation).

CS Wind first provided the requested entry summaries in response to Commerce's December 22, 2023, supplemental questionnaire. *See* CS Wind SQR 5 at S5-1, Appx____ (requesting Forms 7501 and bills of lading for four project numbers because CS Wind previously provided only sales invoices). Commerce did not issue additional supplemental questionnaires requesting clarification.

People's Republic of China; 2021" (Oct. 27, 2023) at 16–18). Rather,

Commerce accepted samples of selected sales instead of requiring

Forms 7501 for *every* U.S. sale. *See id.* at 17 (dismissing the notion that

a failure to provide CBP Forms 7501 for certain sales undermines that

sales made through an affiliate do not meet the requirements for an

EVA). Moreover, even though the respondent provided substitutes for

other sales in the case cited by Commerce, there was no evidence that

the respondent provided substitute documentation for every entry

requested by Commerce.

CS Wind explained why the Forms 7501 for certain sample projects

requested by Commerce were not available because they were sold on

[          ] basis. *See* CS Wind 56.2 Br. at 55 (*citing* Letter from Trade

Pacific PLC, re: "Fifth Supplemental Questionnaire Response" (Jan. 3,

2024), C.R. 141–142, P.R. 247, at S5-1, S5-2, Appx____, Appx____ ("CS

Wind SQR 5")). In other words, CS Wind did not arrange for entry for

the sales for which it did not provide entry summaries.

Commerce never explained how the absence of Forms 7501 for the

other two projects undermined that CS Wind Korea's invoice value

established the imported value of subject merchandise produced by CS

Case No. 24-00079                            PUBLIC VERSION

Wind Malaysia when the entry summaries *uniformly* demonstrated

that CS Wind Korea's invoiced value was almost identical to the

entered values for the same project codes.

> ### 2. Differences Between Entered Values and Invoiced Values do Not Justify Denying an Entered Value Adjustment

Defendant misleadingly claims that small differences between the

entered values stated in the invoices and the two Form 7501s show that

the U.S. invoice did not establish the customs value of imported

merchandise. Def.'s Resp. Br. at 35. Neither the magnitude, nor the

direction, of the tiny observed differences between invoice prices and

entered values undermines that the invoiced price of CS Wind Korea to

its unaffiliated customer established the customs value to which the

CVD duties are applied.

Defendant-Intervenor claims, without any legal support, that the

values on the Forms 7501 and the commercial invoice must be identical.

D-I Resp. Br. at 9. Moreover, Defendant-Intervenor highlights the

absolute differences in value in the projects while ignoring the relative

value differences between the values on the Forms 7501 and the

commercial invoices issued by CS Wind Korea to its unaffiliated

customer. *Id.* at 10. It is to be expected that the absolute difference

between the dutiable value (*i.e.*, the price actually paid for imported

merchandise, excluding international freight, insurance, and other

charges) and the invoiced value for **[                              ]**

terms for a more expensive product would be greater than for a lower-

priced product. The combined contract price for project #s **[          ]**

was **[          ]**. *See* Letter from Trade Pacific PLLC, re:

"Supplemental Questionnaire Responses" (Feb. 24, 2023), C.R. 81–83,

P.R. 110, at S-19 to S-20, Exs. S-12(a), Appx____, Appx____, Appx____

("CS Wind SQR 1"). The size and direction of the absolute differences in

dutiable value versus invoiced price highlighted by Defendant-

Intervenor do not undermine that the Forms 7501 established the

import value of the transactions.

Defendant-Intervenor wrongly claims that CS Wind asks the Court

to re-weigh the evidence. D-I Resp. Br. at 10–11. CS Wind is not asking

the Court to assess whether the differences were significant. CS Wind

asks the Court to review whether substantial evidence supports

Commerce's justification for determining that the Forms 7501 did not

demonstrate the import value of the subject merchandise and whether

Commerce sufficiently explained how the evidence supported denial of

the EVA. Commerce's determinations are unsupported by substantial

evidence "where Commerce has relied on inadequate facts or reasoning,

or failed to provide an adequate basis for its conclusions." *Rhone-*

*Poulenc, Inc. United States*, 20 CIT 573, 575, 927 F. Supp. 451, 454

(1996). Plainly, Commerce has not explained why the miniscule

observed differences undermine that the import value of the

merchandise is established by Forms 7501 and failed to provide a basis

for its contrary conclusions for the reasons stated above.

Next, Defendant-Intervenor baselessly implies that inter-company

[        ] undermine the reliability of CS Wind Malaysia's transfer price

to CS Wind Korea. D-I Resp Br. at 14. As an initial matter, Defendant-

Intervenor wrongly claims that Commerce recognized distorted transfer

pricing existed. *Id.* Commerce made no such finding. On the contrary,

Commerce said it would examine these arguments made by the

petitioner in a future review. Final Decision Memo at 11.

Defendant-Intervenor's point about the alleged unreliability of the

transfer price between CS Wind Malaysia and CS Wind Korea

undermines Commerce's determination to base the countervailable

subsidy rate on the price charged by CS Wind Malaysia to CS Wind

Korea. If these prices are unreliable and not verifiable, as Defendant-

Intervenor alleges, then why would Commerce use them to calculate

countervailable subsidy rates?

Transfer pricing is irrelevant to establishing the imported price of

merchandise because CS Wind Korea resold merchandise produced by

CS Wind Malaysia on a "back-to-back" basis to unaffiliated customers.

In other words, the imported value of subject merchandise is

established by CS Wind Korea's sale to the unaffiliated customer that

imported the subject merchandise, not by the intermediate sales value

from CS Wind Malaysia to CS Wind Korea. Defendant-Intevenor points

to no record evidence that could support the notion that the price

between CS Wind Korea and its unaffiliated customer was, or could

have been, manipulated.

Defendant-Intervenor also questions that the record demonstrates

that the prices at which CS Wind Korea resold the subject merchandise

to unaffiliated customers in the United States were higher than the

revenue recorded by CS Wind Malaysia. D-I Resp Br. at 15–16.

Specifically, Defendant-Intervenor repeats a claim—debunked by CS

Wind during the administrative review—that CS Wind Korea resold

certain wind towers **[         ]**. *Id.* As an initial matter, Commerce

made no such finding, so this cannot have justified denial of an EVA.

Nevertheless, the Defendant-Intervenor's claim stems from a

misunderstanding of the selling practices of CS Wind Korea and CS

Wind Malaysia. CS Wind Malaysia and CS Wind Korea contracted to

sell wind towers on a project basis, not on an individual section basis.

*See* Letter from Trade Pacific PLLC, re: "Second Supplemental

Questionnaire Response" (July 21, 2023), C.R. 100–102, P.R. 156, at S2-

10, Appx____. Contrary to Defendant-Intervenor's claims, CS Wind

demonstrated that the contract amount for the relevant project was

**[      ]** higher than the contract amount between CS Wind Malaysia

and CS Wind Korea. *See id.*, Appx____.

Finally, Defendant dismisses CS Wind's argument that Commerce

should have provided an opportunity for CS Wind to explain the small

differences between the entered values and the invoice values for the

projects for which it did provide Forms 7501. Def.'s Resp. Br. 40–41.

Defendant argues that requesting additional information would have

been futile because CS Wind concedes it did not have entry summaries

19

for the other two sales requested by Commerce. This argument misunderstands CS Wind's point.

CS Wind did not suggest that Commerce should have requested more entry summaries. Rather, Commerce should have provided CS Wind with an opportunity to link the invoice prices with the Forms 7501 if Commerce had concerns about the minor differences between the entered values and the invoice prices rather than basing CS Wind's countervailable subsidy rate on a sales denominator that obviously does not reflect the imported price of merchandise.

Commerce unlawfully denied CS Wind an opportunity to reconcile the entered values with CS Wind Korea's invoice value if it had doubts that the entered values reflected the imported value of imported merchandise. Failure to account for such markup, where the respondent demonstrates that it meets the criteria to be entitled to an EVA, violates 19 U.S.C. § 1671(a). For these reasons, Commerce's denial of the EVA is contrary to law and otherwise not supported by substantial evidence.

### C. Commerce Unlawfully Included Non-Comparable Land Prices in the Land Benchmark Price

#### 1. Commerce Failed to Select Domestic Transactions for Similar Land and Account for Other Factors Affecting Comparability

Defendant claims that CS Wind did not demonstrate that the land prices from the Malaysia Investment Development Authority ("MIDA") data were market-based. Def.'s Resp. Br. 47. Specifically, Defendant cites Commerce's determination in its preliminary results, in which Commerce found that record evidence did not demonstrate that the MIDA land pricing data was market-based. *Id.* at 48 (*citing Utility Scale Wind Towers from Malaysia*, 88 Fed. Reg. 61,516, 61,517 (Dep't Commerce Sept. 7, 2023) (preliminary results and partial rescission of countervailing duty administrative review, 2021), P.R. 221, Appx____, and accompanying Memorandum, re: "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review, 2021: Utility Scale Wind Towers from Malaysia" (August 30, 2023), at 6, P.R. 215, Appx____).

Defendant ignores that Commerce changed its mind in the final results. Commerce stated that it included the MIDA data in the average of "more than one commercial available market price to construct a

Case No. 24-00079 **PUBLIC VERSION**

benchmark price." *See* Final Decision Memo at 22, Appx____. Commerce

also recognized that it found the MIDA data to reflect "usable market

prices" in other proceedings. *Id.* at 21, n.112, Appx____. While

Commerce recognized imperfections in both sets of land data used to

construct the land benchmark, Commerce found that the MIDA data

was market-based in the final results.

Defendant acknowledges that the C.B. Richard Ellis land data is also

imperfect. Def.'s Resp. Br. at 49. But Defendant, like Commerce,

incorrectly claims that Tier One benchmark practice is to average

usable prices. *Id.* In fact, averaging available data sets is Commerce's

regulatory preference in the context of Tier Two benchmarks, not Tier

One benchmarks. *Compare* 19 C.F.R. § 351.511(a)(2)(i) (calling for

Commerce to compare the government price to a market-determine

price, which could include prices stemming from actual transactions)

*with* 19 C.F.R. § 351.511(a)(2)(ii) (calling for averaging of more than one

commercially available word market price to the extent practicable).

Commerce articulated no reason why averaging two "imperfect data

sets" yielded a superior land benchmark price.

Defendant-Intervenor argues that 19 C.F.R. § 351.511(a)(2)(i) only requires Commerce to base Tier One benchmarks on transactions in the *country* in question, *not the region*. D-I Resp. Br. at 27 (emphasis in original). Defendant's argument ignores the remainder of the regulation, which requires Commerce to "consider product similarity; quantities sold or imported; and other factors affecting comparability" in choosing transactions or sales *within the country* in question. 19 C.F.R. § 351.511(a)(2)(i). Thus, neither Commerce's regulation, nor its practice justifies ignoring significant factors that undermine the similarity between the land rented by CS Wind Malaysia and the Penang land price included in Commerce's benchmark.

## 2. CS Wind Exhausted Administrative Remedies Where Required

Defendant and Defendant-Intervenor argue that CS Wind did not exhaust administrative remedies for arguments based on differences in the size of land rented by CS Wind and the land parcel reflected in the CB Richard Ellis data. Def.'s Resp Br. 51–52, D-I Resp. Br. 26. Likewise, both Defendant and Defendant-Intervenor claim that the Court should not consider CS Wind's challenge to Commerce's calculation of the land benchmark by calculating the *single* land

transaction from Penang with the *multiple* land transactions reflected in the MIDA data because CS Wind did not raise the issue in the administrative review. Both arguments are without merit, for the reasons explained below.

### a) CS Wind Raised Arguments Concerning Non-Comparability of the C.B. Richard Ellis Data

In its case brief, CS Wind argued that Commerce should select only the MIDA benchmark data to value CS Wind's rental land because it was more comparable and significantly more robust in that it contained many pricing data points than the single data point reflected in the C.B. Richard Ellis dataset. Letter from Trade Pacific PLLC, re: "CS Wind's Case Brief" (Jan. 16, 2024), at 20, C.R. 143, P.R. 252, Appx____ ("CS Wind Case Br."). While CS Wind's comparability arguments focused primarily on the lack of geographic proximity and lack of economic comparability between the land market in Penang relative to that of Pahang, CS Wind's points about land parcel size ultimately relate back to the regulatory requirement for Commerce to correct for factors affecting comparability in its Tier One benchmark practice.

A party is not precluded from raising additional facts to support its argument where those facts were on the record and the party raised the

Case No. 24-00079                    PUBLIC VERSION

same general issue in its case brief. *See*, *e.g.*, *Blue Field (Sichuan) Food Indus. Co., Ltd. v. United States*, 37 CIT 1619, 1628, 949 F.Supp.2d 1311, 1322 (2013) (finding that the respondent exhausted its remedies with respect to data from 2009-2010 data where it cited data from other years and generally argued Commerce should have used the same data source rather than the alternative data selected). CS Wind's arguments that C.B. Richard Ellis data was not sufficiently comparable apprised Commerce of its objection that Commerce's land benchmark selection failed to allow for factors affecting comparability required by the regulation. *See* CS Wind Case Br. at 21, Appx____ (arguing that the MIDA data reflects the most comparable pricing for land most similar to that rented by CS Wind in Pahang during the POR). CS Wind objected to the non-comparability of the CB Richard Ellis data, and Commerce was on notice that it needed to defend the land benchmark selection based on comparability.

Neither Defendant nor Defendant-Intervenor argue Commerce reasonably ignored differences in land parcel size in selecting a land benchmark.

25

### b)　Commerce First Averaged Two Land Benchmark Sources in the Final Results

CS Wind was not required to exhaust its administrative remedies with respect to Commerce's land benchmark averaging methodology because Commerce changed its benchmark calculation methodology to average two benchmark sources for the first time in the final results. *See* CS Wind Final Calc Memo at 2, Appx____.  CS Wind could not have had a full and fair opportunity to raise the issue at the administrative level where Commerce changed its methodology in the final results. *Zhaoqing Tifo New Fibre Co., Ltd. v. United States*, 60 F.Supp.3d 1328, 1346–47 (Ct. Int'l Trade 2015).

In other words, CS Wind did not have a full and fair opportunity to review Commerce's revised benchmark calculation methodology, or the way Commerce would use the data on the record, until the final results. Accordingly, CS Wind was not required to raise this issue before Commerce before the Court may consider this challenge.

The only defense Defendant offers for Commerce's averaging methodology is that CS Wind suggested Commerce do so. Def.'s Resp. Br. 53–54. As an initial matter, CS Wind's primary argument was that the C.B. Richard Ellis data should be excluded as unsuitable. Further,

CS Wind did not suggest equally weighting these sources when the CB Richard Ellis data reflects a single data point for a single parcel of land with a defined size with data that already reflects average land pricing in Malaysia. CS Wind's suggestion does not render Commerce's benchmark calculation to be supported by substantial evidence.

Defendant and Defendant-Intervenor also attack the MIDA data on the grounds that it did not provide the source data for reported pricing. Def.'s Resp. Br. at 54, D-I Resp. Br. at 28. First, Commerce's stated practice is to find official government publications to be reliable and credible sources of information. *See*, *e.g.*, *Polyethylene Terephthalate Film, Sheeting, and Strip from the People's Republic of China*, 80 Fed. Reg. 33,241 (Dep't Commerce June 11, 2015) (final results of antidumping administrative review and final determination of no shipments; 2012-2013), and accompanying "Issues and Decision Memorandum for the Final Results of the 2012-2013 Administrative Review" (June 3, 2015), at 10. The MIDA data is compiled by a Malaysian government authority. *See* Letter from Trade Pacific PLLC, re: "Benchmark Submission" (Aug. 1, 2023), P.R. 160–161, at Ex. 1, Appx____.

27

Case No. 24-00079                              PUBLIC VERSION

Second, any concerns regarding the reliability of the MIDA data are speculative and do not support a departure from Commerce's practice of presuming that government-published data is reliable and accurate. Moreover, despite the Department's stated concerns about the absence of a description of the methodology used to report the MIDA data, the C.B. Richard Ellis report itself lacks any description of the methodology used to gather or compute the pricing data contained in its report. See Memorandum to The File, re: "Placing Benchmark on the Record" (Aug. 30, 2023), P.R. 216, at Attach. (page 64), Appx____. Therefore, these objections do not explain why the land benchmark was improved by calculating the simple average of two data sets had vastly different breadth of coverage.

Even if Commerce's practice of weighting multiple benchmark sources were generally reasonable in the Tier One context—which it is not, for the reasons explained above—Commerce unreasonably equally weighted the price for a single parcel of land in a non-comparable region of Malaysia with MIDA data that already reflected multiple land transactions in the same region in which CS Wind's land is located. *See* CS Wind Final Calc Memo at 2, Appx____.

28

### D. Substantial Evidence Does Not Support Commerce's Selection of Singapore Electricity Tariffs as a Tier Three Benchmark for Electricity

Defendant argues that Commerce reasonably relied upon factors including geographic proximity and interconnectivity of transmission lines or grids, the class/type of electricity of consumer, and the similarity of electricity pricing mechanisms between Malaysia and Singapore in its Tier Three benchmark analysis. Def.'s Resp Br. 60–61. Defendant-Intervenor goes even farther, claiming that Commerce's practice focuses on whether the benchmark country and the country in question share a transmission line or grid. D-I Resp. Br. at 31.

Defendant-Intervenor mischaracterizes the relevance of "interconnectedness" to Commerce's selection of a Tier Three benchmark by implying that "physical interconnectedness" is a prerequisite to suitability of a utility. *See* D-I Resp. Br. at 32 (*citing ArcelorMittal USA LLC v. United States*, 337 F. Supp. 3d 1285, 1296 (Ct. Int'l Trade 2018). Grid interconnection is neither required to select a Tier Three utility benchmark nor determinative. On the contrary, in *ArcelorMittal USA LLC*, the Court did not review Commerce's selection of regional European gas prices as a Tier Three benchmark because of

physical infrastructure links because it was considering the threshold

issue of whether the provision of natural gas for LTAR is *de facto*

specific. *See ArcelorMittal*, 337 F. Supp. 3d at 1307, n.15. Defendant

admits that Commerce focused on whether the markets were

interconnected, not the physical interconnections in utility lines in the

underlying determination. Def.'s Resp. Br. 57 (stating that Commerce

considered whether the benchmark prices for natural gas "were part of

the same regional market"). Defendant-Intervenor's claim  that

Commerce reasonably considers physical interconnectedness of grids in

its Tier Three benchmark analysis is unsupported by Commerce's

practice.

Defendant attempts to bolster the relevance of geographic

proximity by highlighting cases where Commerce considered geographic

proximity for utility benchmarks. *See* Def.'s Resp. Br. at 70. However, in

*Cold-Rolled Steel from Russia*, cited by Defendant, Commerce concluded

that regional European natural gas pricing could serve as an

appropriate Tier Three natural gas benchmark, in part, because

evidence on the record showed that European *regional markets* (*i.e.*,

market-based trading of natural gas across borders) were

interconnected, not that the physical utility pipelines were

interconnected. See *Countervailing Duty Investigation of Certain Cold-*

*Rolled Steel Flat Products From the Russian Federation*, 81 Fed. Reg.

49,935 (Dep't Commerce July 29, 2016) (final affirmative countervailing

duty determination and final negative critical circumstances

determination), and accompanying Memorandum, re: "Countervailing

Duty Investigation of Certain Cold-Rolled Steel Flat Products from the

Russian Federation: Issues and Decision Memorandum for the Final

Determination" (July 20, 2016), at 70).

To the extent Commerce does consider interconnectedness in the

utility context, its practice is not relevant to this case where Commerce

relied on physical interconnectedness of the electricity grids between

Singapore and Malaysia. Final Decision Memo at 41, n. 216, Appx____.

Neither Defendant nor Commerce cite any support in the record for the

notion that Singapore and Malaysia were part of a market-determined

regional Southeast Asian market for electricity.

Defendant also argues that Commerce's selection of Singapore

electricity tariffs was supported by substantial evidence because the

Singapore's electricity tariffs are market-based and share a similar electricity setting framework. Def.'s Resp. Br. at 61.

Even accepting that Singapore and Malaysian utilities may include a common Incentive-Based Regulation framework among the components of their electricity tariff-setting structures, Commerce did not explain the relevance of these factors to assessing whether Malaysia's electricity tariffs were market-based or whether Singapore electricity tariffs were a reasonably proxy for electricity prices in Malaysia. Instead, Commerce faulted the Turkish electricity data as a benchmark alternative because it claimed the benchmark source lacked detailed information about the pricing mechanism. Final Decision Memo at 41, Appx____. But, the Singapore data lacked information showing its market had no government involvement in electricity pricing or to demonstrate Singapore's electricity pricing mechanism was similar to that of Malaysia. *See* Letter from Wiley Rein LLP re: "Utility Scale Wind Towers from Malaysia: Submission of Benchmark Information" (Aug. 1, 2023), P.R. 162–168, at Ex. NFI-1, Appx____ (showing that the Singapore data only contained a tariff table and screenshots from the website from which the table was generated).

32

Therefore, the relative strength of the Singapore electricity data's explanation of its electricity price setting methodology did not explain why the Singapore electricity data was superior to the Turkish data.

The only case cited by Commerce and Defendant to support the notion that geographic proximity, physical interconnectivity of transmission lines or grides, and the similarity of pricing mechanisms are critical to a Tier Three Benchmark analysis is Commerce's own final determination in the underlying investigation. Def.'s Resp. Br. 60, Final Decision Memo at 40, n. 213 (*citing* Utility Scale Wind Towers from Malaysia, 86 Fed. Reg. 15,887 (Dep't Commerce Mar. 25, 2021) (preliminary affirmative countervailing duty determination), and accompanying "Decision Memorandum for the Preliminary Determination in the Countervailing Duty Investigation of Utility Scale Wind Towers from Malaysia" (Mar. 19, 2021), at 6 (*unchanged* in *Utility Scale Wind Towers From Malaysia*, 86 Fed. Reg. 30,593 (Dep't Commerce June 9, 2021) (final affirmative countervailing duty determination)).

Commerce's reliance on the underlying investigation is problematic for at least three reasons. First, Commerce's final

determination in the underlying investigation was not reviewed by a
Court. Second, in the investigation Commerce had no alternative
electricity benchmark to consider in the underlying investigation. *See
Utility Scale Wind Towers From Malaysia*, 86 Fed. Reg. 30,593 (Dep't
Commerce June 9, 2021) (final affirmative countervailing duty
determination) and accompanying Memorandum re: "Issues and
Decision Memorandum for the Final Determination in the
Countervailing Duty Investigation of Utility Scale Wind Towers from
Malaysia" (June 2, 2021), at 37 (relying on Singapore prices, as facts
available, as the best available benchmark on the record because
Commerce found information is missing from the record due to the
GOM's partial response to Commerce's cost-related questions, but not
considering any potential alternative benchmark source). Third, one
determination based on different factual records does not create a
practice.

In this administrative review, Commerce failed to meaningfully
address the Turkish alternative Tier Three benchmark source or
explain why the Singapore data was superior. Therefore, Commerce's

selection of Singapore electricity prices as a Tier Three benchmark is not supported by substantial evidence.

Defendant and Defendant-Intervenors dismiss the relevance of price or economic comparability by citing the Court's decision in *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*. Def.'s Resp. Br. at 58, D-I Resp. Br. at 31. But, *Habaş* stands only for the notion that Commerce's regulation does not require it to consider price comparability when conducting a Tier Three benchmark analysis. *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*, 536 F.Supp.3d 1333, 1345. The Court did not hold that price comparability, or economic comparability are irrelevant to a Tier Three benchmark analysis.

Defendant devotes a subsection of its brief to attacking the relevance of economic comparability, and gross national income ("GNI") data, to selecting Tier Three benchmarks for electricity. Def.'s Resp. Br. 61–68. Specifically, Defendant faults CS Wind for not providing correlative studies to causally link economic comparability with electricity pricing and price setting mechanisms. *Id.* at 63–65.

**PUBLIC VERSION**

Given that Commerce has considered these factors to be relevant in the context of other Tier Three benchmarks—including for land—Commerce had to explain why economic comparability is not relevant to assessing whether utility pricing may be comparable across countries with vastly different levels of economic development. Second, Defendant points to no evidence that Commerce's Tier Three benchmark practice requires detailed correlative studies before considering GNI to be relevant. In light of Commerce's past practice, CS Wind was not required to provide detailed studies linking GNI with electricity pricing to explain the relevance of GNI to comparability.

Even if Commerce's regulation does not require it to consider price or economic comparability, its Tier Three benchmark practice does. *See, e.g.*, *Certain Corrosion Inhibitors from the People's Republic of China*, 86 Fed. Reg. 7,537 (Dep't Commerce Jan. 29, 2021) (final affirmative countervailing duty determination*)*, and accompanying Memorandum, re: "Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Corrosion Inhibitors from the People's Republic of China" (Jan. 25, 2021), at 35–36 (requiring Commerce to consider economic comparability in a Tier

Case No. 24-00079                                        **PUBLIC VERSION**

Three benchmark at least where evidence of economic comparability of the countries from which the benchmarks are derived was on the record).

Courts have also required Commerce to consider price comparability in the Tier Three benchmark context. *See Risen Energy Co., Ltd. v. United States*, 46 CIT __, __, 570 F.Supp.3d 1369, 1375 (2022) (finding that Commerce had not adequately explained its selection of a Tier Three benchmark source for land where Commerce did not sufficiently weigh geographic proximity concerns against a widening gap in economic comparability metrics, including GNI), *Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1314 (Ct. Int'l Trade 2022) (noting that "it is important that Commerce's choices do not result in an unreasonable comparison between the benchmark price and the government price" in the context of selecting Tier Three benchmarks).  Therefore, Commerce could not dismiss the highly disparate level of economic development between Malaysia and Singapore without explaining why economic comparability did not undermine its Tier Three benchmark selection for electricity.

**Case No. 24-00079**                                    **PUBLIC VERSION**

## III.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the

Court grant its Motion for Judgment on the Agency Record and remand

this case to Commerce with instructions consistent with the points set

forth in this Memorandum of Law.

Respectfully submitted,

<u>/s/ Kenneth N. Hammer</u>
Jarrod M. Goldfeder
Kenneth N. Hammer
Sezi Erdin

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue,
SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

*Counsel to Plaintiffs*
CS Wind Malaysia Sdn. Bhd. and
CS Wind Corporation

Dated:  July 17, 2025

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION, | ) ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| UNITED STATES, | ) Ct. No. 24-00079 |
| *Defendant,* | ) ) |
| and, | ) ) |
| WIND TOWER TRADE COALITION, | ) ) |
| *Defendant-Intervenor.* | ) ) |

CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Reply Brief of Plaintiffs, CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation, dated July 17, 2025, complies with the word-count limitation stated in the Fourth Amended Scheduling Order, June 20, 2025, ECF No. 41.

The reply brief contains 6,931 words according to the word-count function of the word-processing software used to prepare the brief.

Respectfully submitted,

/s/ Kenneth N. Hammer
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE,
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  July 17, 2025