C-557-822
Remand
Slip Op 25-149
POR: 3/25/2021 – 12/31/2021
**Public Document**
E&C/OV: KH

*CS Wind Malaysia Sdn. Bhd. v. United States* **Ct. No. 24-00079,**
**Slip Op. 25-149 (CIT December 5, 2025)**
**Utility Scale Wind Towers from Malaysia**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination in accordance with the remand order of the U.S. Court of International Trade

(the Court) in *CS Wind Malaysia Sdn. Bhd. v. United States*, Ct. No. 24-00079, Slip Op. 25-149

(CIT December 5, 2025) (*Remand Order*). These final results of redetermination concern the

*Final Results* in the first administrative review of the countervailing duty (CVD) order on utility

scale wind towers from Malaysia[1] covering the period of review (POR) March 25, 2021, through

December 31, 2021.[2]

In the *Remand Order*, the Court sustained in part,[3] and remanded in part, Commerce's

*Final Results*. In particular, the Court remanded two aspects of Commerce's determination.

First, the Court ordered Commerce to address certain arguments relating to the selection of a

benchmark for calculation of a subsidy rate for the land for less-than-adequate-remuneration

(LTAR) program. Specifically, the Court ordered Commerce to consider whether the relied-

---

[1] *See Utility Scale Wind Towers from Malaysia: Countervailing Duty Order*, 86 FR 41950 (August 4, 2021).
[2] *See Utility Scale Wind Towers from Malaysia: Final Results of Countervailing Duty Administrative Review; 2021*,
89 FR 17404 (March 11, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 8 ("{T}he court sustains Commerce's determination that the full value of duty exemptions
that CS Wind received conferred a countervailable benefit.") and 20 ("Commerce's selection of Singaporean rates as
a tier-three benchmark to value what CS Wind paid for electrical power supplied by the Malaysian government is
supported by substantial evidence.").

upon transaction from the CBRE Benchmark Data was appropriate in light of the location and size of the parcel.[4]  Second, regarding Commerce's decision to deny mandatory respondent CS Wind Malaysia Sdn Bhd (CS Wind Malaysia) an entered value adjustment (EVA), the Court ordered that Commerce must explain why certain evidentiary requirements it imposes prior to granting an EVA are appropriate.  We have provided additional explanation of these points below.

## II.   BACKGROUND

### A.  The Underlying Administrative Review

In the 2021 administrative review of wind towers from Malaysia, Commerce individually examined one company, CS Wind Malaysia.[5]  In the *Preliminary Results*, we calculated a subsidy rate of 10.96 percent for CS Wind Malaysia, which included a subsidy rate for a land for LTAR program.[6]  Regarding our selection of a benchmark for the program, we explained:

> Commerce is using a tier-one benchmark analysis.  While CS Wind {Malaysia} submitted a land benchmark from the Malaysia Investment Development Authority (MIDA) that included annual rental prices, there is no accompanying explanation of the methodology as to how these prices were collected, nor any clear evidence indicating whether these prices are private transactions or government transactions.  Therefore, we are preliminarily relying on information found in the "Real Estate Market Outlook 2020 Malaysia" publication from C.B. Richard Ellis {*i.e.*, the CBRE Benchmark Data}, which Commerce has placed on the record ourselves.  This source provides purchase prices and lease rates for industrial land in Malaysia during the POR.  The submitted information contains data on private land transactions in Malaysia during 2020.  We relied on a rental price of industrial land between two private parties in Penang as our benchmark.[7]

---

[4] *Id*. at 13 (directing Commerce to consider whether the "rental price in Penang is not comparable to its lease rate in Pahang due to the disparity in real estate costs between the two Malaysian jurisdictions") and 15 (directing that "Commerce must also address the company's argument that the size of its property in Pahang is not comparable to the land in the Ellis report transaction.").  *See also* Memorandum, "Placing Benchmark on the Record," dated August 30, 2023 (CBRE Benchmark Data) at 64.
[5] *See* Memorandum, "Respondent Selection," dated November 15, 2022.
[6] *See Utility Scale Wind Towers from Malaysia:  Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review, 2021*, 88 FR 61516 (September 7, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 9.
[7] *Id*. at 6 (internal citations omitted).

Thus, we preliminarily relied solely on a transaction price from the CBRE Benchmark Data for the benchmark. This approach yielded a program-specific rate of 2.23 percent.

Additionally, we preliminarily denied CS Wind Malaysia's request for an EVA. Specifically, we explained:

> during this POR, CS Wind {Malaysia} … was the producer of the wind towers and was the first seller of the subject merchandise. Accordingly, we have preliminarily relied on CS Wind {Malaysia}'s reported sales revenue as the appropriate denominator. We intend to consider parties' comments regarding this approach in the final results.[8]

Therefore, we relied on CS Wind Malaysia's own sales values as the denominators in our subsidy rate calculations, consistent with Commerce's standard practice.[9]

We received comments from interested parties on our *Preliminary Results*.[10] As a result of these comments, we modified the benchmark for calculation of a subsidy rate under the land for LTAR program to incorporate the MIDA data submitted by CS Wind Malaysia. Although we noted certain concerns with the MIDA data, we also acknowledged that, where there is more than one usable price to construct a benchmark, it is Commerce's practice to average the prices to the extent possible.[11] Thus, instead of relying exclusively on the CBRE Benchmark Data transaction, we took a simple average of the rental price from the CBRE Benchmark Data (*i.e.*, a transaction relating to land in the State of Penang) with the price contained in the MIDA data

---

[8] *Id*. (internal citations omitted).

[9] *See generally* 19 CFR 351.525(b); *see also* Final Results of Redetermination Pursuant to Court Order, *Jiangsu Zhongji Lamination Materials Co., Ltd., et al. v. United States*, Consol. Court No. 18-00089, dated January 27, 2020 (*Aluminum Foil Remand*) at 5, available at https://access.trade.gov/Resources/remands/19-122.pdf (noting that "the EVA is not required under U.S. law or regulation" and that "the adjustment has been granted in a limited number of cases").

[10] *See* Petitioner's Letter, "Petitioner's Case Brief," dated January 12, 2024; and CS Wind's Letter, "CS Wind's Case Brief," dated January 12, 2024 (CS Wind Case Brief); *see also* Petitioner's Letter, "Petitioner's Rebuttal Brief," dated January 22, 2024; and CS Wind's Letter, "CS Wind's Rebuttal Brief," dated January 22, 2024.

[11] *See Final Results* IDM at Comment 3.

(*i.e.*, relating to transactions in the State of Pahang).[12]  Doing so resulted in a program-specific rate of 1.99 percent.

We continued to deny CS Wind Malaysia's request for an EVA, stating that "{w}e disagree with CS Wind {Malaysia} that the record evidence supports the granting of an EVA or otherwise demonstrates that a revision to the denominators used in our *Preliminary Results* is warranted."[13]  We explained:

> Commerce's practice is to use a respondent's {free on board} sales values as the denominator in its subsidy rate calculations.  However, in limited circumstances, Commerce has adjusted (via an EVA) the calculation of the subsidy rate when the sales value used to calculate that subsidy rate does not match the entered value of the subject merchandise, *e.g.*, where subject merchandise is exported to the United States with a mark-up from an affiliated company, and where the respondent can demonstrate that:  (1) the price on which the alleged subsidy is based differs from the U.S. invoiced price; (2) the exporters and the party that invoices the customer are affiliated; (3) the U.S. invoice establishes the customs value to which the {countervailing duty (CVD)} duties are applied; (4) there is a one-to-one correlation, except for differences in price, between the invoice that reflects the price on which subsidies are received and the invoice with the mark-up that accompanies the shipment; (5) the merchandise is shipped directly to the United States; and (6) the invoices can be tracked as back-to-back invoices that are identical except for price.[14]

We determined that such criteria were not met in this case because CS Wind Malaysia could not satisfy the third criterion.  In particular, we requested supporting documentation regarding the relevant U.S. transactions in our evaluation of the third criterion, and CS Wind Malaysia stated that it was unable to provide the U.S. Customs and Border Protection (CBP) Form 7501s for two of the four projects for which we requested supporting documentation.  For the other two sales, for which CS Wind Malaysia did provide documentation in response to Commerce's request, there was a discrepancy between the sales value listed on the invoices and the total entered value

---

[12] *Id*.
[13] *Id*. at Comment 1.
[14] *Id*.

on the CBP 7501 forms.  Therefore, we determined that the record did not demonstrate that the U.S. invoice established the customs value to which the countervailing duties are applied.  As a result, we determined that an EVA was not appropriate.

In the *Final Results*, CS Wind Malaysia received a rate of 10.72 percent.[15]  This litigation ensued.

### B.  The Court's *Remand Order*

In the *Remand Order*, the Court remanded two aspects of Commerce's *Final Results*. Regarding the selection of a benchmark for our calculation of a subsidy rate under the land for LTAR program, the Court raised two concerns relating to the CBRE Benchmark Data.  First, the Court ordered Commerce to consider whether the relied-upon transaction from the CBRE Benchmark Data was appropriate in light of the location and size of the underlying parcel as compared with CS Wind Malaysia's land.[16]  In this regard, the Court found that Commerce, "simply—and impermissibly—elided CS Wind {Malaysia}'s argument that the {CBRE Benchmark Data} rental price in Penang is not comparable to its lease rate in Pahang due to the disparity in real estate costs between the two Malaysian jurisdictions."[17]  As a result, the Court found that "{a} remand is thus necessary for the agency to tackle that question."[18]  Second, the Court found that "Commerce must also address the company's argument that the size of its property in Pahang is not comparable to the land in the Ellis report transaction {*i.e.*, in the CBRE Benchmark Data submission}."[19]

---

[15] *See generally Final Results.*
[16] *See Remand Order* at 13.
[17] *Id.*
[18] *Id.*
[19] *Id.*

Regarding the second issue, Commerce's decision to deny CS Wind Malaysia an EVA, the Court ordered Commerce to explain why the evidentiary requirements the agency imposes prior to granting an EVA are appropriate.[20]  The Court acknowledged Commerce's practice of applying a standard six-part test for evaluating a request for an EVA, but it questioned whether such requirements—in particular, evidence that the U.S. invoice establishes the customs value to which the countervailing duties are applied—are necessary in light of Commerce's current methodology for implementing such adjustments.[21]  In this regard, the Court noted that, "Commerce appears to have adopted a different methodology for calculating an {EVA, whereby Commerce} seemingly now adjusts a subsidy rate by changing the denominator of the original subsidy rate from the respondent's total *worldwide export sales* to the affiliate's marked-up total worldwide export sales" and "{t}his calculation method does not specifically account for a U.S. mark-up and does not require U.S.-specific sales data."[22]  Against this backdrop, the Court ordered that "Commerce must explain the relevance of the third criterion on which it relied to deny CS Wind {Malaysia}'s requested adjustment."[23]

## III.    ANALYSIS

### A.  Selection of a Land Benchmark

Consistent with the *Remand Order*, we are providing further explanation that our determination that our reliance on an average price—based on a Penang land transaction from the CBRE Benchmark Data and the Pahang aggregate price from the MIDA data—reflects an appropriate benchmark.  Therefore, we have not modified our subsidy rate calculation for the land for LTAR program in these final results of redetermination.

---

[20] *Id*. at 26.
[21] *Id*. at 22-23.
[22] *Id*. at 25 (emphasis in original) (internal citations and quotations omitted).
[23] *Id*. at 26.

In selecting a tier-one benchmark to measure the adequacy of remuneration, Commerce considers various factors, including "product similarity . . . and other factors affecting comparability."[24]  Here, the Court ordered Commerce to consider whether the agency properly relied on the transaction from CBRE Benchmark Data in constructing the benchmark, despite the differences in location and size of the underlying land parcel as compared with CS Wind Malaysia's land parcel.[25]  After further review of the potential benchmark sources on the record,[26] we continue to find that the record does not warrant a different benchmark price selection in this regard.

With respect to the size difference between the land parcels,[27] we find no basis to conclude that the difference in parcel size invalidates Commerce's use of the CBRE Benchmark Data transaction.  The MIDA data proffered by CS Wind Malaysia do not identify the size of the land parcels that underpin the prices contained in that source.[28]  Accordingly, although we acknowledge the substantial difference in size between CS Wind Malaysia's parcel and that contained in the CBRE Benchmark data, there is no indication that a similarly significant disparity is not also present in the MIDA data.  Thus, the alternative MIDA data provided by the

---

[24] *See* 19 CFR 351.511(a)(2)(i).

[25] *See Remand Order* at 13-14.

[26] *See generally* CS Wind's Letter, "Benchmark Submission," dated August 1, 2023 (CS Wind Benchmark Submission), at Attachments 1-3); and CBRE Benchmark Data.

[27] The Court determined that CS Wind Malaysia did not fail to exhaust its argument regarding the size difference between the CS Wind Malaysia parcel and the CBRE Benchmark Data transaction, stating that, "{a}lthough the government argues that CS Wind waived this argument by failing to exhaust it, recall that the agency did not consider this topic in its preliminary determination." *See Remand Order* at 13.  Commerce respectfully notes, however, that it countervailed the provision of land for LTAR in the *Preliminary Results* using the CBRE Benchmark Data transaction in question.  Thus, parties did have the opportunity to raise arguments regarding the size of the CBRE Benchmark Data parcel in case briefs before the agency.

[28] *See* CS Wind Benchmark Submission at Attachments 1-3.  The data for 2016 through 2021 do not contain size figures.  The data for 2014 and 2015 do not identify the size of the underlying plots but do identify the price ranges above/below a certain size threshold for select locations.

respondent do not fare better on this criterion.[29]  Consequently, CS Wind Malaysia's observation regarding the difference in size between the company's rental land as compared with the CBRE Benchmark Data transaction does not warrant a different benchmark selection when considered in light of the alternative benchmark data on the record.

Regarding the location of the various land parcels, we disagree that Penang prices are unusable because they are for more expensive parcels located in a different state from CS Wind Malaysia's parcel in Pahang.  In support of the proposition that Penang is too developed for comparison to Pahang, CS Wind Malaysia highlights land price differences between the two states, as reflected in the MIDA data and CBRE Benchmark Data, which show higher land prices in Penang and lower ones in Pahang.[30]  However, the existence of differences in land prices in and of themselves does not render the Penang prices objectively worse or the Pahang prices objectively better.  Differences in prices between benchmarks and respondents' purchases could in fact be the result of government subsidization.  Excluding non-aberrational benchmarks due solely to price differences would not necessarily yield a more accurate benchmark.  Indeed, CS Wind Malaysia acknowledges, and this case demonstrates, that the Government of Malaysia subsidizes entities located in the East Coast Economic Region, which includes Pahang, through various mechanisms.[31]  As the CBRE Benchmark Data source notes, "{t}he Gebeng Industrial Area {*i.e.*, where CS Wind Malaysia is located in Pahang, within the East Coast Economic Region} also offers land for local and foreign demand to set up new plants or warehouses,

[29] Furthermore, the other relevant transactions shown in the CBRE Benchmark Data either contain no land size information or, in one instance, there is size information which indicates that the transaction was for a land parcel that differs in size from CS Wind Malaysia's plot to an even greater degree, *i.e.*, the parcel we relied upon was 78,024 square feet, whereas the alternative plot in the CBRE data was 44,000 square feet (and thus was *more* different from CS Wind Malaysia's lot size).  *See* CBRE Benchmark Data at 63-64.

[30] *Id*. at 62-64, and 67; and CS Wind Benchmark Submission at Attachments 1-3.

[31] *See* CS Wind Case Brief at 20 (noting, for instance, that the East Coast Economic Region "seeks to attract investment through various incentive packages, including a 100 percent income tax exemption").

backed by competitive land price, availability of skilled labor and amenities offered by the State Government."[32]  Therefore, it is not surprising that land prices in Pahang would be lower; the extent to which these lower prices are a function of government support is unclear.  As noted in the *Preliminary Results*, it was largely this consideration—*i.e.*, that certain transactions in the MIDA data covering Pahang could reflect subsidized governmental transactions—which led to Commerce's initial concern regarding these data.[33]  Because each data source contains limitations, Commerce reasonably relied on an average of the CBRE Benchmark Data and the MIDA data, consistent with its preference for using multiple benchmark sources and in light of the fact that the MIDA data reflected transactions from the same region as CS Wind Malaysia.[34]

The chart below summarizes the available data points on the record of this review, with the relied upon transactions in bold:

| Parcel(s): | Location | Size | Parties | # of Transactions |
|---|---|---|---|---|
| **MIDA Avg** | **Pahang** | **No data** | **No data** | **Multiple, Unknown #** |
| **CBRE 1** | **Penang** | **78,024 sq ft** | **Private** | **Single** |
| CBRE 2 | Penang | 44,000 sq ft | Govt/Private | Single |
| CBRE 3 | Iskandar Malaysia | No data | No data | Multiple, Unknown # |
| CBRE 4 | Sarawak | No data | No data | Multiple, Unknown # |

**Sources**:  CS Wind Benchmark Submission at Attachments 1-3 (MIDA Avg); and CBRE Benchmark Data at pages 63-64 (CBRE 1), 63 (CBRE 2), 65 (CBRE 3), 69 (CBRE 4).

Against this backdrop, we incorporated the MIDA data, which were favorable due to location similarity and the multiple underlying data points, despite other drawbacks, into the benchmark.  We also continued to rely on the best available transaction from the CBRE

---

[32] *See* CBRE Benchmark Data at 67.

[33] *See Preliminary Results* PDM at 6 ("While CS Wind submitted a land benchmark from the Malaysia Investment Development Authority (MIDA) that included annual rental prices, there is no accompanying explanation of the methodology as to how these prices were collected, nor any clear evidence indicating whether these prices are private transactions or government transactions").

[34] *See Final Results* IDM at Comment 3.

Benchmark Data, which was favorable because it was clearly a transaction between two private parties.

Accordingly, Commerce finds that its benchmark selection reflects a reasonable exercise of its discretion considering the options available on the record, is supported by substantial evidence on the record, and complies with the Court's remand instructions.

**B. Denial of an EVA**

Consistent with the *Remand Order*, Commerce articulates its current methodology for calculating EVAs, explains the relevance of the six-part test (including the necessity of the third factor), and further explains why it reasonably denied CS Wind Malaysia's request for an EVA. We continue to find that our denial of an EVA for CS Wind Malaysia was appropriate. Therefore, we have not modified our subsidy rate calculations for these final results of redetermination.

In its *Remand Order*, the Court acknowledged Commerce's existing six-factor test for evaluating a request for an EVA.[35]  However, it ordered Commerce to explain whether the criteria set forth in the test, and in particular the third criterion—*i.e.*, that "the U.S. invoice establishes the customs value to which the CVD duties are applied"—are relevant in light of Commerce's current calculation methodology for implementing EVAs.[36]  We find that it is, and we highlight that Commerce's current approach to implementing an EVA is based on U.S.-specific data.

At the outset, and as the Court noted, Commerce may make an adjustment to a respondent's calculated subsidy rate when the "sales value used to calculate that subsidy rate

---

[35] *See Remand Order* at 22-23.
[36] *Id*. at 22-23 and 26.

does not match the entered value."[37]  This can occur when a respondent sells its merchandise to an affiliated trading company that marks up the price for resale to the United States; under such circumstances, the subsidy calculation is based on one denominator (the initial sale), but the countervailing duties at the border are based on application of the *ad valorem* subsidy rate to the resale price/entered value of the goods (the second sale), which could inflate the amount of duties owed on the merchandise.  This can be seen in the example below:

| Step | Component | Formula | Value |
|---|---|---|---|
| A | CVD Rate | | 20.0% |
| B | Respondent's U.S. Sales | | $5,000 |
| C | Collectible U.S. Duty | A * B | *$1,000* |
| D | Affiliate U.S. Sales (with mark-up as entered in U.S.) | | $5,500 |
| E | Actual Duty Collected | A * D | *$1,100* |

In the above example, CBP would have applied a 20 percent CVD rate to the U.S. entered value amount of $5,500, resulting in $1,100 of actual duty collected, as opposed to the appropriate $1,000.  This situation would, therefore, result in the overcollection of duties in the amount of $100.  The purpose of an EVA, then, is to ensure that, in appropriate circumstances, the countervailing duties imposed and collected upon entry into the United States correspond to the calculated subsidy rate for the merchandise.

Commerce established the six above-referenced EVA requirements to assist in determining whether the assumptions underlying a potential adjustment are warranted.[38]  For instance, Commerce must be confident that the overall U.S. entered value is, in fact, actually

---

[37] *See Certain Uncoated Paper from Indonesia:  Final Affirmative Countervailing Duty Determination*, 81 FR 3104 (January 20, 2016), and accompanying IDM at 12.
[38] *See, e.g., Ball Bearings and Parts Thereof from Thailand; Final Results of Countervailing Duty Administrative Review*, 57 FR 26646 (June 15, 1992).

higher than the sales value used to calculate the subsidy rate.[39]  Similarly, if only select sales have a markup while others do not (or the markup varies substantially from sale to sale), using those sales to derive an across-the-board downward adjustment to the duties applied upon entry may not reflect an accurate collection of duties.  Thus, Commerce requires evidence of the mark up between the respondent's sale to the affiliate and the affiliate's sale to a customer in the United States.  As part of this, we require that there be a one-to-one linkage between the initial sale and the subsequent sale; we ensure this linkage by requiring that the invoices are for back-to-back shipments (*i.e.*, direct from the *Order* country to the U.S. customer), with invoices that are identical except for price.  This methodology provides Commerce with the necessary assurance that the merchandise that *enters* the United States is the same merchandise *sold* to the affiliate, on a shipment-specific basis.[40]  Further, we find that the requirement for U.S. invoices to correlate with the entered value is crucial to prevent manipulation of the duty collection based on overstated or irregular mark-ups, as well as manipulation of the calculation through false invoices and/or the use of shell companies.  As the Court has recognized, "{w}ithout record evidence demonstrating that *U.S. entries* experienced a markup that was not accounted for, the court can give no credence to … claims of overcollection."[41]

In the *Remand Order* here, the Court referenced a particular EVA calculation methodology whereby Commerce would implement an adjustment based on "worldwide sales,"

---

[39] *See, e.g.*, *Canadian Solar, Inc. v. United States*, Ct. No.18-00184, Slip Op. 20-23, at *18-21 (CIT Feb. 25, 2020) (*Canadian Solar I*).

[40] *See, e.g.*, *Canadian Solar II*, 537 F. Supp. 3d at 1397 ("Commerce's desire to verify the existence of a U.S. markup is reasonable because an EVA is intended to prevent the overcollection of duties, which can only occur upon entry of the merchandise to the United States") and 1397 n.14 ("{T}he court acknowledge{d} that granting an EVA appears feasible only when a mark-up is added consistently and as a matter of course, given verification concerns.  This concern is understandable because a respondent could potentially receive an excessive EVA based on a sample U.S. invoice showing a higher U.S. markup that is not consistently applied to all U.S. sales.") (internal citations omitted).

[41] *See Canadian Solar I*, Slip Op. 20-23, at *20 (emphasis added).

and, in light of such an adjustment methodology, the Court questioned whether U.S.-specific sales/entered value data are relevant to Commerce's calculation.[42] Stated differently, if a potential EVA calculation is not based on U.S. sales values, the Court reasoned that Commerce's requirement that a respondent demonstrate that the U.S. invoice establishes the U.S. customs value may not be necessary.[43] The Court cites certain cases, including *Canadian Solar II*[44] and *Jiangsu Zhongji*,[45] in support of the proposition that a prospective EVA calculation may be based on worldwide sales figures.

Commerce acknowledges that, at one time, we applied such a methodology and that, previously, as noted in *Canadian Solar II* and *Jiangsu Zhongji*, we used the respondent's "worldwide," or total, sales to make an EVA. However, Commerce's practice has changed. In conducting an EVA analysis, Commerce must satisfy itself that the markup to the respondent's sales by its affiliate flows through to the entered value and, therefore, determine whether the trading company's sales value to its U.S. customer needs to be adjusted for assessment purposes at the time of duty collection. Therefore, we have found that it is most appropriate to look at whether the U.S. invoice establishes the customs value. We find that this is consistent with our obligation under section 701(a) of the Tariff Act of 1930, as amended (the Act), which requires that Commerce collect the amount of duties owed based on the actual subsidization of the product under investigation.

Further, we note that CS Wind Malaysia has requested an EVA and has provided certain (albeit incomplete) information for its sales to the to the United States.[46] The markup may differ

---

[42] *See Remand Order* at 23.
[43] *Id*.
[44] *See Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1389 n.6 (CIT 2021) (*Canadian Solar II*).
[45] *See Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1327 (CIT 2019) (*Jiangsu Zhongji*).
[46] *See* CS Wind Malaysia's Letter, "Section III Questionnaire Response," dated January 11, 2023 (CS Wind Malaysia IQR), at III-12-13.

from market to market, and the use of worldwide sales may lead to over- or under- collection.

The actual determination of whether the entered value reflects a markup that is actionable

through an EVA will always be facts-specific based on the sales pattern of the merchandise

under consideration.

The change to our EVA calculation reflects the above considerations and no longer

involves changing the sales denominators but rather making an adjustment to the rate itself.  This

allows us to distinguish EVA analysis from the disparate methodology of choosing an

appropriate sales denominator during the course of the investigation or review, based on how the

subject government subsidizes.  That analysis is separate from our EVA analysis, which is

concerned with the duty collection at the border to reflect the business practice of the company

that is selling to the United States through an affiliate with a price markup.  In *Aluminum Foil*

*from China 2021*, for instance, Commerce explained our calculation methodology:

> Commerce is implementing a modified EVA calculation methodology in light of
> earlier litigation in this proceeding, in which we stated that Commerce intends to
> re-evaluate its EVA methodology, as well as the circumstances under which an
> EVA may be granted, in a future segment of this aluminum foil proceeding.
> Consistent with methodological concerns identified in the Final Remand, this
> methodology narrows the focus of the calculation *to U.S. sales and U.S. entered*
> *value*, and better addresses the core issue of potential overcollection of duties at the
> U.S. border. …  We calculated the countervailing duties to be collected on
> {respondent} Zhongji's imports into the United States during the POR by
> multiplying Zhongji's net *ad valorem* subsidy rate by Zhongji's reported value of
> exports to the United States of subject merchandise, prior to any sales markup.  We
> then divided this amount of countervailing duties to be collected by *the total U.S.*
> *sales invoice amount, i.e., the entered value amount of Zhongji HK's U.S. sales of*
> *subject merchandise produced by Zhongji*, which yields an adjusted CVD rate to
> be applied to *the entered value of Zhongji's imports into the United States*. … If, in
> the course of applying this new methodology in this or other CVD proceedings,
> Commerce finds that the methodology is not appropriate in certain circumstances,
> *e.g.*, where there is evidence of distorted transfer pricing between the related parties
> as evidenced by unusually high mark-ups in the U.S. entered value, Commerce may

revisit the new methodology's utility and may reassess the criteria for granting an EVA.[47]

Thus, in that case, we divided the amount of countervailing duties to be collected by the total U.S. sales invoice amount, which reflected the entered value of the affiliated reseller's U.S. sales of subject merchandise, yielding an adjusted CVD rate to be applied to the entered value of the respondent's imports into the United States.[48]  This can be demonstrated using the example highlighted earlier:

| Step | Component | Formula | Value |
|---|---|---|---|
| A | CVD Rate | | 20.0% |
| B | Respondent's U.S. Sales | | $5,000 |
| C | Collectible U.S. Duty | A * B | *$1,000* |
| D | Affiliate U.S. Sales (with mark-up as entered in U.S.) | | $5,500 |
| E | Adjusted CVD Rate | C/D | 18.2% |
| F | U.S. Entered Value | D | $5,500 |
| G | Actual Duty Collected | E * F | *$1,000* |

As can be seen in the table above, the potential "overcollection" of duties has been remedied by adjusting the CVD rate to account for the different, marked up entered value of the merchandise.  Given this methodology, accurate entered values and corresponding invoices are important not only to demonstrate that a problem exists (*i.e.*, the potential overcollection of duties), but is also a critical component of the EVA calculation itself.  Without accurate sales figures, accurate connections between invoices and entered values, and accurate entered value

---

[47] *See Certain Aluminum Foil from the People's Republic of China:  Preliminary Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2021*, 88 FR 28496 (May 4, 2023), and accompanying PDM at 9, unchanged in *Certain Aluminum Foil from the People's Republic of China:  Final Results of Countervailing Duty Administrative; 2021*, 88 FR 75267 (November 2, 2023) (*Aluminum Foil from China 2021*), and accompanying IDM at Comment 2 (emphasis added).
[48] *See Aluminum Foil from China 2021* IDM at Comment 2.

figures, it is not possible for Commerce to make an accurate EVA that would remedy the potential issue at hand.

In other words, recent decisions confirm that (1) we no longer rely on a worldwide markup, but rather use U.S. sales data to make the EVA, and (2) we treated the reported U.S. invoice value as a proxy for entered value, after sampling relevant customs documentation[49] to ensure that the invoices were reflective of entered value.  We took the same approach in the following two administrative reviews on aluminum foil from China, the latter of which is ongoing.[50]  Thus, Commerce's current approach to applying an EVA does, in fact, rely on U.S. sales values.[51]  We find that this is an accurate and appropriate methodology and we also note that it was implemented following the prior EVA litigation before the Court.[52]

Further, we also note that, where there are an especially large number of transactions, the record may not contain the entered value or invoice information for all sales during the period of investigation or review.  It is critical for Commerce to be able to select sample transactions to ensure that the entered value is reflective of the claimed markup.  Here, CS Wind Malaysia was unable to provide the CBP 7501s for two of the four projects for which we requested supporting

---

[49] *Id.* (noting that "{w}e find that Zhongji provided the requested CBP forms, and where it was unable to do so, Zhongji provided a satisfactory substitute as appropriate," and "Zhongji explained that, for certain shipments through certain locations, the CBP 7501 forms were not available and different U.S. customs forms were used to track the shipment of goods {and} Zhongji submitted these alternative forms in lieu of CBP 7501 forms for such shipments to the record").

[50] *See Certain Aluminum Foil from the People's Republic of China:  Final Results of Countervailing Duty Administrative; 2022*, 89 FR 88957 (November 11, 2024), and accompanying IDM at Comment 3; and *Certain Aluminum Foil from the People's Republic of China:  Preliminary Results and Rescission, in Part, of Countervailing Duty Administrative Review; 2023*, 90 FR 38442 (August 8, 2025); *see also Aluminum Foil Remand* at 6-7 ("The EVA was intended to address a very narrow and relatively straightforward U.S. Customs collection problem.  It was not intended to change our subsidy valuation and attribution, the methodology for which is well established by our regulations and practice… Because the EVA intends to address a U.S. Customs collection problem, any adjustment to the cash deposit or assessment rate should be limited to the mark-up that is experienced on sales that enter the United States.").

[51] As noted above (and in each of the aluminum foil from China segments), we find that this is an accurate and appropriate methodology and we also note that it was implemented in response to the prior EVA litigation before the Court.  We also, however, have cautioned that it may not be the most appropriate methodology in all scenarios with which Commerce is faced when considering future requests for an EVA.

[52] *See Aluminum Foil Remand* at 6-8.

documentation or any alternative customs documentation to establish the entered value of the relevant shipments.[53]  In addition, we note that for the two sales for which CS Wind Malaysia did provide documentation, there was a discrepancy between the sales value listed on the invoices and the total entered value on the CBP 7501 forms.[54]  Further, we note that these differences were not uniform in terms of value or direction.  Given these deficiencies, Commerce lacked sufficient information to determine the customs value for these sales or that the U.S. invoice established the appropriate customs value.

For the reasons stated, Commerce's EVA evidentiary requirement that the U.S. invoice establishes the customs value to which the CVD duties are applied is warranted and necessary in light of Commerce's calculation methodology, as applied in multiple recent proceedings.  Thus, CS Wind Malaysia's failure to meet those evidentiary requirements here – first, by failing to provide supporting documentation for certain transactions and, second, by providing customs documentation that did not demonstrate that the invoice and customs values matched – supported Commerce's determination to deny the requested EVA in this case.

## IV.    INTERESTED PARTY COMMENTS

We released the Draft Results to interested parties on February 11, 2026.[55]  On February 19, 2026, we received comments from the petitioner and CS Wind Malaysia.[56]  The arguments are summarized and addressed below.

---

[53] *See* CS Wind Malaysia's Letter, "Fifth Supplemental Questionnaire Response," dated January 3, 2024 (CS Wind January 3, 2024 SQR), at S5-1-2.

[54] *Id*.

[55] *See* Draft Results of Redetermination Pursuant to Court Remand, *CS Wind Malaysia Sdn. Bhd. v. United States*, Court No. 24-00079, Slip Op. 25-149 (CIT December 5, 2025), Utility Scale Wind Towers from Malaysia, released February 11, 2026 (Draft Results).

[56] *See* Petitioner's Letter, "Comments on Draft Results of Redetermination," dated February 19, 2026 (Petitioner's Comments); *see also* CS Wind Malaysia's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated February 19, 2026 (CS Wind Malaysia's Comments).

**Comment 1: Benchmark for the Land for LTAR Program**

*CS Wind Malaysia's Comments*[57]

The following is a verbatim summary of the argument submitted by CS Wind Malaysia.

For further details, *see* CS Wind Malaysia's Comments at 6-10.

{Commerce's} calculation of the Tier One land benchmark, which continues to include land rental prices from Penang that are neither similar nor comparable to land rental prices in Pahang, ignores the Court's instruction to address record information that rental prices in Penang were not comparable to those in Pahang. Even more importantly, {Commerce} ignores its regulation, which requires it to select a Tier One benchmark that reflects similar land transactions for which it is seeking to measure the adequacy of remuneration and account for other factors affecting comparability.

{Commerce's} Draft Remand Results continue to ignore that the 2021 average rental rate for a factory facility located in mainland Penang {} (*i.e.*, 1.5 Malaysian ringgit (RM)) reflected in the {MIDA} Malaysia Cost of Doing Business Reports for 2021 is three times higher than the average rental rate for a factory facility in Pahang (*i.e.*, 0.5 RM) in the same source. Therefore, the MIDA data, which {Commerce} concluded was market-based, shows that average land rental prices for factory facilities in Penang are three times higher than average rental prices for factory facilities in Pahang.

{Commerce's} inclusion of factory rental land that is *three times* more expensive on a per-square foot basis than factory rental land in Pahang gives no effect to the regulatory requirement to select actual rental transactions in Malaysia based on similarity of the land and factors affecting comparability.

The table contained on page 9 of the Draft Remand Results underscores that {Commerce's} determination to average prices from the C.B. Richard Ellis dataset and the MIDA datasets did not consider the lack of price comparability among the regions because it does not include per-square foot price. Instead, {Commerce} compares the sources only for similarity in location and size, as well as the types of parties, and the number of transactions. By excluding the fact that land rental pricing in Penang is not comparable to that in Pahang, {Commerce} ignores the Court's direction that it do so. More importantly, it ignores the requirement in its own regulation, which requires {Commerce} to base its Tier One benchmark on actual transaction prices that are similar and allow for factors affecting comparability. The decision to include the Penang land rental price in {Commerce's} Tier One benchmark to measure the adequacy of remuneration of CS Wind {Malaysia}'s land rental is contrary to law and otherwise not supported by substantial evidence.

[57] *See* CS Wind Malaysia's Comments at 2-3 (internal citations omitted).

*Petitioner's Comments*[58]

The following is a verbatim summary of the argument submitted by the petitioner. For further details, *see* Petitioner's Comments at 3-6.

{A}s it has in its draft remand analysis, {Commerce} should continue to find in its final remand determination that the CBRE Benchmark Data is an appropriate benchmark for CS Wind Malaysia{'s} rental of land for {LTAR}. On remand, the Court instructed {Commerce} to address CS Wind Malaysia's argument that the CBRE Benchmark Data is not comparable to CS Wind Malaysia's lease rate on the basis of the location and price or size. In its draft remand results, {Commerce} provided additional explanation for its decision to average data from CBRE and the {MIDA}. {Commerce} also addressed CS Wind Malaysia's claims about comparability of the CBRE Benchmark Data and highlighted deficiencies in CS Wind Malaysia's proposed alternatives. Thus, {Commerce} complied with the Court's instruction to consider these factors, and {Commerce} reasonably continued to rely on the market-based, Malaysian transaction benchmark from the CBRE report.

**Commerce Position:** We continue to find it appropriate for Commerce to calculate the benchmark for measuring the adequacy of remuneration for the land for LTAR program using the average of the prices contained in the CBRE and MIDA data. Commerce's regulations at 19 CFR.351.511(a)(2) direct Commerce to:

seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. Such a price could include prices stemming from actual transactions between private parties, actual imports, or in certain circumstances, actual sales from competitively-run government auctions. In choosing such transactions or sales, {Commerce} will consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability.

Here, consistent with this regulation, we compared CS Wind Malaysia's rental price to the average of prices from two data sources, both involving prices for actual rental transactions in Malaysia (*i.e.*, the country in question, as required by the regulation). As noted above, we disregarded the remaining potential benchmark information on the record (*i.e.*, CBRE 2 – CBRE

---

[58] *See* Petitioner's Comments at 2 (internal citations omitted).

4 in the table on page 9) because the underlying transactions had factors which rendered them insufficiently comparable to the land provided to CS Wind Malaysia by the Pahang State Development Corporation as compared to the two benchmarks selected.

We recognize that neither of the selected benchmarks is a perfect match to the land rented by CS Wind Malaysia. The CBRE Benchmark data are for a parcel that is significantly smaller than CS Wind Malaysia's land, and it is located in a different state; that said, these data reflect a transaction between private parties for a specific parcel size. On the other hand, the MIDA data cover multiple transactions in the same state, but nothing else is known about these transactions except the price range/average. In weighing whether to choose only one, or both, of these sources as benchmarks, we considered the relative advantages of each, as well as the relative disadvantages. We disagree with CS Wind Malaysia that this holistic approach is improper.

After analyzing the data, we find that relying on an average is appropriate, and CS Wind Malaysia's arguments to the contrary do not alter this conclusion. CS Wind Malaysia first asserts that Commerce failed to address the Court's concern that prices in Penang were not comparable to those in Pahang and urges that we consider any observed price disparities between regions.[59] However, CS Wind Malaysia fails to explain why a price difference alone should be determinative. As noted above, the existence of different land prices does not render the Penang prices objectively worse or the Pahang prices objectively better. While the price difference in this case seems significant, it would be illogical to conclude, from a price difference alone, that the MIDA data for Pahang are more reliable or that the underlying parcels are more comparable. The fact is that the MIDA data disclose even *less* about the parcels (*e.g.*, parties to the transaction(s) and size) than the CBRE data do.[60] Therefore, we have little basis to conclude that

---

[59] *See* CS Wind Malaysia's Comments at 6-10 (internal citations omitted).
[60] *See* CBRE Benchmark Data; and CS Wind Benchmark Submission at Attachments 1-3.

20

those data are better or that the price difference is meaningful in the way that CS Wind Malaysia claims.[61]

Further, with respect to the regional price disparities contained in the benchmark sources themselves (in which Penang prices were higher in the MIDA and CBRE reports), this concern was squarely addressed in the Draft Results.[62]  There, we found that Penang prices are not unusable "due to being located in a different state from CS Wind Malaysia's parcel in Pahang" and found unavailing CS Wind Malaysia's argument that "Penang is too developed for comparison to Pahang" based on its observations that there are price differences between the two states, as reflected in the MIDA data and CBRE Benchmark Data.[63]  In this regard, we specifically acknowledged the observed price differences but noted that they could be the result of subsidization, and, indeed, the record contains evidence supporting such an interpretation, because the CBRE source itself indicated that land and other amenities are provided *by the state government* to recipients in Pahang.[64]  This observation is also consistent with the record of this review, wherein CS Wind Malaysia received land from the state-level land authority (*i.e.*, the Pahang State Development Corporation), as well as earlier findings during a prior segment of this proceeding; for instance, we noted in the initial investigation that the government established favorable land policies in the East Coast Economic Region, which includes Pahang but not

---

[61] Moreover, CS Wind Malaysia's contention that we should reject benchmark information due to price differences is circular.  After all, it is the difference between one price (a benchmark) and another price (the price a respondent actually paid) that reflects the extent of subsidization; CS Wind Malaysia's argument implies that a benchmark price is inappropriate merely by virtue of being different from the price paid.

[62] CS Wind Malaysia asserts that Commerce improperly "did not consider the lack of price comparability among the regions" because it did not "include per-square foot price" in the comparison chart provided in the Draft Results. *See* CS Wind Malaysia Comments at 9-10.  However, for the reasons stated, the price discrepancy itself is not a consideration that drives Commerce's benchmark selection.

[63] *See* page 8, *supra*.

[64] *See* CBRE Benchmark Data at 67 (referencing the provision of "land for local and foreign demand to set up new plants or warehouses, backed by competitive land price, availability of skilled labour and amenities *offered by the State Government.*") (emphasis added).

Penang.[65]  The extent to which the MIDA data for Pahang reflect the full universe of prices (and, in particular, prices between private parties) throughout that state is unclear, given the lack of information on the record regarding the data's sample selection or methodology.  However, to the extent that these prices contain transactions with government entities, such as potentially CS Wind Malaysia's own transaction, this would distort the benchmark.

In this regard, we find CS Wind Malaysia's assertion that "the MIDA data" is a source that "{Commerce} concluded was market-based"[66] to be an overstatement.  While we recognize that we have relied on this source under 19 CFR.351.511(a)(2), as stated above, we have no assurance that the MIDA data represent transactions solely between private entities; indeed, Commerce has maintained since the *Preliminary Results* that the record lacks certain key information regarding these data.[67]  Given this drawback, the most that one could presume is that some of the prices within the MIDA data are market-based; in spite of this deficiency, we elected to use these data in order to construct a broader-based benchmark.

In short, CS Wind Malaysia presumes that the MIDA data better meet the regulatory standard, but this conclusion appears to primarily be based on a presumption that benchmark transactions must be from the same state/subregion or within a similar price band.  The regulation, however, does not require benchmarks to be discounted or ignored because they relate to transactions in a different state within that country; nor does it provide that such geographic similarity is the sole criterion for "price comparability."  Further, the regulation does

---

[65] *See, e.g.*, *Utility Scale Wind Towers from Malaysia:  Preliminary Affirmative Countervailing Duty Determination*, 86 FR 15887 (March 25, 2021), and accompanying PDM at 9 (noting that the petition contained evidence that the regional governing body "collaborates with state governments for the implementation and development of industrial parks through an arrangement in which {t}he States provide the land at raw land price") (internal citations omitted), unchanged in *Utility Scale Wind Towers from Malaysia:  Final Affirmative Countervailing Duty Determination*, 86 FR 30593 (June 9, 2021).
[66] *See* CS Wind Malaysia's Comments at 7-8.
[67] *See Preliminary Results* PDM at 8-9.

not require benchmarks to be at a particular, predetermined price level in order to be usable. CS Wind Malaysia's arguments seek to impose a narrower standard for benchmark selection than what is contemplated in 19 CFR.351.511(a)(2) or the Act. Thus, contrary to CS Wind Malaysia's arguments, we have not "ignored" the price differences between the states. Rather, for the reasons stated, we disagree that any such differences render the Pahang data unusable, given the flaws identified with the MIDA data (*e.g.*, unknown parties to the transactions, no size data).

**Comment 2:  CS Wind Malaysia's Request for an EVA**

*CS Wind Malaysia's Comments*[68]

The following is a verbatim summary of the argument submitted by CS Wind Malaysia. For further details, *see* CS Wind Malaysia's Comments at 10-19.

> The Draft Remand Results fail to explain why the commercial and entry documentation for the two projects provided by CS Wind {} did not demonstrate that the imported value of CS Wind Malaysia's sales reflects the marked-up value of CS Wind Korea's sales to unaffiliated U.S. customers.
>
> The fact that the observed differences between CS Wind Korea's invoiced price to its unaffiliated U.S. customers were not uniform in value or direction does not undermine that CS Wind Korea's invoiced value reflects the total entered value for the projects for which CS Wind {provided} commercial documentation, including entry summaries. The much greater disparity between CS Wind Malaysia's invoiced price to its parent company and the Form 7501 compared to the tiny observed difference between CS Wind Korea's invoiced price to its unaffiliated U.S. customer significantly undermines {Commerce's} conclusion that it lacked sufficient information to determine that CS Wind Korea's invoiced prices to its unaffiliated U.S. customers established the appropriate customs value for these projects.
>
> {Commerce's} recent {EVA} practice is to adjust a subsidy rate by changing the denominator of the original subsidy rate from the respondent's total worldwide sales to the affiliate's marked-up sales value. If {Commerce} required additional information to understand why CS Wind Korea's invoiced price to its U.S. customer could be higher or lower than the entered values reflected in the Forms

---

[68] *See* CS Wind Malaysia's Comments at 3-4 (internal citations omitted).

7501 for a given project, it was required to request an explanation from CS Wind rather than denying the EVA without further inquiry.

The number of entry summary documents provided by CS Wind was significant relative to its total number and value of export sales on a project basis. The absence of Forms 7501 for the other two projects for which {Commerce} requested entry summary documentation did not undermine that CS Wind Korea's invoice value established the imported value of subject merchandise produced by CS Wind Malaysia when the entry summaries uniformly demonstrated that CS Wind Korea's invoiced value was practically identical to the entered values for the same project codes. Therefore, {Commerce's} determination to calculate CS Wind's CVD rate based on the value of CS Wind Malaysia's sales to its parent company is not in accordance with law and not supported by substantial evidence.

In its final remand redetermination, {Commerce} should weight average the markups between CS Wind Malaysia's invoice price and the entered value on the Forms 7501 for the two projects for which CS Wind provided Forms 7501 to adjust CS Wind Malaysia's sales values in accordance with its practice. Alternatively, {Commerce} may choose to adjust CS Wind Malaysia's sales denominator by the POR-wide by the POR-wide average mark-up reported by CS Wind Korea of merchandise produced by CS Wind Malaysia and sold on a back-to-back basis by CS Wind Korea to the unaffiliated U.S. customer.

*Petitioner's Comments[69]*

The following is a verbatim summary of the argument submitted by the petitioner. For further details, *see* Petitioner's Comments at 6-9.

{Commerce} should also continue to deny CS Wind Malaysia's entered value adjustment {EVA} in the final remand determination. On the EVA issue, the Court instructed {Commerce} to 'articulate what methodology it uses to calculate the denominator' and 'explain the relevance of the third criterion . . .' of the EVA analysis (*i.e.*, that 'the U.S. invoice establishes the customs value to which the CVD duties are applied).' {Commerce's} draft results clarify that it has employed its recently revised methodology, which relies, in part, on U.S. customs value for the respondent's U.S. sales through an affiliate. As a result, U.S. entry documentation remains necessary to corroborate this U.S. customs value upon which the EVA calculation relies.

**Commerce Position:** For the reasons detailed herein, we continue to find that Commerce's

EVA evidentiary requirements (including the requirement that the U.S. invoice establishes the

---

[69] *See* Petitioner's Comments at 2-3 (internal citations omitted).

customs value to which the CVD duties are applied) are necessary and consistent with Commerce's corresponding calculation methodology, as applied in recent proceedings. We also continue to find that CS Wind Malaysia failed to meet those evidentiary requirements here – by providing only partial, and inconsistent, supporting documentation that did not demonstrate that the invoice and customs values for its U.S. sales matched.

CS Wind Malaysia first ostensibly disagrees with Commerce's conclusion that "the invoices issued by CS Wind Korea to its unaffiliated U.S. customers and the entered values stated in two Form 7501s do not show that the U.S. invoice established the customs value of imported merchandise."[70] In fact, however, CS Wind Malaysia does not actually disagree that there are discrepancies between the two sources. Rather, the company acknowledges the differences but seeks to downplay their significance, characterizing the discrepancies as "small," "tiny," and "miniscule."[71] Regardless of the magnitude of these differences, we find it significant that they do not match.[72] As CS Wind Malaysia recognizes: "{t}he relevant inquiry under {Commerce}'s practice, as required by the statute to avoid overcollection of duties, is whether CS Wind's invoiced price to its unaffiliated U.S. customer matched the entered value on the Form 7501."[73] Here, the values *did not match* – even for the subset of transactions for which CS Wind Malaysia provided documentation.

---

[70] *See* CS Wind Malaysia's Comments at 11 (internal citations omitted).

[71] *Id*. The company also emphasizes that these differences are relatively small when compared to the observed mark-up value between the CS Wind Malaysia sale and the CS Wind Korea sale. *Id*. at 12-14. However, this is inapposite; this portion of Commerce's EVA analysis (*i.e*., whether the U.S. invoice establishes the customs value to which the CVD duties are applied) relates to whether the invoice price matches entered value such that one can serve as a reliable proxy for the other. Moreover, as discussed below, CS Wind Malaysia did not provide Commerce with documentation that would permit us to consider whether there are similar (or greater) discrepancies relating to its other two U.S. entries during the POR.

[72] As CS Wind Malaysia notes in its comments on the Draft Results, "{c}ountervailing duties must be assessed upon an accurate imported value, *as reflected on the commercial and entry documentation on which U.S. Customs computes* those countervailing duties" (emphasis added). *Id*. at 12.

[73] *Id*. at 16.

Second, CS Wind Malaysia asserts that, if Commerce "required additional information to understand why CS Wind Korea's invoiced price could be higher or lower than the entered values reflected in the Forms 7501 for the projects on the record, it was required to request an explanation."[74]  This argument amounts to a request that Commerce relieve CS Wind Malaysia of meeting the burden for demonstrating eligibility for an EVA.[75]  The requirements for an EVA were acknowledged by CS Wind Malaysia itself, in its initial questionnaire response,[76] and, thus, CS Wind Malaysia clearly understood that the U.S. invoice must establish the customs value. Additionally, as noted above, in an effort to assess whether the discrepancies were consistent across all sales (and to consider the magnitude of any such discrepancies), Commerce requested documentation for the other two POR transactions, which CS Wind Malaysia did not provide.[77] Because it did not provide such information, Commerce cannot even consider – much less agree with – CS Wind Malaysia's characterization that the "Forms 7501 provided by CS Wind uniformly demonstrated that CS Wind Korea's invoiced value was almost identical to the entered values."[78]

Third, in a related argument, CS Wind Malaysia asserts that a respondent should not be required to submit entry documentation for every transaction to establish an EVA.[79]  In principle,

---

[74] *Id*. at 17.

[75] *See, e.g.*, *2,4-Dichlorophenoxyacetic Acid from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 90 FR 14961 (April 7, 2025), and accompanying IDM at Comment 8 ("{I}n order to qualify for an {entered value} adjustment to its sales denominator, a respondent must be able to demonstrate that there is a higher customs value for *all* of its U.S. sales") (emphasis in original) (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 FR 63788 (October 17, 2012), and accompanying IDM at Comment 12)); *see also Yama Ribbons & Bows Co., Ltd. v. United States*, 865 F. Supp. 2d 1294, 1254 (CIT 2012) ("{Plaintiff} contends that Commerce should have requested the necessary information, but it is well established that in AD and CVD investigations, the burden falls on the interested party to place relevant information within its possession on the record").

[76] *See* CS Wind Malaysia January 11, 2023 IQR at III-12-13.

[77] *See* CS Wind January 3, 2024 SQR at S5-1-2.

[78] *See* CS Wind Malaysia's Comments at 17.

[79] *Id*. at 17-18.

we do not disagree with this proposition.  For example, in an instance where there are a large number of transactions, Commerce could select a sample set of transactions to test the relationship between the invoice values and customs values.[80]  Here, however, after receiving two sets of documentation that demonstrated that the invoice value *did not* accurately establish the corresponding customs value, Commerce requested additional documentation.[81]  This approach is to be expected, as the initial "sample" documentation submitted to the record did not support CS Wind Malaysia's assertions regarding whether the company met the third criterion for an EVA.

Finally, CS Wind Malaysia advances several arguments regarding the manner in which Commerce should adjust its subsidy rate.[82]  However, these arguments are moot; Commerce need not address whether inconsistent mark-up values undermine CS Wind Malaysia's claim to an EVA, because the baseline requirements for such an adjustment have not been met.[83]  As CS Wind Malaysia acknowledges, "{t}he relevant inquiry under {Commerce}'s practice, as required by the statute to avoid overcollection of duties, is whether CS Wind's invoiced price to its unaffiliated U.S. customer matched the entered value on the Form 7501."[84]  Here, they did not match.  Nonetheless, it bears noting that CS Wind Malaysia's preferred method of calculating a markup is necessarily based on a subset of POR sales to the United States, because the company did not provide certain key information to support its request for an EVA.[85]

---

[80] Once satisfied that the invoice value establishes the customs value, Commerce may then rely on the invoice value to accurately apply an EVA, assuming the remining criteria are met.

[81] *See* Commerce's                                        Letter, "Supplemental Questionnaire," dated December 21, 2023; and CS Wind January 3, 2024 SQR at S5-1-2.

[82] *See* CS Wind Malaysia's Comments at 15.

[83] *Id*. at 16.

[84] *Id*.

[85] *Id*. at 15 ("This option allows {Commerce} to base the percentage by which {Commerce} alters the denominator on *sales for which CS Wind provided Forms 7501*").

27

## V.    FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, we have further explained Commerce's selection of a benchmark for the land for LTAR program and our treatment of CS Wind Malaysia's request for an EVA. Commerce continues to find that the land benchmark was appropriate given the available information on the record of this review. Commerce also determines that our decision to deny CS Wind Malaysia's request for an EVA was warranted, because the evidentiary requirements associated with Commerce's six-factor EVA test are relevant to the ultimate calculation methodology that Commerce applies in making such an adjustment, and CS Wind Malaysia was unable to satisfy these requirements. As a result, CS Wind Malaysia's subsidy rate is unchanged for these final results of redetermination and remains 10.72 percent *ad valorem*.

3/26/2026

X _Chris Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance