IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION, | ) ) ) |
| *Plaintiffs,* | ) ) ) ) Ct. No. 24-00079 |
| v. | ) |
| UNITED STATES, | ) Non-Confidential Version ) |
| *Defendant,* | ) Confidential Information ) has been redacted on ) pages: |
| and, | ) 15–17, 23, 24, 27, and 31. ) |
| WIND TOWER TRADE COALITION, | ) ) |
| *Defendant-Intervenor.* | ) ) ) |

COMMENTS OF PLAINTIFFS CS WIND MALAYSIA SDN.
BHD. AND CS WIND CORPORATION IN OPPOSITION TO
REMAND REDETERMINATION

Jarrod M. Goldfeder
Kenneth N. Hammer
Sezi Erdin

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE,
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated: May 14, 2026              *Counsel for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................... iii

GLOSSARY OF CASE SPECIFIC ACRONYMS .....................................iv

I.    INTRODUCTION.........................................................................1

II.   BACKGROUND ...........................................................................2

    A. COMMERCE CONTINUED TO DENY CS WIND AN
    ENTERED VALUE ADJUSTMENT ...........................................2

    B. COMMERCE CONTINUED TO INCLUDE LAND PRICES
    FROM PENANG IN ITS TIER ONE LAND BENCHMARK .....4

III.  SUMMARY OF ARGUMENT.........................................................6

IV.   ARGUMENT..............................................................................12

    A. Commerce Unlawfully Continued to Calculate CS Wind's
    Countervailable Subsidy Rate Based on CS Wind Malaysia's
    Sales Denominator ....................................................................12

        1. Commerce Continued to Unlawfully Ignore Evidence that
        Uniformly Demonstrates that CS Wind Korea's Invoice
        Price Established the Imported Price of Subject
        Merchandise.........................................................................13

        2. Commerce's Entered Value Adjustment Calculation Does
        Not Rely Upon Individual Entered Values ......................20

        3. Even if Commerce Reasonably Required Entry Documents
        to Match Invoice Values, Commerce Failed to Provide CS
        Wind an Opportunity to Reconcile Those Values ............26

4. CS Wind Provided A Sufficient Number and Value of Forms 7501 to Establish that CS Wind Korea's Invoice Price Reflects the Imported Value of Subject Merchandise ....................................................................................... 29

B. Commerce Continued to Unlawfully Include Non-Comparable Land Prices in the Land Benchmark Price ............................... 32

V.    CONCLUSION ............................................................................ 41

## TABLE OF AUTHORITIES

**Page No.**

**STATUTES**

19 U.S.C. § 1677m(d) ................................................................. 5, 26, 29

19 U.S.C. § 1671(a) ................................................................. 14, 27, 29

19 U.S.C. § 1677(5)(E)(iv) ............................................................... 33

**REGULATIONS**

19 C.F.R. § 351.511(a)(2)(i) ............................................................ 33, 38

**CASES**

*CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation v. United States,* Slip Op. 25-149, ECF No. 60, Dec. 5, 2025, 2025 WL 3496986 ............................................................ 1, 2, 4, 9, 11, 13, 28, 33, 35, 41

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 41 CIT __, 405 F.Supp.3d 1317 (2019) ................................................................. 14

*Canadian Solar Inc. v. United States*, 45 CIT __, 537 F.Supp.3d 1380 (2021) ............................................................................... 14, 19, 27

**ADMINISTRATIVE DETERMINATIONS**

*Certain Aluminum Foil from the People's Republic of China*, 88 Fed. Reg. 75,267 (Nov. 2, 2023) (final results of countervailing duty administrative review) and accompanying Issues and Decision Memorandum ............................................................................. 30

## GLOSSARY OF CASE SPECIFIC ACRONYMS

Entered Value Adjustment:          EVA

Malaysia Investment Development Authority:     MIDA

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079          NON-CONFIDENTIAL VERSION

## I. INTRODUCTION

Plaintiffs, CS Wind Malaysia Sdn. Bhd. ("CS Wind Malaysia") and CS Wind Corporation ("CS Wind Korea") (collectively, "CS Wind" or "Plaintiffs"), hereby submit these Comments in Opposition to the United States Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand. *See Final Results of Redetermination Pursuant to Court Remand*, ECF No. 65-1, Mar. 26, 2026, Rem. P.R. 7, Appx10195–10222 ("*Remand Results*"). Commerce issued the *Remand Results* pursuant to the Court's Opinion and Order in *CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation v. United States*, Slip Op. 25-149, ECF No. 60, Dec. 5, 2025, 2025 WL 3496986 ("*Remand Order*").

Commerce continues to unlawfully calculate CS Wind's countervailing duty ("CVD") rate based on the *intermediate* sales value paid by CS Wind Malaysia's parent company, CS Wind Korea, and not the value merchandise imported, or sold  for importation into the United States. Commerce also continues to unlawfully include a single non-comparable land transaction in its Tier One benchmark to measure the adequacy of remuneration of land leased by CS Wind Malaysia.

1

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**               **NON-CONFIDENTIAL VERSION**

Therefore, the Court should find that Commerce unlawfully failed to grant CS Wind an entered value adjustment ("EVA") and failed to revise its benchmark for determining the benefit for the alleged provision of land for less than adequate remuneration. Plaintiffs respectfully request that the Court remand this case to Commerce with instructions to recalculate the *ad valorem* subsidy rates for CS Wind in accordance with the Court's opinion in this action.

## II. BACKGROUND

### A. COMMERCE CONTINUED TO DENY CS WIND AN ENTERED VALUE ADJUSTMENT

The Court remanded Commerce's determination not to adjust CS Wind's subsidy rate by changing the sales denominator of the original subsidy rate from CS Wind Malaysia's total worldwide export sales to CS Wind Korea's marked-up total worldwide export sales. *Remand Order*, Slip Op. 25-149, at *26, 2025 WL 3496986, at *10. The Court directed Commerce to explain what methodology it uses to calculate the sales denominator where it increases the CVD denominator to the U.S. sales price of an affiliate that resold the merchandise to the final U.S. customer in a back-to-back sales (*i.e.*, grants an EVA). *Id.* Further, the Court required Commerce to explain the relevance of assessing whether

2

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

the U.S. invoice price establishes the customs value to which CVD

duties are applied to evaluating whether a respondent is entitled to an

EVA. *Id.* at *26, *26 n.6, 2025 WL 3496986, at *10, *10 n.6.

In the *Remand Results*, Commerce continued to deny CS Wind an

EVA. *Remand Results* at 10, Rem. P.R. 7, Appx10204. Commerce

clarified that it no longer bases its EVA calculation on determining a

mark up on a respondent's "worldwide sales," but rather is focused on

U.S. sales values. *Id.* at13, Rem. P.R. 7, Appx10207. Commerce

explained that, it calculates an EVA by adjusting the *ad valorem* CVD

rate by dividing "the amount of countervailing duties to be collected by

the total U.S. sales invoice amount, which reflected the entered value of

the affiliated reseller's U.S. sales of subject merchandise." *Id.*

Commerce acknowledged that the purpose of selecting sample

transactions is to "ensure that the entered value is reflective of the

claimed markup" between the respondent's sale and the final sale to the

unaffiliated U.S. customer. *Id.* at 15, Rem. P.R. 7, Appx10209.

Commerce continued to highlight differences between the sales values

listed on CS Wind Korea's invoices to the unaffiliated U.S. customer

and the total entered value on the Form 7501 for sales provided by CS

3

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**　　　　　　**NON-CONFIDENTIAL VERSION**

Wind in response Commerce's requests. *Id.* Commerce denied the EVA because it found that CS Wind Malaysia failed to provide supporting documentation for certain transactions and by "providing documentation that did not demonstrate that the invoice and customs value matched." *Id.* at 16. Appx10210.

## B. COMMERCE CONTINUED TO AVERAGE LAND PRICES FROM TWO SOURCES IN ITS TIER ONE LAND BENCHMARK

The Court remanded Commerce's land benchmark to consider CS Wind's argument that the C.B. Richard Ellis "rental price in Penang is not comparable its lease rate in Pahang due to the disparity in real estate costs between the two Malaysian jurisdictions." *Remand Order*, Slip Op. 25-149, at *13, 2025 WL 3496986, at *5.

In the *Remand Results*, Commerce continued to include the C.B. Richard Ellis rental price in Penang derived from the "Real Estate Market Outlook 2020 Malaysia" report published by C.B. Richard Ellis, in its Tier One land benchmark. *Remand Results* at 7, Rem. P.R. 7, Appx10201. Commerce asserted that differences in land prices do not render the Penang prices objectively worse because it theorized that

4

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

those price differences "could in fact be the result of government subsidization." *Id.* at 8, Rem. P.R. 7, Appx 10202.

Citing strengths and weaknesses in the C.B. Richard Ellis and MIDA data, Commerce found that it appropriate to average the two datasets because it generally prefers multiple data sources. *Id.* at 9, Rem. P.R. 7, Appx10203.  Commerce framed its selection as a reasonable balancing of the strengths and weaknesses of each data source. *Id.* Commerce summarized the merits of the two data sources included in its Tier One land benchmark by explaining that it continued to include the MIDA data from Pahang in its Tier One land benchmark because it reflected the same location and reflected multiple underlying data pointS. *Id.* According to Commerce, the C.B. Richard Ellis land transaction in Penang should also be included in the benchmark "because it was clearly a transaction between two private parties." *Id.* at 10, Rem. P.R. 7, Appx10204.

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079             NON-CONFIDENTIAL VERSION

## III. SUMMARY OF ARGUMENT

CS Wind summarizes the arguments below on the following two

issues raised in these comments in opposition to the *Remand Results*:

### A. Commerce Continued to Unlawfully Deny CS Wind an Entered Value Adjustment

Commerce's continues to unlawfully deny CS Wind an EVA because

the commercial documentation provided by CS Wind for a significant

share of projects exported during the period of review ("POR") uniformly

demonstrates that CS Wind Korea's invoiced price to its unaffiliated

U.S. customer establishes the imported value of subject merchandise

exported by CS Wind Malaysia. Specifically, the Commercial

documentation showed that CS Wind's invoiced price was virtually

identical to the entered values reflected in the Forms 7501 for the two

projects for which CS Wind provided documentation. *See* Letter from

Trade Pacific PLLC, re: "Fifth Supplemental Questionnaire Response"

(Jan. 3, 2024), at Exs. S5-1(2), S5-2(1), C.R. 141–142, Appx5491–

Appx5494, Appx5510–Appx5517 ("CS Wind SQR 5"). In contrast, the

disparity between the invoice price of CS Wind Malaysia's sales to its

intermediate parent company and the entered values reflected on the

Forms 7501 for the same projects was far greater. *Compare id.* at Exs.

6

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    NON-CONFIDENTIAL VERSION

S5-1(2), S5-2(1) C.R. 141–142, Appx5497–Appx5505, Appx5486–

Appx5488, *with id.* at Exs. S5-1(2), S5-2(1), C.R. 141–142, Appx5494,

Appx5514–5517.

The *Remand Results* never address, let alone explain, why the far

greater divergence between CS Wind Malaysia's invoice price and the

entered values on the Forms 7501 for the same projects does not

undermine its conclusion that CS Wind Korea's invoice price to its

unaffiliated U.S. customer does not reflect the imported price of subject

merchandise exported by CS Wind Malaysia. Therefore, Commerce's

denial of an EVA is unlawful and not supported by substantial

evidence.

Commerce acknowledges that it calculates its EVA by adjusting the

overall *ad valorem* CVD rate calculated for the respondent by a ratio of

the respondent's collectible U.S. duty to the value of the affiliate's total

U.S. sales. *Remand Results* at 13, Rem. P.R. 7, Appx10207. Therefore,

Commerce's EVA CVD rate adjustment calculation relies upon CS Wind

Korea's invoice values of individual projects. Commerce fails to explain

why a perfect match between CS Wind Korea's invoice price and the

Forms 7501 is required to meet its statutory obligation to ensure that

7

*Business Proprietary Information Has Been Redacted*

CVD duties are applied to the imported value of subject merchandise. Accordingly, Commerce failed to explain why the evidence on the record was insufficient to support that CS Wind Korea's invoice value to its unaffiliated customer established the imported value of subject merchandise exported by CS Wind Malaysia.

Even if it were reasonable to require that CS Wind's U.S. invoice prices match the corresponding Forms 7501 exactly—which it is not for the reasons explained above—the insignificant observed differences between the invoice values and entered values for projects on the record and the statute required Commerce to request an explanation from CS Wind if Commerce required additional information to understand why invoice prices could differ slightly from the entered values reflected in the Forms 7501 for a given project. *See* 19 U.S.C. § 1677m(d) (requiring that, if a response is deficient, Commerce must promptly inform the party and provide it with an opportunity to remedy or explain the deficiency). Commerce unlawfully failed provide CS Wind an opportunity to clarify the information reported or reconcile the entered values with CS Wind Korea's invoice values. Accordingly, the Court should again remand Commerce's determination to deny CS Wind an

8

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

EVA with instructions to recalculate CS Wind's CVD rate by adjusting

CS Wind's CVD rate based on CS Wind Korea's reported U.S. sales

value of merchandise exported by CS Wind Malaysia.

## B. Commerce Continues to Include a Non-Comparable Land Rental Price in Its Land Benchmark

Commerce's *Remand Results* fail to address the fact that the MIDA

Malaysia Cost of Doing Business Reports for 2021 shows that rental

prices in Penang are not comparable to those in Pahang. The Court

should again remand Commerce's remand redetermination because

Commerce disregarded the Court's direction that it consider the

disparity in real estate prices between Penang and Pahang to ensure

that its Tier One benchmark reflects only actual market transactions

for comparable land. *See Remand Order*, Slip Op. 25-149, at *13, 2025

WL 3496986, at *5.

Commerce continues to ignore that the 2021 average rental rate for a

factory located in mainland Penang (i.e., 1.5 RM) reflected in the MIDA

data for 2021 is three times higher than the average rental rate for a

factory facility in Pahang (i.e., 0.5 RM) in the same data source. *See*

Letter from Trade Pacific PLLC, re: "Benchmark Submission" (Aug. 1,

2023), P.R. 160–161, at Ex. 1, Appx5868–5873 ("CS Wind BM

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

Submission") (showing that 2021 per square foot monthly rental prices of rent for a factory in Mainland Penang range from 1.00 to 2.00 RM per square foot while rent for a factory located in Pahang during this period ranges from 0.40 to 0.60 RM per square foot).

Commerce dismisses the relevancy of the price disparity across different regions because it speculates that the price disparities "could be the result of subsidization." *Remand Results* at 21, Rem. P.R. 7, Appx10215. The record does not support Commerce's claim. Rather, the statement in the C.B. Richard Ellis report cited in Commerce's *Remand Results* lists the factors that drive investment in Pahang, none of which are linked in the report to Government intervention in the property market. *See* Memorandum to The File, re: "Placing Benchmark on the Record" (Aug. 30, 2023), P.R. 216, at Attach. (page 67), Appx10083 ("DOC Land BM Data").

Even if it were true that the MIDA data may contain some transactions between private parties and government entities—which the record evidence does not support for the reasons explained above— there is no evidence that this issue is limited to the Pahang region or does not affect the Penang pricing reported in the same MIDA data.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

Yet, the MIDA data itself reflects that land prices in Penang are three times higher than those in Pahang. Thus, the pricing disparity highlighted by CS Wind shows that the disparity is not caused by government subsidization, as Commerce speculates. Therefore, Commerce's failure to explain why the significantly higher prices in Penang do not show that land prices in that region are not comparable to those in Pahang renders its determination to average the C.B. Richard Ellis industrial land transaction in Penang with average industrial land prices in Pahang contrary to law.

Upon remand, Commerce continued to ignore evidence that demonstrated that industrial land rental prices in Penang were not comparable to those in Pahang, which the Court rightfully required Commerce to consider. *Remand Order*, Slip Op. 25-149, at \*13, 2025 WL 3496986, at \*5. The *Remand Results* fail to correct Commerce's original errors. Accordingly, the Court should again remand Commerce's land benchmark to Commerce and instruct it to recalculate the benchmark excluding the non-comparable land transaction from a non-comparable region.

11

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                         NON-CONFIDENTIAL VERSION

## IV.  ARGUMENT

### A. Commerce Unlawfully Continued to Calculate CS Wind's Countervailable Subsidy Rate Based on CS Wind Malaysia's Sales Denominator

Commerce unlawfully ignored that the commercial sales documentation, including Forms 7501, provided by CS Wind *uniformly* demonstrate that invoice price of CS Wind Korea to its unaffiliated U.S. customer established the U.S. sales value required to calculate an EVA under its practice. Although Commerce's EVA does not rely upon any specific invoice values, Commerce claims that even small differences between invoiced prices and the Forms 7501 for the same sales justifies denying an EVA. *See Remand Results* at 25, Rem. P.R. 7, Appx10219. Commerce unlawfully ignored that the documentation, including entry summary documentation for a significant number and value of export sales relative to its total number and value of export sales, demonstrated that CS Wind Korea's invoice price to its unaffiliated U.S. customer reflects the imported value of subject merchandise as reported on the Forms 7501. Therefore, the Court should remand to Commerce and instruct it to grant CS Wind an EVA by calculating an adjusted CVD rate based on the ratio of the total value of CS Wind Malaysia's

12

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**             **NON-CONFIDENTIAL VERSION**

sales of wind towers sold to CS Wind Korea that were resold in the U.S.

to the value of CS Wind Korea's U.S. sales, with mark-up.

### 1. Commerce Continued to Unlawfully Ignore Evidence that Uniformly Demonstrates that CS Wind Korea's Invoice Price Established the Imported Price of Subject Merchandise

The *Remand Results* fail to explain why the miniscule observed

difference between the entered value stated in the Forms 7501 for the

two projects for which CS Wind provided documentation justifies basing

CS Wind's CVD rate on the sales value of CS Wind Malaysia's sale to its

intermediate parent company, CS Wind Korea. Therefore, the

Department's denial of the EVA is not in accordance with law and is not

supported by substantial evidence.

The Court directed Commerce to explain what justifies its

determination that the U.S. invoice issued by CS Wind Korea to the

unaffiliated U.S. customer did not establish the customs value to which

the CVD duties are applied. R*emand Order*, Slip Op. 25-149, at *26,

2025 WL 3496986, at *10. The statute requires Commerce to base its

calculation of countervailing duties on countervailable subsidies:

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

{w}ith respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation into the United States.

19 U.S.C. § 1671(a).

Countervailing duties must be assessed upon the imported value, as reflected on the commercial and entry documentation on which U.S. Customs computes those countervailing duties. *See Jiangsu Zhongji Lamination Materials Co. v. United States*, 41 CIT __, __, 405 F.Supp.3d 1317, 1330 (2019). Commerce must adjust the calculated *ad valorem* subsidy rate to ensure that the FOB export value upon which the subsidy rate is calculated equals the import value of the merchandise entering the United States upon which duties are collected. *See Canadian Solar Inc. v. United States*, 45 CIT __, __, 537 F.Supp.3d 1380, 1395 (2021). Where the total export value, before the mark-up applied by the affiliate in a back-to-back sal,e is less than the total imported value of merchandise after mark-up, failure to grant an EVA could lead to an overcollection of duties. *Id.*

Commerce claims that it correctly denied CS Wind an EVA because CS Wind Korea's invoice prices and the entered values on the Forms 7501 did not match. *Remand Results* at 25, Rem. P.R. 7, at Appx10219.

14

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

In so doing, Commerce ignored the commercial documentation placed on the record, which *uniformly* demonstrated that CS Wind Korea's invoiced value was almost identical to the entered values for the same project codes. Therefore, Commerce unlawfully failed to ensure that the FOB export value upon which CS Wind's subsidy rate is calculated equals the imported value of the merchandise entering the United States.

The magnitude of the tiny observed differences between invoice prices and entered values on the Forms 7501 highlighted in the *Remand Results* do not undermine that the invoiced price of CS Wind Korea's sales to its unaffiliated U.S. customer establish the imported value of the subject merchandise produced by CS Wind Malaysia. Specifically, CS Wind Korea's commercial invoice issued to its unaffiliated U.S. customer (i.e., **[                    ]**) for project # **[    ]** reflects a U.S. invoiced price of **[            ]** and the Form 7501 reflects an entered value of **[          ]**. CS Wind SQR 5 at Ex. S5-2(1), C.R. 141–142, Appx5510–Appx5517. The magnitude of the difference between the U.S. invoiced price from CS Wind Korea to

15

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

the unaffiliated U.S. customer and the entered value reflected on the

Form 7501 was merely **[        ]** for the same project. *See id.*

Similarly, CS Wind Korea's commercial invoice issued to its

unaffiliated U.S. Customer (i.e., **[                                    ]**)

for project # **[      ]** reflects a U.S. invoiced price from CS Wind Korea to

the unaffiliated customer of **[                ]** and the same project has

an entered value of **[            ]** in the Form 7501 provided. *See id.*, at

Ex. S5-1(2), C.R. 141–142, Appx5491–Appx5494. In other words, the

difference between the U.S. invoiced price from CS Wind Korea to the

unaffiliated customer and the entered value reflected on the Form 7501

was merely **[        ]** for project # **[      ]**. See *id.*

Commerce also ignored that the difference between CS Wind

Malaysia's invoiced price to CS Wind Korea and the entered value

reflected on the Forms 7501 on the record was far greater than the

differences between CS Wind Korea's invoiced price and the Forms 7501

for the same projects. Specifically, CS Wind Korea's invoice price for

project # **[      ]** (i.e., **[                ]**) was **[        ]** higher than the CS Wind

Malaysia's invoiced price to CS Wind Korea (i.e., **[                ]**).

*Compare id.* at Ex. S5-1(2), C.R. 141–142, Appx5486–Appx5488

16

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**          **NON-CONFIDENTIAL VERSION**

(containing commercial invoice for project # [     ] issued by CS Wind

Malaysia to CS Wind Korea, which reflects an invoiced price of

[             ]) *with id.* at Ex. S5-1(2), C.R. 141–142, Appx5494

(containing the Form 7501 for project # [     ], which reflects an entered

value of [            ]). Similarly, the magnitude of the difference

between CS Wind Malaysia's invoiced price to CS Wind Korea and the

entered value reflected on the Form 7501 for project # [    ] (i.e.,

[            ]) was [      ] higher than the CS Wind Malaysia's

invoiced price to CS Wind Korea (i.e., [                ]). *Compare id.* at

S5-2(1), C.R. 141–142, Appx5497–Appx5505 (containing the three

commercial invoices for project # [    ] issued by CS Wind Malaysia to

CS Wind Korea, which reflect a combined invoiced price of

[             ]) *with id.* at S5-2(1), C.R. 141–142, Appx5514–5517

(containing the Forms 7501 for project # [    ], which reflect a combined

entered value of [           ]). Commerce's *Remand Results*

completely fail to address how the much larger disparity between CS

Wind Malaysia's invoice price to CS Wind Korea and the Forms 7501 on

the record for each project do not undermine its conclusion that CS

Wind failed to demonstrate that CS Wind Korea's invoice price to its

17

*Business Proprietary Information Has Been Redacted*

unaffiliated customer reflected the imported value of subject merchandise. Accordingly, Commerce's determination to deny the EVA is not supported by substantial evidence and its determination to base CS Wind's CVD rate on CS Wind Malaysia's sales denominator is contrary to law.

Commerce contends that, even small differences between CS Wind Korea's invoiced price and the Forms 7501 for the same projects, are significant. *Remand Results* at 25, Rem. P.R. 7, at Appx10219 (concluding that CS Wind failed to support its request for an EVA because CS Wind Korea's invoices to its unaffiliated customers and the entered values stated in two Forms 7501 do not match, regardless of the magnitude of these differences). Even Commerce recognizes that the purpose of selecting a sample set of transactions is "to test the *relationship* between the invoice values and customs values." *Remand Results* at 27, Rem. P.R. 7, at Appx10221 (emphasis added). Since Commerce acknowledges that the purpose of reviewing individual Forms 7501 is to spot-check sales to ensure that the Forms 7501 reflect the higher marked-up price charged by the affiliate in the back-to-back sale, Commerce's rigid insistence on a perfect match between invoice

18

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079 NON-CONFIDENTIAL VERSION

price and the entered value is not necessary to ensure an accurate EVA calculation.

The fact that the observed differences between CS Wind Korea's invoiced price to its unaffiliated U.S. customers were not uniform in value or direction does not undermine that CS Wind Korea's invoiced value reflects the total entered value for the projects for which CS Wind commercial documentation, including entry summaries. Nor does it justify overcollection of duties by calculating CS Wind's overall CVD rate based on values of CS Wind Malaysia's intermediate sales to its parent company, which clearly do not reflect the entered value for the reasons explained above.

As Commerce acknowledges, its current EVA practice no longer requires that a respondent demonstrate a specific mark-up for its worldwide sales. *Remand Results* at 14, Rem. P.R. 7, at Appx10207. The overall purpose of the EVA is to ensure that the CVD rate is applied to the imported value of merchandise, not an intermediate value where the other EVA criteria are satisfied. *See Canadian Solar Inc. v. United States*, 45 CIT __, __, 537 F.Supp.3d 1380, 1395 (2021). The statute requires that Commerce apply the EVA where the record evidence

19

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

demonstrates the affiliate's marked-up price in a back-to-back sale is greater than the total value of merchandise before mark-up (i.e., reflects the imported value) because failure to grant an EVA could lead to an overcollection of duties. *See id.*

The two projects for which CS Wind provided documentation show that CS Wind Malaysia's invoiced price to CS Wind Korea is consistently lower than CS Wind Korea's invoiced price to its unaffiliated customer. The relationships between the sales values of the intermediate and final sale are sufficiently established by the Forms 7501 on the record. Miniscule inconsistencies between the entered values and the invoiced price of CS Wind to its unaffiliated customer do not justify overcollection of duties. Accordingly, Commerce acted contrary to law by continuing to deny CS Wind an EVA.

### 2. Commerce's Entered Value Adjustment Calculation Does Not Rely Upon Individual Entered Values

Commerce claims that, without accurate entered values and corresponding invoices, it is not possible to make an accurate EVA that would remedy the potential overcollection of duties. *Remand Results* at 14, Rem. P.R. 7, Appx10208. But Commerce's own description of its EVA calculation shows otherwise. Commerce calculates its EVA by

20

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

adjusting the overall *ad valorem* CVD rate calculated for the

respondent by a ratio of the respondent's collectible U.S. duty to the

value of the affiliate's total U.S. sales. *Id.* at 13, Rem. P.R. 7,

Appx10207. Commerce provided the following summary of its

methodology for calculating the adjustment to the respondents CVD

rate:

| Step | Component | Formula | Value |
|---|---|---|---|
| A | CVD Rate | | 20% |
| B | Respondent's U.S. Sales Value | | $5,000 |
| C | Collectible U.S. Duty | A * B | **$1,000** |
| D | Affiliate U.S. Sales (with mark-up as entered in U.S.) | | $5,500 |
| E | Adjusted CVD Rate | C/D | 18.2% |
| F | U.S. Entered Value | D | $5,500 |
| G | Actual Duty Collected | E * F | $1,000 |

*Id.* at 15, Rem. P.R. 7, Appx10209.

No component of the EVA calculation relies on any specific invoice

value or any specific markup derived from any Form 7501. Rather, had

Commerce granted an EVA, it would have adjusted CS Wind's net *ad*

*valorem* CVD rate by multiplying the reported invoice value of all

21

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

merchandise produced by CS Wind Malaysia during the POR that was

exported to the United States by CS Wind Korea. *See id.* Then,

Commerce would have divided that amount of CVD duties to be

collected by the total sales invoice amount of CS Wind Korea's sales to

the United States (i.e., the entered value of CS Wind's Korea's U.S.

sales produced by CS Wind Malaysia). *See id.*

Commerce acknowledges that its EVA calculation relies on the

overall invoice value of U.S. imports, not the customs value. *Id.* at 27,

Rem. P.R. 7, at Appx10221 (stating that, once satisfied that the invoice

value establishes the customs value, it relies on the invoice value to

accurately apply an EVA). Therefore, the fact that the Forms 7501 did

not perfectly match the invoice values does not prevent Commerce from

calculating the EVA based on the reported value of CS Wind Korea's

sales of subject merchandise to unaffiliated U.S. customers.

CS Wind reported each component used in the EVA calculation and

reconciled those values to its accounting records. Letter from Trade

Pacific PLLC, re: "Section III Questionnaire Response" (Jan. 11, 2023),

at Ex. II.C.2, C.R. 32–51, Appx2348 ("CS Wind IQR") (reconciling CS

Wind Malaysia's total POR sales revenues, as recorded in its 2021

22

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

audited financial statements to its trial balance, which reflects only

sales of wind towers to CS Wind Korea that were exported to the U.S.

and export sales to another affiliate). The total value of CS Wind

Malaysia's sales of all exports of subject merchandise to the United

States from CS Wind Malaysia to CS Wind Korea during the POR was

[                    ]. *See id.* at Ex. II.C.1(b), C.R. 32–51, Appx2342. The total

value of CS Wind Korea's corresponding resales of the same subject

merchandise to the ultimate unaffiliated U.S. customer was

[                    ]. *See id.*, Appx2342.

Commerce fails to explain what portion of its EVA calculation relied

on CS Wind Korea's invoiced prices matching the entered values stated

on the Forms 7501. Therefore, Commerce's insistence that the Forms

7501 must perfectly match CS Wind's invoiced price to its unaffiliated

customer is not grounded in its own practice. By denying the EVA

where CS Wind demonstrated that CS Wind Korea's imported price

essentially matches the Forms 7501, Commerce acted contrary to law

by failing to adjust CS Wind's sales denominator to reflect the marked-

up price of CS Wind Korea's back-to-back sale to its unaffiliated U.S.

customer.

23

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

Commerce claims that the "sample" documentation submitted to the record did not support that the Forms 7501 establish that CS Wind's Korea's invoice values reflect the imported values. *See Remand Results* at 27, Rem. P.R. 7, at Appx10221. This claim is not supported by the record. The markup of reported by CS Wind for total sales of subject merchandise to the United States approximates the markup reflected on the Forms 7501 provided in response to Commerce's requests. Specifically, the U.S. invoiced value of subject merchandise exported to the United States during the POR is approximately **[       ]** higher than the value of subject merchandise exported to the United States invoiced by CS Wind Malaysia to CS Wind Korea during the POR. See CS Wind IQR at Ex. II.C.1(b), Appx2342 (*i.e.*, **[**

**]**). The sample documentation for individual sales provided by CS Wind reflected a similar markup to the POR-wide markup reported for all sales. *See* CS Wind SQR 5 at Ex. S5-2(1), C.R. 141–142, Appx5510–Appx5517 (reflecting a **[       ]** markup for project # **[     ]**), S5-1(2), C.R. 141–142, Appx5497–Appx5505 (reflecting a **[       ]** markup for project # **[     ]**).

24

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

The record shows that CS Wind's invoiced price to its unaffiliated U.S. customer was virtually the same as the entered value on the Form 7501 and that the entered value was uniformly greater than the intermediate price CS Wind Malaysia charged to its parent company, CS Wind Korea. Commerce fails to explain why a perfect match between CS Wind Korea's invoice price and the Forms 7501 is required to meet its statutory obligation to ensure that CVD duties are applied to the imported value of subject merchandise. Commerce wrongly focuses on tiny differences between the invoiced values of CS Wind's back-to-back U.S. sales to the unaffiliated customer and the entered values while overlooking the much greater differences between the invoiced values of CS Wind Malaysia's sales to CS Wind Korea and the entered values for the same projects. Accordingly, Commerce failed to explain why the evidence on the record was not sufficient to support that CS Wind Korea's invoice value to its unaffiliated customer established the imported value of subject merchandise.

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

### 3. Even if Commerce Reasonably Required Entry Documents to Match Invoice Values, Commerce Failed to Provide CS Wind an Opportunity to Reconcile Those Values

As noted above, Commerce's EVA calculation does not rely on establishing a perfect match between CS Wind Korea's invoice issued to its unaffiliated customer and the Form 7501 for the same project because the information on the record demonstrates that the CS Wind Korea's U.S. invoice to its unaffiliated established the imported value of merchandise exported by CS Wind Malaysia. Even if it were reasonable to require a perfect match, given the minor observed differences, Commerce was required to request an explanation from CS Wind if Commerce required additional information to understand why invoice prices could differ slightly from the entered values reflected in the Forms 7501 for a given project rather than denying the EVA without further inquiry. *See* 19 U.S.C. § 1677m(d) (requiring that, if a response is deficient, Commerce must promptly inform the party and provide it with an opportunity to remedy or explain the deficiency). Providing CS Wind an opportunity was also necessary to avoid the potential overcollection of duties because it was evident that the disparity between CS Wind Malaysia's invoiced price and the entered values for

26

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

the same projects were far greater, as discussed above. *See* 19 U.S.C.

§ 1671(a) (requiring that the collection of duties equal the net

countervailable subsidy), *Canadian Solar*, 45 CIT at __, 537 F.Supp.3d

at 1395.

Commerce implies that it requested additional sample

documentation because the documentation initially proffered by CS

Wind contained discrepancies. *Remand Results* at 26, Rem. P.R. 7, at

Appx10220. The record does not support Commerce's claim.

Commerce did not allege any alleged discrepancies in Forms 7501

during the administrative review. In fact, CS Wind provided only sales

invoices for Project #s **[                    ]** in its initial Section III

questionnaire response. *See* CS Wind IQR at Exs. II.C.1(a), II.C.1(b),

C.R. 32–51, Appx2321–Appx2340, Appx2341–2342 (containing

commercial invoices, but not Forms 7501, for the projects for which CS

Wind provided documentation).

CS Wind first provided the requested entry summaries in response to

Commerce's December 22, 2023, supplemental questionnaire. *See* CS

Wind SQR 5 at S5-1, Appx5458 (requesting Forms 7501 and bills of

lading for four project numbers because CS Wind previously provided

27

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

only sales invoices). Commerce did not issue additional supplemental questionnaires requesting clarification.

Commerce unlawfully did not provide CS Wind an opportunity to correct or clarify the information reported or to verify whether CS Wind could explain how the entered value could be reconciled with CS Wind Korea's invoice value even though the statute required it to do so. Aside from the statutory obligation to identify and give respondents an opportunity to rectify deficiencies in questionnaire responses, Commerce's lack of transparency in articulating what methodology it uses to calculate the denominator and the relevancy of the U.S. invoice to establishing the customs value to which CVD duties are applied heightens its burden to ensure that the duties collected equal the net countervailable subsidy. *See Remand Order*, Slip Op. 25-149, at *26, 2025 WL 3496986, at *10 (finding that Commerce "neglected to articulate what methodology it uses to calculate the denominator).

Finally, Commerce objects that requiring it to request clarification to understand the observed difference between the entered value and CS Wind Korea's U.S. invoice price would relieve CS Wind of its burden of demonstrating eligibility for an EVA. *Remand Results* at 26, Rem. P.R.

28

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

7, at Appx10220. But, as discussed above, CS Wind provided

information to demonstrate that CS Wind Korea's invoice value—which

was also consistently higher than CS Wind Malaysia's invoiced value to

CS Wind Korea for the same projects—almost perfectly matched the

Forms 7501. Accordingly, CS Wind met its burden to establish that CS

Wind Korea's back-to-back invoice price established the imported value

for the sample projects for which it provided documentation. Even if

Commerce had a basis to require a perfect match—which it did not for

the reasons explained above—Sections 1677m and 1671(a) required it to

identify the mismatch and provide CS Wind with an opportunity to

reconcile the tiny observed difference to ensure that the CVD rate did

not result in overcollection of duties.

> **4. CS Wind Provided A Sufficient Number and Value of Forms 7501 to Establish that CS Wind Korea's Invoice Price Reflects the Imported Value of Subject Merchandise**

Commerce also claims that the fact that CS Wind did not provide

supporting documentation for two of the four transactions identified in

Commerce's supplemental questionnaire supports denying the EVA.

*Remand Results* at 25, Rem. P.R. 7, at Appx10219. But, the number of

entry summary documents for the two projects provided by CS Wind

29

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

was significant relative to the total number and value of CS Wind's export sales during the POR. Commerce has never explained how the absence of Forms 7501 for the other two projects undermined that CS Wind Korea's invoice value established the imported value of subject merchandise produced by CS Wind Malaysia when the entry summaries *uniformly* demonstrated that CS Wind Korea's invoiced value was almost identical to the entered values for the same project codes.

In other past cases, Commerce did not expect perfect compliance and accepted Forms 7501 for a *subset* of U.S. sale to grant an EVA. *See Certain Aluminum Foil from the People's Republic of China*, 88 Fed. Reg. 75,267 (Nov. 2, 2023) (final results of countervailing duty administrative review), and accompanying Memorandum from Scot Fullerton, Associate Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, re: "Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Certain Aluminum Foil from the People's Republic of China; 2021" (Oct. 27, 2023) at 16–18. Rather, Commerce accepted samples of selected sales instead of requiring Forms 7501 for *every* U.S. sale. *Id.* at 17.

30

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

The number of entry summary documents provided by CS Wind was significant relative to its total number and value of export sales on a project basis. CS Wind exported only **[    ]** total projects to the U.S. during the POR. The four projects accounted for almost **[    ]**% of the total number of projects exported during the POR. *See* CS Wind IQR at Ex. II.C-2, C.R. 32–51, Appx2343–2356. The two projects for which CS Wind provided supporting documentation (*i.e.*, Projects #s **[**

**]**) accounted for **[      ]** of the total sections exported to the United States during the period of review ("POR"). *See id.* The same  two projects accounted for **[      ]** of the total value of CS Wind's U.S. export sales during the POR. *See id.* Thus, the relative share of total projects for which CS Wind provided Forms 7501 was sufficient to evaluate whether CS Wind Korea's U.S. invoice price established the imported value of the subject merchandise.

CS Wind explained that the Forms 7501 for certain sample projects requested by Commerce were not available because they were sold on **[         ]** basis. *See* CS Wind SQR 5 at S5-1, S5-2, C.R. 141–142, Appx5458, Appx5459. In other words, CS Wind did not arrange for entry for the sales for which it did not provide entry summaries.

31

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

Commerce fails to explain why the Forms 7501 provided were insufficient to demonstrate that CS Wind Korea's invoice value established the imported value of subject merchandise produced by CS Wind Malaysia when the entry summaries *uniformly* demonstrated that CS Wind Korea's invoiced value was almost identical to the entered values for the same project codes.

## B. Commerce Continued to Unlawfully Include Non-Comparable Land Prices in the Land Benchmark Price

In the *Remand Results*, Commerce continues to fail to address record evidence that rental prices in Penang are not comparable to those in Pahang because those rental prices are three times higher than the average land prices in Pahang, where CS Wind's facility is located. Rather, Commerce continues to justify including non-comparable land rental pricing from Penang in its Tier One land benchmark *solely* because the C.B. Richard Ellis report data point reflects a rental price between private parties. *Remand Results* at 9, Rem. P.R. 7, Appx10203. The Court should again remand Commerce's *Remand Results* to address the Court's order that it consider the disparity in real estate prices between Penang and Pahang to ensure that its Tier One benchmark

32

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                     NON-CONFIDENTIAL VERSION

reflects only actual market transactions for comparable land. *See*

*Remand Order*, Slip Op. 25-149, at *13, 2025 WL 3496986, at *5.

Section 1677(5)(E)(iv) requires Commerce to determine the adequacy

of remuneration in relation to "prevailing conditions," *i.e.,* price, quality,

availability, marketability, transportation, and other conditions of sale,

for the goods being provided or purchased in the country that is subject

to the administrative review. *See* 19 U.S.C. § 1677(5)(E)(iv). Where

Commerce chooses a benchmark based on actual transactions in the

country in question (i.e., a Tier One benchmark), Commerce's regulation

provides that it "will consider product similarity; quantities sold,

imported or auctioned; and other factors affecting comparability" in

selecting transactions or sales *within the country* in question. 19 C.F.R.

§ 351.511(a)(2)(i).

Commerce continues to ignore that the 2021 average rental rate for a

factory facility located in mainland Penang (i.e., 1.5 RM) reflected in the

MIDA Malaysia Cost of Doing Business Reports for 2021 is three times

higher than the average rental rate for a factory facility in Pahang (i.e.,

0.5 RM) in the same data source. *See* Letter from Trade Pacific PLLC,

re: "Benchmark Submission" (Aug. 1, 2023), P.R. 160–161, at Ex. 1,

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

Appx5868–5873 ("CS Wind BM Submission") (showing that 2021 per square foot monthly rental prices of rent for a factory in Mainland Penang range from 1.00 to 2.00 RM per square foot while rent for a factory located in Pahang during this period ranges from 0.40 to 0.60 RM per square foot). In other words, within the MIDA pricing data, average land rental prices for factory facilities in Penang are three times higher than average rental prices for factory facilities in Pahang. See *id.*

Commerce wrongly suggests that CS Wind's contention that it should reject benchmark information due to price differences is circular. See *Remand Results* at 21 n.61, Rem. P.R. 7, Appx10215. Commerce misconstrues CS Wind's argument as implying that a benchmark is inappropriate merely because it is different from the price CS Wind paid. *See id.* On the contrary, CS Wind argues that Commerce disregarded information within the MIDA data—one of the two benchmark sources selected by Commerce—that itself demonstrated that land prices in Penang are not comparable to those in Pahang state for the reasons explained above.

34

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079                    NON-CONFIDENTIAL VERSION

Commerce continues not to explain why it is reasonable to conclude that Penang industrial land pricing is comparable to land in Pahang given the significant disparity in pricing between two states reflected within the MIDA dataset. Therefore, Commerce unlawfully failed to account for factors affecting comparability, as required by its regulation, when it included the C.B. Richard Ellis land price in its land benchmark. Commerce's *Remand Results* also fail to respond to the Court's order that it explain its benchmark in light of the disparity in real estate costs between the two regions. *Remand Order*, Slip Op. 25-149, at *13, 2025 WL 3496986, at *5.

Commerce dismisses the relevancy of the price disparity across different regions because it speculates that the price disparities "could be the result of subsidization." *Remand Results* at 21, Rem. P.R. 7, Appx10215. First, Commerce wrongly claims that the record supports that Pahang pricing is lower due to land and other amenities being offered by the State of Kuantan, which is located Pahang. *Id.* (*citing* Memorandum to The File, re: "Placing Benchmark on the Record" (Aug. 30, 2023), P.R. 216, at Attach. (page 67), Appx10083 ("DOC Land BM Data")). The statement highlighted by Commerce does not link lower

35

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

land prices to amenities offered by the State Government. Rather, the statement in the C.B. Richard Ellis report merely highlights that investors may be attracted to the Gebeng Industrial Area because of multiple factors, including competitive land prices, the availability of skilled labor, and other amenities offered by the State Government. *Id.* Therefore, Commerce's conclusion that lower land prices could be driven by government intervention in the land market in Pahang is not supported by the quoted statement.

Second, even if it were true that the MIDA data may contain transactions with government entities—which the record evidence does not support for the reasons explained above—the price disparity in the MIDA data still supports that land prices in Penang are three times higher than those in Pahang. To the extent Commerce may still conclude that subsidization contributes to lower land prices, the record source Commerce relied upon in the *Remand Results* supports that Penang may benefit from similar amenities and government involvement. *See* DOC Land BM Data, P.R. 216, at Attach. (page 64), Appx10080 (stating that planned infrastructure improvements by the Ministry of Economic Affairs in Penang could attract more foreign

36

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

investment). Therefore, there is no merit to Commerce's theory that the price differential stems primarily from government subsidization or involvement in the property market in Pahang that does not exist in Penang.

Commerce does not conclude—and there is no basis in the record to support any conclusion—that that the MIDA average pricing data Pahang reflects transactions between private parties and government entities while the same data for Penang does not. Yet, the MIDA data itself reflects that land prices in Penang are three times higher than those in Pahang. Thus, the pricing disparity highlighted by CS Wind shows that the disparity in prices is not caused by government subsidization in Pahang, as Commerce speculates.

Without explaining why the prices in Penang within the MIDA data are comparable to the much lower prices in Pahang, Commerce fails to address the disparity in pricing between the regions within the MIDA data itself. Therefore, Commerce's determination that industrial land pricing in Penang and Pahang are comparable is not supported by substantial evidence, and its determination to average the MIDA data

37

*Business Proprietary Information Has Been Redacted*

with the single transaction contained in the CB Richard Ellis data is contrary to law.

Commerce also objects that the regulation does not require benchmarks to be discounted or ignored because they relate to a different state within the country or provide that geographic similarity is the sole criterion for price comparability. *Remand Results* at 22, Rem. P.R. 7, Appx10216. Moreover, Commerce claims that the regulation does not require benchmarks to be at a particular predetermined price level to be usable. *Id.* at 23, Rem. P.R. 7, Appx10217. Commerce's argument is directly contradicted by the text of Commerce's benchmark regulation, which requires it to select transactions and sales between private partes stemming from actual transactions that are similar and comparable. 19 C.F.R. § 351.511(a)(2)(i).

CS Wind does not argue that Commerce must select benchmark data from Pahang or based on similarity of location, as Commerce implies. Rather, CS Wind objects to the inclusion of rental land in Penang in the Tier One land benchmark because the MIDA data shows that land rental prices in that region were not comparable to those in Pahang. CS Wind BM Submission at Ex. 1, P.R. 160–161, Appx5868–5873.

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                              **NON-CONFIDENTIAL VERSION**

Commerce's inclusion of factory rental land from a region that the

MIDA data shows is *three times* more expensive on a per-square foot

basis than factory rental land in Pahang gives no effect to the Court's

order to consider such evidence or to the regulatory requirement to

select actual rental transactions in Malaysia based on similarity of the

land and factors affecting comparability. Therefore, Commerce's

determination to include the C.B. Richard Ellis rental price from

Penang in its land benchmark fails to respond to the *Court's Remand*

*Order* and is also contrary to law and otherwise not supported by

substantial evidence.

Finally, Commerce claims that its decision to average the MIDA and

C.B. Richard Ellis pricing reasonably considers relative advantages of

multiple datasets with relative strengths and weaknesses. R*emand*

*Results* at 20, Rem. P.R. 7, Appx10214. Commerce claims that its

"holistic approach" reasonably weighed the strengths and weaknesses of

the MIDA and C.B. Richard Ellis datasets. *Id.* But, the summary table

contained on page 9 of the *Remand Results* underscores that

Commerce's determination to average the two datasets did not consider

the lack of price comparability among the regions, which is required by

39

*Business Proprietary Information Has Been Redacted*

Case No. 24-00079 NON-CONFIDENTIAL VERSION

the regulation and the Court's *Remand Order*. *See* R*emand Results* at 9,

Rem. P.R. 7, Appx10203. The table does not include price comparability,

but rather compares the sources for only for similarity in location and

size, along with the types of parties to the transaction, and the number

of transactions. *Id.*

Commerce has discretion to average similar and comparable actual

land transactions between private parties in Malaysia. But the

regulation prohibits including actual land transactions from a region

that record evidence demonstrates is not comparable in price with those

within the same region for which it is seeking to measure the adequacy

of remuneration of land rental transactions. Commerce ignores the

baseline requirement that the benchmark include *only* comparable

prices stemming from actual transactions. For this reason, the decision

to include the Penang land rental price in the Tier One benchmark to

measure the adequacy of remuneration of CS Wind's land rental is

contrary to law and otherwise not supported by substantial evidence.

In summary, upon remand, Commerce continued to ignore evidence

that demonstrated that industrial land rental prices in Penang were not

comparable to those in Pahang, which the Court rightfully required

40

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**  **NON-CONFIDENTIAL VERSION**

Commerce to consider. *Remand Order*, Slip Op. 25-149, at \*13, 2025 WL 3496986, at \*5. The *Remand Results* fail to correct Commerce's errors in the Final Results of this administrative review.

## V. CONCLUSION

Commerce "doubles-down" on its unlawful determinations to: (1) calculate CS Wind's CVD rate on the sales denominator that reflects CS Wind Malaysia's intermediate sales to CS Wind Korea rather than on the imported value of CS Wind Korea's sales of wind towers produced by CS Wind Malaysia to unaffiliated U.S. customers; and (2) include non-comparable pricing from Penang in its Tier One benchmark calculation. Commerce continues to fail to meaningfully address any of the evidence that detracts from either unlawful determination.

Therefore, the Court should direct Commerce upon remand to grant CS Wind an EVA and recalculate the Tier One benchmark by excluding the non-comparable price of industrial land in Penang.

41

*Business Proprietary Information Has Been Redacted*

**Case No. 24-00079**                    **NON-CONFIDENTIAL VERSION**

Respectfully submitted,

/s/ Kenneth N. Hammer
Jarrod M. Goldfeder
Kenneth N. Hammer
Sezi Erdin

**TRADE PACIFIC PLLC**

700 Pennsylvania Avenue,
SE, Suite 500
Washington, D.C. 20003
(202) 223-3760

*Counsel to Plaintiffs*
CS Wind Malaysia Sdn. Bhd. and
CS Wind Corporation

Date: May 14, 2026

42

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |  |
|---|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>and,<br><br>WIND TOWER TRADE COALITION,<br><br>*Defendant-Intervenor*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Ct. No. 24-00079 |

CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Comments in Opposition to Final Results of Remand Redetermination of Plaintiffs, CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation, dated May 14, 2026, complies with the word-count limitation stated in the Post-Remand Scheduling Order, April 24, 2026, ECF No. 68.

The comments in opposition to Commerce's final remand redetermination contain 7,806 words according to the word-count function of the word-processing software used to prepare the brief.

Respectfully submitted,

/s/ Kenneth N. Hammer
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE,
Suite 500
Washington, D.C.  20003
(202) 223-3760
*Counsel for Plaintiffs*

Dated:  May 14, 2026

2

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |  |
|---|---|---|
| CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION, | ) ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) ) | |
| UNITED STATES, | ) ) | Ct. No. 24-00079 |
| *Defendant,* | ) ) ) | |
| and, | ) ) | |
| WIND TOWER TRADE COALITION, | ) ) ) | |
| *Defendant-Intervenor.* | ) ) | |

CERTIFICATION OF NON-USE OF GENERATIVE ARTIFICIAL
INTELLIGENCE

The undersigned counsel at Trade Pacific PLLC hereby certifies that the Comments of CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation in Opposition to the U.S. Department of Commerce's Remand, dated May 14, 2026, were not prepared with the assistance of a generative artificial intelligence program based on natural language prompts—such as, but not limited to—ChatGPT, Google Bard, or any similar program.

Respectfully submitted,

/s/ Kenneth N. Hammer
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE,
Suite 500
Washington, D.C.  20003
(202) 223-3760
*Counsel for Plaintiffs*

Dated:  May 14, 2026