**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| CS WIND MALAYSIA SDN. BHD. AND CS WIND CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>WIND TOWER TRADE COALITION,<br><br>Defendant-Intervenor. | Court No. 24-00079 |

**DEFENDANT'S CORRECTED COMMENTS SUPPORTING REMAND REDETERMINATION**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

ISABELLE AUBRUN
Trial Attorney | Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
202-616-0465 |
isabelle.aubrun2@usodj.gov
*Attorneys for Defendant*

Of Counsel:

BRIEN STONEBREAKER
Attorney
Department of Commerce
Office of Chief Counsel for Trade Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

August 20, 2026

TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

BACKGROUND ..... 1

I. The Court Remands In Part Commerce's Initial Finding ..... 1

II. The Remand Redetermination ..... 3

SUMMARY OF ARGUMENT ..... 8

ARGUMENT ..... 9

I. Standard Of Review ..... 9

II. Commerce's Remand Redetermination to Continue Denying CS Wind an Entered Value Adjustment Is Supported By Substantial Evidence and In Accordance with Law ..... 10

A. Commerce Explained Its Current EVA Methodology and the Relevant of the Third Criterion ..... 10

B. Substantial Evidence Supports Commerce's Finding That CS Wind Failed To Demonstrate That The U.S. Invoice Values Established Customs Values ..... 18

C. Commerce Was Not Required To Give CS Wind Another Opportunity After CS Wind Failed To Provide Documentation Establishing Its EVA Claim ..... 24

D. CS Wind's Requested Alternatives Would Require Commerce To Make An Unsupported Adjustment Despite CS Wind's Failure to Satisfy The EVA Requirements ..... 30

III. Commerce Reasonably Continued To Include The CBRE Penang Transaction In Calculating The Land Benchmark ..... 33

A. Commerce Addressed The Court's Concerns Regarding Price and Parcel-Size Comparability between Penang and Pahang .............. 34

B. Commerce Reasonably Weighed The Strengths And Weaknesses Of The CBRE and MIDA Benchmark Sources .................................................. 37

C. The Court Previously Sustained Commerce's Use Of A Simple Average When Commerce Adequately Explains The Comparability of The CBRE Transaction ..................................................... 42

D. CS Wind's Criticism Of Commerce's Discussion Of Potential Government Influence on Pahang Prices Does Not Undermine The Remand Results ............................................................... 43

CONCLUSION ........................................................................ 46

TABLE OF AUTHORITIES

**Cases**

*Canadian Solar Inc. v. United States*,
537 F. Supp. 3d 1380 (Ct Int'l Trade 2021)........................................17

*CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation v. United States*,
Slip Op. 25-149, 2025 WL 3496986 (Ct. Int'l Trade Dec. 5, 2025) ........2

*Dong-A Steel Company v. United States*,
475 F. Supp. 3d 1317 (Ct. Int'l Trade 2020)........................................25

*Jiangsu Senmao Bamboo & Wood Indus. Co., Ltd. v. United States*,
651 F. Supp. 3d 1348 (Ct. Int'l Trade 2023)........................................27

*Jiangsu Zhongji Lamination Materials Co. v. United States*,
405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019)........................................17

*MacLean-Fogg Co. v. United States*,
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015)..........................................9

*Nippon Steel v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)..........................................................40

*QVD Food Co. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011)..........................................................29

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*,
Slip Op. 15-28, 2015 WL 1455445 (Ct. Int'l Trade Apr. 1, 2015) ........41

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
803 F. Supp. 3d 1276 (Ct. Int'l Trade 2025)........................................40

*Yama Ribbons & Bows Co. v. United States*,
865 F. Supp. 2d 1294 (Ct. Int'l Trade 2012)........................................29

## Statutes

19 U.S.C. § 1677e(a) .......................................................... 25

19 U.S.C. § 1677m(d)........................................................ 24, 25, 26, 27

## Regulations

19 C.F.R. § 351.511(a)(ii)........................................................ 34

## Federal Register Notices

*Certain Aluminum Foil from the People's Republic of China: Final Results of Countervailing Duty Administrative Review*,
88 Fed. Reg. 75,267 (Dep't of Commerce Nov. 2, 2023)........................ 15

Defendant, the United States, respectfully responds to the comments of plaintiffs, CS Wind Malaysia Sdn. Bhd. (CS Wind Malaysia) and CS Wind Corporation (CS Wind Korea) (collectively, CS Wind) (Cmts.) (ECF Nos. 69, 72) concerning the U.S. Department of Commerce's remand results in this matter. *Final Results of Redetermination Pursuant to Court Remand* (March 26, 2026) (ECF No. 65) (Rem. P.R. 7)[1] (Remand Results), Appx19105-10222. We respectfully request that the Court sustain the remand results because they comply with the Court's remand order and because they are supported by substantial evidence and otherwise lawful.

## BACKGROUND

### I. The Court Remands In Part Commerce's Initial Finding

This case concerns Commerce's final results in the 2021 countervailing duty (CVD) administrative review of Utility Scale Wind Towers from Malaysia, for the period of review from March 25, 2021, to December 31, 2021. *See Utility Scale Wind Towers from Malaysia: Final Results of Countervailing Duty Administrative Review; 2021*, 89

---

[1] For ease of reference, the record citations with P.R./C.R. designate citation to the initially filed administrative record index, *see* ECF No. 21, and Rem. P.R./Rem. C.R. designate citation to the remand record index. *See* ECF No. 66.

Fed. Reg. 17,404 (Dep't Commerce March 11, 2024) (P.R. 262) (Final Results), and accompanying Issues and Decision Memorandum (IDM) (P.R. 260).

On December 5, 2025, the Court sustained Commerce's Final Results in part and remanded them in part. *See CS Wind Malaysia Sdn. Bhd. and CS Wind Corporation v. United States*, Slip Op. 25-149, 2025 WL 3496986 (Ct. Int'l Trade Dec. 5, 2025) (ECF No. 60) (Remand Order). The Court sustained Commerce's determination that the full value of duty exemptions CS Wind received conferred a countervailable benefit. Remand Order at 8. The Court also sustained Commerce's selection of Singaporean electricity rates as a tier-three benchmark to value electricity supplied by the Government of Malaysia. Remand Results at 20, Appx10214.

The Court remanded two aspects of Commerce's Final Results. First, with respect to the land for less-than-adequate-remuneration program, the Court directed Commerce to address CS Wind's argument that the C.B. Richard Ellis (CBRE) rental price in Penang was not comparable to CS Wind Malaysia's lease rate in Pahang because of the disparity in real estate costs between Penang and Pahang. Remand

Order at 13-15. The Court also directed Commerce to address CS Wind's argument that the size of its Pahang property was not comparable to the CBRE transaction. *Id* at 13-14.

Second, the Court remanded Commerce's denial of CS Wind's request for an entered value adjustment (EVA). The Court observed that Commerce had required CS Wind to satisfy Commerce's six-factor EVA test, including the third criterion requiring evidence that the U.S. invoice establishes the customs value to which countervailing duties are applied. Remand Results at 24-26, Appx10218-10220. The Court directed Commerce to articulate what methodology it uses to calculate the denominator when granting an EVA and, insofar as Commerce uses a methodology other than the affiliate's marked-up U.S. sales, to explain the relevance of the third criterion in light of that methodology. Remand Results at 26, Appx10220.

II. <u>The Remand Redetermination</u>

Commerce released draft results to interested parties on February 11, 2026, and provided the parties an opportunity to comment on those results. CS Wind Malaysia and petitioner/defendant-intervenor in this case, Wind Tower Trade Coalition, submitted comments. Commerce

then issued the Remand Results on March 26, 2026. Commerce provided further explanations on both remanded issues and did not modify CS Wind's calculated subsidy rate. Remand Results at 1-2, 6-17, 27, Appx10196-10197, Appx10200-10211, Appx10221

For the land LTAR benchmark, Commerce explained that, in selecting a tier-one benchmark under 19 C.F.R. § 351.511(a)(2)(i), Commerce considers factors affecting comparability. Remand Results at 6-10, Appx10200-10202. Commerce then addressed the location and size concerns identified by the Court. Remand Results at 7-10, 20-23, Appx10201-10204, Appx10213-10217. With respect to size, Commerce explained that the Malaysian Investment Development Authority (MIDA) data submitted by CS Wind Malaysia did not identify the size of the land parcels underlying the prices contained in that source. Remand Results at 7-8, Appx10201-10202. Commerce acknowledged the substantial difference in size between CS Wind Malaysia's parcel and the CBRE transaction but explained that there was no indication that a similarly significant disparity was not also present in the MIDA data. *Id.* Commerce therefore found that the MIDA data were not necessarily more comparable with respect to this criterion. *Id.*

With respect to location and price, Commerce explained that Penang prices were not unusable merely because they were for more expensive parcels located in a different state from CS Wind Malaysia's parcel in Pahang. Remand Results at 8-10, 21-23, Appx10202-10204, Appx10213-10217. Commerce acknowledged that the MIDA and CBRE Benchmark Data reflected higher land prices in Penang and lower prices in Pahang, but explained that differences in land prices, by themselves, did not render the Penang prices objectively less comparable or the Pahang prices objectively better. *Id.* at 8-9, 21, Appx10202-10203, Appx10215. Commerce also explained that the record shows government support in the East Coast Economic Region, which includes Pahang, and that the CBRE Benchmark Data stated that the Gebeng Industrial Area offered land backed by competitive land prices, skilled labor, and amenities offered by the state government. Remand Results at 8-9, 21-23, Appx10202-10203, Appx10213-10217. Commerce continued to rely on an average of the CBRE Benchmark Data and the MIDA data, explaining that each data source contained limitations and that Commerce reasonably relied on both sources consistent with its preference for using multiple

benchmark sources. Remand Results at 9-10, 20-23, Appx10203-10204, Appx10214-10217.

For the EVA, Commerce clarified that its current EVA methodology does not use a worldwide markup methodology. Remand Results at 13-17, Appx10207-10211. Commerce explained that its current methodology no longer changes the sales denominators but instead adjusts the *ad valorem* CVD rate itself. Remand Results at 14-16, Appx10208-10210. Specifically, Commerce explained that it calculates the countervailing duties to be collected by multiplying the respondent's net *ad valorem* subsidy rate by the respondent's reported value of exports to the United States before any sales markup and then divides that amount by the total U.S. sales invoice amount, which reflects the entered value of the affiliated reseller's U.S. sales of subject merchandise. Remand Results at 14-15, Appx10208-10209. Commerce explained that, under this methodology, accurate entered values, corresponding invoices, and accurate connections between invoices and entered values are important both to demonstrate whether a potential overcollection problem exists and to calculate any adjustment accurately. Remand Results at 15-16, Appx10209-10210.

Commerce also explained why CS Wind Malaysia failed to satisfy the EVA evidentiary requirements on this record. Commerce requested supporting documentation for four projects, including the invoice from CS Wind Malaysia to CS Wind Korea, the invoice from CS Wind Korea to the U.S. customer, bills of lading and packing lists, and Customs and Border Protection (CBP) Form 7501s. Remand Results at 4-5, 16-17, Appx10198-10199, Appx10210-10211. CS Wind Malaysia did not provide CBP Form 7501s, or alternative customs documentation establishing entered value, for two of the four projects. Remand Results at 16-17, 25, Appx10210-10211, Appx10219. For the two sales for which CS Wind Malaysia provided documentation, Commerce found a discrepancy between the sales value listed on the invoices and the total entered value on the CBP Form 7501s and further found that those differences were not uniform in value or direction. Remand Results at 17, 25-27, Appx10211, Appx10219-10221. Given those deficiencies, Commerce found that it lacked sufficient information to determine the customs value for the sales or that the U.S. invoice established the appropriate customs value and continued to deny the requested EVA. Remand Results at 17, 25-27, Appx10211, Appx10219-10221.

## SUMMARY OF ARGUMENT

Consistent with the Court's remand order, Commerce addressed the issues identified by the Court and further explained its determinations regarding CS Wind's requested EVA and the selection of the land benchmark. CS Wind's arguments in opposition to the remand results do not displace Commerce's reasoned and well-supported conclusions.

With respect to the EVA, Commerce explained that its methodology relies on U.S.-specific sales and entered-value information and that the third criterion remains necessary to confirm that the U.S. invoice values correspond to the customs values on which duties are collected. Commerce continued to deny CS Wind an EVA because CS Wind failed to provide customs documentation for two of the four selected projects, and the documentation for the remaining projects showed discrepancies between the U.S. invoice values and entered values.

For the land benchmark selection, Commerce addressed the Court's concerns regarding the price disparity between Penang and Pahang and the difference in parcel size between CS Wind Malaysia's

property and the CBRE Penang transaction. After weighing the MIDA data's location and multiple-transaction advantages against its lack of party and parcel-size information, as well as the fact that the CBRE data represented an actual private industrial land transaction with parcel-size information, Commerce continued to include the CBRE Penang data by averaging it with the MIDA data.

Accordingly, Commerce complied with the Court's remand order, and its remand redetermination is supported by substantial evidence and in accordance with law.

## ARGUMENT

### I. Standard Of Review

The Court reviews remand redeterminations under the same standard as its review of original determinations. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). Therefore, in remand proceedings, the Court will sustain Commerce's determination if it is "in accordance with the remand order," and is "supported by substantial evidence and otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

## II. Commerce's Remand Redetermination to Continue Denying CS Wind an Entered Value Adjustment Is Supported By Substantial Evidence and In Accordance with Law

On remand, Commerce did as the remand order instructed by explaining (1) the methodology it uses to calculate the denominator in its assessment of whether to grant an EVA and (2) the relevance of the third criterion requiring that the U.S. invoice establish the customs value to which countervailing duties are applied. Remand Results at 10-17, 23-27, Appx10204-10211, Appx10217-10221. After so explaining, Commerce reasonably determined that CS Wind failed to satisfy the requirement that the U.S. invoice establish the customs value to which CVD duties are applied because it provided incomplete and inconsistent customs documentation and an EVA was not supported. *Id.* CS Wind's arguments to the contrary ask the Court to reweigh the evidence in the record and to excuse CS Wind from the evidentiary burden necessary to obtain a limited adjustment that is not required by either statute or regulation.

### A. Commerce Explained Its Current EVA Methodology and the Relevant of the Third Criterion

Briefly, and as the Court observed in its remand opinion, Commerce typically calculates a "countervailable subsidy rate by dividing the

amount of the benefit allocated to the period of review (the numerator) by the sales value during that same period of the product(s) to which the agency attributes the subsidy (the denominator)." Remand Order at 21. But when "the sales value that would normally be the denominator does not match the goods' value at U.S. import," an exporter can seek an EVA to remedy this mismatch and thereby prevent the overcollection of duties. *Id.* at 21-22. In Commerce's methodology, it considered six factors in its analysis, the third of which is at issue now on remand: "(3) the U.S. invoice establishes the customs value to which the CVD duties are applied." Appx1000-1015; 1018-1059.[2]

The Court did not take issue with the six criteria analysis per se. Instead, in its remand order, the Court explained that it was remanding the EVA issue because in its final decision memorandum Commerce

---

[2] A respondent seeking an EVA must demonstrate that: "(1) the price on which the alleged subsidy is based differs from the U.S. invoiced price; (2) the exporters and the party that invoices the customer are affiliated; (3) the U.S. invoice establishes the customs value to which the CVD duties are applied; (4) there is a one-to-one correlation, except for differences in price, between the invoice that reflects the price on which subsidies are received and the invoice with the mark-up that accompanies the shipment; (5) the merchandise is shipped directly to the United States; and (6) the invoices can be tracked as back-to-back invoices that are identical except for price. Appx1026-1027.

had not articulated the methodology it used to calculate the denominator when granting an EVA and had not explained why the third criterion remained relevant if Commerce had used a methodology that did not require U.S.-specific sales data. Remand Order at 25-26. On remand, Commerce identified its EVA calculation methodology as relying on those six factors and explained why, under that methodology (which relies on U.S. sales values and entered value), the third criterion remains a necessary element of the analysis. The Court draws a distinction between how Commerce calculated the EVA ("by calculating the marked-up ratio of U.S. sales and then multiplying that ratio by the original subsidy rate") and what Commerce appears to have done more recently, ("adjust{ing} a subsidy rate by changing the denominator of the original subsidy rate from the respondent's total worldwide export sales to the affiliate's marked-up total *worldwide export sales*"). Remand Order at 23 (internal quotation omitted) (emphasis in original).

We understand the Court to be seeking clarity from Commerce on precisely what its methodology of calculating an EVA is and how it applied that methodology in CS Wind's case. That is, the Court instructed Commerce to (1) explain its methodology and "insofar as

{Commerce} explains that it now looks to the affiliate's total marked-up *worldwide* sales or some other metric rather then the affiliate's marked-up *U.S.* sales, Commerce must explain the relevance of the third criterion on which it relied to deny CS Wind's requested adjustment." Remand Order at 26. As Commerce explained in its remand results, it *does not* rely on worldwide sales and instead, relies on U.S. sales data when considering whether to make an EVA. Remand Results at 16-17, 24-25, Appx10210-10211, Appx10218-10219. Because this calculation methodology relies on U.S. customs values, Commerce reasonably looked to criterion number three: whether the U.S. invoice establishes the customs value to which the CVD duties are applied.

Commerce clarifies on remand, as requested by the Court, that Commerce's *current* methodology, reflected in recent administrative reviews, uses U.S.-specific sales and entered-value information and adjusts the *ad valorem* CVD rate when the record establishes that the sales value used to calculate the subsidy rate does not match the entered value on which CBP collects duties. Remand Results at 13-16,

Appx10207-10210.[3] This approach reflects a change only in the *calculation* methodology, not in *evidentiary* requirements (those have remained consistent). On remand, Commerce clarified that the EVA is designed to address a customs-collection problem, not to change Commerce's subsidy valuation or attribution rules. Remand Results at 14-15, Appx10208-10209. Thus, when Commerce grants an EVA, it calculates the adjustment using the amount of countervailing duties to be collected and the total U.S. sales invoice amount, which must reflect the entered value of the affiliated reseller's U.S. sales of subject merchandise. Remand Results at 13-15, Appx10207-10210. Commerce provided an example of this calculation on page 15 of its remand results, explaining that, if it determines there is an overcollection of duties based on the documentation provided by the proponent of an EVA, Commerce adjusts the CVD rate. Remand Results at 15, Appx10209. This is a change from how Commerce applied the adjustment in separate proceedings, when it used respondent's

[3] *See* Remand Results at 16, n. 50, Appx10210 (citing two recent administrative reviews in which Commerce took the same approach concluding that "any adjustments to the cash deposit or assessment rate should be limited to the mark-up that is experienced on sales that enter the United States")

"worldwide," or total, sales to make an EVA. In this case, as the Court is aware, Commerce did not grant CS Wind an EVA.

Given Commerce's revised calculation methodology discussed above, in its remand results, Commerce reasonably explained that this third criterion remains necessary for Commerce's evaluation of whether an exporter is entitled to an EVA. This is because Commerce treats the reported U.S. invoice value as a proxy for entered value—but only if the record supports the relationship. Remand Results at 14-16, Appx10208-10210. As an example of that, in is remand redetermination, Commerce references an administrative review of Aluminum Foil from China: The exporter provided alternate customs forms (not CBP 7501 forms), and Commerce found the alternate documentation of entered value to suffice. Remand Results at 16 n.49, Appx10210 (citing *Certain Aluminum Foil from the People's Republic of China: Final Results of Countervailing Duty Administrative; 2021*, 88 FR 75267 (November 2, 2023) and accompanying IDM at Comment 2), Appx10210. Accordingly, although individual entered values do not necessarily become line-item inputs in the EVA calculation (and Commerce may use invoices as a proxy for entered value), Commerce must be able to confirm through

customs documentation that the U.S. invoice value corresponds to the customs value to which CVD duties are applied. Remand Results at 14-16, Appx10208-10210.

In addressing Commerce's EVA methodology, CS Wind argues that Commerce's EVA calculation does not rely on individual entered values and therefore Commerce cannot require values on CBP Form 7501s to match invoice values. Cmts. at 20-25. Specifically, CS Wind claims that the EVA calculation does not rely on a single invoice value, but instead on overall invoice values, such that Commerce impermissibly focused on the information contained in the CBP Form 7501. *Id.*

That argument misses Commerce's point. Commerce did not state that each individual entered value becomes a line item input in the EVA formula. Commerce explained that CS Wind's customs documentation is necessary to validate the premise of the calculation: that the U.S. invoice values used in the adjustment are reflective of entered value. Remand Results at 15-17, Appx10209-10211. When a respondent asks Commerce to calculate an EVA (which would be implemented using the affiliate's U.S. sales invoice amount), Commerce

must verify that the claimed U.S. invoice value is tied to the customs value used for duty collection. That is the function of the third criterion. Remand Results at 15-17, 23-27, Appx10209-10211, Appx10217-10221. As concerns CS Wind, Commerce requested documentation for the four transactions during the period of review and for two of those transactions, there were discrepancies between the invoice price and the entered value.

CS Wind's position would require Commerce to accept aggregate invoice values even when the respondent cannot establish that those values correspond to entered values. *Canadian Solar* and *Jiangsu Zhongji* do not require that result. *See Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1395-99 (Ct Int’l Trade 2021); *Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1326-30 (Ct. Int'l Trade 2019). Those cases address the need to avoid potential overcollection when a respondent demonstrates that the entered value is marked up relative to the value used to calculate the subsidy rate. See *Canadian Solar*, 537 F. Supp. 3d at 1395; *Jiangsu Zhongji*, 405 F. Supp. 3d at 1330. They do not hold that Commerce must grant an EVA when the respondent provides incomplete customs

documentation or when the customs documentation provided fails to establish that the U.S. invoice values correspond to entered values. Commerce explained that, after the EVA litigation cited by CS Wind, Commerce implemented a methodology that relies on U.S. sales values and continues to require evidence tying those values (as they appear on invoices) to the corresponding entered values. This approach has been applied in the Aluminum Foil from China proceeding, following the *Jiangsu Zhongji* litigation. Remand Results at 12-17, 24-27, Appx10206-10211, Appx10218-10221.

## B. Substantial Evidence Supports Commerce's Finding That CS Wind Failed To Demonstrate That The U.S. Invoice Values Established Customs Values

Commerce's denial of the EVA is supported by the record. To evaluate whether CS Wind satisfied the third EVA criterion, Commerce requested documentation for four projects, including invoices, bills of lading, packing lists, and CBP Form 7501s. Remand Results at 4-5, 10-17, 23-27, Appx10198-10199, Appx10204-10206, Appx10217-10221. CS Wind provided only partial documentation in response to Commerce's request. Appx5458-5459. For two of the four selected projects, CS Wind did not provide CBP Form 7501s, or alternative customs

documentation establishing entered value. Remand Results at 16-17, 25, Appx10210-10211, Appx10219; Appx5450-5568. For the remaining two projects, CS Wind provided customs documentation, but Commerce found discrepancies between the values listed on the U.S. invoices and the total entered values reported on the CBP Form 7501s. Remand Results at 17, 23-27, Appx10211, Appx10217-10221; *see also* Appx5491–5494, Appx5510–5517. Thus, the documentation CS Wind provided did not permit Commerce to establish that the U.S. invoice values corresponded to the customs values to which CVD duties applied. Remand Results at 17, 27, Appx10211, Appx10221.

That evidence is sufficient to support Commerce's determination. Commerce explained that CS Wind was required to demonstrate that it satisfied the evidentiary requirements for an EVA, including the requirement that the U.S. invoice establish the customs value applied. Remand Results at 10-17, 23-27, Appx10204-10211, Appx10217-10221. Commerce requested the documentation necessary to evaluate whether CS Wind's U.S. invoice values established entered values. CS Wind could not provide customs documentation for half of the projects Commerce selected, and the documentation it did provide showed

discrepancies between invoice values and entered values. Remand Results at 16-17, 25-27, Appx10210-10211, Appx10219-10221. Commerce therefore reasonably determined that CS Wind did not satisfy the third criterion.

CS Wind repeatedly describes the observed discrepancies as tiny, small, miniscule, or insignificant. Cmts. at 15-20, 25-29. By CS Wind's telling, it *did* submit alternate documentation by which Commerce could conclude the imported value of CS Wind's subject merchandise—invoices from CS Wind Malaysia's affiliate, CS Wind Korea, that show the sale of wind turbines at a marked-up aggregate price in the United States. Cmts. At 14-15. The issue with the documentation is the disconnect between the invoices and the entered value, as explained above in our discussion about the discrepancies. CS Wind argues that Commerce improperly ignored documentation that CS Wind submitted that, CS Wind argues, "*uniformly* demonstrated the CS Wind Korea's invoiced value was almost identical to the entered value for the same project codes." Cmts. at 15 (emphasis in original). Any slight discrepancy, CS Wind argues, is hardly enough to "undermine that the invoiced price of CS Wind Korea's sales to its unaffiliated U.S. customer

established the imported value of the subject merchandise produced by CS Wind Malaysia." Cmts. at 15.

But Commerce did not deny the EVA solely because the discrepancies exceeded a particular numerical threshold, as CS Wind suggests. Commerce explained that the values did not match and that the discrepancies were not uniform in value or direction. Remand Results at 17, 25-27, Appx10211, Appx10219-10221. That finding about the nature of the discrepancies mattered in Commerce's remand because Commerce examined only a subset of CS Wind's customs documentation—to determine whether the U.S. invoice values were reflective of entered value. Remand Results at 16-17, 25-27, Appx10210, Appx10219-10221. The absence of a consistent relationship between invoice values and entered values (in the subset of documentation that CS Wind did provide) undermines CS Wind's claim that the U.S. invoices establish customs value. Moreover, CS Wind's focus on the two projects with CBP Form 7501s does not cure its failure to provide CBP Form 7501s, or alternative customs documentation, for the other two projects that Commerce selected for examination.

CS Wind also argues that the CS Wind Korea invoice values were closer to entered values than CS Wind Malaysia's invoice values were. Cmts. at 13-20. In its comments on the remand redetermination, CS Wind reprises its original argument in the initial round of briefing, arguing that the customs documentation from CS Wind Korea's sales was sufficient basis upon which Commerce could determine the customs value to which to apply CVD duties—so-called minor differences notwithstanding. Cmts. at 14-17 (detailing the specific, dollar and percentage amount differences between CS Wind Korea's invoiced price and the entered value on the corresponding CBP Form).

But relative closeness in figures does not establish entitlement to an EVA. The third criterion of the EVA analysis asks whether the U.S. invoice establishes the customs value to which CVD duties are applied. Remand Results at 4-5, 16-17, 25-27, Appx10198-10199, Appx10210-10211, Appx10219-10221. It is not enough for the U.S. invoice to be *closer* to the entered value than another invoice; Commerce reasonably required evidence from CS Wind that the U.S. invoice value actually corresponded to the customs value used for duty collection. *Id.* Because the values did not match for the documented projects, the discrepancies

were not uniform in value or direction, and CS Wind failed to provide customs documentation for the remaining requested projects (and, accordingly, Commerce could not consider whether discrepancies between entered value and invoice value were present for those transactions), Commerce reasonably found that CS Wind did not carry its burden to establish that it had satisfied the third criterion.

CS Wind's reliance on aggregate period-of-review-wide markup information, or the relative share of sales covered by the two projects with CBP Form 7501s, does not compel a different result. Cmts. at 20-26, 29-32. CS Wind argues that Commerce was wrong to conclude that it could not make an EVA determination without individual entered values. Cmts. at 20-25. In its remand redetermination, however, Commerce acknowledges that, in principle, it may use a sample of transactions when there are numerous transactions. Remand Results at 16-17, 25-27, Appx10210-10211, Appx10219-10221. However, Commerce explained, in the case of CS Wind, that the sample documentation did not support CS Wind's claim because the invoice values did not match the entered values, and CS Wind did not provide customs documentation or alternative customs documentation for the

remaining requested projects. *Id.* And, as previously discussed, the information provided was faulty—it contained a discrepancy that Commerce found rendered it insufficient. This hardly amounts to what CS Wind claims it is—a "fail[ure] to explain why the evidence on the record was not sufficient to support that CS Wind Korea's invoice value to its unaffiliated customer established the imported value of the subject merchandise." Cmts. at 25. Therefore, Commerce reasonably determined that the record in this case did not establish that CS Wind Korea's aggregate U.S. sales values could be used for an EVA.

### C. Commerce Was Not Required To Give CS Wind Another Opportunity After CS Wind Failed To Provide Documentation Establishing Its EVA Claim

CS Wind also argues that Commerce violated 19 U.S.C. § 1677m(d) because Commerce did not provide CS Wind another opportunity to reconcile discrepancies between U.S. invoice values and entered values. Cmts. at 26-29. Specifically, CS Wind argues that, if Commerce required additional information to understand why invoice values differed from entered values, section 1677m(d) required Commerce to request an explanation before denying the EVA. *Id.* That argument fails because Commerce requested the documentation

necessary to evaluate CS Wind's EVA claim, CS Wind provided such documentation, and Commerce determined that the documentation provided did not establish that CS Wind satisfied the third EVA criterion. Commerce did not apply facts otherwise available under 19 U.S.C. § 1677e(a) or (b). *See Dong-A Steel Company v. United States*, 475 F. Supp. 3d 1317, 1347 n.22 (Ct. Int'l Trade 2020) ("That Commerce did not request any additional information beyond what was provided by {Plaintiff} does not discredit the validity of the conclusion drawn from that evidence. Furthermore, Commerce had no obligation under 19 U.S.C. § 1677m(d) to work with {Plaintiff} to correct for "deficiencies" in the record, since as discussed above, it does not appear that deficiencies existed in the first place. Rather, the fundamental difference in conclusions reached by {Plaintiff} and Commerce derived not from any shortcomings in the data, but rather from differing yet equally reasonable interpretations of the evidence.").

Section 1677m(d) requires Commerce, when it determines that a response to a request for information does not comply with the request, to inform the person submitting the response of the nature of the deficiency and, to the extent practicable, provide an opportunity to

remedy or to explain the deficiency prior to applying facts available. Commerce reasonably concluded that the documentation offered by CS Wind was insufficient to demonstrate entitlement to a favorable adjustment, *not* that the information provided was not compliant with Commerce's request such that it warranted application of facts available.

Even if the Court were persuaded that this constituted an application of facts available, Commerce still fulfilled its obligations under 19 U.S.C. § 1677m(d). The third EVA criterion requires CS Wind to demonstrate that the U.S. invoice established the customs value to which CVD duties were applied; CS Wind does not dispute that. Remand Results at 4-5, 10-17, 25-27, Appx10198-10199, Appx10204-10211, Appx10219-10221. Commerce requested the documentation necessary to evaluate that criterion, including the invoice from CS Wind Malaysia to CS Wind Korea, the invoice from CS Wind Korea to the U.S. customer, bills of lading and packing lists, and CBP Form 7501s for selected projects. Remand Results at 4-5, 16-17, Appx10198-10199, Appx10210-10211; Appx5458–5459. CS Wind responded that it could not provide CBP Form 7501s for two of the projects, and it provided no

alternative customs documentation establishing entered value for those projects. Remand Results at 16-17, 25, Appx10210-10211, Appx10219. Commerce was not required to reopen the record again to ask CS Wind to provide documents it had already said it could not provide. *See Jiangsu Senmao Bamboo & Wood Indus. Co., Ltd. v. United States*, 651 F. Supp. 3d 1348, 1368-69 (Ct. Int'l Trade 2023) ("The Court concludes that Commerce was reasonable in not providing another opportunity for Plaintiff to submit the missing production records.) In *Jiangsu Senmao Bamboo & Wood Indus.*, Commerce explained that "the operable language in 19 U.S.C. § 1677m(d) is 'to the extent practicable." *Id.* Because the plaintiff in that case had previously explained that it did not do the thing Commerce sought (tracking the quantity of wood scrap generated during a period of review), "even if Commerce allowed another opportunity for Plaintiff to produce the requested information, Plaintiff already stated that it did not keep records of the quantity of wood scrap necessary to demonstrate that it was entitled to a by-product offset." *Id.* The same logic applies to this case, where CS Wind had already made clear it did not have the sort of documentation that would remedy its reporting.

Likewise, Commerce was not required to issue a further supplemental questionnaire because the documentation that CS Wind provided did not establish what CS Wind needed to prove. The requested CBP Form 7501s allowed Commerce to test whether the U.S. invoices established the customs value to which duties were applied. Although the Court concluded that in the original determination Commerce had not adequately explained the relevance of that requirement, Commerce supplied the requested explanation in the Remand Results. Remand Results at 15-17, 25-27, Appx10209-10211, Appx10219-10221. CS Wind acknowledged the EVA requirements in its initial questionnaire response, including the requirement that the U.S. invoice establish customs value. *See* Appx1027; Remand Results at 26, Appx10220. Then, Commerce issued a supplemental questionnaire related to this requirement, and CS Wind's response did not demonstrate entitlement to an EVA. Appx5446-5449.

Commerce's decision not to provide another opportunity to explain non-matching values did not shift the burden away from CS Wind. Rather, Commerce held CS Wind to the evidentiary requirements for obtaining the requested EVA as it would any exporter. Commerce's

conclusion is consistent with the authority Commerce relied upon in its remand results: "in AD and CVD investigations, the burden falls on the interested party to place relevant information within its possession on the record." *See Yama Ribbons & Bows Co. v. United States*, 865 F. Supp. 2d 1294, 1299 (Ct. Int'l Trade 2012), *cited* in Remand Results at 26, Appx10220; *see also See QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (interested parties bear the burden of creating an adequate record).

CS Wind's section 1677m(d) argument also fails because the Court remanded for Commerce to explain its methodology and the relevance of the third criterion; it did not require Commerce to reopen the record. Remand Order at 26. Commerce's Remand Results explain why the third criterion remains relevant and why CS Wind's existing documentation fails to satisfy that criterion. Remand Results at 10-17, 23-27, Appx10204-10211, Appx10217-10221. In these circumstances, section 1677m(d) is inapplicable to these circumstances, and the provision does not require Commerce to provide another opportunity after CS Wind failed to submit requested customs documentation for two projects and submitted documentation for the remaining two

projects that did not establish the required relationship between invoice value and entered value.

D. CS Wind's Requested Alternatives Would Require Commerce To Make An Unsupported Adjustment Despite CS Wind's Failure to Satisfy The EVA Requirements

CS Wind argues that Commerce should have granted an EVA because, in CS Wind's view, the CBP Form 7501s showed that CS Wind Korea's invoice values were practically identical to entered values. Cmts. at 29-32. CS Wind also asks the Court to direct Commerce to grant an EVA and to calculate an adjusted CVD rate based on CS Wind Korea's U.S. sales value for merchandise produced by CS Wind Malaysia. *Id.* at 12-13, 41.

In its remand, Commerce explains that it need not address whether inconsistent mark-up values undermined CS Wind's claim to an EVA because the baseline requirements for such an adjustment had not been met: the invoiced price did not match the entered value. Remand Results at 25-27, Appx10219-10221. Additionally, using two projects to construct an adjustment would not cure the missing customs documentation for the other two of the four requested projects. Remand Results at 16-17, 25-27, Appx10209-10211, Appx10219-10221. Nor

would a POR-wide average mark-up cure the same problem because it would assume what Commerce could not verify with the documentation provided by CS Wind: that CS Wind Korea's invoice values established the entered values for the merchandise on which duties were collected. *Id*.

Nor does CS Wind's argument that the two documented projects represented a sufficient share of U.S. sales to resolve the defect Commerce identified. Cmts. at 29-32. CS Wind argues that the two transactions for which it provided documentation were sufficient when there were two projects for which it did not provide customs documentation, pointing to another allegedly similar administrative review. *Id.* Commerce explained however, that, although a sample of transactions may be used in principle, the sample documentation in this case did not support CS Wind's claim. Specifically, Commerce relied on the fact that the invoice values did not match the entered values and because CS Wind did not provide customs documentation or alternative customs documentation for the remaining requested projects. Remand Results at 16-17, 25-27, Appx10209-10211, Appx10219-10221. Commerce explained, that although in a case with a considerably large

number of transactions a subset of those transactions may be sufficient to establish that the entered value is reflective of the claimed markup, in this case, when the sample accounted for fifty percent—or two of four, both of which showed discrepancies—Commerce reasonably concluded that subset could not be viewed as sufficiently representative of the whole (even absent the other deficiencies in the data).

The Court should not require Commerce to grant an EVA based on assumptions that the agency reasonably found unsupported. Commerce's standard practice is to use the respondent's sales value as the denominator in its subsidy rate calculations. Remand Results at 3-5, Appx10196-10198. The EVA is a limited exception to that practice. Remand Results at 10-17, Appx10204-10211. Because CS Wind failed to establish that it satisfied the evidentiary criteria for that exception, including the requirement that the U.S. invoice establish the customs value to which CVD duties are applied, Commerce reasonably continued to use CS Wind Malaysia's sales values as the denominator. Remand Results at 4-5, 16-17, 25-27, Appx10198-10199, Appx Appx10209-10211, Appx10219-10221

## III. Commerce Reasonably Continued To Include The CBRE Penang Transaction In Calculating The Land Benchmark

Commerce also complied with the remand order and supported its land benchmark determination with substantial evidence. The Court directed Commerce to address CS Wind's arguments concerning the Penang and Pahang real estate cost disparity and the size comparability of CS Wind Malaysia's Pahang property and the CBRE Penang transaction. Remand Order at 13-15. Commerce did so. Remand Results at 7-10, 20-23, Appx10201-10204, Appx10214-10217.

CS Wind's comments continue to challenge Commerce's inclusion of the CBRE Penang transaction, principally by arguing that Commerce did not adequately account for the price disparity between Penang and Pahang reflected in the MIDA data on remand, despite the Court's instruction to do so. Cmts. at 32-35, 38-41. But Commerce addressed that argument on remand, explaining the relative strengths and limitations of the CBRE and MIDA data, and reasonably determined to continue to average both sources. Remand Results at 7-10, 18-23, Appx10201-10204, Appx10212-10217.

### A. Commerce Addressed The Court's Concerns Regarding Price and Parcel-Size Comparability between Penang and Pahang

Commerce's regulation provides that, for a tier-one benchmark, Commerce measures the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. 19 C.F.R. § 351.511(a)(2)(i). In choosing such transactions or sales, Commerce considers product similarity, quantities sold, imported, or auctioned, and other factors affecting comparability of the good or service. *Id.* This regulation does not require Commerce to use only transactions from the same state, region, or locality as the respondent's government-provided land. Nor does it require Commerce to reject a benchmark source solely because the transaction is from a different state within the country or because another source reports lower prices in the respondent's region. Remand Results at 20-23, Appx10214-10217. When no market-determined prices are available on the record (19 C.F.R. § 351.511(a)(2)(i)), and no world market prices available to consumers in the country in question (19 C.F.R. § 351.511(a)(ii)), then Commerce must assess how the government sets its prices and whether

the price setting mechanism is consistent with market principles. 19 C.F.R. § 351.511(a)(2)(iii).

On remand, Commerce considered factors of comparability in selecting a land benchmark. With respect to size, Commerce acknowledged the substantial difference between the size of CS Wind Malaysia's Pahang parcel and the CBRE Penang parcel. Remand Results at 7-8, Appx10201-10202. Commerce explained, however, that the MIDA data preferred by CS Wind did not identify the size of the parcels underlying the reported prices. *Id.* Thus, Commerce had no basis to conclude that the MIDA data were more comparable in terms of parcel size, and CS Wind's size disparity objection did not warrant rejecting the CBRE transaction. *Id.* Commerce also considered other CBRE transactions and explained that the other potential CBRE data points either lacked size information or, where size information existed, reflected a parcel even less comparable in size than the CBRE transaction that Commerce selected. Remand Results at 8-10, 10202-10204.

Commerce also addressed location and price. Commerce acknowledged that the MIDA and CBRE data show higher land prices

in Penang than in Pahang. Remand Results at 8-10, 21-23, Appx10202-10204, Appx10215-10217. But Commerce explained that price differences alone do not render Penang prices objectively worse or Pahang prices objectively better. Remand Results at 8-9, 21, Appx10202-10203, Appx10215. Commerce explained that rejecting benchmark information based on price differences alone would be circular because the purpose of the benchmark is to measure whether the government price is for less than adequate remuneration—that is, whether it is subsidized by the government. Remand Results at 20-21, Appx10214-10215. Commerce therefore reasonably declined to treat the price disparity between Penang and Pahang as dispositive on its own, particularly when the MIDA data do not identify the parties to the underlying transactions, do not identify parcel sizes, and do not disclose enough information for Commerce to determine that the MIDA data were superior to the CBRE transaction on comparability grounds. Remand Results at 7-10, 20-23, Appx10201-10204, Appx10214-10217.

Commerce further explained why the price disparity did not require exclusion of the CBRE transaction on this record. The record indicates that CS Wind Malaysia's land was located in the East Coast

Economic Region, an area where the Government of Malaysia provides incentives and support to companies, including favorable land policies. Remand Results at 8-9, 21-23, Appx10202-10203, Appx10213-10217. The CBRE source states that the Gebeng Industrial Area, where CS Wind Malaysia is located, offered land for local and foreign demand backed by competitive land prices, skilled labor, and amenities offered by the state government. Remand Results at 8-9, 22, Appx10202-10203, Appx10214. Commerce did not rely on this evidence to find that every Pahang transaction in the MIDA data was subsidized. Rather, Commerce relied on it to explain why the observed price disparity, *standing alone*, did not establish that the MIDA Pahang data were superior or that the private CBRE Penang transaction was unusable. Remand Results at 20-23, Appx10214-10217.

B. Commerce Reasonably Weighed The Strengths And Weaknesses Of The CBRE and MIDA Benchmark Sources

Commerce's determination was a reasonable choice between record benchmark sources with different strengths and limitations. Commerce acknowledged that the MIDA data had advantages: they reflected Pahang, the same state where CS Wind Malaysia's land was located, and reflected multiple underlying transactions. Remand Results at 9-

10, 20-23, Appx10203-10204, Appx10214-10217. But the MIDA data also had serious limitations. Commerce explained that the data did not identify the parties to the transactions (i.e., did not identify whether the transactions were private or government transactions), did not provide parcel-size information for the relevant years, and did not otherwise disclose enough information for Commerce to evaluate whether the underlying parcels were comparable to CS Wind Malaysia's land. Remand Results at 7-10, 20-23, Appx10201-10204, Appx10214-10217.

The CBRE Penang transaction also had advantages and limitations. Commerce acknowledged that the CBRE data were primarily limited by location: the transactions Commerce relied upon involved Penang rather than Pahang, and the record showed Penang prices were higher than Pahang prices. Remand Results at 8-10, 20-23, Appx10202-10204, Appx10214-10217. But the data also had important strengths. For one, the CBRE data transaction represented an actual Malaysian industrial land transaction. Remand Results at 2, 9-10, 20, Appx10202-10204, Appx1023-10204, Appx10214 It reflected a transaction between private parties. Remand Results at 9-10, 20-23,

Appx10202-10204, Appx10214-10217. And it included parcel-size information. Remand Results at 7-10, Appx10201-10204.

After reconsidering the issue on remand, Commerce reasonably found that those characteristics supported continued reliance on the CBRE transaction when averaged with the MIDA data, particularly because the MIDA data had location and multiple-transaction advantages but lacked party and parcel-size information. Remand Results at 7-10, 20-23, Appx10201-10204, Appx10214-10217.

In its comments on the remand redetermination, CS Wind insists that the price disparity between Penang and Pahang proves non-comparability. CS Wind Cmts. at 32-33, 38-41. CS Wind disagrees with Commerce's interpretation of the record, claiming that, even if the MIDA data contains transactions with government entities (which it disputes), that does not overcome the effect of the price disparity. Cmts. at 35-36. But the relevant regulation requires Commerce to consider comparability factors; it does not make any one factor alone dispositive. 19 C.F.R. § 351.511(a)(2)(i). Commerce considered price, location, size, transaction parties, and number of transactions. Remand Results at 7-10, 20-23, Appx10201-10204, Appx10214-10217. Commerce

acknowledged the Penang and Pahang price disparity and explained that price differences alone did not render Penang prices objectively worse or Pahang prices objectively better, particularly when the MIDA data lacked information necessary to evaluate whether the underlying transactions were between private parties or related to parcels that were comparable in size. Remand Results at 8-10, 20-23, Appx10202-10204, Appx10214-10217; CS Wind Cmts. at 39-41. Commerce therefore reasonably concluded that averaging the CBRE and MIDA data accounted for the relative strengths and limitations of both sources. Remand Results at 9-10, 20-23, Appx10203-10204, Appx10214-10217.

The Court should not reweigh those factors. Under the Court's standard of review of substantial evidence, Commerce is permitted to choose among reasonable alternatives on the record. *Nippon Steel v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 20903). For benchmarks, the Court has recognized that Commerce may choose among imperfect valuation sources when it reasonably explains its choice and addresses relevant objections. *See e.g.*, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 803 F. Supp. 3d 1276, 1289-91 (Ct. Int'l Trade

2025) (finding on remand that Commerce adequately exercised its discretion when choosing between imperfect options and adequately addressed why it did so).

When discussing land-benchmarks, Commerce may reasonably rely on a simple average when the record does not support treating one data point as more representative than another, particularly given the varied and imperfectly documented factors affecting land prices. *See Toscelik Profil ve Sac Endustrisi A.S. v. United States*, Slip Op. 15-28, 2015 WL 1455445, at *3-4 (Ct. Int'l Trade Apr. 1, 2015) (sustaining Commerce's use of a simple average when the agency lacked sufficient information to determine that any one land parcel was more representative than the others and explaining that a simple average accorded equal weight to the various pricing factors reflected in the available sample). CS Wind's preferred approach would treat the Penang and Pahang price disparity as the sole relevant factor in deciding which data source was the proper comparator, all while discounting the limitations of the MIDA data and the CBRE transaction's record-supported strengths. Commerce is not required to adopt that view after considering the comparability factors identified in

19 C.F.R. § 351.511(a)(2)(i) and explaining why both sources remained usable when averaged together. Remand Results at 7-10, 20-23, Appx10201-10204, Appx10214-10217.

### C. The Court Previously Sustained Commerce's Use Of A Simple Average When Commerce Adequately Explains The Comparability of The CBRE Transaction

CS Wind's comments also should be considered in light of the Court's prior holding. The Court rejected CS Wind's challenge to Commerce's use of a simple average, if Commerce adequately explained on remand why the CBRE transaction was otherwise comparable. Remand Order at 14-15. The Court held that CS Wind had invited any alleged error in averaging because CS Wind itself had argued that Commerce should average the rental prices on the record provided that Commerce found the CBRE and MIDA data comparable. *Id.*

Commerce has now provided the explanation the Court requested. Remand Results at 7-10, 18-23. Appx10201-10204, Appx10212-10217. CS Wind nevertheless continues to challenge Commerce's inclusion of the CBRE transaction and the resulting average. CS Wind Cmts. at 32-41. But the remaining issue is not whether averaging was permissible in the abstract. The Court already sustained that aspect of Commerce's

determination, subject to the comparability explanation. Remand Order at 14-15. The issue is whether Commerce reasonably addressed the price disparity and parcel size comparability concerns identified by the Court. Commerce did so by explaining the strengths and limitations of the CBRE and MIDA data and why averaging the two sources remained a reasonable approach. Remand Results at 7-10, 18-23, Appx10201-10204, Appx10212-10217.

### D. CS Wind's Criticism Of Commerce's Discussion Of Potential Government Influence on Pahang Prices Does Not Undermine The Remand Results

CS Wind argues that Commerce's discussion of potential government influence on Pahang prices was speculative. Cmts. at 35-36. But Commerce did not rest its determination on a finding that every Pahang transaction in the MIDA data was subsidized. Commerce made a more limited and reasonable point: price differences between Penang and Pahang, standing alone, do not prove that Penang prices are unusable or that Pahang prices are more reliable. Remand Results at 8-9, 21-23, Appx10202-10203, Appx10213-10217. Commerce explained that the extent to which the lower Pahang prices reflected government support was unclear, and that uncertainty supported

Commerce's decision to use both benchmark sources rather than treating the MIDA data as categorically superior. Remand Results at 8-10, 21-23, Appx10202-10204, Appx10215-10217.

That determination is supported by record evidence. Commerce cited record information showing that CS Wind Malaysia was located in the East Coast Economic Region, where the government provided investment incentives, and that the CBRE source described Gebeng as offering competitive land prices and state-government amenities. Remand Results at 8-9, 22, Appx10202-10203, Appx10216. Commerce also recognized its original concern that the MIDA data do not identify whether the underlying transactions were private or government transactions. Remand Results at 9, 20-23, Appx10203, Appx10214-10217. Those considerations reasonably supported Commerce's conclusion that the Penang and Pahang price disparity did not, by itself, require Commerce to reject the private CBRE transaction or rely solely on the MIDA Pahang data.

CS Wind's claim that Penang also may have received government-supported infrastructure, Cmts. at 36, does not change the analysis. Commerce did not treat the potential government-influence evidence as

a basis to find that Pahang prices were subsidized and Penang prices were not; rather, Commerce relied on that evidence, together with the MIDA data's limitations, to explain why the Penang and Pahang price disparity alone did not make the MIDA Pahang data superior or the CBRE Penang transaction unusable. Remand Results at 8-10, 20-23, Appx10202-10208, Appx10214-10217.

CS Wind's argument would require Commerce to treat the MIDA Pahang price as conclusively superior despite the limited information underlying that source. Commerce is not required to do so. Commerce incorporated the MIDA data into the benchmark to account for location similarity and multiple underlying data points, while also retaining the CBRE data to account for the strengths of a known private industrial land transaction with parcel size information. Remand Results at 7-10, 20-23, Appx10202-10203, Appx10213-10217. That balancing was reasonable and consistent with 19 C.F.R. § 351.511(a)(2)(i), which requires Commerce to consider product similarity, quantities sold, imported, or auctioned, and other factors affecting comparability.

* * * * *

Commerce complied with the Court's remand order. Commerce explained its EVA methodology and the relevance of the third EVA criterion and reached a determination that is supported by the record. CS Wind has failed to demonstrate that the U.S. invoice values established the customs values to which CVD duties were applied. Commerce also addressed the location, price, and size issues identified by the Court and reasonably continued to include the CBRE Penang

## CONCLUSION

For these reasons, we respectfully request the Court to sustain the Remand Results and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

Reginald T. Blades, Jr.
Assistant Director

/s/ Isabelle Aubrun
Isabelle Aubrun
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-0465
isabelle.aubrun2@usdoj.gov

*Attorneys for Defendant, the United States*

BRIEN STONEBREAKER
Attorney
Department of Commerce
Office of Chief Counsel for Trade Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

Dated August 20, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 8,324 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Isabelle Aubrun

## CERTIFICATION OF NO GENERATIVE ARTIFICIAL INTELLIGENCE ASSISTANCE

I hereby certify, pursuant to requirement 6 of Judge Baker's Document Formatting Instructions, ECF 31, that these comments supporting the remand redetermination were not prepared with the assistance of generative artificial intelligence programs.

/s/ Isabelle Aubrun