Ct. No. 24-00079

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**CS WIND MALAYSIA SDN. BHD. and CS WIND CORPORATION,**

**Plaintiffs,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**WIND TOWER TRADE COALITION**

**Defendant-Intervenor.**

**Before: Hon. M. Miller Baker, Judge**

**Court No. 24-00079**

**DEFENDANT-INTERVENOR'S CORRECTED COMMENTS IN SUPPORT OF REMAND REDETERMINATION**

**Alan H. Price, Esq**
**Robert E. DeFrancesco III, Esq.**
**Laura El-Sabaawi, Esq.**
**Derick G. Holt, Esq.**
**Kimberly A. Reynolds, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

***Counsel to Wind Tower Trade Coalition***

**Dated: September 3, 2026**

# TABLE OF CONTENTS

**Page(s)**

I. Introduction ..... 1

II. Executive Summary ..... 1

III. Argument ..... 3

A. Commerce Has Adequately Explained its Use of the CBRE Benchmark Data in its Land for LTAR Calculation ..... 3

B. Commerce Complied with the Court's Order to Explain its Eva Methodology and the Necessity of Cs Wind Malaysia's Missing Information ..... 8

IV. Conclusion ..... 13

**Ct. No. 24-00079**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Canadian Solar Inc. v. United States*,
537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ................................ 8, 9, 10

*CS Wind Malaysia Sdn. Bhd. V. United States,*
Court No. 24-00079, Slip op. 25-149 (Dec. 5, 2025) ................... 2, 3, 8

*Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*,
405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ............................. 9, 10, 11

## Other Authorities

19 C.F.R. § 351.511(a)(2)(i) ............................................................ 4, 5, 6

*Certain Aluminum Foil from the People's Republic of China*,
88 Fed. Reg. 28,496 (Dep't Commerce May 4, 2023).......................... 10

*Coated Free Sheet from the People's Republic of China*, ..................... 9, 10
72 Fed. Reg. 60,645 (Dep't Commerce Oct. 25, 2007)

## GLOSSARY

**CBRE**

Real Estate Market Outlook 2020 Malaysia Report

**ECER**

East Coast Economic Region

**EVA**

Entered Value Adjustment

**LTAR**

Less than Adequate Remuneration

**MIDA**

Malaysia Investment Development Authority

**Petitioners**

Wind Tower Trade Coalition

## I. INTRODUCTION

On behalf of the Wind Tower Trade Coalition ("Defendant-Intervenor"), we hereby submit comments in support of the final redetermination on remand issued by the U.S. Department of Commerce's ("Commerce") pursuant to this Court's decision in *CS Wind Malaysia Sdn. Bhd. V. United States,* Court No. 24-00079, Slip op. 25-149 (Ct. Int. Trade Dec. 5, 2025) (Mar. 26, 2026), ECF No. 65, P.R.R. 7, Appx10199-10208 ("Remand Redetermination"); *CS Wind Malaysia Sdn. Bhd. V. United States,* Court No. 24-00079, Slip op. 25-149 (Dec. 5, 2025), ECF No. 60 ("Slip Op. 25-149"). For the reasons described below, Commerce's Redetermination complies with the Court's Remand Order and is supported by substantial evidence. This Court should therefore affirm the remand redetermination.

## II. EXECUTIVE SUMMARY

This remand proceeding involves two issues: (1) Commerce's land for less than adequate remuneration ("LTAR") benchmark and (2) Commerce's entered value adjustment ("EVA") methodology. The Court's order did not require Commerce to undertake a revision on either of these issues. Rather, the Court simply instructed Commerce to provide

additional explanation for its reasoning or methodology. In each instance, Commerce has provided a reasonable explanation, based on substantial evidence, to support its conclusions. As such, the Court should affirm Commerce's remand redetermination.

First, the Court instructed Commerce to address CS Wind Malaysia's argument that the CBRE Benchmark Data is not comparable to CS Wind Malaysia's lease rate on the basis of the location and price or size. *See* Slip Op. 25-149 at 13-14. In its remand redetermination, Commerce provided additional explanation for its decision to average data from CBRE and the Malaysia Investment Development Authority ("MIDA"). Remand Redetermination at 6-10, Appx10200-10204. Commerce likewise addressed CS Wind Malaysia's claims about comparability of the CBRE Benchmark Data and highlighted deficiencies in CS Wind Malaysia's proposed alternatives. *Id.* Thus, Commerce complied with the Court's instruction to consider these factors, and Commerce reasonably continued to rely on the market-based, Malaysian transaction benchmark from the CBRE report for CS Wind Malaysia Sdn. Bhd.'s ("CS Wind Malaysia") rental of land for less than adequate remuneration ("LTAR"). Remand Redetermination at 5-6, Appx10199-10200.

Second, the Court instructed Commerce to "articulate what methodology it uses to calculate the denominator" and "explain the relevance of the third criterion . . ." of the EVA analysis (*i.e.*, that "the U.S. invoice establishes the customs value to which the CVD duties are applied)." Slip Op. 25-149 at 26. Commerce's remand redetermination clarifies that it has employed its recently revised methodology, which relies, in part, on U.S. customs value for the respondent's U.S. sales through an affiliate. Remand Redetermination at 11-12, Appx10205-10206. As a result, U.S. entry documentation remains necessary to corroborate this U.S. customs value upon which the EVA calculation relies, and Commerce properly denied CS Wind Malaysia's EVA. *Id.* at 14-17, Appx10208-102011.

## III. ARGUMENT

### A. Commerce Has Adequately Explained its Use of the CBRE Benchmark Data in its Land for LTAR Calculation

Per the Court's remand order, Commerce provided further explanation of the information it used as a benchmark for CS Wind Malaysia's land for LTAR program and addressed CS Wind Malaysia's allegations that the CBRE data was not comparable with regard to price and location or size. In the final results, Commerce relied on two pricing sources to

determine a pricing benchmark for the land CS Wind Malaysia rented in Pahang—*i.e.*, CBRE information regarding land in Penang and MIDA information for land in Pehang. *See e.g.*, Remand Redetermination at 9-10, Appx10203-10204. On appeal, the Court instructed Commerce to address CS Wind Malaysia's claim that the parcel included in the CBRE information was not comparable to CS Wind Malaysia's land due to its size and location. *See* Slip Op. 25-149 at 13-14. In its remand redetermination, Commerce addresses the impact of these factors on comparability, weighs the merits and limitations of each source, and explains its decision to continue relying on both the CBRE and MIDA data, satisfying the Court's remand order and the requirement to "consider . . . other factors affecting comparability." 19 C.F.R. § 351.511(a)(2)(i).

As an initial matter, Commerce is required to select a "tier one" benchmark based on "a market-determined price for the good or service resulting from actual transactions in the country in question." *Id.* In doing so, Commerce must consider and weigh a variety of factors that may impact the comparability of a proposed benchmark to the government offered price. *Id.* Commerce's remand redetermination

provided an analysis of the strengths and drawbacks of both potential benchmark sources and explained how each may affect a comparison to CS Wind Malaysia's land rental. Specifically, Commerce recognized that, while the MIDA data may include a more similar location and multiple data points, the MIDA data did not identify the parties to the transaction or the size or the relevant parcels. Remand Redetermination at 8-9, Appx10202-10203. On the other hand, Commerce explained that the CBRE Benchmark Data reflected a transaction between private parties in Malaysia for an industrial property. *Id.* at 9, Appx10203. Thus, Commerce's' remand redetermination analyzes the sources of land benchmark information and explains why each is an acceptable, albeit imperfect, basis for benchmark data.

Regarding size, Commerce's remand redetermination acknowledges that the parcel in the CBRE information is a different size than the land CS Wind Malaysia leased. Remand Redetermination at 7, Appx10201. Size is only one factor of many that Commerce was required to consider when determining whether to use a certain benchmark source. 19 C.F.R. § 351.511(a)(2)(i). As highlighted above, Commerce's remand redetermination discusses size as one factor that may impact

comparability but highlight other factors that may also impact comparability, such as the industrial use of the land or the parties involved in the transaction. In these respects, the CBRE information pertains to land that is comparable to CS Wind Malaysia's lease. Indeed, Commerce notes, the only other potential benchmark information on the record—*i.e.*, CS Wind Malaysia's MIDA information—does not identify the size of the land. Remand Redetermination at 7-8, Appx10201-10202. Thus, as Commerce explained, the MIDA data "do not fare better on this criterion" since they do not identify the size of land that the prices are derived, which is necessary for calculating an accurate denominator for the benchmark calculation. Remand Redetermination at 8, Appx10202. Thus, Commerce has properly considered size as a comparability factor but has explained in its decision to continue relying on the information from CBRE.

Commerce's remand redetermination also addresses differences between the price and location of the location CBRE transaction and CS Wind Malaysia's lease. *Id.* at 8-9, Appx10202-10203. While Commerce's regulations only require a tier one benchmark to be based on a transaction in "the country in question," not a specific region, 19 C.F.R. §

351.511(a)(2)(i), Commerce explained that price differences between two regions do not invalidate a potential benchmark. Indeed, here, the region in which CS Wind Malaysia's lease was located is within the East Coast Economic Region ("ECER"), an area of Malaysia where the government provides amenities for industrial investors like CS Wind Malaysia. Remand Redetermination at 8-9, Appx10202-10203. As CS Wind Malaysia recognizes, these subsidies exist to lower the cost of doing business in the ECER and make investing in the ECER more attractive. *See* Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Utility Scale Wind Towers from Malaysia: CS Wind's Case Brief* (Jan. 16, 2024) C.R. 143, P.R. 252 at 20, Appx5595. And, as Commerce explained in its remand redetermination, "certain transactions in the MIDA data covering Pahang could reflect subsidized governmental transactions." Remand Redetermination at 9, Appx10203. Indeed, this fact "led to Commerce's initial concern regarding these data." *Id.* Therefore, it is reasonable that Commerce relied on a Malaysian land benchmark from outside of the ECER. Moreover, as discussed, location is only one factor that may affect comparability, and Commerce's remand redetermination thoroughly and reasonably explain why location and prices alone do not

outweigh other factors impacting comparability based on the available evidence.

In sum, consistent with the Court's opinion and remand order, Commerce considered the impacts of factors impacting comparability of the CBRE land benchmark, including the size of the land and its price and location. Commerce also weighed the reliability and limitations of each source and reasonably decided to continue relying on an average of the CBRE Benchmark Data and MIDA data.

### B. Commerce Complied with the Court's Order to Explain its EVA Methodology and the Necessity of CS Wind Malaysia's Missing Information

In its remand redetermination, Commerce complies with the Court's instruction to "articulate what methodology it use{d}" to determine the denominator in its EVA analysis and "explained the relevance of the third criterion"—*i.e.*, that "the U.S. invoice establishes the customs value to which the CVD duties are applied"—in its decision to deny CS Wind Malaysia's requested adjustment. *See* Slip Op. 25-149 at 26, n.6. Based on this explanation, Commerce has reasonably decided to deny CS Wind Malaysia's EVA and should continue to do so in the final results.

As a threshold matter, Commerce clarified that it was applying its most recent EVA calculation methodology practice, which relies on U.S. sales, rather than a previous methodology, which relied on total marked-up worldwide sales. Remand Redetermination at 12-13, Appx10206-10207. Commerce has employed three EVA calculation methodologies in an attempt to account for an exporter's mark-up on its U.S. sales without over-assessing duties. *See Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 405 F. Supp. 3d 1317, 1327 (Ct. Int'l Trade 2019) ("*Jiangsu Zhongji*"); *see also Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) ("*Canadian Solar II*"). Originally, Commerce "adjusted the subsidy rate by calculating the mark-up ratio on U.S. sales and then multiplying that ratio by the original subsidy rate to obtain the adjusted subsidy rate for U.S. sales." *See Canadian Solar II*, 537 F. Supp. 3d at 1395. Given the importance of the amount of the U.S. customs duty in this calculation, Commerce required, among other factors, that respondents be able to demonstrate that "the U.S. invoice establishes the customs value to which the CVD duties are applied . . . ." *See Jiangsu Zhongji*, 405 F. Supp. 3d at 1318 (quoting Issues and Decision Memorandum accompanying *Coated Free*

*Sheet from the People's Republic of China*, 72 Fed. Reg. 60,645 (Dep't Commerce Oct. 25, 2007) (final affirm. countervailing duty deter.) (ACCESS Barcode: 4737769-01) at Comment 21). This determination requires matching the amount listed on the U.S. invoice with the values listed on Customs and Border Protection ("CBP") entry documentation.

However, Commerce subsequently adopted a new methodology for calculating an EVA, which was based on the respondent's total worldwide export sales. *See Jiangsu Zhongji*, 405 F. Supp. 3d at 1327 (quoting Issues and Decision Memorandum accompanying *Coated Free Sheet from the People's Republic of China*, 72 Fed. Reg. 60,645 (Dep't Commerce Oct. 25, 2007) (final affirm. countervailing duty deter.) (ACCESS Barcode: 4737769-01) at Comment. 21). Thus, because Commerce's adjustment calculation was no longer based on U.S. sales, the Court questioned the relevance of requiring respondents to identify all U.S. sales and provide all U.S. sales invoices under the third factor of its original analysis. *Jiangsu Zhongji*, 405 F. Supp. 3d at 1330. In *Canadian Solar II*, the Court required Commerce to either grant an EVA without the U.S. sales invoice requirement or explain why requiring U.S. sales information was necessary. *Jiangsu Zhongji*, 405 F. Supp. 3d at 1330.

Subsequently, and prior to the *Wind Tower Malaysia* CVD decision, Commerce adopted a new, more accurate methodology that sought to once again "narrow{} the focus of the calculation to U.S. sales and U.S. entered value . . . ." Preliminary Decision Memorandum accompanying *Certain Aluminum Foil from the People's Republic of China*, 88 Fed. Reg. 28,496 (Dep't Commerce May 4, 2023) (preliminary results of countervailing duty admin. rev. and rescission of rev., in part; 2021) (ACCESS Barcode: 4370595-02) at 9. In *Certain Aluminum Foil from the People's Republic of China*, Commerce acknowledged the Court's decision in *Jiangsu Zhongji* and announced its intention to adapt its EVA methodology to better account for any overcollection of duties. *Id.* Rather than use the respondents' worldwide export sales, Commerce "multipl{ied} {the respondent's} net *ad valorem* subsidy rate by {the respondent's} reported value of exports to the United States of subject merchandise, prior to any sales markup." *Id.* Commerce then divided those countervailing duties by "the total U.S. sales invoice amount, *i.e.*, the entered value amount of {the affiliate's} U.S. sales of subject merchandise produced by {the respondent} . . . ." *Id.* As a result, Commerce was able to account for the affiliate's markup and determine

an adjusted CVD rate for the value of the respondent's entries without "overcollect{ing}" duties. *Id.*

Commerce's remand redetermination clarifies that it relies on this more recent and more accurate methodology to calculate an EVA adjustment. As the remand redetermination shows, this methodology captures the mark-up between the respondent's sales to its affiliate and the affiliate's U.S. sales. Remand Redetermination at 14, Appx10208. Moreover, given that Commerce's methodology once again relies on U.S. sales values, the U.S. customs information remains necessary for determining the values to which CVD duties are applied. Here, as Commerce explains, CS Wind Malaysia was unable to provide CBP 7501 entry forms (or any other entry documentation) for two of its four projects. *Id.* Additionally, the two sales CS Wind Malaysia could provide entry documentation for included discrepancies. *Id.* Commerce was therefore unable to confirm the customs value to which CVD duties should be applied and cannot perform its EVA analysis. Thus, Commerce properly denied CS Wind Malaysia's EVA request and should continue to do so in the final remand results.

## IV. CONCLUSION

For the reasons discussed above, Commerce's remand redetermination satisfies the Court's remand order, the court should affirm this final redetermination.

* * *

Should you have any questions, please do not hesitate to contact the undersigned.

Respectfully submitted,

*/s/ Derick G. Holt*
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Derick G. Holt., Esq.
Kimberly A. Reynolds, Esq.

*Counsel to the Wind Tower Trade Coalition*

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor Wind Tower Trade Coalition's Corrected Comments in Support of Remand Redetermination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2026), is 2309 words.

The undersigned also certifies that this submission was not prepared with the assistance of a generative acritical intelligence program based on natural language prompts—such as, but not limited to, ChatGPT or Google Bard.

*<u>/s/ Derick G. Holt</u>*
(Signature of Attorney)

<u>Derick G. Holt</u>
(Name of Attorney)

<u>Wind Tower Trade Coalition</u>
(Representative Of)

<u>September 3, 2026</u>
(Date)